ACCEPTED
03-14-00725-CV
3737749
THIRD COURT OF APPEALS
AUSTIN, TEXAS
1/12/2015 4:19:03 PM
JEFFREY D. KYLE
CLERK

No. 03-14-00725-CV

In the Third Court of Appeals
Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
1/12/2015 4:19:03 PM
JEFFREY D. KYLE
Clerk

**GEORGE GREEN AND GARLAN GREEN,**
*Appellants*

**v.**

**PORT OF CALL HOMEOWNERS ASSOCIATION**
*Appellee*

**APPEAL FROM CAUSE NO. 18314
33RD JUDICIAL DISTRICT COURT OF LLANO COUNTY, TEXAS
HON. ALLAN GARRETT, PRESIDING**

**APPELLANTS' BRIEF**

David Junkin
State Bar No. 11058020
Law Office of David Junkin
P.O. Box 2910
Wimberley, Texas 78676
512/847-8600
512/847-8604 (fax)
david@junkinlawoffice.com
*Attorney for Appellants*

**ORAL ARGUMENT (CONDITIONALLY) REQUESTED**

## STATEMENT REGARDING ORAL ARGUMENT

Appellants believe that the briefs and records will adequately present the facts and legal arguments involved in this appeal and that oral argument would not aid the decisional process significantly. *See* Tex. R. App. P. 39.1. However, should the Court conclude that oral argument would be helpful, Appellants stand ready and request the opportunity to participate.

**IDENTITY OF PARTIES AND COUNSEL**

The following is a complete list of all parties to the trial court's order at issue, as well as the names and addresses of all trial and appellate counsel.

Plaintiff/Appellants:                           Counsel for Appellants:

George Green                                     David Junkin
Garlan Green                                     P.O. Box 2910
                                                 Wimberley, Texas 78676

Defendant/Appellees:                            Counsel for Appellees:

Port of Call Homeowners Association             Brantley Ross Pringle, Jr.
Randolph Harig                                   Heidi Coughlin
Phillip Jacobs                                   Wright & Greenhill, PC
John Ross Buckholtz                              221 West 6th Street, Suite 1800
Richard Pat McElroy                              Austin, TX  78701

# TABLE OF CONTENTS

**Index of Authorities** ........................................................................ vi

**Statement of the Case** .......................................................................1

**Issues Presented**

    A.    DID THE TRIAL COURT ABUSE ITS DISCRETION IN HOLDING A HEARING ON THE MOTION TO ENFORCE THE PROTECTIVE ORDER WHICH SOUGHT SANCTIONS AS RELIEF WITH LESS THAN 3 DAYS' NOTICE TO APPELLANTS? ......................................3

    B.    DID THE TRIAL JUDGE ABUSE HIS DISCRETION IN ENTERING AN ORDER PROHIBITING APPELLANTS FROM MAKING ANY COMMUNICATIONS TO APPELLEES, EXCEPT THROUGH ATTORNEYS OF RECORD? ............................................... 3

    C.    THE ORDER THAT IS THE BASIS OF THIS APPEAL EXTENDED THE TIME FOR APPELLEE PORT OF CALL HOMEOWNERS' ASSOCIATION TO PRODUCE RECORDS FROM EVERY FORTY-FIVE (45) DAYS TO EVERY SIXTY (60) DAYS BEGINNING NOVEMBER 15, 2014. DID THE TRIAL JUDGE ABUSE HIS DISCRETION IN CHANGING THE TIME FOR PRODUCTION OF RECORDS IN THIS CASE NUNC PRO TUNC? ......................................3

    D.    DID THE TRIAL JUDGE ERR IN SANCTIONING APPELLANTS WITHOUT ANY EVIDENCE TO SUPPORT THE AWARD? ..................3

**Background** ...................................................................................4

**Summary of the Argument** ...............................................................5

**Standard of Review**......................................................................5

**Argument**

        **A.** **THE TRIAL COURT ABUSED ITS DISCRETION IN HOLDING A HEARING ON THE MOTION TO ENFORCE THE PROTECTIVE ORDER, WHICH SOUGHT SANCTIONS AS RELIEF, WITH LESS THAN THREE (3) DAYS' NOTICE TO APPELLANTS** ...........................................5

        **B.** **THE TRIAL COURT ABUSED ITS DISCRETION IN ENTERING AN ORDER PROHIBITING APPELLANTS FROM HAVING ANY COMMUNICATIONS WITH APPELLEES EXCEPT THROUGH ATTORNEYS OF RECORD** .................................................. 7

           **i. THE ORDER IS AN UNCONSTITUTIONAL PRIOR RESTRAINT ON FREE SPEECH**...........................7

           **ii. THE REQUIREMENTS FOR INJUNCTIVE RELIEF WERE NOT ESTABLISHED**.............................. 10

        **C.** **THE TRIAL COURT IMPROPERLY EXTENDED THE TIME FOR THE APPELLEE PORT OF CALL HOME OWNERS ASSOCIATION TO AUTOMATICALLY PRODUCE RECORDS FROM EVERY FORTY-FIVE (45) DAYS TO EVERY SIXTY (60) DAYS** .................................................... 10

        **D.** **THE TRIAL COURT ERRED IN SANCTIONING APPELLEES WITHOUT ANY EVIDENCE TO SUPPORT THE AWARD** ........................................................ 13

iv

**Conclusion and Prayer** ............................................................................ 15

**Certificate of Service** ............................................................................. 17

**Appendix**

    Order Granting Motion for Enforcement (the "Order") ................ Tab 1

    Order Granting Defendants' Motion to Compel
    and Protective Order (the "Initial Order") .................................... Tab 2

    Cases ............................................................................................... Tab 3

    Statutes ........................................................................................... Tab 4

    Rules ............................................................................................... Tab 5

# INDEX OF AUTHORITIES

**Case Law**                                                                 **Page(s)**

*Alexander v. United States*,
     509 U.S. 544, 113 S. Ct. 2766, 125 L.Ed.2d 441 (1993) ........................ 8

*Bantam Books, Inc. v. Sullivan*,
     372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) .................................. 8

*Burton v. Cravey,*
     759 S.W.2d 160 (Tex. App.—Houston [1st Dist.] 1988, no writ)... 11, 12

*Davenport v. Garcia*,
     834 S.W.2d 4 (Tex. 1992) ........................................................................ 8

*Ex parte Chambers,*
     898 S.W.2d 257 (Tex. 1995) ................................................................. 15

*Ex parte Price,*
     741 S.W.2d 366 (Tex. 1987) ................................................................. 15

*Ex parte Tucker*,
     110 Tex. 335, 220 S.W. 75 (Tex. 1920)............................................. 8, 9

*Hajek v. Bill Mowbray Motors, Inc.*,
     647 S.W.2d 253 (Tex. 1983) ................................................................... 8

*Huie v. DeShazo*,
     922 S.W.2d 920 (Tex. 1996) ................................................................... 7

*Kinney v. Barnes*,
     443 S.W.3d 87 (Tex. 2014) ......................................................... 8, 9, 10

*Kutch v. Del Mar College,*
     831 S.W.2d 506 (Tex. App. —Corpus Christi 1992, no writ) .............. 13

*McWhorter v. Sheller,*
     993 S.W.2d 781 (Tex. App. —Houston [14th Dist.] 1999, pet. denied).13

*Nath v. Texas Children's Hospital*,
Cause No. 12-0620 (Tex. August 29, 2014) ............................................. 7

*Neb. Press Ass'n v. Stuart*,
427 U.S. 539, 96 S. Ct. 2791, 49 L.Ed.2d 683 (1976) ............................ 8

*San Antonio Models, Inc. v. Peeples*,
686 S.W.2d 666 (Tex. App.—San Antonio 1985, orig. proceeding).... 11

*Sobel v. Taylor*,
640 S.W.2d 704 (Tex. App—Houston [14[th] Dist.] 1982, no writ) .......... 10

*Sprague v. Sprague*,
363 S.W.3d 788 (Tex. App.—Houston [14[th] Dist.] 2012, pet denied)..13

*Town of Palm Valley v. Johnson*,
87 S.W.3d 110, 111 (Tex. 2001) ............................................................. 9

*TransAmerican Natural Gas Corp. v. Powell*,
811 S.W.2d 913 (Tex. 1991) ..................................................................7

**Statutes**

Tex. Const. art. I, § 8 ....................................................................................... 8

Tex. Const. art. I, § 8 interp. Commentary (West 2007) ................................... 8

Tex. Prop. Code § 81.209 ............................................................................... 11

Tex. Prop. Code § 82.114 ............................................................................... 11

Tex. Bus. Org. Code § 22.351 ........................................................................ 11

Tex. Bus. Org. Code § 252.010 ...................................................................... 11

**Rules**

Tex. R. Civ. P. 4.......................................................................................... 5, 6

Tex. R. Civ. P. 21.................................................................................5, 6

Tex. R. Civ. P. 682........................................................................... 10

Tex. R. Civ. P. 683........................................................................... 10

Tex. R. Civ. P. 684........................................................................... 10

**Other**

A. Bickel, the Morality of Consent 61 (1975)...................................... 8

TO THE HONORABLE THIRD COURT OF APPEALS:

Appellants, George Green and Garlan Green file this brief asking the Court to reverse or dissolve the trial court's order granting injunctive and related relief based on the following:

## STATEMENT OF THE CASE

*Order Signed by:*    The Honorable Allan Garrett

*Trial Court:*    33rd Judicial District Court

*Appellants:*    Appellant Garlan Green is a property owner in the Port of Call townhome development in Horseshoe Bay, Texas. Appellant George Green is Garlan Green's son, lives with Garlan Green as a caretaker, and has power of attorney for Garlan Green. The Appellants are referred to as "Apellants" or "Green."

*Appellees:*    Appellee Port of Call Homeowners Association ("POC") is the homeowners association of the Port of Call development and was an unincorporated association of persons until November, 2013 when it incorporated as a non-profit corporation. The individual Appellees, Randolph Harig, Phillip Jacobs, John Ros Buchholtz, and Richard Pat McElroy are current or former members of the Port of Call Homeowners Association board of directors.

*Nature of the Case:*    This controversy essentially began as a request for review of POC records due to what Appellants believed to be misuses of POC funds. When Appellants believed they were deprived of full access to the records, Appellants brought a claim in Justice Court in Llano County under the Property Code for access to the records. The

Justice Court ordered the documents produced and entered judgment against POC for attorney's fees and court costs. See CR 100; RR, Vol. 2, Page 7, lines 4 – 23 and Page 15, line 25 – page 16, line 18. The review of those records led to the instant suit for misuse of funds by POC and individual members of its board of directors.

*Course of Proceedings:*      This case was filed on February 5, 2013. CR 8. The case was, by agreement, abated for several months to try to resolve the matter. Discovery progressed and new parties were joined and new claims added. CR 67 (Plaintiff's First Amended Original Petition, Request for Equitable Relief & Request for Disclosure) and CR136 (Plaintiff's Second[1] Amended Original Petition, Request for Equitable Relief & Request for Disclosure).

In connection with discovery issues, both parties filed Motions to Compel. CR 89 and CR 100. A hearing was held on those motions on August 14, 2014. The Trial Court summarized its findings (RR, Vol. 2, page 52, line 9 - page 62, line 11) and an Order was entered (the "Initial Order"). CR 131. The Initial Order was an attempt by the Court to fashion a compromise between the broad rights of access to POC's records under the Texas Property Code and the POC governing documents and the discovery obligations imposed on litigants by ordering the automatic production of POC records every forty-five (45) days. No objection was made to the Initial Order by any party.

On October 10, 2014, POC served Defendants' Motion to Enforce Protective Order and set the matter for hearing on October 14, 2014. CR153 and 167. The motion was generally based on letter requests for records made after the Initial Order. Appellants objected to the setting because it failed

---

[1] Incorrectly styled as Plaintiff's *First* Amended Original Petition, Request for Equitable Relief & Request for Disclosure (emphasis added).

to give the required three (3) days' notice under the Texas Rules of Civil Procedure. CR 145. Objection was made at the hearing as well and that objection was overruled. RR, Vol. 3, page 4, line 12 – page 15. The hearing was conducted as a non-evidentiary hearing. After the hearing, POC filed Defendants' Supplemental Motion to Enforce Protective Order. CR 169.

*Trial Court's Disposition:*    On October 21, 2014, the Court entered an Order Granting Motion for Enforcement which modified the Initial Order "nunc pro tunc," imposed injunctive relief against Appellants, extended the automatic record supplementation to every sixty (60) days, and awarded sanctions against Appellants. CR 175. It is this order that forms the basis of this appeal (the "Order").

# ISSUES PRESENTED

A.    The Court held a hearing on the Order with less than three (3) days' notice under Rules 4 and 21 of the Texas Rules of Civil Procedure. Did the trial judge correctly overrule Appellants' objection to the defective notice?

B.    The Order requires, among other things, that "all communications between the parties be had through attorneys of record" and Appellants are ordered not to communicate with any Appellee for any reason at all. Did the trial judge abuse his discretion in entering an order prohibiting any communication except through attorneys?

C.    The Order extended the time for POC to produce records to "every sixty (60) days beginning November 15, 2014." Did the trial judge abuse his discretion in changing the time for production of records in this case, as a nunc pro tunc order?

D.    Did the trial judge err in entering sanctions without any evidence of costs incurred, fees expended, etc.?

## BACKGROUND

As a property owner in the Port of Call development and his agent, Appellants, exercising their rights by way of the POC governing documents and under Texas statutes, began requesting inspection of POC records. Ultimately, Appellants believed they were intentionally being deprived of full access to the records, so Appellants brought a claim under the Property Code in Justice Court in Llano County for access to the records. The Justice Court ordered the documents produced and entered judgment against POC for over $3,000 in attorney's fees and court costs. See CR 100; RR, Vol. 2, Page 7, lines 4 – 23 and Page 15, line 25 – page 16, line 18. The review of those records led to this suit for misuse of funds by POC and individual members of its board of directors. In response to a motion for protection and motions to compel filed by both Appellants and Appellees, in August, 2014 the Court entered the Initial Order. In October, 2014 the Appellees filed, and with essentially one day notice under the rules, set for hearing a motion to enforce the Initial Order. No evidence was introduced at the hearing by Appellees. The Court then entered the Order "nunc pro tunc"[2] prohibiting any communication of any kind by Appellants (their agents, heirs, etc.) with the Appellees (their agents, heirs, etc.), modifying the Initial Order, and awarding sanctions against Appellants.

---

[2] CR 175.

## SUMMARY OF THE ARGUMENT

The Order was entered after a hearing held on less than the three (3) days' notice required by Rules 4 and 21 of the Texas Rules of Civil Procedure despite sanctions being the only relief requested by Appellees, the unavailability of Appellants, and no evidence being presented by Appellees. By prohibiting any communication of any kind between Appellants and Appellees, except through attorneys, the Order is overly broad and unconstitutionally prohibits the exercise of free speech by Appellants. The Order also improperly, and without a pleading or evidence from the Appellees to support it, modified the terms of the Initial Order and extended the time for Appellees to produce records from forty-five (45) days to sixty (60) days. There was no evidence to support an award, or the amount, of sanctions against Appellants.

## STANDARD OF REVIEW

The issues raised by Appellants are governed by an abuse of discretion standard.

## ARGUMENT

A. THE TRIAL COURT ABUSED ITS DISCRETION IN HOLDING A HEARING ON THE MOTION TO ENFORCE THE PROTECTIVE ORDER WHICH SOUGHT SANCTIONS AS RELIEF, WITH LESS THAN THREE (3) DAYS' NOTICE TO APPELLANTS.

1. Rule 21 of the Texas Rules of Civil Procedure provides: "[a]n application to the court for an order and notice of any hearing thereon, not

presented during a hearing or trial, must be served upon all other parties not less than three days before the time specified for the hearing, unless otherwise provided by these rules or shortened by the court." In computing the three day period in Rule 21, the day of the notice is not to be included and "the last day of the period so computed is to be included, unless it is a Saturday, Sunday, or legal holiday, in which event the period runs until the end of the next day which is not a Saturday, Sunday, or legal holiday." Tex. R. Civ. P. 4.

2. On October 10, 2014, Appellees served Defendants' Motion to Enforce Protective Order and at the same time set the matter for hearing on October 14, 2014. CR153 and 167. Green objected to the setting because it failed to give the required three (3) days' notice under Texas Rules of Civil Procedure 4 and 21. CR 145. October 10, 2014 was a Friday and Monday, October 13, 2014 was a federal holiday (Columbus Day). With the hearing held on October 14, 2014 the Appellants got one (1) day notice under the Texas Rules of Civil Procedure. Appellee claimed no further notice should be given due to the impending birth of a child in 25 days and because receiving letters from Appellants asking for a response in three (3) days constituted an emergency. RR, Vol. 3, page 5, line 6 – page 8. Appellants were not able to attend the hearing. However, Appellants' objections to the short notice were overruled. RR, Vol. 3, page 4, line 12 – page 15.

3.      There was no evidence introduced showing the necessity for shortening the notice requirements.  The Appellees did not show how the impending birth of a child prohibited Appellee from giving proper notice. The Appellees did not show how the receipt of a letter seeking a response in three days constituted an "emergency," particularly when Appellee did not establish it intended to respond to such communication within the time period and the time period had already passed as of the time of the hearing.

4.      The relief sought in Appellees' Motion to Enforce Protective Order was sanctions for alleged violations of the Initial Order.  CR 154. While the Court has discretion with respect to shortening the time for a hearing, the relief sought by Defendants further implicated due process protections requiring Appellees to provide Appellants with, at a minimum, three (3) days' notice of the hearing.[3]

B.    THE TRIAL JUDGE ABUSED HIS DISCRETION IN ENTERING AN ORDER PROHIBITING APPELLANTS FROM MAKING ANY COMMUNICATIONS TO APPELLEES, EXCEPT THROUGH ATTORNEYS OF RECORD.

*i. The Order is an unconstitutional prior restraint on free speech.*

5.      The prior restraint of free speech is presumptively overly broad and unconstitutional.  As the Texas Supreme Court recently reiterated:

---

[3] A sanctions award that fails to comply with due process constitutes an abuse of discretion because a trial court has no discretion in determining what the law is or applying the law to the facts. *See Nath v. Texas Children's Hospital*, Case No. 12-0620 (Tex. 2014), citing, *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991); *Huie v. DeShazo*, 922 S.W.2d 920, 927 (Tex. 1996).

"Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press." Tex. Const. art. I, § 8. Enshrined in Texas law since 1836, this fundamental right recognizes the "transcendent importance of such freedom to the search for truth, the maintenance of democratic institutions, and the happiness of individual men." Tex. Const. art. I, § 8 interp. commentary (West 2007). Commensurate with the respect Texas affords this right is its skepticism toward restraining speech. While abuse of the right to speak subjects a speaker to proper penalties, we have long held that "pre-speech sanctions" are presumptively unconstitutional. *Davenport v. Garcia*, 834 S.W.2d 4, 9 (Tex. 1992); *see also Ex parte Tucker*, 110 Tex. 335, 220 S.W. 75, 76 (Tex. 1920).

The First Amendment of the U.S. Constitution is similarly suspicious of prior restraints, which include judicial orders "forbidding certain communications" that are "issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 125 L.Ed.2d 441 (1993) (citation and internal quotation marks omitted). The U.S. Supreme Court has long recognized that "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559, 96 S. Ct. 2791, 49 L.Ed.2d 683 (1976); see also id. ("If it can be said that a threat of criminal or civil sanctions after publication 'chills' speech, prior restraint 'freezes' it at least for the time." (quoting A. Bickel, the Morality of Consent 61 (1975)). As such, they "bear a heavy presumption against [their] constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). This cornerstone of First Amendment protections has been reaffirmed time and again by the Supreme Court, this Court, Texas courts of appeals, legal treatises, and even popular culture.

*Kinney v. Barnes,* 443 S.W.3d 87, 90-91 (Tex. 2014) (footnotes omitted).

While free speech is not an absolute right and the court's remedies to punish an abuse of that right remains, a prior restraint on free speech by injunction is not an appropriate remedy. *Id.* at 94, *citing, Hajek v. Bill Mowbray Motors, Inc.,*

647 S.W.2d 253 (Tex. 1983) (per curiam); *Ex parte Tucker,* 110 Tex. 335, 220 S.W. 75 (Tex. 1920). The Texas Supreme Court went on to note that,

> "[o]f course, the requirements for injunctive relief still must be met. A plaintiff must show that damages are inadequate or cannot otherwise be measured by any pecuniary standard.

*Id.* at 93, fn 8, *citing, Town of Palm Valley v. Johnson*, 87 S.W.3d 110, 111 (Tex. 2001) (per curiam).

6.      The Order at issue in this appeal provides, in part, "all communications between the parties be had through attorneys of record, and George Green and Garlan Green, and any of their agents, assigns, officers, executors or any person acting or working on their behalf in any way, [sic] other than their attorney(s) of record, shall make no communication to Defendants during this litigation." CR 175. While the injunctive language is not clear, it purports to be an overly broad and unconstitutional restraint on Appellants exercise of free speech rights. The Order does not seek to limit the scope, timing, or substance of the communications, it simply prohibits all communications of any kind for any reason. By way of examples only and carried to the extreme, the Order effectively prohibits:

   (i)     Appellants from speaking or asking questions at any meeting of the Port of Call Homeowners Association,
   (ii)    Appellants from voting (at least from communicating in any manner what their vote is) in any POC election,
   (iii)   Appellees from complying with the provisions of the Texas Property Code in providing notice to Appellants of its meetings except through counsel,

(iv)    Appellants from notifying Appellees of any problems or emergencies on the common property, and

(v)    contesting any demand for payment or even making a payment if it includes any "communication."

The scope of the relief in the injunctive provisions of the Order constitutes an unconstitutional, overly broad limitation on the Appellants' free speech rights.

### *ii. The requirements for injunctive relief were not established.*

7.    Further, as noted above, in order for the Court to issue injunctive relief, the requirements for injunctive relief must still be met. *Kinney*, 443 S.W.3d 93fn 8. In this case, the Appellees did not pled for this relief, introduced no evidence of irreparable injury or that no adequate remedy at law is available, posted no bond, and the order does not include a trial date as required by the Texas Rules of Civil Procedure. *See Sobel v. Taylor*, 640 S.W.2d 704, 708 (Tex. App—Houston [14th Dist.] 1982, no writ) (finding that an order for injunctive relief was issued without compliance with the Texas Rules of Civil Procedure and that portion of the order "must be dissolved.").[4] The Order should be dissolved with respect to the injunctive relief.

C.    THE TRIAL COURT IMPROPERLY EXTENDED THE TIME FOR APPELLEE PORT OF CALL HOMEOWNERS' ASSOCIATION TO PRODUCE RECORDS FROM EVERY FORTY-FIVE (45) DAYS TO EVERY SIXTY (60) DAYS.

8.    At the hearing on August 14, 2014 resulting in the issuance of the Initial Order, the Court was provided with and referred to copies of relevant

---

[4] *See also.,* TEX. R. CIV. P. 682, 683, and 684.

Texas statutes relating to access to property owner associations and non-profit corporation records.[5] *See* RR, Vol. 2, page 40, line 14 – page 45, line 5.[6] These authorities create independent requirements for POC to make its records available to Appellants. These requirements are independent of the duties related to discovery in litigation. As the Court in *Burton v. Cravey* pointed out:

> Appellees sought the production of records that they were statutorily entitled to inspect. Appellants' complaints about the order appear to be an attempt to engraft discovery notions upon the appellees' statutory right of inspection, which is independent of any right of discovery in litigation. *See San Antonio Models, Inc. v. Peeples*, 686 S.W.2d 666 (Tex. App.— San Antonio 1985, orig. proceeding). The right to inspect under article 1396-2.23 encompasses "all books and records." . . .
>
> Again, we note that appellants are attempting to engraft notions borrowed from Texas discovery practice onto a statutory right to inspect. Article 1396-2.23 contains no limitations on the member's right to inspect as

---

[5] The provisions referred to include: (i) TEX. PROP. CODE §81.209 (". . . (b) The accounts and supporting vouchers of a condominium regime shall be made available to the apartment owners for examination on working days at convenient, established, and publicly announced hours."); (ii) TEX. PROP. CODE §82.114 arguably applicable after November 2013 (". . . (b) All financial and other records of the association shall be reasonably available at its registered office or its principal office in this state for examination by a unit owner and the owner's agents."), (iii) TEX, BUS. ORG. CODE § 22.351 (providing that a member of a non-profit organization, "on written demand stating the purpose of the demand, is entitled to examine and copy at the member's expense, in person or by agent, accountant, or attorney, at any reasonable time and for a proper purpose, the books and records of the corporation relevant to that purpose."), (iv) TEX. BUS. ORG. CODE §252.010. (". . . (a) A nonprofit association shall keep correct and complete books and records of account for at least three years after the end of each fiscal year and shall make the books and records available on request to members of the association for inspection and copying.").

[6] The Trial Court was also provided with copies of governing documents for POC that require the production of records to members of the association. However, the Articles, Bylaws and recorded POC Records Production Policy were not introduced into evidence.

long as the books and records are those of the non-profit corporation and the inspection is for "any proper purpose."

*Burton v. Cravey*, 759 S.W.2d 160, 162 (Tex. App.—Houston [1st Dist.] 1988, no writ). The obligations with respect to the inspection and production of documents imposed by governing documents and Texas statutes are not the same as those governing discovery.

9. In the Initial Order, the Court reasonably sought to strike a balance between the requirements of production placed on Appellee Port of Call Homeowners' Association's by statute and its own governing documents and its discovery obligations in this litigation by ordering an automatic forty-five (45) day supplementation of all of its records to Appellants. No party objected to this order or sought to modify it. However, at the hearing on October 14, 2014, without any supporting pleading or evidence being introduced, the trial Court modified the automatic "supplementation" period and extended it to sixty (60) days. There was no evidence that the forty-five (45) day period was unreasonably burdensome or unworkable. The Trial Court should not have modified the Initial Order as a "nunc pro tunc" order because there was no evidence introduced to support the change, it was not requested by the

Appellees in the Motion to Enforce or any other pleading, and the change in the term of days is not correcting a clerical error.[7]

D.   THE TRIAL COURT ERRED IN SANCTIONING APPELLANTS WITHOUT ANY EVIDENCE TO SUPPORT THE AWARD.

10.   Trial courts have inherent power to sanction "to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process, such as any significant interference with the traditional core functions of Texas courts." *Sprague v. Sprague*, 363 S.W.3d 788, 803 (Tex. App.—Houston [14th Dist.] 2012, pet denied), *citing McWhorter v. Sheller*, 993 S.W.2d 781, 789 (Tex. App. —Houston [14th Dist.] 1999, pet. denied), *citing Kutch v. Del Mar College*, 831 S.W.2d 506, 509-10 (Tex. App.— Corpus Christi 1992, no writ). These core functions include "hearing evidence, deciding issues of fact raised by the pleadings, deciding questions of law, entering final judgment and enforcing that judgment." *Kutch*, 831 S.W.2d at 510.  For the trial court to exercise its inherent power to sanction, there must be some evidence of significant interference with the core functions of the court. *McWhorter*, 993 S.W.2d at 789 (citing *Kutch*, 831 S.W.2d at 510).

11.   In this case, and to the extent that this Court has jurisdiction over this part of the Order, the Appellees did not present any evidence to support

---

[7] The Court initially thought supplementation every month (30 days) would  be appropriate then revised it to every forty-five (45) days.  See RR, Vol. 2, page 53, line 25 – page 54, line 7.

an award of sanctions.  For example, Appellees introduced no admissible evidence that one or more letters were sent by Appellants or that one was sent with any particular content.  Appellees offered no evidence of any costs, delays, expenses, attorney fees, etc. that were incurred by Appellees.  Appellees offered no evidence of a significant interference with the core functions of the Court or even of significant interference with its own operations.  For example, the Appellees offered no evidence that any letter from Appellants caused them to behave or act differently than they would have acted under the existing order.  In other words, Appellees did not offer evidence that any letter from Appellants caused them or would have caused them to produce documents more often than the forty-five (45) automatic supplementation provision in the Initial Order.  There is no evidence to support an award, or amount, of sanctions against Appellants.

12.  Lastly, the Initial Order contains no language prohibiting the Appellants from communicating with the Appellees or sending letters.  At best, the Court made an oral ruling that the Appellants should not, individually, make requests for documents.  While there was an oral pronouncement from the bench at the time the Initial Order was signed to the effect that "the client needs to step aside when it comes to document requests" and "the plaintiff, individually, will not make specific requests under the statute during the pendency of this litigation, but rather that will be

dealt with by updating responses to discovery,"[8] that language was not included in the Initial Order. CR 131. Even though styled as a nunc pro tunc order, the Order, by entering sanctions, effectively finds the Appellants in contempt for violation of the Initial Order. Ordinarily, a party "cannot be held in constructive contempt of a Court order that has not been reduced to writing at the time the actions allegedly violated that order. *See Ex parte Chambers*, 898 S.W.2d 257, 262 (Tex. 1995) ("A contemnor cannot be held in constructive contempt of court for actions taken prior to the time that the court's order is reduced to writing."); *see also, Ex parte Price*, 741 S.W.2d 366 (Tex. 1987) (noting that in the contempt context oral orders are poor substitutes for a written order). The Trial Court should not have awarded sanctions against the Appellants based solely on an oral instruction to "step aside" when it comes to document requests or to "not make specific requests under the statute" without identifying the statute or showing that the requests were made under a statute as opposed to, for example, the POC governing documents.

## CONCLUSION AND PRAYER

Appellants respectfully move that the Order entered by the trial court on October 21, 2014 be vacated in all respects, dissolved as to any injunctive

---

[8] RR, Vol. 2, page 53, lines 9 – 21.

relief, and further requests all such other and further relief, including general relief, to which they might be entitled.

Respectfully submitted,

Law Office of David Junkin

_____
David Junkin
State Bar No. 11058020
P.O. Box 2910
Wimberley, Texas 78676
512/847-8600
512/847-8604 (fax)
david@junkinlawoffice.com

Attorney for Appellants
George and Garlan Green

## CERTIFICATION REGARDING LENGTH OF BRIEF

Counsel for Appellants herby certifies that the length of Appellants' Brief as indicated by the word processing system used to generate the brief, excluding appendices, is 4,707 words. While not required, this word count includes the caption, identity of the parties and counsel, statement of oral argument, table of contents, index of authorities, statement of the case and issues presented, signature block, and certificate of service.

_____
David Junkin

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this brief was served on the following counsel of record and in the manner indicated on January 12, 2015.

**CERTIFIED MAIL, RETURN RECEIPT REQUESTED**
**#7013 0600 0001 1397 6886 AND/OR EFILE**

      Brantley Ross Pringle, Jr.
      Heidi Coughlin
      Wright & Greenhill, PC
      221 West 6th Street, Suite 1800
      Austin, TX  78701

**CERTIFIED MAIL, RETURN RECEIPT REQUESTED**
**#7013 3020 0001 5962 8986 AND/OR EFILE**

      L. Hayes Fuller, III
      Naman, Howell, Smith, & Lee, PLLC
      P.O. Box 1470
      Waco, TX  76703-1470

                              _____
                              David Junkin

NO. 18314

| | | |
|---|---|---|
| GEORGE GREEN, | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| | § | |
| v. | § | 33RD JUDICIAL DISTRICT |
| | § | |
| PORT OF CALL HOMEOWNERS | § | |
| ASSOCIATION, RANDOLPH HARIG, | § | |
| NANCY CAROTHERS, AND PHILLIP | § | |
| JACOBS, JOHN ROSS BUCHHOLTZ, | § | |
| AND RICHARD PAT MCELROY | § | LLANO COUNTY, TEXAS |



FILED
OCT 21 2014
at 2:34 o'clock __ P.M
JOYCE GILLOW
CLERK DISTRICT COURT, LLANO COUNTY, TEXAS
BY_____ DEPUTY

## ORDER GRANTING MOTION FOR ENFORCEMENT

On the 14th day of October, 2014, the Court heard Movants' Motion for Enforcement of Protective Order. Having considered the Motion, the evidence and the arguments of counsel, the Court finds and concludes that the Motion should be, and it hereby is, GRANTED.

IT IS FURTHER ORDERED, that all communication between the parties be had through attorneys of record, and that George Green and Garlan Green, and any of their agents, assigns, officers, executors or any person acting or working on their behalf in any way, other than their attorney(s) of record, shall make no communication to Defendants during this litigation.

IT IS FURTHER ORDERED, that Defendants only need to supplement documents from previous discovery requests and information requests made by Plaintiff every sixty (60) days beginning on November 15, 2014. Such supplementation shall occur without prompting or request by Plaintiff (as the same is expressly prohibited by this Order), and shall include any POA-related documents that members may lawfully request due to their status as POA members.

IT IS FURTHER ORDERED, that Plaintiff pay to Defendants the sum of $500.00 as reasonable and necessary attorneys fees incurred in bringing the said Motion For Enforcement.

175

IT IS FURTHER ORDERED, that any violation of this Order is subject to a sanction/fine of up to $1,500.00 per occurrence, and the award of reasonable and necessary attorney's fees to the prevailing party in a Motion to Enforce this Order.

Notwithstanding the efficacy of this Order in granting Defendant's Motion For Enforcement of Protective Order, it is the express intent of the Court that this Order act as a clarification to the August 14, 2014 Order Granting Defendants' Motion To Compel and Protective Order nunc pro tunc.

SIGNED this ___21st___ day of ___October___, 2014.

_____
Presiding Judge

CAUSE NO. 18314

| | | |
|---|---|---|
| GEORGE GREEN | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| V. | § | OF LLANO COUNTY, TEXAS |
| | § | |
| PORT OF CALL HOMEOWNERS | § | |
| ASSOCIATION, RANDOLPH HARIG, | § | |
| NANCY CAROTHERS, AND PHILLIP | § | |
| JACOBS, JOHN ROSS BUCHHOLTZ, | § | 33ʳ JUDICIAL DISTRICT |
| AND RICHARD PAT MCELROY | § | |

## ORDER GRANTING DEFENDANTS' MOTION TO COMPEL AND PROTECTIVE ORDER

On this 14th day of August came for consideration in the above-styled and numbered cause, Defendant's Motion to Compel and Motion for Protective Order.

I.

This Court having heard the arguments of both Plaintiff and Defendants agrees to GRANT Defendants' Motion to Compel George Green ~~and Garlan Green's~~ Deposition. This Court ORDERS George Green and Garland Green be presented for deposition on or before Sept 30, 2014. ~~This Court conditionally grants Defendants' reasonable attorneys' fees against the Plaintiff in the amount of Seven Hundred Fifty Dollars and 00/100 Dollars ($750.00) with those fees becoming due and payable only if George Green and Garlan Green do not appear for deposition as stated above.~~

II.

This Court also GRANTS Defendants' Protective Order and this Court ORDERS that documents previously produced to Plaintiff in a digital format are sufficient to comply with Defendants' requirements for production of documents. Further, this

131

Court ORDERS that Defendants only need to supplement documents to Plaintiff every ~~six months~~ 45 days beginning on August 14th 2014 and the supplementation needs to be complete records of the PSH.

~~It is, therefore, ORDERED, ADJUDGED and DECREED that Defendant's Motion For Leave to Designate Responsible Third Party is hereby GRANTED and DHL Delivery Services is designated as a responsible third party.~~

SIGNED this 14th day of August, 2014.

_____
Judge Presiding

**Rahul K. Nath, M.D., Petitioner,**

**v.**

**Texas Children's Hospital and Baylor College of Medicine, Respondents**

**No. 12-0620**

**August 29, 2014**

Argued February 5, 2014

On Petition for Review from the Court of Appeals for the Fourteenth District of Texas

Justice Guzman delivered the opinion of the Court in which Chief Justice Hecht, Justice Johnson, Justice Willett, and Justice Devine joined.

Eva M. Guzman Justice

In a civil suit, few areas of trial court discretion implicate a party's due process rights more directly than sanctions. This proceeding involves one of the highest reported monetary sanctions awards in Texas history stemming from baseless pleadings and one of the largest such awards in the United States.[1] Further, the award was levied against a party rather than an attorney. The Civil Practice and Remedies Code and our Rules of Civil Procedure allow for pleadings sanctions against parties and attorneys when, among other things, a pleading was filed with an improper purpose or was unlikely to receive evidentiary support. We have held that due process concerns impose additional layers of protection on sanctions awards by requiring, among other things, that the awards be just and not excessive.

In this suit between a physician and other medical providers, the trial court imposed sanctions against the physician well in excess of one million dollars for filing groundless pleadings in bad faith and with an improper purpose. We conclude the physician plaintiff's pleadings asserted time-barred claims and addressed matters wholly irrelevant to the lawsuit in an attempt to leverage a more favorable settlement, and therefore are sanctionable. But in assessing the amount of sanctions, the trial court failed to consider whether, by litigating for over four years before seeking sanctions, the defendants bore some responsibility for the attorney's fees they incurred. Accordingly, we reverse the court of appeals' judgment and remand to the trial court to reassess the amount of the sanctions award.

## I. Background

Dr. Rahul K. Nath is a plastic surgeon who was employed by Baylor College of Medicine and affiliated with Texas Children's Hospital (the Hospital). Nath reported to Dr. Saleh Shenaq, the Chief of Baylor College of Medicine's Division of Plastic Surgery, who also was Nath's partner at the Hospital's Obstetrical Brachial Plexus Clinic. Baylor received fifteen percent of the clinic's patient fees, and Nath and Shenaq evenly split the remainder of the fees.

Nath's relationship with his colleagues turned acrimonious in 2003, when several doctors complained that Nath billed excessively, performed unnecessary procedures, and treated fellow colleagues in an unprofessional manner. A letter from his faculty supervisors states that, "there have been several complaints pertaining to your billing practices, ethics, and professional conduct, " and described his academic contributions as "minimal." For these reasons, the letter announced that Nath's faculty appointment would not be renewed, and his employment with Baylor was terminated effective June 30, 2004. Nath's former office manager also claimed Nath had a history of making racially-provocative statements and seemed to harbor delusions of grandeur.

Shortly after receiving the letter, Nath retained an attorney and notified Baylor that its employees were making statements "potentially damaging to Dr. Nath's reputation, " allegedly in an effort to get Nath's patients to remain at the clinic. In 2006, Nath sued Shenaq, Baylor, and the Hospital. Nath and Shenaq settled two years later. Shenaq and another clinic doctor subsequently died and the clinic never reopened.

In his original pleading in 2006, Nath asserted claims for defamation and tortious interference with business relations against Baylor and the Hospital.[2] Nath's third amended petition added claims for negligent supervision and training predicated on the previously alleged facts. Nath's fourth amended petition added allegations that Shenaq had been operating on patients despite impaired vision. Similarly, Nath's fifth amended petition added that Shenaq had been operating on patients while afflicted with hepatitis. The fifth amended petition also included a declaratory judgment claim (that Nath could or should disclose to his patients that Shenaq was in poor health). The Hospital counterclaimed for attorney's fees pursuant to the declaratory judgment act, and in December 2009, moved for summary judgment on all of the claims in Nath's fifth amended petition. Baylor moved for summary judgment in January 2010. In response, Nath moved to compel additional depositions, extend the deadline to respond to the motions, and continue the summary judgment hearing—all of which the trial court granted. In March 2010, Nath again moved to continue the summary judgment hearing, which the trial court denied. Nath retained new counsel, Daniel Shea, who appeared at the hearing and filed a motion to

recuse the judge. Nath also moved to recuse the judge assigned to hear the motion to recuse. Ultimately, the motions to recuse were denied.

Nath also filed a sixth amended petition in April 2010, in which he abandoned his defamation, tortious interference, negligence, and declaratory judgment claims and brought a claim for intentional infliction of emotional distress. The Hospital and Baylor moved for summary judgment on the new claim. Nath failed to respond to the motions and instead objected to the notice of hearing based on a technical defect. All parties appeared at a summary judgment hearing in June 2010, more than four years after the suit began, where the trial court dismissed Nath's claims.[3]

Two months later, the Hospital nonsuited its declaratory judgment counterclaim. The Hospital then moved to modify the judgment to assess attorney's fees as sanctions against Nath. Nath retained new counsel and filed special exceptions to the motion for sanctions in September. After a hearing on the special exceptions and the Hospital's sanctions motions, the trial court denied the special exceptions and granted the sanctions motion. The court issued findings of fact and conclusions of law indicating the sanctions were based on: (1) "Nath's improper purposes in filing the pleadings in this case;" (2) "the bad faith that his actions manifest;" and (3) "the lack of any factual predicate for his claims, as previously established by the Court's orders granting the motions for summary judgment." The court explained that its finding of bad faith stemmed from Nath's conduct in seeking information regarding Shenaq's health, conduct for which the court had previously admonished Nath.[4] Finally, the court concluded that Nath's leveraging of this information in an attempt to obtain a settlement constituted an improper purpose.

The trial court further found that Nath took "a personal, participatory role in this litigation." The court posited that Nath "is knowledgeable about the law and legal issues, having previously studied the law, " for several semesters in the early 1980s in Canada. According to the trial court, Nath insisted on delaying the summary judgment hearing so he could be present at two depositions. Nath also filed an affidavit in response to the motion for summary judgment indicating he authorized the facts and theories set forth in the petitions. The court further found that Nath met with one deponent shortly before his deposition to discuss his testimony. And the trial court observed that "Nath has used the court system to intimidate adversaries and to stifle dissent with baseless legal allegations" by suing an alleged defamer, suing his former partner in a MRI business, suing two individuals associated with the Texas Medical Board (which later dismissed its proceedings against Nath), and asserting claims in federal court related to the sale of his home (on which he prevailed).[5]Ultimately, the trial court found that the Hospital's fees of $776, 607 in defending the suit were reasonable and awarded them as

sanctions.

Before the hearing on the Hospital's motion for sanctions, Nath moved to sever the claims as to Baylor, and after severance, Baylor also moved to modify the judgment to assess fees as sanctions. After a hearing on Baylor's sanctions motion in November 2010, the trial court made similar findings and awarded Baylor's $644, 500.16 in attorney's fees as sanctions against Nath. The court of appeals affirmed the awards, and we granted Nath's petition for review. 375 S.W.3d 403, 415.

## II. Discussion

Nath primarily argues in this Court that the sanctions imposed against him as the client were not visited on the true offender and were excessive. The Hospital and Baylor counter that Nath had personal, active involvement in the litigation and that the fee award was appropriate given the circumstances. We agree with the Hospital and Baylor that the trial court properly sanctioned Nath because he pursued time-barred claims and irrelevant issues in order to leverage a more favorable settlement. But concerning the excessiveness of the award, the Hospital and Baylor waited almost four years into the litigation before moving for summary judgment on Nath's claims and only moved for sanctions after obtaining a final judgment. We previously advised courts to consider a variety of factors when imposing sanctions, including the degree to which the non-sanctioned parties' behavior caused their own expenses. The trial court failed to discuss this relevant factor, and we reverse and remand for it to do so.

### A. Standard of Review

We review the imposition of sanctions under an abuse of discretion standard. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007). Both Chapter 10 of the Texas Civil Practice and Remedies Code and Texas Rule of Civil Procedure 13 are applicable to this case, and sanctions imposed pursuant to both are reviewed under this abuse of discretion standard. *Id.* A sanctions award will not withstand appellate scrutiny if the trial court acted without reference to guiding rules and principles to such an extent that its ruling was arbitrary or unreasonable. *Cire v. Cummings*, 134 S.W.3d 835, 838&ndash;39 (Tex. 2004). A sanctions award that fails to comply with due process constitutes an abuse of discretion because a trial court has no discretion in determining what the law is or applying the law to the facts. *See TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991); *Huie v. DeShazo*, 922 S.W.2d 920, 927 (Tex. 1996). But we will not hold that a trial court abused its discretion in levying sanctions if some evidence supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009). Generally, courts presume pleadings and other papers are filed in good faith. *GTE Commc'ns Sys. Corp. v. Tanner*, 856 S.W.2d 725, 730 (Tex. 1993). The party seeking sanctions bears the burden of overcoming this

presumption of good faith. *Id.* at 731.

## B. Substantive Law Governing Sanctions

The sanction at issue here concerns pleadings, and its propriety is thus primarily governed by Chapter 10 of the Texas Civil Practice and Remedies Code and Texas Rule of Civil Procedure 13.[6] Chapter 10 allows sanctions for pleadings filed with an improper purpose or that lack legal or factual support. It provides that upon signing a pleading or motion, a signatory attests that:

(1) the pleading or motion is not being presented for any improper purpose, including to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) each claim, defense, or other legal contention in the pleading or motion is warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; [and]

(3) each allegation or other factual contention in the pleading or motion has evidentiary support or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

Tex. Civ. Prac. & Rem. Code § 10.001.[7] Pleadings that violate these Chapter 10 requirements are sanctionable. *Id.* § 10.004(a). But a court may not sanction a represented party under section 10.001 for unfounded legal contentions. *Id.* § 10.004(d).

Rule 13 provides that pleadings that are groundless and in bad faith, intended to harass, or false when made are also sanctionable:

The signatures of attorneys or parties constitute a certificate by them that they have read the pleading, motion, or other paper; that to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith or groundless and brought for the purpose of harassment. Attorneys or parties who . . . make statements in pleading which they know to be groundless and false, for the purpose of securing a delay of the trial of the cause, shall be held guilty of a contempt . . . .

Courts shall presume that pleadings, motions, and other papers are filed in good faith. No sanctions under this rule may be imposed except for good cause, the particulars of which must be stated in the sanction order. "Groundless" for purposes of this rule means no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law . . . .

Tex. R. Civ. P. 13. Importantly, Rule 13 does not permit sanctions on the issue of groundlessness alone. Rather, the filing in question must be groundless and also either brought in bad faith, brought for the purpose of harassment, or false when made. *Id.*

We have held that in order to safeguard constitutional due process rights, a sanction must be neither unjust nor excessive. We promulgated this standard most clearly in *TransAmerican*, 811 S.W.2d at 913. The underlying case in *TransAmerican* was complex and multi-partied. *Id.* at 914. In brief, TransAmerican's president was sanctioned for discovery abuse pursuant to Rule of Civil Procedure 215 for failing to appear at a deposition. *Id.* at 915&ndash;16. In considering whether those sanctions complied with due process, we established a two-part test.

The first prong of the *TransAmerican* test concerns the relationship between the conduct evinced and the sanction imposed and requires a direct nexus between the offensive conduct, the offender, and the sanction award. *See id.* at 917. A just sanction must be directed against the abusive conduct with an eye toward remedying the prejudice caused to the innocent party, and the sanction must be visited upon the true offender. *Id.* A court must attempt to determine whether the offensive conduct is attributable to counsel only, to the party only, or to both. *Id.* Yet we warily noted in *TransAmerican* that apportioning blame between an attorney and a represented party "will not be an easy matter in many instances." *Id.* Such caution is warranted. The closeness that typically defines interaction between a litigant and his attorney not only binds their interests but may lend an overall opacity to the relationship that renders it difficult to determine where a party's input ends and where an attorney's counsel begins.

The second prong of the due process analysis under *TransAmerican* considers the proportionality of the punishment relative to the misconduct and warns "just sanctions must not be excessive." *Id.* Not only should a punishment (*i.e.*, sanctions) fit the crime (*i.e.*, the triggering offense), the sanction imposed should be no more severe than necessary to satisfy its legitimate purposes. *Id.* Legitimate purposes may include securing compliance with the relevant rules of civil procedure, punishing violators, and deterring other litigants from similar misconduct. *Spohn Hosp. v. Mayer*, 104 S.W.3d 878, 882 (Tex. 2003).

We require courts to consider less stringent sanctions and weigh whether such lesser sanctions would serve to promote compliance. *TransAmerican*, 811 S.W.2d at 917.[8] Evidencing our reticence to wield the heavy hammer of sanctions, we have cautioned: "[c]ase determinative sanctions may be imposed in the first instance only in exceptional cases when they are clearly justified and it is fully apparent that no lesser sanctions would promote compliance with the rules." *Tanner*, 856

S.W.2d at 729.

Historically, awards for groundless pleadings in Texas have been moderate, at least in monetary terms. *See id.* at 730 (reversing a sanctions award of $150,000 in attorney's fees for groundlessness and discovery non-compliance); *Dike v. Peltier Chevrolet, Inc.*, 343 S.W.3d 179, 183 (Tex. App.&mdash;Texarkana 2011, no pet.) (reversing a groundless pleadings sanction of $15,353); *Parker v. Walton*, 233 S.W.3d 535, 538 (Tex. App.&mdash;Houston [14th Dist.] 2007, no pet.) (reversing a groundless pleading sanction of $3,500 in attorney's fees); *Emmons v. Purser*, 973 S.W.2d 696, 699 (Tex. App.&mdash;Austin 1998, no pet.) (reversing a groundless pleadings sanctions award of $3,200); *see also Robson v. Gilbreath*, 267 S.W.3d 401, 405 (Tex. App.&mdash;Austin 2008, pet. denied) (affirming a groundless pleadings sanction of $10,000 for failure to conduct a reasonable inquiry). While this tour d'horizon is not intended to be comprehensive, it is nonetheless representative of what our reported cases suggest have been typical groundless pleadings awards in this state.[9]

Though we specifically addressed sanctions stemming from a charge of discovery abuse in *TransAmerican*, we have previously held the due process requirements we established there apply to pleadings sanctions as well. *Low*, 221 S.W.3d at 619&ndash;20.

### C. Analysis

In the trial court, Nath brought claims for a declaratory judgment (regarding Shenaq's health), intentional infliction of emotional distress, defamation, tortious interference, and negligence. The trial court sanctioned Nath for (1) bad faith in his pursuit of discovery on the irrelevant issue of Shenaq's health; (2) an improper purpose of leveraging information concerning Shenaq's health to favorably settle a baseless claim; and (3) bringing claims that lacked a factual predicate. Chapter 10 requires that we analyze an improper purpose pleading-by-pleading, but we assess claim-by-claim whether a claim lacked a legal or factual basis.[10]

### 1. Waiver

As an initial matter, we address the claim of the Hospital and Baylor that Nath waived his objection to the size of the sanctions award by failing to raise the issue of excessiveness at the trial court level. The court of appeals agreed, finding that the issue had not been properly preserved for review. 375 S.W.3d at 412. We disagree. The record plainly reveals Nath's objections to the award, including objections specifically predicated on the ground of excessiveness. On December 20, 2010, Nath filed a motion for new trial and a motion to modify the trial court's November judgment and sanctions order, arguing the sanctions award "violates the Excessive Fines clause of the Constitution of the United States of America&mdash;Eighth Amendment&mdash;and the Excessive Fines clause of the Texas Constitution&mdash;Article I, section 13." Additionally, Nath cited United States Supreme Court precedent to bolster his contention that the trial court should consider "whether the penalties in question were excessive."[11] We are generally loath to turn away a meritorious claim due to waiver; where the party has clearly and timely registered its objection, we find a waiver argument particularly unavailing. *See Verburgt v. Dorner*, 959 S.W.2d 615, 616&ndash;17 (Tex. 1997). We conclude Nath did not waive his objection to the excessiveness of the sanctions award.

### 2. Nath's Fourth, Fifth, and Sixth Amended Petitions

Central to its ultimate imposition of sanctions, the trial court found that Nath's pursuit of information relating to Shenaq's health was in bad faith, and that Nath's ostensible intent to use that information to leverage a favorable settlement for a baseless claim constituted an improper purpose. Nath originally included allegations relating to Shenaq's health in his fourth amended petition, filed in November 2008.[12] Nath moved to compel discovery relating to Shenaq's health and in July 2009 filed a fifth amended petition that included a request for declaratory judgment relating to Shenaq's health. The trial court admonished Nath's counsel that the information was irrelevant to his lawsuit. *See supra* note 4. Nath later filed a sixth amended petition that abandoned his prior claims and added a claim for intentional infliction of emotional distress. But that petition retained allegations regarding Shenaq's health.[13] For the reasons explained below, we agree with the court of appeals that the trial court properly found Nath's pleadings sanctionable.

The hallmarks of due process for sanctions awards are that they be just and not excessive. *TransAmerican*, 811 S.W.2d at 917. Sanctioning Nath for pleadings relating to Shenaq's health was demonstrably just. First, there was a direct nexus between this portion of the trial court's sanctions and the offensive conduct. The trial court found such pleadings to be in bad faith (due to their irrelevance) and filed for an improper purpose (leveraging a settlement). The trial court's finding is supported by some evidence and is therefore not an abuse of discretion. *See Unifund*, 299 S.W.3d at 97. Nath admittedly was seeking information relating to Shenaq's health so he could disclose it to Shenaq's patients. But such disclosures would not be relevant to triable issues related to Nath's then-contemporaneous claims for defamation, tortious interference, and negligence.

Moreover, there was some evidence supporting the trial court's determination that Nath was improperly seeking irrelevant information to leverage a favorable settlement. On the eve of a mediation in June 2009, Nath's counsel sent a letter to the Hospital indicating

Nath was anxious to conduct discovery regarding Shenaq's health conditions, the results of which "would most certainly require prompt actions to notify patients so that they can undergo immediate testing and obtain legal counsel to advise them of their rights." During Nath's deposition, attorneys for Baylor and the Hospital likened Nath's use of legal process in this manner to extortion. The trial court agreed with this assessment, characterizing Nath's conduct in seeking information related to Shenaq's health as "an abuse of process" and "a form of extortion." Accordingly, the improper purpose of Nath's pleadings regarding Shenaq's health indicates the trial court appropriately levied sanctions regarding this conduct.[14]

In addition to considerations described, the just-award prong of the due process analysis also examines whether the sanction was visited on the true offender. The trial court made various findings of fact regarding Nath's direct involvement in the case, particularly noting his effort to seek information relating to Shenaq's health, and the record supports these findings. Relations between Nath and Shenaq deteriorated to the point of acrimony in the time leading up to Nath's departure from Baylor, and they only worsened as litigation ensued. The affidavit Nath filed in response to the motions for summary judgment claimed the relationship between Nath and Shenaq grew tense when Nath confronted Shenaq for performing surgery with allegedly impaired vision. And Nath, by his own admission, specifically sought information related to Shenaq's health so that he could inform former patients of Shenaq's health problems. Nath's affidavit also lists forty-five patient surgeries Shenaq performed with allegedly impaired vision. Further, Nath personally attended two depositions of Shenaq's colleagues where his counsel asked questions concerning Shenaq's health. Ultimately, Nath's conduct surrounding Shenaq's health appears to be less about pursuing a legal redress for an injury (the province of the attorney) and more about seeking irrelevant personal information (an extrajudicial desire of the client). While litigation is contentious by definition and often utilized to compel a desired end, we agree with the trial court that, on these facts, using a legal mechanism to force damaging, irrelevant information into the public domain and thereby compel a more favorable settlement constitutes an improper purpose. Against this backdrop and the logical inferences that flow from it, we cannot say the trial court abused its discretion by imposing the sanction against Nath personally.

Nath claims that even if some of the sanctions against him were proper, sanctions against him for the sixth amended petition were improper because the lawyer who drafted that petition swore in an affidavit that Nath had no involvement with the claim in that petition. Specifically, the attorney indicated he "exercised [his] own legal judgment" when deciding what claims to file in the sixth amended petition and asserted that Nath "had no involvement in the selection of what pleadings and motions were filed in this case." Nonetheless, the sixth amended petition contains facts regarding Shenaq's health from the prior petitions, and we have already determined that information likely came from Nath himself. In addition, Nath almost certainly knew of the inclusion of those allegations in the sixth amended petition because his attorney "kept Dr. Nath reasonably informed"&mdash;as was his professional obligation.[15] Accordingly, we reject Nath's argument and conclude the trial court did not abuse its discretion in labeling Nath the true offender, insofar as the sixth amended petition continued to make issue of Shenaq's health.

We note, however, that while Nath may be properly deemed the true offender, his attorneys possess ethical obligations and may share in the blame for sanctionable conduct. An attorney has ethical obligations to both his client and to the judicial system as an officer of the court.[16] Though zealous advocacy is expected of an attorney&mdash;indeed, it is a professional obligation&mdash;the attorney must not permit client desires to supersede the attorney's obligation to maintain confidence in our judicial system.[17] As our rules of professional conduct unambiguously require: "A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others."[18]Further, these rules of conduct require an attorney to "maintain the highest standards of ethical conduct" throughout representation.[19] Regardless, Baylor and the Hospital only moved to sanctionNath&mdash;not his lawyers&mdash;and the trial court declined to sanction the lawyers sua sponte.[20] Thus, under the true-offender inquiry, we must uphold the trial court's decision to sanction Nath personally because some evidence supports the sanction. *See Unifund*, 299 S.W.3d at 97.

We are mindful of course that due process analysis for sanctions must encompass analyzing whether the award was excessive. But we will refrain from engaging in this analysis until we have examined all pleadings and claims for which Nath may appropriately be sanctioned.

### 3. Defamation

Nath's initial petitions included claims for defamation, tortious interference, and negligence. We address them in turn. The trial court made discrete findings as to Nath's defamation claim. Specifically, the trial court found the defamation claim was time-barred by a one-year statute of limitations[21] and that some of the statements Nath claimed were defamatory were not actually defamatory.[22] But Chapter 10 expressly disallows sanctions against a party for improper legal contentions when the party is represented by counsel. Tex. Civ. Prac. & Rem. Code § 10.004(d). The trial court did not find that the statements did not occur. Rather, it sanctioned Nath because of legal impediments to recovering for the alleged statements.[23] Thus, Chapter 10 precluded the trial court from sanctioning Nath for groundlessness based upon improper legal contentions

when he was represented by counsel.

However, the trial court also held that the time-barred status and nondefamatory nature of some of the statements in his defamation claim indicated Nath filed the claim in bad faith and for an improper purpose. Defamation claims are subject to a one-year limitations period, and Nath filed suit in February 2006. The trial court found that most of the allegedly defamatory statements occurred in June or July of 2004, and none occurred after the end of 2004, when the Hospital closed the clinic. Nath's affidavit opposing summary judgment detailed the allegedly defamatory statements and claimed they damaged his medical practice and caused him financial harm. Further, Nath's affidavit admits he learned of eight of these allegedly defamatory statements in 2004&mdash;over one year before he filed suit.[24] As previously addressed, this matter involves legal contentions&mdash;which Chapter 10 does not allow Nath to be sanctioned for on the basis of legally groundless pleadings because he was represented by counsel. *Id.* But Chapter 10 offers no similar stricture for sanctions based on improper purpose. And in any event, Nath was represented by counsel no later than June 8, 2004, when he claimed the statements were "potentially damaging to [his] reputation." Because there is some evidence supporting the finding that Nath brought his defamation claim with an improper purpose, the trial court did not abuse its discretion in sanctioning Nath for this claim.

Nath nonetheless argues such sanctions violate the constitutional requirement that the sanction be visited on the true offender. We disagree. The fact that Chapter 10 does not shelter parties from sanctions for flawed legal contentions that demonstrate an improper purpose is simply a reflection of our warning in *TransAmerican* that the attorney-client relationship is opaque by default. Nath only diminished that opacity for his sixth amended petition, which contained a claim for intentional infliction of emotional distress. The attorney who filed that claim indicated Nath had no involvement in drafting the claim. But Nath presented no similar evidence with respect to the pleadings containing Nath's defamation claim. Accordingly, because some evidence supports the trial court's finding, and no evidence clarifies the respective roles of Nath and his attorneys in regards to his defamation claim, we conclude the trial court did not abuse its discretion in sanctioning Nath for that claim.

### 4. Tortious Interference

Nath's remaining claims are for tortious interference and negligence. The trial court did not find that Nath filed his tortious interference claim in bad faith or for an improper purpose. Rather, the trial court generally found Nath's claims to be sanctionable because they lacked merit, as evidenced by the court's summary judgment dismissal. The trial court also found Nath's claim to be groundless to the extent it relied on time-barred

defamatory statements. As explained below, the trial court's first rationale violates the Legislature's directive in Chapter 10, but some evidence supports its second rationale.

Generally, groundless pleadings are sanctionable under either Rule 13 or Chapter 10. Under Rule 13, groundlessness in and of itself is an insufficient basis for sanctions. A pleading must also be in bad faith, intended to harass, or knowingly false to justify sanctions. Tex.R.Civ.P. 13.[25] The trial court made no findings of bad faith, improper purpose, or falsity regarding the tortious interference claim. Accordingly, Rule 13 cannot support the sanctions as to this claim.

However, Chapter 10 provides that a claim that lacks a legal or factual basis&mdash;without more&mdash;is sanctionable. Tex. Civ. Prac. & Rem. Code § 10.001; *see also Low*, 221 S.W.3d at 617. Legally, the claim must be warranted by existing law or a nonfrivolous argument to change existing law. Tex. Civ. Prac. & Rem. Code § 10.001(2). But Chapter 10 expressly prohibits monetary sanctions against a represented party based on the legal contentions in a pleading. *Id.* § 10.004(d) ("The court may not award monetary sanctions against a represented party for a violation of Section 10.001(2)."). Accordingly, the trial court could not have properly awarded sanctions against Nath for groundless legal contentions in his tortious interference claim.

Chapter 10 requires that each factual contention must have evidentiary support or be likely to receive it after a reasonable opportunity for discovery. *Id.* § 10.001(3); *Low*, 221 S.W.3d at 616&ndash;17. We held in *Low* that a pleading was sanctionable because it alleged two doctors prescribed a drug that medical records in the attorney's possession demonstrated they did not prescribe. 221 S.W.3d at 616. Thus, in holding the pleading was sanctionable, we held that the allegations did not have, and were not likely to subsequently receive, evidentiary support in light of the evidence the attorney possessed when filing the claim. *Id.*

Unlike in *Low*, the trial court's findings here only indicate it viewed the pleadings as groundless as of the time it granted summary judgment. But the court's findings miss the mark, as the vantage point for assessing evidentiary support is at the time the pleading is filed.[26] Establishing a vantage point at the time of a merits adjudication four years or more into a proceeding would unnecessarily chill litigation in cases where claimants in good faith believe they possess a claim, but have not yet discovered sufficient evidence on every essential element of their claim. We cannot endorse a view that runs so contrary to the Legislature's chosen words in Chapter 10 and our construction of them.

Nonetheless, a distinction between sanctions for groundless pleadings and sanctions for discovery abuse is

worth noting. A claim may be likely to receive evidentiary support when filed and thus not be groundless under Chapter 10. But if a party later learns through discovery that no factual support for the contention exists and still pursues litigation, such conduct might be sanctionable. But the sanctionable conduct would likely be the abuse of the discovery process, not the filing of pleadings, as our rules of civil procedure specify that a court may sanction a party or counsel if the court "finds that any interrogatory or request for inspection or production is unreasonably frivolous, oppressive, or harassing." Tex.R.Civ.P. 215.3. While the ultimate penalty may be similar in its effect on the sanctioned party, its application is predicated on a different ground.[27]

But in addition to concluding that Nath's claims ultimately lacked merit, the trial court also specifically noted in a footnote in its findings of fact and conclusions of law that "Nath's claims of negligence and tortious interference are also groundless to the extent that those claims rely on time-barred, allegedly defamatory statements." Defamation is subject to a one-year statute of limitations, Tex. Civ. Prac. & Rem. Code § 16.002(a), while tortious interference is subject to at least a two-year statute of limitations, *First Nat'l Bank of Eagle Pass v. Levine*, 721 S.W.2d 287, 289 (Tex. 1986). However, the Fifth Circuit and several Texas courts of appeals have held that, when the sole basis for a tortious interference claim is defamatory statements, the one-year statute of limitations for defamation applies.[28] Likewise, we have applied a one-year statute of limitations to business disparagement claims when the gravamen of the complaint is defamatory injury to reputation and there is no evidence of special damages. *See Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987). We now similarly conclude that if a tortious interference claim is based solely on defamatory statements, the one-year limitations period for defamation claims applies.

Nath's tortious interference claim was predicated solely on the allegedly defamatory statement because it alleges the Hospital and Baylor tortiously interfered "by continuing to make false statements regarding" Dr. Nath to third parties. Accordingly, Nath's tortious interference claim was subject to the one-year statute of limitations. The trial court correctly found the earliest of the allegedly defamatory statements occurred in June 2004. Nath filed his tortious interference claim in February 2006, after the one-year limitations period had run. Thus, some evidence supports the trial court's finding that Nath's tortious interference claim (as with his defamation claim) was time-barred and demonstrated an improper purpose.

### 5. Negligence

Nath's final claim was for negligence, in which Nath claimed that Baylor and the Hospital's negligent training and supervision of its employees led them to defame him and tortiously interfere with his practice. As

with Nath's tortious interference claim, the trial court (1) generally found Nath's claims to be sanctionable because they lacked merit due to their dismissal at summary judgment, and (2) specifically found the negligence claim to be groundless to the extent it relied on time-barred defamatory statements. As explained above, assessing groundlessness only at the time of a merits dismissal over four years into the litigation contravenes the requirement in Chapter 10 that groundlessness is assessed as of the time of filing. Thus, the trial court's first rationale cannot support sanctions as to the negligence claim.

But the trial court's second rationale—that the negligence claim relied on time-barred statements—is a sufficient basis for sanctions. Nath filed his negligence claim in his third amended petition in September 2008, over four years after learning of the first allegedly defamatory statements in June 2004. Regardless of whether the two-year limitations window for negligence claims was truncated to one year because Nath's claim was predicated solely on defamatory statements (as with the tortious interference claim), limitations barred the negligence claim. For the same reason sanctions are appropriate for Nath's defamation and tortious interference claims, they are appropriate for his negligence claim.

### D. Remand

In short, all of Nath's petitions are sanctionable. But we must still assess whether the amount of the award was excessive. A trial court abuses its discretion by failing to adhere to guiding rules and principles. *Cire*, 134 S.W.3d at 838–39. We set forth these guiding rules and principles for assessing the amount of pleadings sanctions in *Low*.[29] 221 S.W.3d at 620 n.5. This nonexclusive list of factors is helpful in guiding the often intangible process of determining a penalty for sanctionable behavior, and it provides context for our review of the trial court's award. We advised in *Low* that "[a]lthough we do not require a trial court to address all of the factors . . . to explain the basis of a monetary sanction . . . it *should consider relevant factors* in assessing the amount of the sanction." *Id*. at 620–21 (emphasis added). In practice, this means that when a factor is relevant to a party being sanctioned, that factor must inform the issuance of the award. To take just one example, one factor we referenced in *Low* is "any prior history of sanctionable conduct on the part of the offender." *Id*. at 620 n.5. A court obviously need not consider prior sanctionable conduct in calibrating a sanction award for a first-time litigant for the self-evident reason that no such conduct exists. Yet, were the example reversed and a sanctioned litigant possessed a lengthy history of prior sanctions, the court "should consider" that party's checkered history in levying a sanction. *Id*. at 620–21 & 620 n.5.

Here, the trial court cited and then considered nearly all of the relevant *Low* factors. In the context of

this matter, however, one factor made relevant by the protracted nature of this litigation is "the degree to which the offended person's own behavior caused the expenses for which recovery is sought." *Id.* at 620 n.5 (quotation marks omitted). The trial court failed to address this factor, though it is unquestionably relevant. The statements Nath addressed in his original petition were made in 2004, and Nath filed suit well after the one-year limitations period had run. Yet, the record indicates that all three parties litigated a host of merits issues for nearly a half-decade before the Hospital and Baylor moved for summary judgment on such grounds as limitations. Thus, while Nath was the initiator of this litigation, the degree to which the Hospital and Baylor caused their attorney's fees is a relevant inquiry.

A party is entitled to thoroughly and vigorously litigate a matter. But if issues asserted in pleadings are revealed to be frivolous, and the defending party delays moving for summary judgment and sanctions, the defending party adopts some responsibility for the overall increase in litigation costs. Of course, placing the entire cost of litigation on a plaintiff may be proper and deserved if the plaintiff was the party responsible for sustaining frivolous litigation over a prolonged period. Here, the trial court found the defamation claims were frivolous ab initio because the statements were alleged to have been made at least one year before suit was filed. Moreover, the time-barred statements permeated subsequent pleadings. The defendants, however, did not file a summary judgment for years after the allegations were first made. A defending party cannot arbitrarily shift the entirety of its costs on its adversary simply because it ultimately prevails on a motion for sanctions. Because the trial court did not discernibly examine this relevant *Low* factor, we remand for it to do so.[30]

### E. Response to the Dissent

The dissent tacitly agrees with our analysis, but would affirm the sanctions award rather than remand for the trial court to assess the relevant *Low* factor. Specifically, the dissent argues that we should outright affirm the award of sanctions because, among other things: (1) the findings of fact and conclusions of law contained a typographical error, and (2) our direction that trial courts "should" consider the relevant *Low* factors is permissive.

The dissent first contends the trial court made a typographical error in stating that it considered the extent to which Nath caused the Hospital and Baylor's fees. But viewing the findings and conclusions as a whole belies the dissent's position. The trial court was careful to detail its rationale for the *Low* factors it found to be relevant&mdash;except the extent to which the Hospital and Baylor caused their own injuries. For example, the findings and conclusions spent considerable time discussing Nath's bad faith, his degree of willfulness, and his knowledge and expertise. When a trial court recites a

relevant issue but fails to discuss it, we cannot automatically conclude that such cursory mention is tantamount to compliance. This was true in the case of the $50,000 sanction we reversed in *Low*, and it is equally as true of the $1.4 million sanction presented here.

Additionally, the dissent contends that our admonishment that trial courts "should" consider the relevant *Low* factors is permissive. Notably, the dissent does not contend the extent to which the Hospital and Baylor caused their attorney's fees is irrelevant. And regardless of whether consideration of the relevant *Low* factors is permissive, the trial court went to great lengths to examine all the relevant *Low* factors except for the extent to which the non-sanctioned parties caused their own injuries. We do not believe the standard of review allows a trial court that dutifully considers almost all of the relevant *Low* factors to essentially ignore a relevant factor. As noted, failure to adhere to guiding rules and principles constitutes an abuse of discretion. *Cire*, 134 S.W.3d at 838&ndash;39. *Low* offered these guiding rules and principles, the trial court failed to adhere to them, and this amounted to an abuse of discretion.

### III. Conclusion

Due process requires that sanctions be just, meaning that there be a direct nexus between the sanction and the sanctionable conduct, and be visited on the true offender. Here, the trial court's sanctions award complied with these requirements because Nath's petitions were filed for the improper purpose of pursuing an unrelated issue and advancing time-barred claims. However, when assessing the amount of sanctions, the trial court failed to examine the extent to which the Hospital and Baylor caused the expenses they accrued in litigating a variety of issues over several years. Accordingly, we remand for the trial court to reassess the amount of the sanctions award while considering the omitted factor. *See Low*, 221 S.W.3d at 622.

Justice Green, joined by Justice Lehrmann, Justice Boyd and Justice Brown, dissenting.

The Court holds that the trial court abused its discretion when it assessed sanctions against Dr. Rahul K. Nath without examining the extent to which Texas Children's Hospital and Baylor College of Medicine caused the accrual of their own attorney's fees. __ S.W.3d __, __. Because I read the trial court's orders as having addressed that specific factor, and because I believe the trial court's discretion is broader in this context than the Court does, I respectfully dissent.

The abuse of discretion standard is critical to our analysis in this case. Under this standard, we may reverse the trial court *only* if it acted "without reference to any guiding rules and principles, such that its ruling was arbitrary or unreasonable." *Low v. Henry*, 221 S.W.3d

609, 614 (Tex. 2007) (citing *Cire v. Cummings* , 134 S.W.3d 835, 838–39 (Tex. 2004)).

The amount of a sanction is limited only by the trial court's duty to act within its sound discretion in accordance with the Due Process clause of the Texas Constitution. *Low*, 221 S.W.3d at 619; *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991). In exercising its discretion, the trial court must ensure that the sanction: (1) relates directly to the abuse found; and (2) is not excessive. *Low*, 221 S.W.3d at 620; *Powell*, 811 S.W.2d at 917. In *Low*, we provided a list of non-exhaustive factors to assist a trial court in determining whether a sanction is appropriate. *Low*, 221 S.W.3d at 620–21 n.5. We explained that a trial court need not consider every factor listed, but rather "should consider relevant factors in assessing the amount of the sanction" in each case. *Id.* at 621.

The Court's holding that the trial court abused its discretion in assessing the amount of sanctions rests on two erroneous propositions: (1) the trial court omitted from its analysis a single *Low* factor regarding the extent to which Texas Children's Hospital and Baylor caused the accrual of their own attorney's fees, *see Low*, 221 S.W.3d at 620–21 n.5; and (2) the trial court was required to consider that factor when assessing monetary sanctions. S.W.3d at .

First, the trial court's exhaustive findings of fact and conclusions of law in support of its sanctions award indicate that it considered all of the *Low* factors. Paragraph 91 of the Texas Children's Hospital order concluded:

*In determining the amount of sanctions, this Court has considered the factors listed in Low v. Henry, 221 S.W.3d at 620 & n.5.* In light of Nath's bad faith and improper purposes, as set forth herein; Nath's knowledge of the law as a former legal student; Nath's prior conduct as a litigant in numerous cases; the expenses incurred by Texas Children's Hospital as a result of the litigation and their reasonable proportion to the amount Nath sought in damages; the relative culpability of Nath, as set forth above; the minimal risk of chilling legitimate litigation activity posed by sanctions here; Nath's ability to pay for the damages he has caused Texas Children's Hospital; the need for compensation to Texas Children's Hospital as a result of the damages inflicted upon it in defending against this lawsuit; the necessity of imposing a substantial sanction to curtail Nath's abuse of the judicial process and punish his bad faith and improper conduct; the burdens on the court system attributable to Nath's misconduct, including his consumption of extensive judicial time and resources in prosecuting this case; and *the degree to which Nath's own behavior caused the expenses for which Texas Children's Hospital seeks reimbursement*, the Court concludes that Texas Children's Hospital should be awarded a substantial portion of its attorney's fees to sanction Nath for his conduct.

(Emphasis added).

The trial court reached a similarly-worded conclusion in its findings of fact and conclusions of law in support of its judgment granting Baylor's request for sanctions. In both orders, the trial court expressly stated that it was familiar with the *Low* factors and had considered them in assessing sanctions. The Court claims, however, that in both orders, the trial court failed to "discernibly examine" an "unquestionably relevant" *Low* factor. __ S.W.3d at __, __. However, reading the findings and conclusions as a whole, I can conclude only that the trial court *did* consider the factor that the majority claims was omitted. In its findings and conclusions, the trial court expressly stated that it considered "the degree to which Nath's own behavior caused the expenses for which Texas Children's Hospital [and Baylor] seeks reimbursement." The trial court's list of considerations mirrors the *Low* factors except in this one instance. While the trial court appears to have transposed Nath's name where Texas Children's Hospital or Baylor's name should have been, we should view this transposition as merely a typographical error which may be forgiven, rather than an omission. *Cf. Bd. of Adjustment of City of San Antonio v. Wende*, 92 S.W.3d 424, 428 n.2 (Tex. 2002) (reading the printed word "riot" to mean "not" in a statute containing a typographical error); *City of Amarillov Martin*, 971 S.W.2d 426, 428 n.1 (Tex. 1998) (inserting the word "not" into a statute to indicate the obvious legislative intent); *Beall v. Chatham*, 99 S.W. 1116, 1117–18 (Tex. 1907) (affirming a judgment containing a typographical error which obscured the trial court's reasoning). After all, Nath's conduct was covered fully by other *Low* factors that the trial court considered.

The trial court's extensive findings of fact and conclusions of law regarding Baylor's request for sanctions totaled forty-one pages and contained ninety-five discrete findings and conclusions. The trial court's findings and conclusions regarding Texas Children's Hospital's request for sanctions totaled forty-two pages and contained ninety-four discrete findings and conclusions. Given the trial court's exhaustive effort to explain its decision and address the *Low* factors, it seems a waste of judicial resources to remand this case so that the trial court may correct a typographical error.

Second, contrary to the Court's holding, a trial court has as much discretion in determining which *Low* factors to consider as it does in determining the amount of the sanctions assessment. The Court cites *Low* for the proposition that when a factor is relevant, a trial court must consider it or risk reversal on appeal. __ S.W.3d at __ (citing *Low*, 221 S.W.3d at 620–21). This reading of *Low*, which unnecessarily constrains a trial court's discretion, begs the question—who is to determine whether a factor is relevant, and, under what standard is that decision reviewed? In my view, we must respect the trial court's discretion to determine which

factors are relevant and its discretion to ensure that the amount of its sanctions assessment is appropriate and supported by evidence. After all, the trial court witnessed the parties' behavior firsthand.

Furthermore, the Court's interpretation of *Low*'s use of "should" as creating a mandatory requirement is unconvincing. Just as this Court has held that a statute or rule containing "shall" does not always mandate action, surely our own use of "should" must likewise be interpreted to be merely directory. *Cf. Lewis v. Jacksonville Bldg. & Loan Ass'n*, 540 S.W.2d 307, 310&ndash;11 (Tex. 1976) (interpreting administrative rule containing "shall" to be merely directory, not mandatory); *Chisholm v. Bewley Mills*, 287 S.W.2d 943, 945 (Tex. 1956) (interpreting statute containing "shall" to be merely directory, not mandatory); *Thomas v. Groebl*, 212 S.W.2d 625, 630&ndash;32 (Tex. 1948) (same).

Again, I would caution against excessive scrutiny of the trial court's application of the *Low* factors when the trial court's assessment of sanctions, as a whole, does not amount to an abuse of discretion. As we noted in *Low*, the amount of a penalty under Chapter 10 of the Civil Practice and Remedies Code should "begin with an acknowledgment of the costs and fees incurred because of the sanctionable conduct." 221 S.W.3d at 621. The trial court found that a large sanction was "required to sufficiently punish Nath's conduct and deter similar conduct in the future." The record details Texas Children's Hospital and Baylor's incurred attorneys' fees, and the trial court's sanctions assessment excludes fees related to the recusal proceedings.[1] The trial court, after finding ten of the thirteen *Low* factors to be applicable, had an ample basis for assessing sanctions at the amount of Texas Children's Hospital and Baylor's incurred attorneys' fees.

We might critique the final amount of the sanctions imposed. We might reach a different result under de novo review. But that is simply not our task. We normally afford the trial court considerable latitude under the abuse of discretion standard. We should not modify our test even when it yields unpalatable results. Provided that the trial court relies upon the guiding principles this Court established in *Low* and supports its findings with evidence in the record, we should affirm even debatable sanctions. Why? Because, as the trial judge wrote: "The Court has witnessed much of this behavior firsthand." The trial court dealt with the parties throughout four years of litigation. The court watched Nath cycle through claim after claim in multiple petitions. The court dealt with numerous attorneys. The court dealt with Nath's last-minute effort to recuse the trial judge&mdash;followed by Nath's attempt to recuse the judge overseeing the recusal process. The court admonished Nath's attorneys to cease certain irrelevant pursuits, and then saw Nath ignore this admonishment in an affidavit reemphasizing irrelevant matters. Finally, the trial court dismissed all of Nath's remaining claims at the summary judgment stage. The trial court witnessed all of Nath's actions firsthand, found support in the record, and relied upon the factors this Court set out in *Low* to arrive at its assessment. Therefore, I would hold that the trial court did not abuse its discretion in assessing sanctions against Nath.

The Court's remand of this case is especially troubling because the trial court judge who presided over the case for four years lost reelection in 2012. His replacement will face the same disadvantage in reviewing the sanctions assessment that the Court does today&mdash;she did not witness Nath's behavior firsthand. The current trial court's unfamiliarity with the parties and the litigation will require her to either conduct additional hearings or base her decision upon the same cold record this Court cautions against. *E.g.*, *In re United Scaffolding, Inc.*, 377 S.W.3d 685, 688 (Tex. 2012). Neither of these options are adequate substitutes for a trial court's firsthand observations, and the Court should not remand the case for an unfamiliar trial court to reconsider sanctions.

*Low* provides boundaries for trial courts assessing sanctions. We must ensure that trial courts act within these boundaries; however, we cannot have appellate courts unnecessarily circumventing a trial court's discretion. Detailed findings of fact and conclusions of law and an extensive record provide support for both the decision to sanction and the amount of the sanctions. On the record here, I conclude that the trial court acted within its discretion. Because the Court holds otherwise, I respectfully dissent.

---------

Notes:

[1] *See* Peter Vieth, *2013: The Year in Review*, Virginia Lawyers Weekly, Dec. 9, 2013 ($881, 000 sanction award in a divorce proceeding was "the largest sanction ever imposed" in Virginia); Cheryl Millet, *Divorcee Slapped with Record-Setting $552K Sanction in Custody Case*, Daily Bus. Rev., Feb. 7, 2012 (discussing record setting sanctions award of $552, 000 in a California divorce proceeding); Lisa Provence, *Unusual outcome: $722K in sanctions, juror judges judge*, The Hook, Nov. 4, 2011, *available at* www.readthehook.com/101759/final-order -plaintiffs sanctioned-722k-juror-judges-judge ($542, 000 sanction against counsel and $180, 000 sanction against litigant was "one of the largest sanctions in Virginia legal history"); *Hunton & Williams and Wachovia Obtain Largest Sanctions Award byTennesseeCourt*, B US. W IRE N EW S R E LE AS E S, Nov. 13, 2006, *availableathttp://www.businesswire.com/news/home/200 61113006140/en/Hunton-Williams-Wachovia-Obtain-Lar gest-Sanctions-*Award#.U6Q_WPldX0s ($1.2 million sanction against litigant was the "largest sanctions award

ever granted by a Tennessee court").

[2] Nath subsequently sued Dr. Allan Belzberg and his employer, Johns Hopkins University, over an allegedly defamatory statement Belzberg made regarding Nath in Belzberg's capacity as a Johns Hopkins employee. After a battle over whether the trial court possessed personal jurisdiction over Belzberg and Johns Hopkins, Nath nonsuited them.

[3] The trial court dismissed all the claims in Nath's fifth and sixth amended petitions, even though the sixth amended petition was Nath's only live pleading at the time of the hearing.

[4] At a hearing on a motion to compel in July 2009 where Nath sought production of information regarding the patients Shenaq had seen, the court responded:

I can't do that. You can't do that. The State Medical Board could do that. Hospital Board, someone else. Somebody that's not here can do that. . . .

You should be before some other board that has a different authority than me. It shouldn't be used as a tool in your litigation. . . .

I'm wondering why you're asking me to uncover [Shenaq's alleged health issues and patients allegedly at risk] instead of the State Medical Board. That's my big issue with your approach. . . .

You're coming to me asking me to blow open this cover. When there is an agency out there that is well situated to deal with all of the [privilege] issues that you are raising. . . .

At another hearing on a motion to compel in January 2010, the court stated:

I think&mdash;I answered that by saying Dr. Shenaq's condition is not in this suit. . . .

I think I was very clear about it last time. If I wasn't, I want to be clear now. . . .

I said it's not relevant to this lawsuit. . . .

It's irrelevant to your lawsuit so it's not your job to do it. Your doctor has an obligation to report it to his medical board and they have a job to do. We don't.

[5] Nath was defending a suit the Fifth Circuit ultimately determined to be groundless. *See Petrello v. Prucka*, 484 Fed.Appx. 939, 942&ndash;43 (5th Cir. 2012).

[6] Chapter 9 of the Texas Civil Practice and Remedies Code also addresses frivolous pleadings and claims, but its application is limited to proceedings in which neither Rule 13 nor Chapter 10 applies. *See* Tex. Civ. Prac. & Rem. Code § 9.012(h); *see also Low*, 221 S.W.3d at 614 (noting "Chapter 9 of the Texas Civil Practice and

Remedies Code only applies in proceedings in which neither Rule 13 nor Chapter 10 applies"). Chapter 9 has largely been subsumed by subsequent revisions to the code. *See* Cynthia Nguyen, *An Ounce of Prevention is Worth a Pound of Cure?: Frivolous Litigation Diagnosis Under Texas Government Code Chapters 9 and 10, and Texas Rule of Civil Procedure 13*, 41 S. Tex. L. Rev. 1061, 1083&ndash;84 (2000) (theorizing "it would be difficult to conceive of a scenario in which Chapter 9 would be applicable, " and noting that "there are only a handful of cases that even cite Chapter 9, and these date from before the 1999 amendment to Section 9.012").

[7] Section 10.001 of the Civil Practice and Remedies Code is worded similarly to Federal Rule of Civil Procedure 11(b). *See Low*, 221 S.W.3d at 615.

[8] *See also Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 849 (Tex. 1992) (citing *TransAmerican* to note that "[a] permissible sanction should, therefore, be no more severe than required to satisfy legitimate purposes. This means that a court must consider relatively less stringent sanctions first to determine whether lesser sanctions will fully promote compliance, deterrence, and discourage further abuse").

[9] Although imposed pursuant to the federal groundless pleadings rule, *see supra* note 7, federal pleadings sanctions may also provide a useful barometer to gauge the size of typical awards. *See generally* Maryann Jones, "*Stop, Think, & Investigate": Should California Adopt Federal Rule 11?*, 22 Sw. U. L. Rev. 337, 354 (1993) (noting that "[w]hile there are reported cases of awards exceeding $100, 000, a recent comprehensive survey of Rule 11 sanctions in the Fifth, Seventh, and Ninth Circuits shows that the median sanction imposed pursuant to Rule 11 [at that time was] $2, 500").

[10] *See* Tex. Civ. Prac. & Rem. Code § 10.001 (providing that signing a pleading or motion certifies that "the pleading or motion is not being presented for any improper purpose, . . . each claim, defense, or other legal contention in the pleading or motion is warranted by existing law . . . [and] each allegation or other factual contention in the pleading or motion has evidentiary support or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery"); *see also Low*, 221 S.W.3d at 615 (recognizing that Chapter 10 requires analysis of each claim against each defendant).

[11] *Austin v. United States*, 509 U.S. 602, 622 (1993).

[12] For example, the fourth amended petition claimed:

Defendants were further motivated to discredit Dr. Nath, damage his reputation, and remove him from their facilities because Dr. Nath had discovered that Dr. Shenaq had become partially or completely blind in one eye after suffering a detached retina in 2003. . . . On

information and belief, Defendants sought to protect their own interests when they failed to inform Dr. Shenaq's patients about Dr. Shenaq's compromised medical condition. . . . Drs. Grossman and Brunicardi, along with Baylor and [the Hospital], knew that Dr. Nath was concerned about, and was knowledgeable of, Dr. Shenaq's condition and were fearful that Dr. Nath would make Dr. Shenaq's condition public.

[13] For example, the sixth amended petition alleged "that many patients were operated on or treated by Dr. Shenaq at Baylor and [the Hospital] after Dr. Shenaq had become partially or completely blind in one eye after suffering a detached retina in November 2003 . . . ."

[14] While bad faith must be coupled with groundless pleadings to support sanctions under Rule 13, Tex.R.Civ.P. 13, an improper purpose alone is a sufficient predicate for sanctions under Chapter 10, Tex. Civ. Prac. & Rem. Code § 10.001; *see Low*, 221 S.W.3d at 617 (discussing the disjunctive nature of Chapter 10's bases for sanctions).

[15] An attorney owes a client a duty to inform the client of matters material to the representation, provided such matters are within the scope of representation. *See, e.g.*, *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 160 (Tex. 2004).

[16] Tex. Disciplinary R. of Prof'l Conduct pmbl. ¶ 1.

[17] *Id.* at ¶ 2.

[18] *Id.* at ¶ 4.

[19] *Id.* at ¶ 1.

[20] *See* Tex. Civ. Prac. & Rem. Code § 10.002 (providing that court may sanction a party or attorney under Chapter 10 "on its own initiative"); Tex.R.Civ.P. 13 (providing that court may sanction a party or attorney under Rule 13 "upon its own initiative").

[21] Tex. Civ. Prac. & Rem. Code § 16.002(a).

[22] "[A] defamatory statement is one that tends to injure a person's reputation." *Hancock v. Variyam*, 400 S.W.3d 59, 62 (Tex. 2013).

[23] *Cf. Dolenz v. Boundy*, 197 S.W.3d 416, 421&ndash;22 (Tex. App.&mdash;Dallas 2006, pet. denied) (affirming pleadings sanctions of $250 against a party when the party was a lawyer proceeding pro se and presumably aware that the claims were time-barred).

[24] For example, on or about June 2, 2004, Nath learned his appointment at Baylor was not renewed because of his billing practices and minimal academic contributions. Nath's affidavit also indicates he learned of seven other allegedly defamatory statements in 2004.

[25] *See also Able Supply Co. v. Moye*, 898 S.W.2d 766, 772 (Tex. 1995).

[26] For example, Chapter 10 specifies that anyone signing a pleading certifies that each allegation "has evidentiary support or . . . is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Tex. Civ. Prac. & Rem. Code § 10.001(3). Likewise, the trial court's sanctions order in *Low* indicated that the factual contentions "did not, on January 31, 2002 [when the petition was filed], and do not now, have evidentiary support; nor were they on January 31, 2002, likely to have evidentiary support after a reasonable opportunity for further investigation." 221 S.W.3d at 617.

[27] This analysis need not detain us here. Nath engaged in questionable discovery conduct surrounding the original setting for the summary judgment motions. But even if this conduct was sanctionable as discovery abuse, it occurred during a time when Nath's fourth, fifth, and sixth amended petitions were on file&mdash;which we have found to be sanctionable pleadings. Thus, we need not assess whether such conduct was sanctionable for a second reason. And in any event, the Hospital and Baylor did not move for discovery sanctions.

[28] *See Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*, 512 F.3d 137, 146&ndash;47 (5th Cir. 2007); *Williamson v. New Times, Inc.*, 980 S.W.2d 706, 710&ndash;11 (Tex. App.&mdash;Fort Worth 1998, no pet.); *Martinez v. Hardy*, 864 S.W.2d 767, 776 (Tex. App.&mdash;Houston [14th Dist.] 1993, no writ); *Gulf Atl. Life Ins. Co. v. Hurlbut*, 696 S.W.2d 83, 97&ndash;98 (Tex. App.&mdash;Dallas 1985), *rev'd on other grounds*, 749 S.W.2d 762 (Tex. 1987).

[29] The list of nonexclusive factors we enumerated was:

a. the good faith or bad faith of the offender;

b. the degree of willfulness, vindictiveness, negligence, or frivolousness involved in the offense;

c. the knowledge, experience, and expertise of the offender;

d. any prior history of sanctionable conduct on the part of the offender;

e. the reasonableness and necessity of the out-of-pocket expenses incurred by the offended person as a result of the misconduct;

f. the nature and extent of prejudice, apart from out-of-pocket expenses, suffered by the offended person as a result of the misconduct;

g. the relative culpability of client and counsel, and the impact on their privileged relationship of an inquiry into that area;

h. the risk of chilling the specific type of litigation involved;

i. the impact of the sanction on the offender, including the offender's ability to pay a monetary sanction;

j. the impact of the sanction on the offended party, including the offended person's need for compensation;

k. the relative magnitude of sanction necessary to achieve the goal or goals of the sanction;

l. burdens on the court system attributable to the misconduct, including consumption of judicial time and incurrence of juror fees and other court costs;

n. the degree to which the offended person's own behavior caused the expenses for which recovery is sought.

*Low*, 221 S.W.3d at 620 n.5 (quoting American Bar Association, Standards and Guidelines for Practice Under Rule 11 of the Federal Rules of Civil Procedure, *reprinted in* 121 F.R.D. 101, 104 (1988) (omission in original)).

[30] We are confident in the trial court's ability to resolve this discrete issue on remand either on the existing record or, at most, after a hearing examining briefing accompanied by affidavits regarding the degree to which the Hospital and Baylor caused their attorney's fees.

[1] Only the judge hearing the recusal motion may assess these sanctions. Tex.R.Civ.P. 18a(h).

---------

**811 S.W.2d 913 (Tex. 1991)**

**TRANSAMERICAN NATURAL GAS CORPORATION, Relator,**

**v.**

**Hon. William R. POWELL, Judge of the 80th District Court of**

**Harris County, Texas, Respondent.**

**No. C-9294.**

**Supreme Court of Texas.**

**June 19, 1991**

James Kronzer, Don Henderson, Robert V. Holland, Jr., John C. Nabors, Karen Zuckerman, Bill Jones, Kenneth E. McKay and Joe H. Reynolds, Houston, for relator.

Michael C. Feehan, Beverly Arleen Sandifer, G. Byron Sims, Daniel J. Kasprzak, Jonathan C.S. Cox, Ann Ryan Robertson and Donald F. Hawbaker, Houston, for respondent.

OPINION

HECHT, Justice.

In this original mandamus proceeding, TransAmerican Natural Gas Corporation seeks to compel the Hon. William R. Powell, Judge of the 80th District Court, to set aside his orders imposing sanctions for discovery abuse. The district court struck TransAmerican's pleadings, dismissed its action against Toma Steel Supply, Inc., and granted Toma an interlocutory default judgment on its counterclaim against TransAmerican, reserving for trial only the amount of damages due Toma. We conditionally grant the writ of mandamus.

I

The underlying case is a complex, multi-party action arising out of Toma's sale of allegedly defective pipe casing to TransAmerican. TransAmerican withheld payment for the casing, apparently some $2.3 million, and sued Toma in April 1987 for damages allegedly caused by its use. Toma counterclaimed for $52 million damages resulting from TransAmerican's refusal to pay for the casing. Numerous other parties also joined in the litigation.

On July 3, 1988, the district court issued a docket control order pursuant to Rule 166

of the Texas Rules of Civil Procedure, which set a discovery cutoff date of April 3, 1989. The order allowed discovery to be conducted beyond that date only upon agreement of the parties.

On March 7, 1989, Toma noticed the deposition of TransAmerican's president, K. Craig Shephard, to take place March 16. Two days later TransAmerican's counsel, who at that time was one of the attorneys in its legal department, telephoned Toma's counsel to inform him that Shephard could not be available on March 16 because of a previously scheduled deposition in another case. When counsel could not agree on another date for Shephard's deposition, TransAmerican filed a motion for protection to quash the deposition notice and postpone the deposition. The motion stated that it would be submitted to the trial court for ruling on March 17. [1] However, the trial court did not rule on the motion on that date.

Beginning April 3, the deadline set by the district court for completion of discovery, the parties' smoldering discovery problem started to flare. On that date, counsel for TransAmerican and Toma agreed that Shephard would be deposed after April 10 on a date to be agreed upon. Despite this understanding, counsel again failed to agree upon a date, and on April 19 Toma noticed Shephard's deposition for May 2 without TransAmerican's consent. On April 20, upon receipt of this second deposition notice, TransAmerican's counsel wrote a letter to Toma's counsel informing him that Shephard would not be available May 2 because, as before, he already had a deposition in another matter scheduled for that day. Toma's counsel replied by letter that he would not agree to reschedule the deposition. On April 27, TransAmerican reset the date for submission of its motion for protection to the trial court for ruling to May 12. By this time, of course, the motion was moot, and it is not apparent why TransAmerican continued to seek a ruling. TransAmerican did not move the trial court to postpone the May 2 deposition.

Also on April 27, Shephard's other deposition scheduled for May 2 was cancelled, leaving him available to be deposed by Toma. However, TransAmerican's counsel did not advise Toma's counsel that Shephard's schedule had changed so that he could be deposed on May 2 after all, nor did Shephard appear on May 2 as noticed. TransAmerican ascribes its failure to produce Shephard for deposition to miscommunication concerning his schedule changes between attorneys in its legal department. Toma alleges that Shephard's failure to appear was purposeful and part of TransAmerican's

intentional obstruction of the discovery process.

On May 8, Toma filed a response to TransAmerican's March 14 motion for protective order, even though it acknowledged that that motion was moot. Toma included in its response, however, a motion for sanctions against TransAmerican based on Shephard's failure to appear at the May 2 deposition. In return, TransAmerican filed its own sanctions motion on May 11, urging that Toma's motion for sanctions was itself an abuse of the discovery process. Toma's and TransAmerican's motions for sanctions both stated that they would be submitted to the court for ruling on May 12, the date set for submission of TransAmerican's original motion for protection.

On May 12, without hearing oral argument, [2] the district court signed an order

**Page 916**

granting Toma's motion for sanctions and striking TransAmerican's pleadings in their entirety. TransAmerican moved for reconsideration, which the district court denied after hearing argument of counsel but refusing to hear any evidence. Based upon his May 12 order striking TransAmerican's pleadings, the district court issued an order on October 6 dismissing TransAmerican's action with prejudice, rendering an interlocutory default judgment against TransAmerican and in favor of Toma on its counterclaim, and setting the case for trial solely on the issue of the damages to be awarded Toma.

TransAmerican sought mandamus relief from the court of appeals to compel the district court to set aside his May 12 and October 6 orders. A divided court of appeals denied TransAmerican leave to file its petition for writ of mandamus in an unpublished per curiam opinion. [3] TransAmerican then moved for leave to file its petition in this Court. We granted the motion in order to review the propriety of the discovery sanctions imposed by the district court.

II

The sanctions imposed by the district court are among those authorized for various discovery abuses under Rule 215 of the Texas Rules of Civil Procedure. The district court did not specify what provision of Rule 215 it relied upon. The portions of the rule applicable to the circumstances here are paragraphs 2(b)(5) and 3. Paragraph 2(b)(5) provides in part:

If a party or an officer ... of a party ... fails to comply with proper discovery requests or to obey an order to provide or permit discovery, ... the court in which the action is pending may, after notice and hearing, make such orders in regard to the failure as are just, and among others the following:

. . . . .

(5) An order striking out pleadings or parts thereof, ... or dismissing with or without prejudice the action or proceedings or any part thereof, or rendering a judgment by default against the disobedient party....

At the time of the district court's rulings, paragraph 3 of Rule 215 stated in part:

If the court finds a party is abusing the discovery process in seeking, making or resisting discovery ..., then the court in which the action is pending may impose any sanction authorized by paragraphs (1), (2), (3), (4), (5), and (8) of paragraph 2b of this rule. Such order of sanction shall be subject to review on appeal from the final judgment. [4]

**Page 917**

Both paragraphs leave the choice of sanctions to the sound discretion of the trial court. *Bodnow Corp. v. City of Hondo,* 721 S.W.2d 839, 840 (Tex.1986). However, paragraph 2(b) explicitly requires that any sanctions imposed be "just". By referring to paragraph 2(b), paragraph 3 incorporates the same requirement. Thus, whether the district court imposed sanctions under paragraph 2(b) or paragraph 3, we consider whether those sanctions were just. [5] See Bodnow, 721 S.W.2d at 840.

In our view, whether an imposition of sanctions is just is measured by two standards. First, a direct relationship must exist between the offensive conduct and the sanction imposed. This means that a just sanction must be directed against the abuse and toward remedying the prejudice caused the innocent party. It also means that the sanction should be visited upon the offender. The trial court must at least attempt to determine whether the offensive conduct is attributable to counsel only, or to the party only, or to both. This we recognize will not be an easy matter in many instances. On the one hand, a lawyer cannot shield his client from sanctions; a party must bear some responsibility for its counsel's discovery abuses when it is or should be aware of counsel's conduct and the violation of discovery rules. On the other hand, a party should not be punished for counsel's conduct in which it is not implicated apart from having entrusted to counsel its legal representation. The point is, the sanctions the trial court imposes must relate directly to the abuse found.

Second, just sanctions must not be excessive. The punishment should fit the crime. A sanction imposed for discovery abuse should be no more severe than necessary to satisfy its legitimate purposes. It follows that courts must consider the availability of less stringent sanctions and whether such lesser sanctions would fully promote compliance.

These standards set the bounds of permissible sanctions under Rule 215 within which the trial court is to

exercise sound discretion. [6] The imposition of very severe sanctions is limited, not only by these standards, but by constitutional due process. The sanctions the district court imposed against TransAmerican are the most devastating

**Page 918**

a trial court can assess against a party. When a trial court strikes a party's pleadings and dismisses its action or renders a default judgment against it for abuse of the discovery process, the court adjudicates the party's claims without regard to their merits but based instead upon the parties' conduct of discovery. "[T]here are constitutional limitations upon the power of courts, even in aid of their own valid processes, to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause." *Societe Internationale v. Rogers,* 357 U.S. 197, 209-10, 78 S.Ct. 1087, 1094, 2 L.Ed.2d 1255 (1958), citing *Hammond Packing Co. v. Arkansas,* 212 U.S. 322, 350-51, 29 S.Ct. 370, 379-80, 53 L.Ed. 530 (1909), and *Hovey v. Elliott,* 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215 (1897); accord *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 705-06, 102 S.Ct. 2099, 2105-06, 72 L.Ed.2d 492 (1982). Discovery sanctions cannot be used to adjudicate the merits of a party's claims or defenses unless a party's hindrance of the discovery process justifies a presumption that its claims or defenses lack merit. Insurance Corp. of Ireland, 456 U.S. 694, 705-06, 102 S.Ct. 2099, 2105-06; Rogers, 357 U.S. at 209-10, 78 S.Ct. at 1094; Hammond Packing, 212 U.S. at 350-51, 29 S.Ct. at 379-80. However, if a party refuses to produce material evidence, despite the imposition of lesser sanctions, the court may presume that an asserted claim or defense lacks merit and dispose of it. Insurance Corp. of Ireland, 456 U.S. at 705-06, 102 S.Ct. at 2105-06. Although punishment and deterrence are legitimate purposes for sanctions, *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (per curiam); *Bodnow Corp. v. City of Hondo,* 721 S.W.2d at 840 they do not justify trial by sanctions, Hammond Packing, 212 U.S. at 350-51, 29 S.Ct. at 379-80; Hovey, 167 U.S. at 413-14, 17 S.Ct. at 843. Sanctions which are so severe as to preclude presentation of the merits of the case should not be assessed absent a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under the rules. See National Hockey League, 427 U.S. at 642-643, 96 S.Ct. at 2780-81. [7]

In the present case, it is not clear whether TransAmerican or its counsel or both should be faulted for Shephard's failure to attend his deposition. Moreover, there is nothing in the record to indicate that the district court considered imposition of lesser sanctions or that such sanctions would not have been effective. If anything, the record strongly suggests that lesser sanctions should have been utilized and perhaps would have been effective. The district court could have ordered

Shephard's deposition for a specific date and punished any failure to comply with that order by contempt or another sanction. He also could have taxed the costs of the deposition against TransAmerican and awarded Toma attorney fees. The range of sanctions available to the district court under Rule 215 is quite broad. The district court dismissed TransAmerican's claims against Toma and rendered default judgment for Toma on its counterclaim solely because, as the record before us establishes, TransAmerican's president failed to present himself for his deposition. [8] Nothing in the

**Page 919**

record before us even approaches justification for so severe a sanction. [9]

We recognize that we affirmed a similar sanction in *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex.1985), cert. denied, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). In that case the trial court struck defendant's answer and rendered a default judgment against it based upon the failure of defendant and his employees to appear for their depositions on three separate occasions without explanation. Even assuming that Downer was correctly decided, the instant case does not show the same pattern of abuse present in Downer. Furthermore, Downer 's approval of the sanction of default judgment was specifically based upon the facts of that case, and the holding in that case is limited to those facts. Rendition of default judgment as a discovery sanction ought to be the exception rather than the rule.

There are cases, of course, when striking pleadings, dismissal, rendition of default and other such extreme sanctions are not only just but necessary. See National Hockey League, 427 U.S. at 642, 96 S.Ct. at 2780. In this case, however, the record before us establishes that the severe sanctions the district court imposed against TransAmerican were manifestly unjust in violation of Rule 215.

III

We next consider whether TransAmerican has an adequate remedy by appeal. If it does, then the writ of mandamus must be denied. *State v. Walker,* 679 S.W.2d 484, 485 (Tex.1984). Rule 215, paragraph 3 states that orders imposing discovery sanctions "shall be subject to review on appeal from the final judgment." Today we have held in *Braden v. Downey,* 811 S.W.2d 922 (1991), that sanctions should not be imposed in such a way that effective appellate review is thwarted. Whenever a trial court imposes sanctions which have the effect of adjudicating a dispute, whether by striking pleadings, dismissing an action or rendering a default judgment, but which do not result in rendition of an appealable judgment, then the eventual remedy by appeal is inadequate. Specifically, in this case TransAmerican does not have an adequate remedy by appeal because it must

suffer a trial limited to the damages claimed by Toma. The entire conduct of the litigation is skewed by the removal of the merits of TransAmerican's position from consideration and the risk that the trial court's sanctions will not be set aside on appeal. Resolution of matters in dispute between the parties will be influenced, if not dictated, by the trial court's determination of the conduct of the parties during discovery. Some award of damages on Toma's counterclaim is likely, leaving TransAmerican with an appeal, not on whether it should have been liable for those damages, but on whether it should have been sanctioned for discovery abuse. This is not an effective appeal.

**Page 920**

We therefore hold that when a trial court imposes discovery sanctions which have the effect of precluding a decision on the merits of a party's claims--such as by striking pleadings, dismissing an action, or rendering default judgment--a party's remedy by eventual appeal is inadequate, unless the sanctions are imposed simultaneously with the rendition of a final, appealable judgment. If such an order of sanctions is not immediately appealable, the party may seek review of the order by petition for writ of mandamus. Although not every such case will warrant issuance of the extraordinary writ, this case does. TransAmerican's remedy by appeal from a final judgment eventually to be rendered in Toma's favor is inadequate.

* * *

Accordingly, we hold that TransAmerican is entitled to the mandamus relief it seeks. We are confident that Judge Powell will vacate his orders of May 12 and October 6, after which he may conduct further proceedings consistent with this opinion. Our writ of mandamus will issue only in the event he fails promptly to comply.

Concurring opinions by GONZALEZ and MAUZY, JJ.

GONZALEZ, Justice concurring.

I concur with the court's opinion and judgment. The sanction in this case was clearly out of proportion to the offense committed by relator and the opinion appropriately disposes of the present controversy. However, neither our rules nor the court have set guidelines for imposing sanctions. They envision a large degree of discretion vested in the trial court and innovation should not be discouraged in attempting to fashion an appropriate sanction. However, trial judges should not be trigger happy. They should first issue orders compelling discovery. In all but the most egregious circumstances, other lesser sanctions should be tried first before imposing the ultimate sanction of the "death penalty" (dismissal of pleadings). Cases should be won or lost on their merits, not on discovery or sanctions

gamesmanship. Thus I write separately to offer additional guidance to the bench and bar.

In assessing sanctions under Rule 215 of the Texas Rules of Civil Procedure, the punishment must fit the crime. Furthermore, a sanction should be a function of both the facts presented and the purpose of the rule the court is enforcing. G. JOSEPH, SANCTIONS: THE FEDERAL LAW OF LITIGATION ABUSE § 16 (1989). If this is not clear from the record, the trial court is more apt to be second guessed by the appellate courts.

The Litigation Section of the American Bar Association promulgated the following standards and guidelines to be considered when determining whether to assess sanctions under Federal Rule 11:

a. the good faith or bad faith of the offender;

b. the degree of willfulness, vindictiveness, negligence, or frivolousness involved in the offense;

c. the knowledge, experience, and expertise of the offender;

d. any prior history of sanctionable conduct on the part of the offender;

e. the reasonableness and necessity of the out-of-pocket expenses incurred by the offended person as a result of the misconduct;

f. the nature and extent of prejudice, apart from out-of-pocket expenses, suffered by the offended person as a result of the misconduct;

g. the relative culpability of client and counsel, and the impact on their privileged relationship of an inquiry into that area;

h. the risk of chilling the specific type of litigation involved;

i. the impact of the sanction on the offender, including the offender's ability to pay a monetary sanction;

j. the impact of the sanction on the offended party, including the offended person's need for compensation;

**Page 921**

k. the relative magnitude of sanction necessary to achieve the goal or goals of the sanction;

l. burdens on the court system attributable to the misconduct, including consumption of judicial time and incurrence of juror fees and other court costs;

m. the degree to which the offended person attempted to mitigate any prejudice suffered by him or

her;

n. the degree to which the offended person's own behavior caused the expenses for which recovery is sought.... [1]

American Bar Association, Standards and Guidelines for Practice Under Rule 11 of the Federal Rules of Civil Procedure, reprinted in 121 F.R.D. 101 (1988).

I recognize that Federal Rule 11 is not comparable to Rule 215 of Texas Rules of Civil Procedure and that Federal Rule 11 does not specify the types of sanctions that may be imposed. However, we do not have to re-invent the wheel. In my opinion, the ABA guidelines developed for determining when to assess sanctions under Federal Rule 11 are instructive whenever sanctions are imposed or denied under Texas Rule 215.

As the court notes, the range of sanctions available to a trial court under Rule 215 is quite broad. Some of these sanctions include:

(1) A reprimand of the offender; [2]

(2) Mandatory continuing legal education;

(3) A fine; [3]

(4) An award of reasonable expenses, including reasonable attorney's fees, incurred as a result of the misconduct;

(5) Reference of the matter to the appropriate attorney disciplinary or grievance authority; [4]

(6) An order precluding the introduction of certain evidence;

(7) An order precluding the litigation of certain issues;

(8) An order precluding the litigation of certain claims or defenses;

(9) Dismissal of the action or entry of a

**Page 922**

default judgment. [5]

ABA Standards and Guidelines, 121 F.R.D. at 124.

Sanctions are tools to be used by a court to right a wrong committed by a litigant. Any given sanction should be designed to accomplish that end. Sanctions can be compensatory, punitive or deterrent in nature. See G. JOSEPH, SANCTIONS: THE FEDERAL LAW OF LITIGATION ABUSE § 16 (1989). The court should assess the type of sanction most likely to prevent a recurrence of the offending conduct. The court should also consider the relative culpability of the counsel and

client when selecting the appropriate sanction. See, e.g., *Westmoreland v. CBS, Inc.,* 770 F.2d 1168, 1178-79 (D.C.Cir.1985).

The foregoing guidelines are simply suggestions to guide a trial court in its struggle to make the punishment fit the crime.

MAUZY, Justice, concurring.

I concur in the Court's judgment, but write separately to outline the guidelines which I feel are necessary to explain the parameters of our decision today. Whether or not a sanction is appropriate must be determined by the particular facts of the individual case. In order to determine the appropriate sanctions in each case, the trial court should engage in a three-part inquiry. First, the trial court must resolve the question of whether the offending conduct actually constitutes an abuse of the discovery process. Second, the court must determine who is actually responsible for the offensive conduct and the extent of their culpability. Third, the court must determine what sanctions would be appropriate under the circumstances. The trial court should impose sanctions only upon those who actually abuse the discovery process and only in a manner consistent with the goals of deterring such conduct and correcting the resulting injustice. Courts must strike a careful balance in imposing sanctions. On one hand, the trial court should make clear that abuse of the discovery process is reprehensible and completely contrary to the orderly administration of justice. On the other hand, the trial court must avoid rulings that would serve to chill vigorous advocacy. In making its determination as to what sanctions would be appropriate in a particular case, the court should also consider the offending behavior in terms of the duty owed the court system. Attorneys, as officers of the court, should be held to a higher standard than others. Parties, however, should only be sanctioned for conduct in which they are actually implicated. For example, a party which, by virtue of contract, incapacity or incompetency, or the very nature of the lawsuit, has only limited control of his attorney and the course of litigation, should not be sanctioned for actions over which it had no control. Courts should strive to curb abuses of the judicial process by litigants and their attorneys, and should impose sanctions upon those who abuse the process in order to deter such misconduct. However, trial judges have an obligation, when imposing sanctions, to ensure that the punishment must fit the crime and is imposed only upon the actual offender or offenders.

---------

Notes:

[1] The local rules governing civil cases in Harris County provide: "Motions shall state a date of submission which shall be at least 10 days from filing, except on leave of court. The motion will be submitted to the court for

ruling on that date or later." Rule 3.3.2, Local Rules of the Civil Trial Division of the Harris County District Courts (1987). The March 17 submission date stated in TransAmerican's motion was only three days from the date of filing of the motion and the day after the deposition was scheduled.

[2] Rule 3.3.4 of the Local Rules of the Civil Trial Division of the Harris County District Courts (1987) allows any party to request oral argument on a motion if the party "views it as necessary." Neither TransAmerican nor Toma appears to have requested oral argument on any of their motions before May 12.

[3] Because of its brevity, we reproduce the court of appeals' opinion below rather than order it published as we would ordinarily do when granting relief:

### OPINION

Relator asks us to order respondent to withdraw his order imposing sanctions. This is a breach of contract case involving the failure of defective casing on gas wells. Relator filed suit against Toma Steel Supply, Inc. Toma filed a counterclaim against relator. Toma filed numerous third party claims against suppliers. Those suppliers have filed cross actions against Toma.

On May 12, 1989, respondent granted Toma's motion for sanctions against relator, striking relator's pleadings for the failure of its president, K. Craig Shephard, to appear for a May 2, 1989, deposition. Relator argues respondent's action constitutes an abuse of discretion.

A writ of mandamus is not properly granted in an ordinary case as relief from sanctions. Street v. Second Court of Appeals, 715 S.W.2d 638, 639-640 (Tex.1986).

The motion for leave is overruled.

### PER CURIAM

Motion for leave to file petition for writ of mandamus overruled June 16, 1989, and Opinion filed June 29, 1989.

Panel consists of Chief Justice J. Curtiss Brown and Justices Junell and Draughn.

Do Not Publish. TEX.R.APP.P. 90.

Justice Draughn would grant.

[4] Rule 215, paragraph 3 was amended, effective September 1, 1990, to require that sanctions be imposed only after notice and hearing and only as "appropriate". (Similar amendments were made at the same time in Rule 13, TEX.R.CIV.P.) However, the requirement that sanctions be appropriate was implicit in the rule before the amendment. Koslow's v. Mackie, 796 S.W.2d 700, 703 n. 1 (Tex.1990). In the context of Rule 215,

"appropriate" and "just" are equivalent standards.

[5] TransAmerican contends that Toma's notice to take Shephard's deposition on May 2 was not a "proper" discovery request under Rule 215, paragraph 2(b) because it issued after the discovery cutoff date set by Judge Powell. Toma responds that its request was proper because TransAmerican agreed that Shephard could be deposed after the cutoff, as permitted by the district court's scheduling order. TransAmerican answers even if there were a binding agreement to depose Shephard after the cutoff, no date was ever agreed to.

TransAmerican also contends that the hearing required by Rule 215, paragraph 2(b) is an oral hearing, not merely a submission of the issue on written motion and response, and that it was denied such a hearing before the imposition of sanctions. Further, TransAmerican argues that the notice required by Rule 215, paragraph 2(b) is at least ten days' notice, and that Toma's motion for sanctions was filed only four days before the district court ruled on it. Toma responds that TransAmerican did not request an oral hearing, that an oral hearing was not necessary and is not required by the rule, and that in any event, TransAmerican received an oral hearing on its motion to reconsider, thus satisfying any requirement of the rule. Toma also argues that Rule 215, paragraph 2(b), requires only reasonable notice, and that four days' notice to TransAmerican in this case was reasonable because TransAmerican was able to respond fully to the motion before the district court ruled.

Our resolution of the matter before us does not require that we address these arguments, and we express no view on any of them.

[6] JUSTICE GONZALEZ' concurring opinion sets out guidelines for assessing sanctions which have been identified in the context of applying Rule 11, FED.R.CIV.P. Post, at 920-922. Our analysis of this case does not require us to consider whether those factors or others are appropriate considerations in imposing sanctions. However, we do subscribe to the principle, inherent in the effort to state guidelines, that the trial court's discretion in assessing sanctions must be guided by a reasoned analysis of the purposes sanctions serve and the means of accomplishing those purposes.

[7] National Hockey League cites Rogers but not Hammond Packing, and does not refer to the rule of the latter that discovery sanctions cannot be used to dispose of the merits of a claim or defense unless the offending party's withholding of evidence warrants a presumption that its claim or defense is without merit. Nevertheless, the conduct sanctioned in National Hockey League was so egregious that it clearly would have justified the same ultimate sanctions under Hammond Packing. The Hammond Packing rule is not in doubt. That it has not been abandoned is further demonstrated in Insurance Corp. of Ireland, which came after National Hockey

League and reasserted the rule of Hammond Packing.

[8] Toma's motion for sanctions was based solely upon Shephard's failure to attend his deposition. As Toma itself stated in its response to TransAmerican's motion to refile its pleadings after they were struck: "[O]n May 12, 1989, the Court granted [Toma's] Motion for Sanctions against [TransAmerican] for TransAmerican's refusal to agree to a date certain for Mr. Craig Shephard's deposition and for the failure of its President, Mr. Craig Shephard, to appear for a properly noticed deposition on May 2, 1989, and struck TransAmerican's pleadings in their entirety." Notwithstanding this rather clear statement in the trial court, during this mandamus proceeding Toma has suggested that the district court properly sanctioned TransAmerican because it had abused the discovery process on other occasions. TransAmerican disputes Toma's assertions. While the district court would have been entitled to consider a pattern of discovery abuse in imposing sanctions, the record does not reveal the existence of any such pattern, Toma did not complain of one, and the district court does not appear to have found one.

[9] The district court made no findings to support the sanctions imposed. Rule 215 does not require a trial court to make findings before imposing discovery sanctions, and we do not add such a requirement here. We note only that we do not have the benefit of any explanation by the district court for the severity of its ruling. It would obviously be helpful for appellate review of sanctions, especially when severe, to have the benefit of the trial court's findings concerning the conduct which it considered to merit sanctions, and we commend this practice to our trial courts. See Thomas v. Capital Security Services, Inc., 836 F.2d 866, 882-883 (5th Cir.1988). Precisely to what extent findings should be required before sanctions can be imposed, however, we leave for further deliberation in the process of amending the rules of procedure.

[1] The omitted guidelines are specifically tailored to address the concerns of Federal Rule of Civil Procedure 11 and therefore are not appropriate for inclusion in this general discussion of sanctions.

[2] Although this is typically the least serious sanction available, some courts have attempted to use the reprimand as a method of embarrassing the lawyer who has committed the offense. For example the court could require the reprimanded lawyer to provide a certified copy of the reprimand order to the members of his law firm. See Huettig & Schromm, Inc. v. Landscape Contractors Council, 582 F.Supp. 1519, 1522-23 (N.D.Cal.1984), aff'd, 790 F.2d 1421 (9th Cir.1986).

[3] If a monetary fee is imposed, other factors should be considered by the trial court, including:

(1) The time and labor involved;

(2) The novelty and difficulty of the questions involved;

(3) The skill requisite to perform the legal service properly;

(4) The customary fee;

(5) Whether the fee is fixed or contingent;

(6) Time limitations imposed by the client or the circumstances;

(7) The amount involved and the results obtained;

(8) The experience, reputation and ability of the attorneys; and

(9) Awards in similar cases;

ABA Standards and Guidelines, 121 F.R.D. at 125-26.

The authority of a trial judge to assess a monetary fine as a sanction for abuse of the discovery process was disputed in Owens-Corning Fiberglas Corp. v. Caldwell, 807 S.W.2d 413, 415 (Tex.App.--Houston [1st Dist.] 1991, orig. proceeding). The court of appeals held that the trial court had no such authority under rule 215(3). However, in Braden v. Downey, 811 S.W.2d 922 (Tex.1991, orig. proceeding), we held that the trial judge did have such authority. A few days ago, the United States Supreme Court held that federal courts had inherent power to impose monetary sanctions on a litigant for bad-faith conduct. Chambers v. Nasco, Inc., 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).

[4] Sanctionable conduct may not necessarily be an ethical violation, however. See Golden Eagle Distrib. Corp. v. Burroughs Corp., 801 F.2d 1531, 1538-39 (9th Cir.1986).

[5] These remedies are essentially equivalent in degree depending on whether the plaintiff or the defendant is the offending party.

---------

922 S.W.2d 920 (Tex. 1996)

Harvey K. HUIE, Jr., Individually, as Independent Executor

of the Estate of Adeline M. Huie, Deceased, and as

Trustee of the Melissa Huie Chenault Trust, Relator

v.

The Honorable Nikki DeSHAZO, Judge, Respondent.

No. 95-0873.

Supreme Court of Texas.

February 9, 1996

Argued Nov. 30, 1995.

Rehearing Overruled June 28, 1996.

G. David Ringer, Timothy D. Zeiger, Michael D. McKinley, Dallas, Douglas W. Alexander, Austin, Dwight M. Francis, Dallas, for Relator.

Donovan Campbell, Jr., T. Wesley Holmes, James J. Hartnett, Jr., James J. Hartnett, Sr., Jack M. Kinnebrew, Gary E. Clayton, and Kim Kelly Lewis, Dallas, for Respondent.

Jay J. Madrid, R. Gregory Brooks, Madrid, Corallo & Brooks, P.C., Dallas, for J. Peter Kline, Robert L. Miars, John A. Beckert, Richard N. Beckert, Edward J. Rohling, Jack Craycroft and Harvey Hotel Corp.

Chief Justice PHILLIPS delivered the opinion of the Court, in which all Justices join.

The issue presented in this original mandamus proceeding is whether the attorney-client privilege protects communications between a trustee and his or her attorney relating to trust administration from discovery by a trust beneficiary. We hold that, notwithstanding the trustee's fiduciary duty to the beneficiary, only the trustee, not the trust beneficiary, is the client of the trustee's attorney. The beneficiary therefore may not discover communications between the trustee and attorney otherwise protected under Texas Rule of Civil Evidence 503. Because the trial court ruled otherwise, we conditionally grant writ of mandamus.

I

Harvey K. Huie, the relator, is the executor of the estate of his deceased wife, who died in 1980. Huie is also the trustee of

three separate testamentary trusts created under his wife's will for the primary benefit of the Huies' three daughters. One of the daughters, Melissa Huie Chenault, filed the underlying suit against Huie in February 1993 for breach of fiduciary duties relating to her trust. [1] Chenault claims that Huie mismanaged the trust, engaged in self-dealing, diverted business opportunities from the trust, and commingled and converted trust property. Huie's other two daughters have not joined in the lawsuit.

Chenault noticed the deposition of Huie's lawyer, David Ringer, who has represented Huie in his capacity as executor and trustee since Mrs. Huie's death. Ringer has also represented Huie in many other matters unrelated to the trusts and estate during that period. Before Chenault filed suit, Ringer was compensated from trust and estate funds for his fiduciary representation. Since the suit, however, Huie has personally compensated Ringer for all work.

Although Ringer appeared for deposition, he refused to answer questions about the management and business dealings of the trust, claiming the attorney-client and attorney-work-product privileges. Chenault subsequently moved to compel responses, and Huie moved for a protective order. After an evidentiary hearing, the trial court held that the attorney-client privilege did not prevent beneficiaries of the trust from discovering pre-lawsuit communications between Huie and Ringer relating to the trust. The court's order, signed July 19, 1995, does not cite to any of the exceptions under Texas Rule of Civil Evidence 503 or otherwise disclose the court's rationale. [2] The court held that the attorney-client privilege protected only communications made under the following circumstances: 1) a litigious dispute existed between Chenault and Huie; 2) Huie obtained legal advice to protect himself against charges of misconduct; and 3) Huie paid for the legal counsel without reimbursement from the estate or trust. The court accordingly ordered Ringer to answer questions relating to events before February 1993, when suit was filed and Huie began personally compensating Ringer. The court also held that the attorney-work-product privilege did not apply to communications made before Chenault filed suit, again without stating its reasoning.

The court of appeals, after granting Huie's motion for leave to file petition for writ of mandamus, subsequently vacated that order as improvidently granted, denying relief. After Huie sought mandamus relief from this Court, we stayed Ringer's deposition pending our consideration of the merits.

II

The attorney-client privilege protects from disclosure confidential communications between a client and his or her attorney "made for the purpose of facilitating the rendition of professional legal services to the client...." TEX.R.CIV.EVID. 503(b). This privilege allows "unrestrained communication and contact between an attorney and client in all matters in which the attorney's professional advice or services are sought, without fear that these confidential communications will be disclosed by the attorney, voluntarily or involuntarily, in any legal proceeding." *West v. Solito,* 563 S.W.2d 240, 245 (Tex.1978). The privilege thus "promote[s] effective legal services," which "in turn promotes the broader societal interest of the effective administration of justice." *Republic Ins. Co. v. Davis,* 856 S.W.2d 158, 160 (Tex.1993).

The Texas Trust Code provides that "[a] trustee may employ attorneys ... reasonably necessary in the administration of the trust estate." TEX.PROP.CODE § 113.018. Chenault

**Page 923**

does not dispute that Huie employed Ringer to assist Huie in the administration of the Chenault trust. Indeed, Chenault does not seriously dispute that an attorney-client relationship existed between Huie and Ringer about trust matters. [3] Further, Rule 503 contains no exception to the privilege for fiduciaries and their counsel. Chenault nonetheless contends that communications between Huie and Ringer regarding trust matters cannot be privileged as to Chenault, a trust beneficiary, even if the elements of Rule 503 are otherwise met. Chenault's primary argument is that Huie's fiduciary duty of disclosure overrides any attorney-client privilege that might otherwise apply.

Trustees and executors owe beneficiaries "a fiduciary duty of full disclosure of all material facts known to them that might affect [the beneficiaries'] rights." *Montgomery v. Kennedy,* 669 S.W.2d 309, 313 (Tex.1984). See also TEX.PROP.CODE § 113.151(a) (requiring trustee to account to beneficiaries for all trust transactions). This duty exists independently of the rules of discovery, applying even if no litigious dispute exists between the trustee and beneficiaries.

Chenault argues that the trustee's duty of disclosure extends to any communications between the trustee and the trustee's attorney. The fiduciary's affairs are the beneficiaries' affairs, according to Chenault, and thus the beneficiaries are entitled to know every aspect of Huie's conduct as trustee, including his communications with Ringer. We disagree.

The trustee's duty of full disclosure extends to all material facts affecting the beneficiaries' rights. Applying the attorney-client privilege does not limit this duty. In Texas, the attorney-client privilege protects confidential communications between a client and attorney made for the purpose of facilitating the rendition of professional legal services to the client. See TEX.R.CIV.EVID. 503(b). While the privilege extends to the entire communication, including facts contained therein, see *GAF Corp. v. Caldwell,* 839 S.W.2d 149, 151 (Tex.App.--Houston [14th Dist.] 1992, orig. proceeding); 1 STEVEN GOODE ET. AL, TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL, § 503.5 n. 15 (1993), a person cannot cloak a material fact with the privilege merely by communicating it to an attorney. See, e.g., *National Tank Co. v. Brotherton,* 851 S.W.2d 193, 199 (Tex.1993).

This distinction may be illustrated by the following hypothetical example: Assume that a trustee who has misappropriated money from a trust confidentially reveals this fact to his or her attorney for the purpose of obtaining legal advice. The trustee, when asked at trial whether he or she misappropriated money, cannot claim the attorney-client privilege. The act of misappropriation is a material fact of which the trustee has knowledge independently of the communication. The trustee must therefore disclose the fact (assuming no other privilege applies), even though the trustee confidentially conveyed the fact to the attorney. However, because the attorney's only knowledge of the misappropriation is through the confidential communication, the attorney cannot be called on to reveal this information.

Our holding, therefore, in no way affects Huie's duty to disclose all material facts and to provide a full trust accounting to Chenault, even as to information conveyed to Ringer. In the underlying litigation, Chenault may depose Huie and question him fully regarding his handling of trust property and other factual matters involving the trust. Moreover, the attorney-client privilege does not bar Ringer from testifying about factual matters involving the trust, as long as he is not called on to reveal confidential attorney-client communications.

The communications between Ringer and Huie made confidentially and for the purpose

**Page 924**

of facilitating legal services are protected. The attorney-client privilege serves the same important purpose in the trustee-attorney relationship as it does in other attorney-client relationships. A trustee must be able to consult freely with his or her attorney to obtain the best possible legal guidance. Without the privilege, trustees might be inclined to forsake legal advice, thus adversely affecting the trust, as disappointed beneficiaries could later pore over the attorney-client communications in second-guessing the trustee's actions. Alternatively, trustees might feel compelled to blindly follow counsel's advice, ignoring their own judgment and experience. See

*In re Prudence-Bonds Corp.,* 76 F.Supp. 643, 647 (E.D.N.Y.1948) (concluding that, without the privilege, "the experience in management and best judgment by [the trustee] is put aside ... which, in the end may result in harm to the [beneficiaries]").

Chenault relies on *Burton v. Cravey,* 759 S.W.2d 160 (Tex.App.--Houston [1st Dist.] 1988, no writ), for the proposition that the attorney-client privilege does not apply where a party has a right to information independently of the rules of discovery. In Burton, condominium owners filed a trial court mandamus action against the condominium association to enforce their statutory right to inspect the association's books and records. See TEX.PROP.CODE § 81.209; TEX.REV.CIV.STAT.ANN. art. 1396-2.23. The trial court allowed inspection of the records, including those in the possession of the association's attorney, finding as a factual matter that the attorney's records constituted part of the association's records. The court of appeals affirmed, holding that the attorney-client privilege did not apply in light of the owners' unqualified right of inspection. 759 S.W.2d at 162.

It is unclear whether the records at issue in Burton were merely records of the association in the possession of the attorney, or whether they contained separate confidential attorney-client communications. To the extent that they consisted of the former, we agree that they were not protected. See Brotherton, 851 S.W.2d at 199. However, to the extent that the court held that the owners' statutory right of inspection somehow trumped the privilege for confidential attorney-client communications, we disapprove of its holding, for the reasons previously discussed. We also disapprove of the court's dicta that the trial court could, in its discretion, decline to apply the attorney-client privilege even if all the elements of Rule 503 were met. See 759 S.W.2d at 162.

Chenault also relies on a study by the Section of Real Property, Probate and Trust Law of the American Bar Association, entitled Report of the Special Study Committee on Professional Responsibility--Counselling the Fiduciary. See 28 REAL PROP., PROB. & TR.J. 823 (1994). This study concludes that, while counsel retained by a fiduciary ordinarily represents only the fiduciary, the counsel should be allowed to disclose confidential communications relating to trust administration to the beneficiaries. Id. at 849-850. The study reasoned as follows:

The fiduciary's duty is to administer the estate or trust for the benefit of the beneficiaries. A lawyer whose assignment is to provide assistance to the fiduciary during administration is also working, in tandem with the fiduciary, for the benefit of the beneficiaries, and the lawyer has the discretion to reveal such information to the beneficiaries, if necessary to protect the trust estate. The interests of the beneficiaries should not be compromised by a barrier of confidentiality.

Id. Several English common-law cases, and treatises citing those cases, also support this view. See, e.g., In re Mason, 22 Ch.D. 609 (1883); Talbot v. Marshfield, 2 Dr. & Sm. 549 (1865); Wynne v. Humbertson, 27 Beav. 421 (1858). See also BOGART, THE LAW OF TRUSTS AND TRUSTEES, § 961 (2nd. ed. 1983); SCOTT, THE LAW OF TRUSTS, § 173 (3rd ed. 1967).

We decline to adopt this approach. We find the countervailing arguments supporting application of the privilege, discussed previously, more persuasive. Moreover, Rule 503 contains no exception applicable to fiduciaries

**Page 925**

and their attorneys. If the special role of a fiduciary does justify such an exception, it should be instituted as an amendment to Rule 503 through the rulemaking process. Ringer testified that he had the "fullest expectation" that his communications with Huie would be privileged. This expectation was justified considering the express language of Rule 503 protecting confidential attorney-client communications. We should not thwart such legitimate expectations by retroactively amending the rule through judicial decision.

We thus hold that, while a trustee must fully disclose material facts regarding the administration of the trust, the attorney-client privilege protects confidential communications between the trustee and his or her attorney under Rule 503. [4]

III

A

We also reject the notion that the attorney-client privilege does not apply because there was no true attorney-client relationship between Huie and Ringer. This argument finds support in some other jurisdictions, where courts have held that an attorney advising a trustee in connection with the trustee's fiduciary duties in fact represents the trust beneficiaries. Accordingly, the trustee has no privilege to withhold confidential communications from the beneficiaries. See, e.g., *Wildbur v. ARCO Chemical Co.,* 974 F.2d 631 (5th Cir.1992); *United States v. Evans,* 796 F.2d 264 (9th Cir.1986); *In the Matter of Torian,* 263 Ark. 304, 564 S.W.2d 521 (1978); *Riggs Nat'l Bank of Washington v. Zimmer,* 355 A.2d 709 (Del.Ch.1976); *In re Hoehl's Estate,* 181 Wis. 190, 193 N.W. 514 (1923). The court in Riggs reasoned as follows:

As a representative for the beneficiaries of the trust which he is administering, the trustee is not the real client in the sense that he is personally being served. And, the beneficiaries are not simply incidental beneficiaries who chance to gain from the professional services rendered. The very intention of the communication is to aid the

beneficiaries.... In effect, the beneficiaries were the clients of [the trustees' attorney] as much as the trustees were, and perhaps more so.

355 A.2d at 713-14.

We conclude that, under Texas law at least, the trustee who retains an attorney to advise him or her in administering the trust is the real client, not the trust beneficiaries. See *Thompson v. Vinson & Elkins,* 859 S.W.2d 617 (Tex.App.--Houston [1st Dist.] 1993, writ denied) (beneficiary lacked standing to sue trustee's attorney for malpractice, as no attorney-client relationship existed between them). "Client" is defined under Rule 503 as

a person, public officer, or corporation, association, or other organization or entity, either public or private, who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from him.

TEX.R.CIV.EVID. 503(a)(1). It is the trustee who is empowered to hire and consult with the attorney and to act on the attorney's advice. While Huie owes fiduciary duties to Chenault as her trustee, he did not retain Ringer to represent Chenault, but to represent himself in carrying out his fiduciary duties. Ringer testified, for example, that he has "never given any legal advice to Mrs. Chenault," and in fact had only seen her on a few isolated occasions. It would strain reality to hold that a trust beneficiary, who has no direct professional relationship with the trustee's attorney, is the real client. See *In re Prudence-Bonds Corp.,* 76 F.Supp. 643 (E.D.N.Y.1948); *Shannon v. Superior Court,*

Page 926

217 Cal.App.3d 986, 266 Cal.Rptr. 242, 246 (1990). We thus hold that Huie, rather than Chenault, was Ringer's client for purposes of the attorney-client privilege.

B

Chenault also advances an argument on post-submission brief to this Court that the trust itself was Ringer's real client. This approach, however, is inconsistent with the law of trusts. Mrs. Huie created the testamentary trusts by devising property to Huie as trustee. See TEX.PROP.CODE § 112.001(3). It is Huie that holds the trust property for the benefit of Chenault, and it is Huie that is authorized to hire counsel. See TEX.PROP.CODE § 113.018. The term "trust" refers not to a separate legal entity but rather to the fiduciary relationship governing the trustee with respect to the trust property. See TEX.PROP.CODE § 111.004. Ringer thus represented Huie in his capacity as trustee, not the "trust" as an entity.

IV

Chenault also argues that communications between Ringer and Huie should be disclosed under the crime-fraud exception to the attorney-client privilege. See TEX.R.CIV.EVID. 503(d)(1). Chenault does not argue that the alleged breaches of trust for which she is suing are crimes or fraud within this exception; rather, she contends that the failure to disclose communications in and of itself is fraud. Because we have held that the trustee's invocation of the attorney-client privilege does not violate his or her duty of full disclosure, we find Chenault's crime-fraud argument to be without merit.

V

A

The party resisting discovery bears the burden of proving any applicable privilege. See *State v. Lowry,* 802 S.W.2d 669, 671 (Tex.1991). Chenault argues that even if the attorney-client privilege is otherwise available, Huie failed to carry his evidentiary burden to establish its applicability in this case.

Ringer, who was allowed to give testimony in narrative form, testified in part as follows:

The questions that were propounded to me during my deposition by [Chenault's counsel] I believe were argumentative, and they sought to go at the very core of things I understood, things that I knew, or even questions that related to whether something occurred or not, would go to the essence of the advice and communication. I have always handled my work with Mr. Huie with the fullest expectation that my correspondence with him and my communications with him and his correspondence with me and his communication with me would be privileged.... I also have Mr. Huie's instruction and expectation that his communications be confidential....

Ringer did not specifically address any of the numerous certified questions before the court, and thus there is no testimony about whether or why each particular question calls for the disclosure of confidential communications. Chenault thus contends that Huie did not prove "what particular deposition testimony would entrench upon the alleged attorney-client privilege...." Huie responds that many of the questions on their face call for privileged communications, but at the same time concedes that other questions "arguably present a close question as to whether confidential attorney-client communications ... would be compromised."

The trial court's ruling is based on its conclusion that the attorney-client privilege does not apply to any pre-litigation communications between a trustee and the trustee's attorney, a contention we have rejected. In light of this holding, we believe the trial court should have an opportunity to consider, in the first instance, whether Huie has carried his evidentiary burden as to each of the certified questions for which Ringer claimed, on Huie's behalf, the attorney-client privilege. The court may, in its

discretion, receive further evidence from the parties.

B

Chenault further argues that many of the certified questions relate to federal tax returns

**Page 927**

filed by the estate. Relying on cases interpreting the federal attorney-client privilege, she contends that the privilege does not apply when an attorney is employed to prepare tax returns, as the attorney is primarily performing accounting, rather than legal, services. See, e.g., *In re Grand Jury Investigation,* 842 F.2d 1223, 1225 (11th Cir.1987); *United States v. Davis,* 636 F.2d 1028, 1043 (5th Cir.1981); *Canaday v. United States,* 354 F.2d 849, 857 (8th Cir.1966). But see *Colton v. United States,* 306 F.2d 633, 637 (2d Cir.1962), cert. denied, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963).

The attorney-client privilege embodied in Rule 503 requires that the communication be "made for the purpose of facilitating the rendition of professional legal services to the client...." The trial court, in considering whether Huie has met his evidentiary burden, should in the first instance determine whether this element is satisfied as to each of the certified questions.

VI

The trial court also overruled Huie's attorney-work-product objections as to communications made before the date Chenault filed suit. Huie contends that the work-product privilege protects communications made after 1988, the time when he contends that he anticipated litigation.

An attorney's "work product" refers to "specific documents, reports, communications, memoranda, mental impressions, conclusions, opinions, or legal theories, prepared and assembled in actual anticipation of litigation or for trial." *National Tank Co. v. Brotherton,* 851 S.W.2d 193, 200 (Tex.1993). The trial court did not rule on Huie's claims of work-product privilege independently of his claims of attorney-client privilege; rather, the court summarily overruled both of these claims as to all pre-litigation communications. It thus appears that the trial court concluded, as it did for the attorney-client privilege, that the work-product privilege simply does not apply in the fiduciary-attorney relationship prior to the time suit is actually filed.

We disagree with this conclusion. The policy reasons supporting the attorney-client privilege in the context of the fiduciary-attorney relationship support even more strongly the work-product privilege, as the latter protects the confidentiality of work prepared in anticipation of litigation. There can be little dispute that a fiduciary must be allowed some measure of confidentiality in defending against an anticipated suit for breach of fiduciary duty.

Further, we do not believe it is determinative that Ringer was compensated from trust funds, rather than by Huie personally, before Chenault filed suit. The determinative factor for the work-product privilege is instead whether litigation was anticipated. While we express no opinion on whether it was proper for Ringer to be compensated from trust funds for any work that may have been done in anticipation of litigation, we hold that any such impropriety would not abrogate the work-product privilege. See *Lasky, Haas, Cohler & Munter v. Superior Court,* 172 Cal.App.3d 264, 218 Cal.Rptr. 205 (1985) (public policy underlying full disclosure by trustee does not overcome work-product privilege, even where attorney is compensated from trust corpus).

Because the trial court concluded that the work-product privilege did not apply to materials or communications generated prior to the time suit was filed and Huie began personally compensating Ringer, it appears that the court never reached the issue of when Huie anticipated litigation. The court should therefore reconsider Huie's work-product objections in accordance with this opinion.

VII

Chenault argues that because the legal question confronting the trial court was an issue of first impression in Texas, the court could not have "abused its discretion" in resolving the issue, and thus mandamus relief is inappropriate. We disagree. "A trial court has no 'discretion' in determining what the law is or applying the law to the facts." *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992). Consequently, the trial court's erroneous legal conclusion, even in an

**Page 928**

unsettled area of law, is an abuse of discretion. See *Lunsford v. Morris,* 746 S.W.2d 471 (Tex.1988). Moreover, because the trial court's order compels the disclosure of potentially privileged information, Huie lacks an adequate remedy by appeal. See Walker, 827 S.W.2d at 843.

We therefore conditionally grant the writ of mandamus and direct the trial court to vacate its July 19, 1995, discovery order. The trial court shall reconsider Huie's claims of attorney-client and attorney-work-product privilege in accordance with this opinion. The court may in its discretion receive additional evidence from the parties.

---------

Notes:

[1] Chenault sued individually, as next friend of her minor daughter, and as next friend of her minor niece, who is under Chenault's conservatorship. Chenault also named several business associates of Huie as additional

defendants.

[2] The trial court initially relied on Texas Rule of Civil Evidence 503(d)(5), which creates an exception to the attorney-client privilege as between joint clients of an attorney regarding matters of common interest to the clients. The court, however, later amended its order to delete this reference.

[3] Chenault argues for the first time in a post-submission brief that Ringer represented the trust itself as an entity, rather than Huie as trustee. This argument is addressed in section III-B below.

[4] Chenault also argues that Huie, by accepting the appointment as trustee with knowledge of his duty of disclosure, impliedly waived the protection of the attorney-client privilege. Because we conclude that a trustee does not violate the duty of full disclosure by invoking the attorney-client privilege, we reject this waiver argument.

---------

**834 S.W.2d 4 (Tex. 1992)**

**Valorie W. DAVENPORT**

 **v.**

 **The Honorable Carolyn GARCIA.**

**No. D-1558.**

**Supreme Court of Texas.**

**June 17, 1992**

Rehearing Overruled Sept. 9, 1992.

Valorie W. Davenport, Houston, for appellant.

Marty R. Akins, B. Lee Ware, Russell B. Serafin, Tom L. Pettiette, Houston, for appellee.

OPINION

DOGGETT, Justice.

In this mandamus proceeding, we address three issues: (1) the ability of a judge to suppress speech with a "gag order;" (2) whether Relator was impermissibly denied access to court records; and (3) the appropriate standard for removal of a guardian ad litem. Applying our state constitutional

guarantee of free expression to invalidate the trial court's unconstitutional prior restraint on speech, we grant this part of the petition for writ of mandamus. Because the trial court did not otherwise abuse its discretion, the remainder of the petition is denied.

A guardian ad litem was appointed to represent two hundred and thirteen children among numerous persons who brought suit concerning toxic chemical exposure at the Brio Dump site in Harris County. In a 1987 settlement the adults released all claims to future medical benefits for their children, and in 1989 the ad litem withdrew. In February 1990 Judge Alice Trevathan, then the presiding judge, appointed Valorie Davenport, Relator herein, as guardian ad litem.

After eighteen months of work, Davenport submitted a bill for her services on August 21, 1991. At a hearing two days later, Judge Carolyn Garcia, who had become the presiding trial judge, on her own motion, questioned the continued need for a guardian ad litem. Additionally, the court entered an oral injunction, described as a "gag order," instructing the ad litem, parties and counsel to "cease and desist any discussion of this case outside the court hearing" and prohibiting any "communications with any other lawyer or discussion at all about the matters that have transpired in this case."

On September 10 the trial court dismissed Davenport, concluding that because the parents were no longer seeking either individual recovery or expense reimbursement, no conflict of interest existed to justify continuation of the ad litem. The court also found unnecessary ad litem oversight of a medical monitoring program proposed by defendants as part of a settlement. While noting that the parents' counsel had "competently handled [this] litigation" in "secur[ing] a generous settlement proposal for the minor children," Judge Garcia did not specify any change in circumstances following Judge Trevathan's appointment of Davenport. The next day, again on its own motion, the court entered a protective order requiring that:

1. Counsel in this case, present and former, are expressly ORDERED to refrain from discussing or publishing in writing or otherwise, any matters of this case with any persons other than their clients, agents, or employees in the necessary course of business in this case.

2. Counsel is ORDERED to refrain from any public comment, casual or otherwise concerning the facts of this case or the conduct of counsel in this case other than in a court hearing.

3. Counsel is ORDERED to inform their clients, witnesses, agents and representatives that this ORDER extends to each of them and is subject to a finding of contempt by this court from disobedience, direct or indirect comment intended to violate this ORDER. Counsel was and is directed to communicate with their clients only, and advise each that they are directed to refrain from discussing the case except with counsel.

I. The Gag Order

The trial court correctly characterized as a "gag order" its oral injunction of August 23, which prohibited all discussion of the Brio case outside the courtroom. Personally informed by the judge that she was "relieved of responsibility," and that she had "been ordered by the Court not to discuss the case with anyone," Relator risked contempt should she speak either in public or even in private to any of the children whose interests she had represented. Nor did the order permit any party to discuss the case or the pending settlement with a family physician, medical expert, or another attorney.

These limitations were reiterated in the written protective order of September 12, which prohibited any public comment or discussion of the litigation with

anyone not involved in the "necessary course of business of this case." Counsel were also directed to inform their clients of the order's applicability to each of them. The sole reason given for this sweeping injunction was the finding that "conflicts between counsel and the parents of the minor children were resulting in miscommunications

**Page 7**

with the parents of the children and with the media and general public."

We consider whether the court's gag orders violate the guarantee of free expression contained in article I, section 8 of the Texas Constitution, which provides in pertinent part:

Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege....

The history of this provision is a rich one, and its language demonstrates Texas' strong and longstanding commitment to free speech. By the plain language of our constitution, this fundamental liberty "shall forever remain inviolate." Tex. Const. art. I, § 29.

From the outset of this state's history, freedom of expression was a priority. As rural communities developed from the wilderness in the young region, Mexico passed the Constitutive Act of 1824, uniting Coahuila and Texas into one Mexican state. Already integrated into the government and with nine times the population of Texas, Coahuila predominated. After unsuccessful efforts to have the new state government forward their written complaints or remonstrances to the central government, [1] dissatisfied Texans sought in 1833 a Mexican state constitution separate from Coahuila. This first proposed constitution incorporated the strong desire of Texans to speak without fear of governmental repression:

The free communication of thoughts and opinions, is one of the inviolable rights of man; and every person may freely speak, write, print, and publish, on any subject, being responsible for the abuse of that liberty.

Proposed Constitution for the State of Texas (1833) art. 16, reprinted in Documents of Texas History, at 80 (Ernest Wallace ed. 1963). As an early advocate of a strong state constitution, [2] Stephen F. Austin was jailed for his outspokenness in personally carrying this proposed charter and other remonstrances to Mexico City. [3] The authoritarianism and unresponsiveness of Mexico to these attempts to exercise and establish protection of free speech were a contributing factor to Texas' revolution and independence. [4]

Although the 1836 Texas Independence Constitution in general closely tracked the wording of the United States Constitution, different language was chosen to protect speech:

Every citizen shall be at liberty to speak, write, or publish his opinions on any subject, being responsible for the abuse of that privilege. No law shall ever be passed to curtail the liberty of speech or of the press; and in all prosecutions for libels, the truth may be given in evidence, and the jury shall have the right to determine the law and fact, under the direction of the court.

Constitution of the Republic of Texas, Declaration of Rights § 4 (1836). [5] Rather than

**Page 8**

a restriction on governmental interference with speech such as that provided by the First Amendment of the United State Constitution, Texans chose from the beginning to assure the liberties for which they were struggling with a specific guarantee of an affirmative right to speak. This language of the Texas Independence Constitution became the model for all of our subsequent state constitutions.

At the 1845 constitutional convention, after renewed deliberation concerning the terms of the free speech provision, [6] the 1836 language was kept largely intact. [7] What had been the Declaration of Rights was, as otherwise revised, renamed the Bill of Rights and moved to a place of overriding prominence, at the outset of the Constitution. The next three constitutions in 1861, 1866, and 1869 retained this language amidst intense public debate over secession [8] and reconstruction.

The drafters of the 1876 Constitution began their convention with a heightened sensitivity of the need for a strong state constitution. [9] While major changes in the Bill of Rights were not initially anticipated, [10] vigorous debate ensued. [11] Delegate McLean's efforts to tie freedom of speech to "good motives" in the libel section was disapproved. [12] Additionally, a proposal to replace the existing free expression provision with alternative language more similar to that of the First Amendment of the United States Constitution was explicitly rejected. [13] By substituting the word "person" for the prior "citizen" in the current language of article one, section eight, "[e]very person shall be at liberty to speak, write, or publish his opinions on any subject," the delegates removed any citizenship requirement. Compare Tex. Const. of 1845, art. I, §§ 5-6. In their careful attention to its language, Texans once again chose protection in article one, section eight that is highly distinct from the First Amendment. Continued inclusion of an expansive freedom of expression clause and rejection of more narrow protections indicates a desire in Texas to ensure broad liberty of speech.

Consistent with this history, we have recognized that in some aspects our free speech provision is broader than the *First Amendment. O'Quinn v. State Bar of Texas,* 763 S.W.2d 397, 402 (Tex.1988) (noting that "Texas' free

speech right [has been characterized] as being broader than its federal equivalent," the court concluded that "it is quite obvious that the Texas

**Page 9**

Constitution's affirmative grant of free speech is more broadly worded than the first amendment"); *Channel 4, KGBT v. Briggs,* 759 S.W.2d 939, 944 (Tex.1988) (Gonzalez, J., concurring) (the state provision is "more expansive than the United States Bill of Rights"). See also *Casso v. Brand,* 776 S.W.2d 551, 556 (Tex.1989) ("our state free speech guarantee may be broader than the corresponding federal guarantee").

Under our broader guarantee, it has been and remains the preference of this court to sanction a speaker after, rather than before, the speech occurs. This comports with article one, section eight of the Texas Constitution, which both grants an affirmative right to "speak ... on any subject," but also holds the speaker "responsible for the abuse of that privilege." The presumption in all cases under section eight is that pre-speech sanctions or "prior restraints" are unconstitutional. *Ex Parte Price,* 741 S.W.2d 366, 369 (Tex.1987) (Gonzalez, J., concurring) ("Prior restraints ... are subject to judicial scrutiny with a heavy presumption against their constitutional validity."); *Amalgamated Meat Cutters v. Carl's Meat and Provision Co.,* 475 S.W.2d 300 (Tex.Civ.App.--Beaumont 1971, writ dism'd). [14]

In Ex Parte Tucker, 110 Tex. 335, 220 S.W. 75 (1920), this court applied section eight to safeguard speech which may not otherwise have been guaranteed under the First Amendment as interpreted in that era. That case involved an injunction prohibiting union members from "vilifying, abusing, or using ... epithets" against the employees of a particular company. While such "fighting words" may not have been federally protected, [15] the court relied upon our own constitution:

The purpose of [article one, section eight] is to preserve what we call "liberty of speech" and "the freedom of the press," and at the same time hold all persons accountable to the law for the misuse of that liberty or freedom. Responsibility for the abuse of the privilege is as fully emphasized by its language as that the privilege itself shall be free from all species of restraint. But the abuse of the privilege ... shall be dealt with in no other way. It is not to be remedied by denial of the right to speak, but only by appropriate penalties for what is wrongfully spoken. Punishment for the abuse of the right, not prevention of its exercise, is what the provision contemplates.

220 S.W. at 76. In two early prior restraint cases, the Court of Criminal Appeals also relied on the state constitution to void injunctions prohibiting publication of trial testimony. *Ex Parte McCormick,* 129 Tex.Cr.R. 457,

88 S.W.2d 104 (App.1935) (orig. proceeding); *Ex Parte Foster,* 44 Tex.Cr.R. 423, 71 S.W. 593 (App.1903).

This court previously indicated that a prior restraint would be permissible only when essential to the avoidance of an impending danger. *Hajek v. Bill Mowbray Motors, Inc.,* 647 S.W.2d 253, 255 (Tex.1983) (striking down an injunction because the language at issue "evoked no threat of danger to anyone and, therefore, may not be subject to the prior restraint of a temporary injunction."). See also *Dallas General Drivers, Warehousemen and Helpers v. Wamix, Inc. of Dallas,* 156 Tex. 408, 295 S.W.2d 873, 879 (1956); *Ex Parte Tucker,* 220 S.W. at 76 (speech is properly restrained only when involving an actionable and immediate threat); *Pirmantgen v. Feminelli,* 745 S.W.2d 576, 579 (Tex.App.--Corpus Christi 1988, no writ) (restriction

**Page 10**

against disseminating an allegedly libelous letter was an unconstitutional prior restraint).

Since the dimensions of our constitutionally guaranteed liberties are continually evolving, today we build on our prior decisions by affirming that a prior restraint on expression is presumptively unconstitutional. With this concept in mind, we adopt the following test: a gag order in civil judicial proceedings will withstand constitutional scrutiny only where there are specific findings supported by evidence that (1) an imminent and irreparable harm to the judicial process will deprive litigants of a just resolution of their dispute, and (2) the judicial action represents the least restrictive means to prevent that harm. Assisting our analysis are federal cases that have addressed prior restraints. The standard enunciated in *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 563-64, 96 S.Ct. 2791, 2804-05, 49 L.Ed.2d 683 (1976), does not, however, sufficiently protect the rights of free expression that we believe that the fundamental law of our state secures. Today we adopt a test recognizing that article one, section eight of the Texas Constitution provides greater rights of free expression than its federal equivalent. [16]

We are fully aware that a prior restraint will withstand scrutiny under this test only under the most extraordinary circumstances. That result is consistent with the mandate of our constitution recognizing our broad right to freedom of expression in Texas. An individual's rights under the state constitution do not end at the courthouse door; rather, the courthouse is properly the fortress of those rights.

The first requirement of our standard advances from the prior holdings of Texas courts that only an imminent, severe harm can justify prior restraint, and in the context of gag orders, that harm must be to the judicial process. *Ex Parte McCormick,* 88 S.W.2d 104; *Ex Parte Foster,* 71 S.W. at 595. The mandate that findings of irreparable

harm be made is based on our state constitutional preference for post-speech remedies. Only when no such meaningful remedies exist will prior restraints be tolerated in this context.

The second part of the test is intended to ensure that no alternative exists to treat the specific threat to the judicial process which would be less restrictive of state speech rights. While this element is shared in common with the ruling in Nebraska Press, 427 U.S. at 563-64, 96 S.Ct. at 2804-05, [17] we view the federal test announced

**Page 11**

therein [18] as too permissive toward prior restraints and decline to adopt it. [19] The federal approach offers only limited guidance concerning gag orders such as that involved here, which restrict access to information by prohibiting individuals from discussing a case. [20] Such orders should be treated like any other prior restraint.

Applying this test to the facts of this case, there can be no doubt but that the gag orders violated article one, section eight of the Texas Constitution. The orders fail to identify any miscommunication that the trial court may have perceived, does not indicate any specific, imminent harm to the litigation, and offers no explanation of why such harm could not be sufficiently cured by remedial action. For instance, had any miscommunication stemmed from improper statements by Relator, as implied by the court, the proper response may have been to sanction her conduct. By stopping not only the purported miscommunications but any communications, the broadly worded injunction certainly fails the second part of our test.

While a gag order may be expeditious in producing a settlement, decisions to terminate litigation based on lack of information can facilitate injustice. Additionally, "the argument of convenience can have no weight as against those safeguards of the constitution which were intended by our fathers for the preservation of the rights and liberties of the citizen." *Ex Parte McCormick,* 88 S.W.2d at 107. These liberties are central to the Texas Constitution. We have before announced:

Let it at once be admitted that courts may arrogate the authority of deciding what the individual may say and may not say, what he may write and may not write, and by an injunction writ require him to adapt the expression of his sentiments to only what some judge may deem fitting and proper, and there may be readily brought about the very condition against which the constitutional guaranty was intended as a permanent protection. Liberty of speech will end where such control begins.

*Ex Parte Tucker,* 220 S.W. at 76 (emphasis added). We conclude today, as we did over seventy years ago, that the judicially imposed gag orders in question are void.

II. The Role of the State Constitution

Having found that the trial court's gag orders violate article I, section 8 of the Texas Constitution, this court need not consider whether the United States Constitution has also been violated. Today we reaffirm our prior pronouncement that "[o]ur constitution has independent vitality, and this court has the power and duty to protect the additional state guaranteed rights of all *Texans."* *LeCroy v. Hanlon,* 713 S.W.2d 335, 339 (Tex.1986). We decline to

**Page 12**

limit the liberties of Texans to those found in the Federal Constitution when this court is responsible for the preservation of Texas' own fundamental charter. When a state court interprets the constitution of its state merely as a restatement of the Federal Constitution, it both insults the dignity of the state charter and denies citizens the fullest protection of their rights.

A.

Over the past twenty years, state courts have increasingly looked to their own constitutions, rather than the Federal Constitution, in examining the extent of their citizens' liberties. [21] This trend toward what has variously been called "state constitutionalism" and "new federalism" has met with broad approval. [22] Numerous commentators and courts, both state and federal, have advocated and applied a method of constitutional analysis wherein the state court may examine its own constitution first to determine whether the right in question is protected. [23] Within the context of such an analysis, a state court can benefit

**Page 13**

from the insights of well-reasoned and developed federal jurisprudence, but is not compelled to reach identical results.

Our courts recognized the importance of our state constitution long before "new federalism" even had a name. A century-long line of Texas cases support applying our state's constitution, [24] particularly in the area of free speech. Our decision in 1920 to rely on the plain language of article I, section 8 in striking down a prior restraint in *Ex Parte Tucker,* 220 S.W. at 76, predated the application of the First Amendment to the states. See *Ex Parte Price,* 741 S.W.2d 366, 369 (Tex.1987) (Gonzalez, J., concurring). [25]

In *Traveler's Insurance Co. v. Marshall,* 124 Tex. 45, 76 S.W.2d 1007, 1010 (1934), this court struck down a state statute solely under the Texas Constitution, dismissing relevant caselaw interpreting a similar federal constitutional provision regarding the state's police power because "it can have no application to the Constitution of Texas." The court explained that "[i]t is quite obvious the

same rule of interpretation cannot be applied to the contract clause in our State Constitution...." Id., 76 S.W.2d at 1011.

In *Sax v. Votteler,* 648 S.W.2d 661 (Tex.1983), we invalidated a statute of limitations under the Texas Constitution's open courts provision. While expressly recognizing that the appeal was brought under both federal and state law, id. at 663, the court concluded that because article I, section 13 "does accord Texas citizens additional rights, we choose not to decide this case on the basis of the United States Constitution." Id. at 664. [26] Holding legislation increasing a filing fee unconstitutional under the state open courts provision, we noted in LeCroy, 713 S.W.2d at 338, that "state constitutions can and often do provide additional rights for their citizens." [27] We relied on the Texas Constitution because "[b]y enforcing our constitution, we provide Texans with their full individual rights and strengthen federalism." Id. at 339 (emphasis added). In doing so we observed that Texas is "in the mainstream of

**Page 14**

this [state constitutionalism] movement." Id. at 338. The next year, the court voided a gender-based distinction in the Family Code based solely on the *Texas Constitution. In re Baby McLean,* 725 S.W.2d 696, 698 (Tex.1987) ("[b]ecause we hold that [a provision] of the Texas Family Code violates the Texas Constitution, we need not reach the federal law issues"). Hence, in the past decade this court has strongly reaffirmed its continued commitment to our state constitution. [28]

This approach has also been embraced by our sister court, the Texas Court of Criminal Appeals. We give thoughtful consideration to that court's analysis in part to avoid conflicting methods of constitutional interpretation in our unusual system of bifurcated highest courts of appeal. See *Commissioners' Court of Nolan County v. Beall,* 98 Tex. 104, 81 S.W. 526, 528 (1904). As noted above, in two early prior restraint cases, the Court of Criminal Appeals applied the state constitution to strike down orders that the press not publish testimony until after a trial was completed. In *Ex Parte Foster,* 71 S.W. 593, the court looked both to Texas' free speech clause and also our guarantee of public trials. Id. at 595. A year after this court decided Traveler's Insurance Co. v. Marshall, the Court of Criminal Appeals again relied on the state constitution in deciding *Ex Parte McCormick,* 88 S.W.2d 104, an equally notable case. [29] Most recently in *Heitman v. State,* 815 S.W.2d 681 (Tex.Crim.App.1991) (en banc), the argument that the Texas Constitution intended harmony with the federal Fourth Amendment was disavowed. Id. at 682. The court explained that it "may review and 'rethink' federal constitutional decisions and thereby ensure that ... [Texas] citizens will have the 'double security' the federal constitution was intended to provide." Id. at 687. After analysis of the history and placement of the Bill of Rights

in our constitution, the court concluded that "[c]learly our own state constitution was not intended by our own founding fathers to mirror that of the federal government." Id. at 690.

This commitment of Texas to its own constitution is consistent with the principle of federalism embodied in the United States Constitution. Its authors intended that "[i]n the compound republic of America, the power surrendered by the people is divided between two distinct governments.... Hence a double security arises to the rights of the people." The Federalist No. 51, at 323 (James Madison) (Clinton Rossiter ed., 1961) (emphasis added). The United States Supreme Court has long recognized that "[i]t is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions." *Minnesota v. National Tea Co.,* 309 U.S. 551, 557, 60 S.Ct. 676, 679, 84 L.Ed. 920 (1940). It has reiterated its unwillingness to "limit the authority of the State ... to adopt in its own Constitution individual liberties more expansive than those conferred by the *Federal Constitution." Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 2040, 64 L.Ed.2d 741 (1980). Noting that the language of the Texas Constitution's due process and equal protection clauses is broader than the federal, it has concluded that:

[A] state is entirely free to read its own State's constitution more broadly than this Court reads the Federal Constitution, or to reject the mode of analysis used by this Court in favor of a different analysis of its corresponding constitutional guarantee.

**Page 15**

*City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 293, 102 S.Ct. 1070, 1077, 71 L.Ed.2d 152 (1982). [30] Indeed, the failure of a state judiciary to rely on its own constitution has appropriately been criticized for "thereby increas[ing] its own burdens as well as ours." *Massachusetts v. Upton,* 466 U.S. 727, 735, 104 S.Ct. 2085, 2089, 80 L.Ed.2d 721 (1984) (per curiam) (Stevens, J., concurring). [31]

The only limit on the states is that, in relying on their constitutions, they may not deny individuals the minimum level of protection mandated by the Federal Constitution. See Sax, 648 S.W.2d at 664 ("While it is true that state constitutional protections cannot subtract from those rights guaranteed by the United States Constitution, there certainly is no prohibition against a state providing additional rights for its citizens."); *LeCroy v. Hanlon,* 713 S.W.2d at 338. This approach has been referred to as a "federal safety net," ensuring that individuals receive all available guarantees of their rights. Shirley S. Abrahamson, Reincarnation of State Courts, 36 Sw.L.J. 951, 959 (1982).

The involvement of state courts is particularly appropriate in the protection of free speech rights. Both

state and federal courts have recognized such rights "as involving community standards and local trends." Judith S. Kaye, A Midpoint Perspective on Directions in State Constitutional Law, 1 Emerging Issues in St.Const.L. 17, 23 (1988). Particularly in the context of judicial proceedings, state courts have long been involved with the protection of speech rights. [32] In the current case, the state interest is all the greater since at issue is the order of a Texas judge instructing members of the Texas bar and their Texan clients not to discuss a case ongoing in a Texas court with anyone.

B.

Our Texas charter bears the distinction of being one of the few state constitutions that were derived from its own independent, national constitution. See M.P. Duncan III, Terminating the Guardianship: A New Role for State Courts, 19 St. Mary's L.J. 809, 839 (1988) (hereinafter Duncan, State Courts ). [33] As we emphasized in LeCroy,

**Page 16**

"[t]he powers restricted and the individual rights guaranteed in the present constitution reflect Texas' values, customs, and traditions." 713 S.W.2d at 339. The diverse drafters of our Constitution represented a "heterogenous miscellany of opinions." [34] The experiences and philosophies of this group were far different than those who sat in a Philadelphia meeting hall a century earlier. [35] As expressed by one commentator, "[o]ur Texas Forbears surely never contemplated that the fundamental state charter, crafted after years of rugged experience on the frontier and molded after reflection on the constitutions of other states, would itself veer in meaning each time the United States Supreme Court issued a new decision." James C. Harrington, The Texas Bill of Rights 41 (1987). [36]

Our state had a unique opportunity to address issues of state constitutionalism and federalism in the 1875 constitutional convention. Though some Texans feared that convening such a gathering so soon after Reconstruction would indicate too much independence from the federal government, [37] the convention was held. In the election of 1873, Democrats swept most state offices, including Richard Coke as Governor. Confronting the propriety of this election in Ex Parte Rodriguez, 39 Tex. 705 (1874), the Texas Supreme Court relied primarily on federal caselaw and the placement of a semicolon to declare the election illegal under the Texas Constitution. [38] The newly elected officials nonetheless came to Austin [39] and enacted a constitutional amendment reorganizing the

**Page 17**

Supreme Court, which enabled Governor Coke to remove all three justices.

Just as our history is distinctive in its insistence that our constitution is of independent force, so is the very letter of that fundamental document. The Texas Constitution begins with the declaration that: "Texas is a free and independent State, subject only to the Constitution of the United States, and the maintenance of our free institutions and perpetuity of the Union depend upon the preservation of the right of local self-government, unimpaired to all the States." Tex.Const. art. I, § 1. Citing this article as a reason for ratifying the 1876 Constitution, Governor Coke explained that:

[T]he new constitution declares, not as does the old one, that ... the perpetuity of our free institutions depends upon the preservation unimpaired of the right of local self-government to all the States. The reassertion of these great principles of government, and the expulsion from our organic law of that insult to the intelligence of the people of Texas, which denies them the right of self-government, their heritage and birthright ... and declares them [mere] vassals and serfs of [the federal government], is worth a thousand fold the cost and effort expended in making the new constitution, even if no other changes had been made.

Address of Governor Coke, in Ratify, Galveston Daily News, Dec. 19, 1875 at 2, col. 4 (emphasis added) (hereinafter Coke Address). [40] The prominent language of section one and the words of its framers clarify that our current Constitution intends to maintain the vitality and independence of our state law to the extent permissible under the Federal Constitution.

Basing decisions on the state constitution whenever possible avoids unnecessary federal review. This not only lessens federal interference into state issues, but also results in "efficient judicial management." [41] This approach relieves the overburdened docket of the United States Supreme Court, and spares state courts from having to deal anew with cases on remand. See Upton, 466 U.S. at 735, 104 S.Ct. at 2089 (Stevens, J., concurring). This efficiency is evidenced by several recent cases in which state courts decided that protection was available to an individual under the federal constitution, only to have the decision reversed by the Supreme Court. [42] Justice Hans Linde, formerly of the Oregon Supreme Court, explains that in each of those cases:

[T]he state's appellate court was convinced of an important constitutional right. In each case, that right was guaranteed by the state's own constitution.... [T]hese cases did not need to go to the United States Supreme Court. The Court's nationwide pronouncement on those issues were not necessary. The cases could have ended with the state court's decisions if the state courts had not chosen otherwise. [43]

Subsequently, several state courts on remand relied

on state law to reach the same result originally reached under their reading

**Page 18**

of the federal law. [44] Such a cumbersome and time-consuming process obviously contributes little to an efficient judiciary. The soundest way to avoid such unnecessary review and delay for litigants is to rely on the state constitution in the first instance.

Once the state court turns to its own constitution, it both enables a local voice in the judicial process and ensures its role as a national leader. "State constitutions allow the people of each state to choose their own theory of government and of law, within what the nation requires, to take responsibility for their own liberties, not only in courts but in the daily practice of government." [45] A state's constitution "is a fit place for the people of a state to record their moral values, their definition of justice, their hopes for the common good. A state constitution defines a way of life." [46] The revival of "new federalism" has thus "returned popular constitutionalism to the American stage." [47] State constitutions "lead all of us to face closer to home some fundamental values that the public has become accustomed to have decided for them by the faraway oracles in the marble temple." Hans A. Linde, First Things First: Rediscovering the States' Bills of Rights, 9 U.Balt.L.Rev. 379, 395 (1980) (hereinafter Linde, First Things First ).

While reflecting local concerns and assuring local accountability, reliance by this court on our own constitution allows Texas to have a meaningful voice in developing this nation's jurisprudence. What Justice Brandeis wrote sixty years ago regarding state legislatures is now particularly applicable to state judicial action: "It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann,* 285 U.S. 262, 311, 52 S.Ct. 371, 386-87, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting). [48] Just as other states may rely on unique Texas law developed independently by the legislature and judiciary of this state, this court has a growing responsibility as one of fifty laboratories of democracy to assist the federal courts in shaping the fundamental constitutional fabric of our country. [49] The poet

**Page 19**

who only quotes the works of others is destined to be both ignored and forgotten. [50]

As a state court, sitting in Texas, our expertise is in Texas law, our judges are Texas citizens and members of the Texas Bar, and our concerns are Texas concerns. If we simply apply federal law in all cases, why have a

Texas Constitution, and why have a Texas Supreme Court? We agree that "it is fundamentally illogical for a state court to skip past guarantees provided in the state's own law, for which the court itself is responsible, and then to conclude that its state falls short of the national standards...." Linde, New Federalism, at 256.

C.

Having concluded that there are numerous reasons why the state constitution should be applied, we are left to consider how to apply it. Today's opinion has centered on a historical review to understand the origins of our liberties as Texans and the intentions of our forebears. This focus should not, however, be misconstrued to suggest any deviation from our traditional method of constitutional interpretation. In *Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d 391 (Tex.1989), we outlined an appropriate approach:

In construing [a provision of the Texas Constitution], we consider "the intent of the people who adopted it." In determining that intent, "the history of the times out of which it grew and to which it may be rationally supposed to have direct relationship, the evils intended to be remedied and the good to be accomplished, are proper subjects of the inquiry." However, because of the difficulties inherent in determining the intent of voters over a century ago, we rely heavily on the literal text. We seek its meaning with the understanding that the Constitution was ratified to function as an organic document to govern society and institutions as they evolve through time.

Id. at 394 (citations omitted). See also *Damon v. Cornett,* 781 S.W.2d 597 (Tex.1989); *Vinson v. Burgess,* 773 S.W.2d 263 (Tex.1989). [51]

Our rich history demonstrates a longstanding commitment in Texas to freedom of expression as well as a determination that state constitutional guarantees be given full meaning to protect our citizens. But historical analysis is only a starting point. The constitution of our state is an organic document. Edgewood, 777 S.W.2d at 394. In no way must our understanding of its guarantees be frozen in the past; rather, our concept of freedom of expression continues to evolve over time. See id. Forms of expression not widely approved in 1875 may well demand state constitutional protection today, just as new methods of infringing on speech may require new methods of protection tomorrow. [52]

**Page 20**

In interpreting our constitution, this state's courts should be neither unduly active nor deferential; rather, they should be independent and thoughtful in considering the unique values, customs, and traditions of our citizens. With a strongly independent state judiciary, Texas should borrow from well-reasoned and persuasive federal procedural and substantive precedent when this is

deemed helpful, [53] but should never feel compelled to parrot the federal judiciary. [54] With the approach we adopt, the appropriate role of relevant federal case law should be clearly noted, in accord with *Michigan v. Long,* 463 U.S. 1032, 1040-41, 103 S.Ct. 3469, 3476-77, 77 L.Ed.2d 1201 (1983) (presuming that a state court opinion not explicitly announcing reliance on state law is assumed to rest on reviewable federal law). A state court must definitely provide a "plain statement" that it is relying on independent and adequate state law, [55] and that federal cases are cited only for guidance and do not compel the result reached. Id. at 1040-41, 103 S.Ct. at 3476-77. See also William J. Brennan, The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights, 61 N.Y.U.L.Rev. 535, 552 (1986). Long offers further reason for developing state constitutional law, since now courts, rather than merely adjudicating state constitutional claims, must be prepared to defend their integrity by both quantitatively and qualitatively supporting their opinion with state authority." Duncan, State Courts, at 838. Consistent with this method, we may also look to helpful precedent from sister states in what New Jersey Justice Stewart Pollock has described as "horizontal federalism." Stewart G. Pollock, Adequate and Independent State Grounds as a Means of Balancing the Relationship Between State and Federal Courts, 63 Tex.L.Rev. 977, 992 (1985). [56]

Our consideration of state constitutional issues is encumbered when they are not

**Page 21**

fully developed by counsel. Many of our sister states, when confronted with similar difficulties, have nevertheless decided cases solely on state grounds or ordered additional briefing of the state issue. [57] We will follow this procedure as necessary and appropriate, when asserted state grounds have not been adequately briefed. [58]

D.

Rejecting our careful and detailed analysis of the development and interpretation of article one, section eight, the concurrence advances an alternative--Texas judges should follow, but never lead, federal jurisprudence. Whenever both federal and state constitutional provisions "overlap or correspond," 834 S.W.2d at 40, the Texas judge should never diverge from the path taken by the federal judiciary. No aspect of Texas history, no series of Texas decisions such as that present here should obscure the obligation of adherence to federal authority.

Texans, we are told, must journey along the "well-traveled road of [federal constitutional] jurisprudence." Id. at 29. "[I]t is inefficient to blaze a trail through the wilderness when there is a perfectly good highway there already, built at considerable expense, and

well traveled." Id. at 40. A traveller relying upon the concurrence's map will, however, find considerable detail missing--the road is marred with chugholes; unmarked detours appear; new roadblocks arise. The most crucial part of the route is just a dotted line where road construction has not yet even gotten underway. Viewed from this jurisprudential federal interstate charted by the concurrence, the history of the Texas Constitution is a mere farm to market road; the past decisions of this court, only undistinguished country lanes.

The fallacy in the concurrence's roadwork is shown by both the federal law upon which it relies [59] and the state law upon which it does not. Because a prior restraint of the type involved here has not previously been the subject of an adequate pronouncement from Washington, the concurrence must search elsewhere for the federal mandate by which all Texans are to be bound. Its dim new travel beacon is *Bernard v. Gulf Oil Co.,* 619 F.2d 459, 467 (5th Cir.1980) (en banc), aff'd on other grounds, 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981). Described by the concurrence as "[t]he principal authority appl[icable]," 834 S.W.2d at 26, Bernard today achieves a renown which it has not previously enjoyed. Nevertheless, we learn much from carefully reviewing it. The complexity and unpredictability of federal law reflected in Bernard is evidenced by the fact that the relevant issue there was initially decided the opposite way, [60] was reconsidered in part because no other federal appellate court had ever ruled on it, [61] was decided on a very splintered vote, and thereafter disregarded by the United States Supreme Court. [62] On only three occasions have even the federal courts extracted a test from Bernard. [63] Solely by

**Page 22**

the most particularized selection of some of the many considerations in that procedurally unique case can the concurrence begin to construct the elements of a test having remote similarity with that we adopt today.

The concurring justices recite a method for interpretation of our state constitutional guarantees that closely parallels our traditional approach in Edgewood and other cases [64] with one notable twist. They add an entirely new element [65] and then proceed to reject each factor with the exception of this one new arrival--federal precedent. [66] Although differences in the language of the state and federal constitutional free speech provisions are declared to be as "plain as day," 834 S.W.2d at 32, those differences are repudiated as meaningless.

Despite the purported need to look to the historical context in which the provision was written, the concurrence trivializes the rather extensive historical discussion which we offer. [67] From our treasured state heritage, law and institutions, the concurrence claims, we can derive nothing. Only federal law, based on different language, different history and different cases, can

resolve the issue we face today.

Our attempt to give effect to what is indelibly written into our state constitution is dismissed in a series of buzzwords: "chauvinism," "arrogan[ce]" "autonomy," and "liberal agenda." Id. at 41, 43, 39 & 43. Instead, the concurrence urges that we exclude any considerations specific to Texas in favor of conformity to a federal standard. Claiming that Texas was never "unique nor first," id. at 33, the concurrence accuses the court of disrupting the harmony among the states regarding free speech nationwide. Id. at 25. We do not say that the Texas guarantee of free expression inevitably varies in all particulars from the federal, or that of New York or California. Rather, consistent with the very diversity that supplies strength to our union, we build from experience in Texas and elsewhere to enhance individual liberty. The national jurisprudence benefits as states across our country offer similar contributions. As individual voices develop strength and tone, so does the grand chorus improve.

After ignoring all that is unique to Texas, the concurring justices repeatedly accuse the court of disregarding relevant federal law when we quite obviously do not. Id. at 25, 35 & 38-39. Federal decisions are potentially helpful but do not inextricably bind Texas in analyzing our constitution. Failing to differentiate between thoughtful review and unquestioning acceptance of federal rulings, the concurrence also mistakenly assumes that independent interpretation must necessarily yield a different result than that achieved by the federal judiciary. This, of course, is not true. Our investigation may reveal federal authority so complete, so well reasoned, and so consistent with the provisions of the Texas Constitution in protecting individual liberties that we reach the same conclusion. Certainly there may be some "congruence" between state and federal constitutions. Id. at 34. First Amendment jurisprudence is not irrelevant, but rather

**Page 23**

an important body of law to be referenced when well-reasoned.

The concurrence next suggests that the record in this case does not support extensive writing on our state constitutional free speech guarantee. [68] All of this masks a very simple truth--if the parties here had dealt exclusively and extensively with the development and scope of our Texas Constitution, if they had "fully presented" it, the court would still be chastised for relying upon a state provision that has not "grown and developed over time," id. at 30, and that represents "largely uncharted terrain." Id. at 29. Even with the most completely briefed and argued cause, the concurrence would still seek marching orders from the federal judiciary. We prefer self-reliance. What we accept today is the responsibility to conduct a thoughtful, complete, and independent search for a sound understanding of our most fundamental state law.

III. The Court Records

Relator contends that she and several parents were denied access to the records in this case after the gag order went into effect. She argues that this constitutes an unwritten sealing order, in violation of Rules 76 and 76a of the Texas Rules of Civil Procedure. One such parent whose child was not represented by the principal plaintiffs' attorneys, Akins and Pettiette, was repeatedly told by a court clerk the file was "sealed" and that "the Judge had put a gag order on the file." Affidavit of Cheryl Finley. Another parent swore that he was told by Judge Garcia personally that the record was "closed until after the settlement hearing." Affidavit of Larry Carter. The co-owner of a community newspaper indicates that she and the paper's editor were told by a court clerk that the record was "sealed." Affidavit of Marie Flickinger. The former Official Court Reporter for the 151st District Court in Harris County explained that a local reporter had requested access to the transcript of a hearing which considered whether the firm which would potentially administer a settlement had acted improperly. Affidavit of Jacquelyn Miles. When the Court Reporter told the court about this request, "Judge Garcia informed [her] that the file was sealed to members of the general public until after the settlement had been finalized." Id. [69]

The Real Parties in Interest, Joseph Edward Powell and Farm & Home Savings Association respond that Judge Garcia never ordered the file sealed. They present an affidavit from the Clerk of the 151st District Court which maintains that "there is no order sealing this file by Judge Garcia," and also that "Judge Garcia has not told me that access to this file is restricted, nor, to my knowledge, has she told anyone else that access to this file is restricted." Affidavit of Chris Sarrat. A parent of one of the children represented by Akins and Pettiette also states that Judge Garcia never represented to her that the files were sealed, and that she was never prohibited from looking at the court's file. Affidavit of Janice Villanueva.

Court records "are presumed to be open to the general public." Tex.R.Civ.P.

**Page 24**

76a(1), and access to them is separately guaranteed to "[e]ach attorney at law practicing in any court ... at all reasonable times to inspect." Tex.R.Civ.P. 76. The sealing of a record must meet the procedural prerequisites set forth in Rule 76a of the Texas Rules of Civil Procedure. See *Chandler v. Hyundai Motor Co.,* 829 S.W.2d 774 (1992) (per curiam). A court may not escape the strict obligations of those rules by tacitly closing the record through an unwritten order.

In this instance, however, we are presented with

conflicting affidavits as to whether the court records were made available to the public. These affidavits create a fact issue which this court may not address on mandamus. See *Brady v. Fourteenth Court of Appeals,* 795 S.W.2d 712, 714 (Tex.1990, orig. proceeding). Additionally, it is the understanding of this court that with the gag order lifted, there should be no impediment to viewing the court records. If, after this opinion issues, Relator should find her access to the records in any way obstructed, she remains free to pursue appropriate remedies.

IV. Removal of the Guardian ad Litem

Relator also urges that she was improperly dismissed as ad litem. While much has been written about the standards for such appointments, there is little guidance on the standard for removal. Relator contends that the appropriate standard is one based on best interest of the child, and the record reveals that Relator may well have acted in that interest, sometimes bringing issues to the court's attention which might not have otherwise been considered. Under the Probate Code a "best interest of the ward" standard is applied in determining the circumstances under which a guardianship can be moved to another county and a guardian replaced. Tex.Prob.Code § 123. Other states have applied a similar standard to removal of ad litems in general. [70]

Under our current procedural rules, however, the sole circumstance in which a guardian ad litem can be appointed is when a minor "is represented by a next friend or guardian who appears to the courts to have an interest adverse to such minor." Tex.R.Civ.P. 173 (emphasis added). This rule as written seems to contemplate only a conflict of interest standard.

Since the trial court's September 1991 dismissal order specifically determined that there was "no conflict of interest," and since the record reflects no such conflict, we find no abuse of discretion.

Summary

We grant Relator's petition in part and hold that the trial court's gag order is in violation of article I, section 8, of the Texas Constitution. Because the existence of an unwritten sealing order raises a fact issue, we do not address that question. Finally, we determine that the trial court did not abuse its discretion in dismissing Relator as ad litem, and deny the remainder of Relator's petition.

Concurring Opinion by HECHT, J., joined by COOK and CORNYN, JJ.

PHILLIPS, C.J., not sitting.

HECHT, Justice, joined by COOK and CORNYN, Justices, concurring in the judgment.

I join in the Court's judgment, but not in its opinion. I agree that mandamus should issue directing the respondent district court to vacate the gag orders of which relator complains, but not to reinstate relator as guardian ad litem. I also agree that we should not direct the district court to allow relator access to court records when relator has failed to establish that her access to those records has been restricted. I differ

**Page 25**

with the Court's reasons for these decisions, however, and write to explain why.

I

Deciding whether the two gag orders which the district court issued in the pending litigation are invalid is not the principal occupation of the Court's opinion. Those orders have already been ordered vacated in response to relator's request for emergency relief. 837 S.W.2d 73. Our reasons for granting this relief do not require elaborate explanation. The Court is unanimous in the view that the gag orders are invalid because they are too broad, they are not necessary to protect against an imminent threat to the administration of justice, and they were issued without following procedures to safeguard against suppression of relator's constitutionally protected speech. Issuance of the orders was a clear abuse of discretion from which relator has no adequate remedy by appeal. Thus, relator is entitled to mandamus relief to have the orders set aside.

That is the Court's decision. Most of the Court's opinion is spent defending its efforts to decide relator's free speech claims using only article I, section 8 of the Texas Constitution without recourse to the First Amendment to the United States Constitution. Borrowing from the literature of the "new federalism movement" of the past fifteen years, the Court adopts a method of constitutional analysis by which it examines the Texas Constitution first, and if a right is found to be protected, never reaches the federal constitution question. In theory, the Court's methodology contemplates that federal law construing a federal constitutional provision will be instructive but not controlling in construing a corresponding provision of the state constitution; in actuality, the Court attempts to ignore federal law altogether. Accordingly, it ventures an independent examination and application of article I, section 8, with no argument and little briefing by the parties, and without regard to more fully developed First Amendment law. Then after determining that the language of article I, section 8 is different and highly distinctive, the Court shortly concludes that the test for reviewing gag orders under that provision is one which happens to be identical to the test under the First Amendment. The Court follows this analysis with a lengthy apologia and accolade for its new method.

The Court's approach to this case, it seems to me, is

contrived and unnecessarily extreme. The Court goes to great lengths to decide this case on our state constitution alone, even though the result would be the same under the First Amendment, for the same reasons. Although a state constitutional provision should not be ignored simply because it has a federal analogue, I think the converse is equally true: federal constitutional law should not be ignored simply because there exists a related state constitutional provision. Where, as here, the issue raised can be resolved on First Amendment grounds entirely consistent with the Texas Constitution, there is every reason to do so. What reasons the Court may have for avoiding this straightforward course is a question to which I shall return.

A

The pending litigation involves claims by over 200 children and their parents for injuries due to exposure to toxic chemicals. The parents settled their claims five years ago, and defendants have proposed to settle the children's claims, subject to the district court's approval. Relator, the guardian ad litem for the children, opposes the settlement. [1] At a hearing on the proposed settlement on August 23, 1991, the district court apparently became concerned that differences and misunderstandings among the participants in the litigation threatened the proposed settlement and the best interests of the minor plaintiffs. Without a request from any party, the district court

**Page 26**

issued the first of two gag orders, orally instructing plaintiffs and defendants, their counsel, and relator not to discuss the case outside the courtroom. The court also "abated" relator's appointment as guardian ad litem and directed her to have no contact with plaintiffs pending further order of the court. Several days later, on September 11, the district court committed its order to writing, explaining the reasons for its issuance. This second, written, order stated in substance:

BE IT REMEMBERED THAT ON THE 23RD DAY OF AUGUST, 1991, at a hearing in these consolidated cases, counsel for Plaintiffs, counsel for Defendant, and the then Guardian ad Litem were present.

Upon hearing evidence that conflicts between counsel and the parents of the minor children were resulting in miscommunications with the parents of the children and with the media and general public, this Court, on its own motion, issued a protective order in the best interest of the minor children of this suit. In so doing, the Court found there was a need for such an extraordinary remedy and ORDERED counsel as follows:

Counsel in this case, present and former, are expressly ORDERED to refrain from discussing or publishing in writing or otherwise, any matters of this case with any persons other than their clients, agents, or employees in the necessary course of business in this case.

Counsel is ORDERED to refrain from any public comment, casual or otherwise concerning the facts of this case or the conduct of counsel in this case other than in a court hearing.

Counsel is ORDERED to inform their clients, witnesses, agents and representatives that this ORDER extends to each of them and is subject to a finding of contempt by this court from disobedience, direct or indirect comment intended to violate this ORDER. Counsel was and is directed to communicate with their clients only, and advise each that they are directed to refrain from discussing the case except with counsel.

At that hearing, the Court abated the appointment of the Guardian ad Litem until further Order of this Court, but specifically applied this protective order to the Guardian and that during the abatement, the Guardian was to have no contact with Plaintiffs. On September 11, 1991, the Court dismissed the Guardian Ad Litem from this Cause, but not from this Order.

This Order was rendered in open court on the 23 of August, 1991 and is effective as of that date.

The Court ORDERS the Clerk of this Court to prepare certified copies of this order for counsel and to convey immediately by telecopier the contents of this written order.

This order prohibits relator from discussing the pending litigation with anyone, ever, except in a hearing before the court, even though she has been dismissed as guardian ad litem in the case. The order even prohibits the parties from communicating with each other, although they do not complain of this prohibition here. The order is, in its own words, "an extraordinary remedy".

Relator complains that the gag orders infringe unlawfully upon her right to freedom of speech under the First Amendment to the United States Constitution. The United States Supreme Court has had several occasions to consider the validity of gag orders in criminal cases. *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991); *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *In re Sawyer,* 360 U.S. 622, 79 S.Ct. 1376, 3 L.Ed.2d 1473 (1959). The principal authority applying the First Amendment to gag orders on the participants in a civil case, however, is *Bernard v. Gulf Oil Co.,* 619 F.2d 459, 467 (5th Cir.1980) (en banc), aff'd on other grounds, 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981), in which the court held that an order restricting the named plaintiffs in a class action and their attorneys from communicating freely with prospective class members violated the First Amendment. The court

determined that

**Page 27**

such gag orders are prior restraints upon free speech. Id. at 467. [2] See also *Rodgers v. U.S. Steel Corp.,* 508 F.2d 152, 162-63 (3d Cir.), cert. denied, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975).

Prior restraints on freedom of speech have long been disfavored in American law. *Near v. Minnesota,* [283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931) ]. While a prior restraint is not unconstitutional per se, there is a heavy presumption against its constitutionality. *Southeastern Promotions, Ltd. v. Conrad,* [420 U.S. 546, 558-59, 95 S.Ct. 1239, 1246-47, 43 L.Ed.2d 448 (1975) ]; *Organization for a Better Austin v. Keefe,* [402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971) ].

Bernard, 619 F.2d at 467. Generally, "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." Nebraska Press, 427 U.S. at 559, 96 S.Ct. at 2803 (1976).

For a prior restraint to violate the First Amendment, it must prohibit protected activity. "The First Amendment is not absolute, and 'the protection even as to previous restraint is not absolutely unlimited.' " Bernard, 619 F.2d at 471 (quoting Near, 283 U.S. at 716, 51 S.Ct. at 631); accord Nebraska Press, 427 U.S. at 570, 96 S.Ct. at 2808; *Times Film Corp. v. Chicago,* 365 U.S. 43, 47, 81 S.Ct. 391, 393, 5 L.Ed.2d 403 (1961); *Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 441, 77 S.Ct. 1325, 1327-28, 1 L.Ed.2d 1469 (1957). Exceptions include speech that is obscene, seditious or extremely provocative. Nebraska Press, 427 U.S. at 590, 96 S.Ct. at 2817 (Brennan, J., concurring). It is unnecessary to decide whether there is some activity prohibited by the gag orders in this case which is not protected by the First Amendment, such as, perhaps, intimidation of the minor plaintiffs. These orders sweep far more broadly, prohibiting relator from speaking at all on any matter concerning the litigation. Beyond question, her First Amendment rights are affected.

According to Bernard, a gag order is permitted by the First Amendment only if it meets three conditions. First, " 'before a prior restraint may be imposed by a judge, even in the interest of assuring a fair trial, there must be "an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil." ' " Bernard, 619 F.2d at 474 (quoting *United States v. Columbia Broadcasting System, Inc.,* 497 F.2d 102, 104 (5th Cir.1974) (quoting *Craig v. Harney,* 331 U.S. 367, 376, 67 S.Ct. 1249, 1255, 91 L.Ed. 1546 (1947))). "In general, a prior restraint may be justified only if the expression sought to be restrained 'surely [will] result in direct, immediate, and irreparable damage.' " Bernard, 619 F.2d at 473 (quoting *International Soc'y for Krishna Consciousness v. Eaves,* 601 F.2d 809, 833 (5th Cir.1979) (quoting *New York Times Co. v. United States,* 403 U.S. 713, 730, 91 S.Ct. 2140, 2149, 29 L.Ed.2d 822 (1971) (Stewart, J., joined by White, J., concurring))). Even " 'the interest of the judiciary in the proper administration of justice does not authorize any blanket exception to the first amendment.' " Bernard, 619 F.2d at 467 n. 8 (quoting Rodgers, 508 F.2d at 163); see *Wood v. Georgia,* 370 U.S. 375, 395, 82 S.Ct. 1364, 1375, 8 L.Ed.2d 569 (1962); Craig, 331 U.S. at 378, 67 S.Ct. at 1256; *Pennekamp v. Florida,* 328 U.S. 331, 347, 349-50, 66 S.Ct. 1029, 1037, 1038-39, 90 L.Ed. 1295 (1946); *Bridges v. California,* 314 U.S. 252, 272-73, 62 S.Ct. 190, 198-99, 86 L.Ed. 192 (1941). Second, a valid prior restraint "must not sweep too broadly. Rather it 'must be narrowly drawn and

**Page 28**

cannot be upheld if reasonable alternatives are available having a lesser impact on First Amendment freedoms.' " Bernard, 619 F.2d at 476 (quoting *CBS, Inc. v. Young,* 522 F.2d 234, 238 (6th Cir.1975)); see also Nebraska Press, 427 U.S. at 562-69, 96 S.Ct. at 2804-08; *Carroll v. Commissioners of Princess Anne,* 393 U.S. 175, 183-84, 89 S.Ct. 347, 352-53, 21 L.Ed.2d 325 (1968). Third, "the restraint 'must have been accomplished with procedural safeguards that reduce the danger of suppressing constitutionally protected speech.' " Bernard, 619 F.2d at 477 (quoting Southeastern Promotions, 420 U.S. at 559, 95 S.Ct. at 1246). These safeguards include evidence and findings. See Nebraska Press, 427 U.S. at 564, 96 S.Ct. at 2805.

The district court's gag orders do not meet First Amendment standards. The orders were not necessitated by any imminent threat imperiling the administration of justice. The meager record before us shows that the district court was concerned that conflicts among the various participants in this litigation were resulting in misstatements and misunderstandings, jeopardizing a proposed settlement and what the court considered to be the best interests of the minor plaintiffs. The existence of those conflicts was apparent from oral argument before this Court. Relator stated quite clearly that as former guardian ad litem she had and still has very strong views about the children's interests. The district court clearly believed that the plaintiffs needed to be protected from relator's insistence on expressing her views, and the other parties appear to share the court's view, joining in defense of the gag orders which they are themselves subject to. As far removed from the conduct of the litigation as we are, it is difficult to evaluate the district court's concerns. Assuming, however, that relator was every bit the threat to her previous wards that the district court considered her to be, that threat did not impinge so imminently upon the administration of justice as to satisfy the first condition of Bernard.

Moreover, the orders were overly broad and were not

the only reasonable alternative for addressing the problems the district court confronted. The district court prohibited relator from talking with anyone about the case under any circumstances except in the course of proceedings. This order is far more expansive than the order struck down in Bernard; it does not merely limit relator's communications about the case, it prohibits them altogether outside the courtroom. Although the district court in this case met with the parties in an effort to dispel confusion, and although it cautioned relator against causing further conflicts and misunderstandings, it did not reasonably exhaust these efforts or explore the use of disciplinary measures [3] or sanctions against relator before drastically restricting her fundamental rights. Removing relator as guardian ad litem might alone have alleviated the conflicts. The district court neither exhausted reasonable alternative measures nor limited its prohibition to what was necessary to accomplish its purposes. Thus the gag orders cannot meet Bernard 's second condition.

Finally, the district court did not follow procedures that would safeguard against an unwarranted infringement of relator's First Amendment rights. The district court acted on its own, without motion or argument from the parties. Although the district court conducted an evidentiary hearing at some point prior to issuing its first order, the record does not reflect whether any of that evidence pertained to the necessity and scope of a gag order.

**Page 29**

The orders come to this Court supported by a single, general finding recited in the written order. These procedures do not comport with those required by Bernard 's third condition.

Bernard does not hold that participants in civil court proceedings have a boundless constitutional right to speak extrajudicially about the litigation, or that a court is powerless to limit such speech in all circumstances. It does, however, set a high standard for any such limitation in recognition of the importance of free speech rights of attorneys and litigants. The issuance of gag orders in these circumstances did not meet this standard and therefore was an unlawful infringement upon relator's constitutionally protected freedom of speech and a clear abuse of discretion. Relator has no right to appeal these interlocutory orders until final judgment is rendered and meanwhile must suffer their irreversible and irrecompensable effects. She is therefore entitled to mandamus relief, which we have already granted, directing the district court to vacate the gag orders.

B

The Court reaches this result but not by the well-traveled road of First Amendment jurisprudence. It insists instead on traversing the largely uncharted terrain of article I, section 8 of the Texas Constitution.

1

I say "insists" because the idea that this case should be decided on state constitutional grounds alone did not originate with the parties but with one Member of this Court. Article I, section 8 was not even mentioned in this case until relator's counsel alluded to it in passing in oral argument, after which the following colloquy occurred:

JUSTICE DOGGETT: Are you asserting--you made reference to the Texas Constitution earlier--are you asserting free speech rights under the Texas Constitution as well as the U.S. Constitution?

RELATOR'S COUNSEL: That is correct, Your Honor. I read article I, section 8 of the Texas Constitution as going beyond the First Amendment.

JUSTICE DOGGETT: Have you briefed that and cited us any authority on the broader protections afforded by the Texas Constitution?

RELATOR'S COUNSEL: No, we haven't, Your Honor. I entered this case after the briefing was terminated.

JUSTICE DOGGETT: Are you interested in filing any supplemental briefing on that issue?

RELATOR'S COUNSEL: We would welcome the opportunity to file supplemental briefing with this Court on the First Amendment issues.

There was no further discussion of article I, section 8 during oral argument. Relator subsequently filed a supplemental brief arguing that the gag orders were not permitted by the First Amendment, and secondarily, that article I, section 8 provides an independent basis for overturning them. Respondent never replied to this brief. [4]

**Page 30**

Thus, in considering the applicability of article I, section 8 to this case, the Court has the benefit of no argument and approximately four pages of briefing which relator filed at the invitation of one Justice. [5] The Court may choose to rest a significant decision on grounds which the parties have not fully presented, but there are always risks in doing so, and the more important the issue, the greater the risks. The validity of prior restraints under article I, section 8, independent of First Amendment law and any law in other states, is a very important issue. Had it been fully presented by the parties, and had our understanding of this provision of our constitution grown and developed over time, the issue might be addressed with more assurance. Today, however, Texas prior restraint law is born a teenager, a

process as remarkable as it is frightful.

2

Article I, section 8 of the Texas Constitution states in pertinent part:

Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press.

This provision in our state Bill of Rights, like the First Amendment to the United States Constitution and similar provisions in the constitutions of other states, enshrines and protects a fundamental right long treasured by the people of this nation, the right of free speech. That right, however, is not absolute, as we long ago learned in our thinking about the First Amendment. Justice Holmes' classic example, familiar to lawyers and non-lawyers alike, is that one does not have the right of "falsely shouting fire in a theatre and causing a panic." *Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919). Free speech can be abused, as article I, section 8 expressly recognizes, and responsibility for that abuse is not only consistent with protecting the freedom, it is part of the freedom itself.

Freedom and responsibility have a symbiotic relationship: they are part of one another, yet in tension. So here, relator contends that she should be free to communicate with the parties to this litigation, and the district court counters that relator's freedom should be restricted because of her responsibility not to cause misunderstandings which threaten the best interests of the minor plaintiffs. Article I, section 8 provides principles for resolving this dispute, but it does not prescribe the resolution. It falls to the Court to determine how these governing principles apply in specific situations. To make this determination we ordinarily look to such things as the language of the constitutional provision itself, its purpose, the historical context in which it was written, the intentions of the framers, the application in prior judicial decisions, the relation of the provision to the law as a whole, the understanding of other branches of government, the law in other jurisdictions, state and federal, constitutional and legal theory, and fundamental values including justice and social policy. See, e.g., *Brown v. Meyer,* 787 S.W.2d 42, 45 (Tex.1990); *Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d 391, 394 (Tex.1989); *State v. Project Principle, Inc.,* 724 S.W.2d 387, 390-91 (Tex.1987); *Spring Branch Indep. Sch. Dist. v. Stamos,* 695 S.W.2d 556, 559-62 (Tex.1985); *City of El Paso v. El Paso Community College Dist.,* 729 S.W.2d 296, 298 (Tex.1986); *Tarrant County v. Ashmore,* 635 S.W.2d 417, 420-

**Page 31**

23 (Tex.1982); *Gragg v. Cayuga Indep. Sch. Dist.,* 539 S.W.2d 861, 865-66 (Tex.), appeal dismissed, 429 U.S. 973, 97 S.Ct. 478, 50 L.Ed.2d 581 (1976); Ex parte Werblud, 536 S.W.2d 542, 544-48 (Tex.1976); *Harris v. City of Fort Worth,* 142 Tex. 600, 180 S.W.2d 131, 133 (1944); *Jones v. Ross,* 141 Tex. 415, 173 S.W.2d 1022, 1024 (1943); *Collingsworth County v. Allred,* 120 Tex. 473, 40 S.W.2d 13, 15 (1931); see also *Dir. of the Dep't of Agric. and Env't v. Printing Indus. Ass'n,* 600 S.W.2d 264, 267 (Tex.1980); *Travelers' Ins. Co. v. Marshall,* 124 Tex. 45, 76 S.W.2d 1007, 1012-25 (1934); *Mellinger v. City of Houston,* 68 Tex. 37, 3 S.W. 249, 252-54 (1887). [6]

In applying article I, section 8 to the gag orders here, the Court attempts to follow this process as it ordinarily would, except that, consistent with its new approach, it expressly refuses to consider whether the orders violate the First Amendment. The Court tries to prove that article I, section 8 can be construed and applied completely independently of the First Amendment. To do this, the Court examines the history of article I, section 8, its text, and caselaw construing it. Its analysis of each of these three areas is seriously deficient, as I shall show before reviewing the Court's conclusions.

3

The Court recites a little history: that Stephen F. Austin was jailed and Lorenzo de Zavala hunted down for being outspoken; that provisions guaranteeing free speech were included in the first proposed Texas Constitution in 1833 and the constitutions of 1836, 1861, 1866, 1869 and 1876; that framers of these constitutions represented a "heterogenous miscellany of opinions" different from the framers of the U.S. Constitution; and that after debate at times vigorous on topics including secession, these framers rejected the free speech provision of the Tennessee Constitution, as well as a provision regarding speech injurious of female reputation libelous without regard to its truth and a provision conditioning free speech on good motives. The provision proposed for the Texas Constitution in 1833 stated:

The free communication of thoughts and opinion, is one of the inviolable rights of man; and every person may freely speak, write, print, and publish, on any subject, being responsible for the abuse of that liberty....

Proposed Constitution for the State of Texas (1833) art. 16, reprinted in Documents of Texas History 80 (Ernest Wallace ed. 1963). This earlier proposal was virtually identical to the Tennessee provision rejected in 1876 by the Texas framers, except only that the latter was limited to citizens. Tennessee's Constitution, first adopted in 1796, provides:

The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty.

TENN. CONST. art. XI, § 19 (1796) (reprinted in

BENJAMIN PERLEY POORE, THE FEDERAL AND STATE CONSTITUTIONS, COLONIAL CHARTERS AND OTHER ORGANIC LAWS OF THE UNITED STATES, Vol. 1 & 2 (2d ed. 1878)). The other two provisions which the Texas framers rejected would have imposed significant limitations on the right of free speech.

These interesting but casual historical notes, which the Court optimistically calls a "rather extensive historical discussion", ante, at 22, indicate that free speech has always been very important in Texas, something I have never supposed was in dispute, but say nothing about how article I, section 8 applies to gag orders, or why. There is a reason for the Court's shallow approach: it does not intend to be bound to any historical interpretation. Historical analysis is "only a starting point", the Court says; "[i]n no way must our understanding of its guarantees be frozen in the

**Page 32**

past." Ante, at 19. In other words, the Court does not accept the premise that the intent of the framers of the constitution governs its future construction. "[W]e use history," the Court explains, "to assist in an understanding of the generalities and ambiguities sometimes present in a constitution." Ante, at 19. If this is true, what "generalities and ambiguities" in article I, section 8 has the Court clarified by its observations about Stephen F. Austin and Lorenzo de Zavala, or any other aspect of its "rather extensive" historical discussion? I cannot find one.

4

The Court also examines the text of article I, section 8, pointing out the inescapable facts that the language is not identical to that of the First Amendment, that it is stated partly in the affirmative ("Every person shall be at liberty to speak") rather than entirely in the negative ("Congress shall make no law"), and that it appears toward the front of the constitution rather than at the end. These facts prove conclusively that the language of article I, section 8 is different from the First Amendment, something that is plain as day. The issue, however, is not whether there are differences, but what, if anything, those differences mean, and the Court's observations shed no light on this issue. The Court cannot substantiate its claim that the framers of the Texas Constitution "explicitly rejected" verbatim adoption of the First Amendment of the U.S. Constitution, but even if it could, we would not know what the framers intended in so doing. [7]

The Court's contention that the language of article I, section 8 is "different" and "highly distinct" is misleading. Texas, like most states, appears to have derived its constitutional provision protecting the right to free speech from Blackstone, who articulated that right as follows: "Every freeman has an undoubted right to lay

what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press: but if he publishes what is improper, mischievous, or illegal, he must take the consequences of his own temerity." 4 WILLIAM BLACKSTONE, COMMENTARIES 152. By 1833, when a constitution was first proposed for Texas, 15 of the 24 states then in the United States had constitutional provisions protecting free speech in words similar to Blackstone's. [8] The language proposed

**Page 33**

for Texas' constitution in 1833, and the language incorporated in the 1876 constitution, are obviously related to Blackstone's formulation of the common law, and are strikingly similar to the provisions of what were then almost two-thirds of the state constitutions except in one respect: the language of our 1876 constitution, unlike the language proposed in 1833, extended freedom of speech to persons instead of citizens. Even in this respect, however, Texas was neither unique nor first: Missouri had already adopted such a provision. Supra note 8.

The close relationship between the free speech guarantees in the constitutions of Texas and many other states should not be surprising. The idea that freedom of speech is a fundamental right is not unique to Texas or any other state, but one inherent in our political structure and shared generally by the people of this nation. While the right has been described in somewhat different words at different times and places, the basic ideas certainly transcend state lines. Free speech is a national idea, not only a Texas idea. The Court's attempt to distinguish Texas free speech as significantly different from First Amendment free speech--and presumably also from New York free speech or California free speech--is not supported by the texts of the various guarantees.

5

The only serious effort the Court makes to determine how article I, section 8 should apply to gag orders is by examining our own precedents, and this effort, though flawed, is exhaustive. For it should be noted that in more than 150 years article I, section 8 has been mentioned in this Court's opinions in only 19 cases, and twice the reference was in a separate opinion. [9] In only five of these 19 cases has this Court written more than a few words about article I, section 8, and only three of those five involved prior restraints. Two of the three prior restraint cases relied entirely on the third, Ex parte Tucker, 110 Tex. 335, 220 S.W. 75 (1920). This is the totality of our prior restraint jurisprudence under the Texas Constitution.

**Page 34**

Tucker, decided before the First Amendment was applied to the states through the Fourteenth Amendment in Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), held that an injunction prohibiting

union employees from " 'vilifying, abusing, or using opprobrious epithets to' " other employees violated article I, section 8. Tucker, 220 S.W. at 75. The Court cites Tucker and quotes from it extensively as an example of the independence of article I, section 8 from the First Amendment. But the Court does not quote the following:

The experience of the English nation and some of the American colonies under the tyranny of such systems is the reason this provision in the Bill of Rights [article I, section 8] is one common to the Constitutions of the American States, and for its incorporation, in like words, in the First Amendment to the Federal Constitution.

Id. at 76 (emphasis added). Tucker did not ignore the First Amendment in its analysis of article I, section 8, as the Court has, nor did it differentiate the two provisions, as the Court attempts to do today. Rather, it linked them in two respects: they were founded on common experience, that of the English nation and the American colonies, and they were framed in "like words".

The other two cases which utilize article I, section 8 to invalidate prior restraints rely entirely upon Tucker. In *Dallas General Drivers v. Wamix, Inc.,* 156 Tex. 408, 295 S.W.2d 873, 879 (Tex.1956), the Court dissolved an injunction prohibiting striking employees from "us[ing] ... insulting, threatening and indecent language" toward non-striking employees "without prejudice to the right of the trial court to reinstate it if future conduct of the [striking employees] should authorize it." Thus, the Court invalidated an injunction as a prior restraint but did not preclude the trial court from reissuing it if the circumstances warranted. This is certainly not a very broad reading of article I, section 8, and may well be narrower than the First Amendment. In *Hajek v. Bill Mowbray Motors, Inc.,* 647 S.W.2d 253, 255 (Tex.1983) (per curiam), the Court dissolved an injunction prohibiting an owner from driving his car on which he had prominently labeled as a "lemon". Although the Court did not refer to the First Amendment, it also did not state that article I, section 8 afforded broader protection of speech.

Thus, all three of this Court's prior restraint cases have at least assumed a congruence between article I, section 8 and the First Amendment. The other two decisions of this Court in which article I, section 8 is discussed at all are *Casso v. Brand,* 776 S.W.2d 551, 556 (Tex.1989), and *O'Quinn v. State Bar of Texas,* 763 S.W.2d 397, 402 (Tex.1988). The Court quotes Casso as stating that "our state free speech guarantee may be broader than the corresponding federal guarantee". Ante, at 9. What Casso actually said was:

While we have recently recognized the possibility that our state free speech guarantee may be broader than the corresponding federal guarantee, see *O'Quinn v. State Bar,* 763 S.W.2d 397, 402 (Tex.1988), that broader protection, if any, cannot come at the expense of a

defamation claimant's right to redress. Unlike the United States Constitution, which contains no explicit guarantee of the right to sue for defamation, the Texas Constitution expressly protects the bringing of reputational torts....

These provisions must be given effect. While we may on occasion grant protections to defamation defendants beyond those required in the United States Constitution, as we have today in requiring public official and public figure plaintiffs to prove their actions against private defendants under the *New York Times [Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ] standard, we have based those decisions on common law, not constitutional grounds.

Casso, 776 S.W.2d at 556 (emphasis added). The Court's quote is somewhat misleading. While Casso admits the "possibility" that article I, section 8 may contain a broader guarantee of free speech than the First Amendment, it also recognizes that the state provision expressly imposes responsibility for abusive speech, something which the First Amendment does not do. On the

**Page 35**

whole, Casso not only fails to lend the Court's position support, it undercuts it. The Court also quotes O'Quinn as stating, " 'Texas' free speech right [has been characterized] as broader than its federal equivalent' ". Ante, at 8. What the Court actually said was: "One commentator has characterized Texas' free speech right as being broader than its federal equivalent...." O'Quinn, 763 S.W.2d at 402 (emphasis added). O'Quinn does not claim that a broader view of article I, section 8 is as widely held as the Court would suggest. Nor did the Court in O'Quinn embrace the view, adding: "We need not decide at this time whether Texas' guarantee of free speech affords greater protection than its corresponding federal rights...." Id.

These five decisions, Tucker, Dallas General, Hajek, Casso and O'Quinn, constitute the entirety of our article I, section 8 caselaw. As if they were hardly sufficient foundation for a rule governing gag orders, the Court also cites two court of appeals decisions, *Amalgamated Meat Cut. v. Carl's Meat & Provision Co.,* 475 S.W.2d 300, 304 (Tex.Civ.App.--Beaumont 1971, writ dism'd w.o.j.), and *Pirmantgen v. Feminelli,* 745 S.W.2d 576, 578 (Tex.App.--Corpus Christi 1988, no writ), cases based upon both the federal and state provisions. Contrary to the Court's new approach in this case, both these cases rely in part upon the First Amendment. The last time this Court addressed a prior restraint was in *Iranian Muslim Org. v. City of San Antonio,* 615 S.W.2d 202 (Tex.1981), where we invalidated the restraint based solely upon the First Amendment without alluding to article I, section 8. The Court does not cite Iranian. Two court of appeals decisions which the Court also does not cite expressly hold that "Texas constitutional provisions guaranteeing

freedom of expression and assembly are coextensive with the corresponding federal guarantees". *Puckett v. State,* 801 S.W.2d 188, 192 (Tex.App.--Houston [14th Dist.] 1990), cert. denied, 502 U.S. 990, 112 S.Ct. 606, 116 L.Ed.2d 629 (1991); *Reed v. State,* 762 S.W.2d 640, 644 (Tex.App.--Texarkana 1988, pet. ref'd), cert. denied, 493 U.S. 822, 110 S.Ct. 81, 107 L.Ed.2d 47 (1989). Reed adds, "and we will apply the same analysis and principles of construction in interpreting them." Id.

Finally, the Court refers to two opinions of our Court of Criminal Appeals, both of which held that newspaper publishers could not be held in contempt for publishing criminal trial testimony in violation of a court order. Both decisions were based upon article I, section 8. However, Ex parte Foster, 44 Tex.Cr.R. 423, 71 S.W. 593 (App.1903), disapproved on other grounds in Ex parte Winfree, 153 Tex. 12, 263 S.W.2d 154, 158 (1953), like Tucker, was decided before the First Amendment was applied to the states. And Ex parte McCormick, 129 Tex.Cr.R. 457, 88 S.W.2d 104, 106 (App.1935), relied upon both federal and state caselaw, and observed that the guaranty of article I, section 8 is also embodied in state constitutions and in the First Amendment. Neither case follows the Court's approach in this case of ignoring First Amendment law, and neither distinguishes article I, section 8 from the First Amendment.

The truth of the matter is that all our prior caselaw either assumes a close identity between the First Amendment and article I, section 8, or is silent on the subject. Not before today has this Court insisted that the two provisions are different in substance, and so much so that we should not even consider the former in construing the latter.

6

It is important to note that the Court does not tie its analysis of the gag orders in this case to the history of article I, section 8, or to its text, or to any prior caselaw. Rather, it states: "Since the dimensions of our constitutionally guaranteed liberties are continually evolving, today we build on our prior decisions by affirming that a prior restraint on expression is presumptively unconstitutional." Ante, at 10. By "continually evolving", the Court means that it is free to construe our constitution unconstrained by its history or any prior construction. "With this concept in mind," the Court adopts a test

**Page 36**

for determining whether gag orders are valid under article I, section 8, the basis for which cannot be found in any kind of precedent that the Court recognizes. That test is as follows:

a gag order in civil judicial proceedings will withstand constitutional scrutiny only where there are specific findings supported by evidence that (1) an imminent and irreparable harm to the judicial process will deprive litigants of a just resolution of their dispute, and (2) the judicial action represents the least restrictive means to prevent that harm.

Ante, at 10.

In deciding upon this test, the Court states that its analysis has been assisted by federal cases, and it cites two: Nebraska Press and Bernard. The Court criticizes both, although they both struck down the gag orders involved. Nebraska Press, it says, is a "fact specific" and "splintered" decision, ante, at 10, which is "too permissive", ante, at 11, and "does not ... sufficiently protect the rights of free expression that we believe that the fundamental law of our state secures", ante, at 10. The Court does not explain how Nebraska Press is any more fact specific than this case, or how it leaves fundamental rights unguarded. Bernard, the Court says, was decided "in the context of Rule 23(d) of the Federal Rules of Civil Procedure", ante, at 10 n. 16, "on a very splintered vote, and thereafter disregarded by the United States Supreme Court", ante, at 21, showing "[i]f anything, the admittedly unsettled nature of the federal law", ante, at 10 n. 16. The truth is, that while Bernard involved federal rule 23, it was decided on First Amendment grounds; that the "very splintered vote" was thirteen judges for the court's opinion, eight concurring, and one dissenting--not too different from our vote in this case; and that the U.S. Supreme Court affirmed the judgment of the Fifth Circuit without reaching the First Amendment issues. As for whether federal law is "admittedly unsettled", Bernard simply assembles and restates the holdings of a number of U.S. Supreme Court decisions in fashioning a test for gag orders.

As flawed as the Court considers Nebraska Press and Bernard to be, it is difficult to conceive how the Court can state a test for gag orders under article I, section 8 that is identical to Bernard 's First Amendment standards. The presumption against the constitutionality of gag orders is the same. The first element of the Court's test--"an imminent and irreparable harm to the judicial process [that] will deprive litigants of a just resolution of their dispute"--is the same as Bernard 's--"an imminent, not merely a likely, threat to the administration of justice", 619 F.2d at 474 (quoting *U.S. v. Columbia Broadcasting System, Inc.,* 497 F.2d 102, 104 (5th Cir.1974)), that "surely [will] result in direct, immediate, and irreparable damage", 619 F.2d at 473 (quoting International Soc'y for Krishna Consciousness, 601 F.2d at 833 (quoting New York Times, 403 U.S. at 730, 91 S.Ct. at 2149)). The second element of the Court's test--"the judicial action represents the least restrictive means to prevent that harm"--is also the same as Bernard 's--the gag order " 'must be narrowly drawn and cannot be upheld if reasonable alternatives are available having a lesser impact on First Amendment freedoms' ", 619 F.2d at 476 (quoting CBS, 522 F.2d at 238). The Court's requirement that there be specific findings supported by

evidence is the same as Bernard 's third condition that there be "procedural safeguards" including evidence and findings, 619 F.2d at 477 (quoting Southeastern Promotions, 420 U.S. at 559, 95 S.Ct. at 1246).

The identity between First Amendment standards for reviewing gag orders and the Court's new standards under article I, section 8 is a very remarkable result considering that the Court's opinion calls for "an independent standard under the Texas Constitution." Ante, at 11. After all, the two constitutional provisions have different authors, different words, and different histories, and according to the Court, they have been and should be treated separately. Although the Court professes not even to have considered the validity of the gag orders under the First Amendment, the

## Page 37

test it announces for applying the unique and distinctive language of article I, section 8 turns out to be identical to the First Amendment test. This can happen, the Court says: "independent interpretation [does not] necessarily yield a different result". Ante, at 22. The Court explains: "Our investigation may reveal federal authority so complete, so well reasoned, and so consistent with the provisions of the Texas Constitution in protecting the individual liberties that we reach the same conclusion." Id. It might, of course, but here it does not; that is, the Court rejects the only two federal cases it cites relating to a test for gag orders as being incomplete, poorly reasoned, and not fully protective of state constitutional free speech rights. The Court has explained how it could reach the same conclusion as federal cases which it considered well-reasoned and authoritative; it has not explained how it could reach the same conclusion as federal cases which it rejects.

If the two constitutional provisions are really as different as the Court insists they are, it is a remarkable coincidence that the standards for applying them to gag orders happen to be identical. But if the standards really are the same, then there is no practical difference in the two provisions, contrary to the Court's insistence. Thus, the Court's analysis strains credulity and finally disproves its own thesis.

7

Without reference to the First Amendment, or to the hundreds of cases construing it, this Court attempts to formulate independent standards for applying the guarantee of free speech in article I, section 8 of the Texas Constitution to one form of prior restraints, gag orders like the ones in this case. The task is daunting, even though the law the Court attempts to create on its own is but a small part of what Americans have come to understand as freedom of speech. And in the end the Court fails in its efforts. Barely managing to cobble together a few fragments of history, obvious truisms

about the constitutional language, exaggerated claims about its distinctiveness, and phrases taken out of context from a few of our cases, the Court produces a test that is identical to more fully developed First Amendment standards. The Court achieves the very end it sought to avoid--adoption of First Amendment standards--without admitting it.

Why? If state and federal constitutional law conflicted, or if federal law were undeveloped or nonexistent, an effort to expound state law might be productive. But these circumstances are not present here. The Court's effort in this case is like creating a new language in order to write a novel: it is possible to do it, but unnecessary when author and readers already share a common language. And one cannot help being skeptical of an author who claims to have written a book in a new language when the new language sounds a lot like English and the book reads a lot like MOBY DICK.

C

Most of the Court's opinion today is devoted to a defense of its new method of constitutional analysis which examines the state constitution first, and if a right is found to be protected, never reaches the federal constitutional question. The Court derives this approach from developments in other jurisdictions and our own caselaw. Neither supports the Court's new methodology.

1

The Court claims that its new method of constitutional analysis is part of a "trend" that "has met with broad approval" and has been endorsed overwhelmingly by state and federal courts as well as commentators throughout the nation. Ante, at 12. These claims are greatly exaggerated. Certainly, there are a number of courts and commentators who have advocated an approach to state courts' decisions of constitutional issues like the one the Court uses today. But the thinking on the subject is not all one way, a fact which the Court attempts to minimize. The truth is that a substantial body of legal commentators disagrees

## Page 38

that an approach like the Court uses is proper or even workable. [10] Most of the cases the Court cites from other jurisdictions are not really as favorable as it suggests. [11] And the Court's assertion that "federal courts have encouraged state courts to embark upon independent analysis of their own constitutions", ante, at 15, is not only unsupported by authority but highly improbable. (Why would federal courts take it upon themselves either to encourage or discourage state courts in applying state constitutions?)

As the Court notes, many of the authorities I have cited support judicial reliance upon state constitutions. So do I. Contrary to the Court's assertions, I do not argue

that state constitutions should be ignored, or that federal law always controls their construction. I contend only

that federal constitutional law should be considered when a state constitutional provision is applied. The Court's new analytical method treats the resource of federal law with marked ambivalence. On the one hand, the Court includes federal law among the considerations its new method is to use: "Within the context of such an analysis, a state court can benefit from the insights of well-reasoned and developed federal jurisprudence, but is not compelled to reach identical results." Ante, at 13. On the other hand, the Court avoids any useful reference to federal law in this case. The Court claims that it "quite obviously" does not disregard federal law, yet it ignores Bernard and the United States Supreme Court decisions on which it relies. The Court says First Amendment jurisprudence is "not irrelevant", but it also says that it "need not consider whether the United States Constitution has also been violated." Ante, at 11. In sum, the Court says federal law can be useful in applying the state constitution, but the Court does not use it in this case.

To portray its new methodology in a more favorable light, the Court contrasts it with a misstatement of this opinion:

Rejecting our careful and detailed analysis of the development and interpretation of article one, section eight, the concurrence advances an alternative--Texas judges should follow, but never lead, federal jurisprudence.... [T]he Texas judge should never diverge from the path taken by the federal judiciary.... [Nothing] should obscure the obligation of adherence to federal authority.

Ante, at 21. This, of course, does not even remotely resemble any argument I make here. Federal authority cannot determine state constitutional construction, and I do not argue that it can or should. There may be circumstances in which article I, section 8 applies differently from the First Amendment, but none are present in this case. The Court adopts the same test for gag orders that has already developed in the federal courts, only it refuses to say so. I would simply acknowledge this source of authority and the fact that in this case at least there is no difference in the application of the First Amendment and article I, section 8.

The Court's attempt to focus constitutional analysis on state law to the exclusion of federal law is at odds with itself. If the Court acknowledges that the test for gag orders under federal law is identical to the test it adopts under article I, section 8, it can hardly claim that it has arrived at this test independently. If the Court refuses to acknowledge federal law, then it assumes the difficult task of constructing a state test from almost no precedent, only to arrive at the very conclusion federal law dictates.

The Court's approach insists upon looking for differences between the state and federal constitutions when none can be found.

One extensive article surveying the thinking concerning "new federalism" explains some of the deficiencies in the Court's approach:

Several observers of recent state constitutional activism have argued that state constitutions should be regarded as the primary sources of individual rights and liberties and that state courts should interpret state constitutions without reference to "all the old, familiar shorthand" of federal constitutional law. According to this "primacy" model, the state court should consider assertions of federal constitutional rights only after all claims resting on state law have failed to provide the requested protections. The assumption underlying this model is that the states are the primary sovereigns and that state constitutions are the basic charters of individual liberties and of the limits of governmental authority. In this model, federal law, including the fourteenth amendment, provides only limited constraints on state autonomy.

The failing of the primacy model is that this assumption no longer resembles reality. Nor does it reflect the fact that litigants typically present state constitutional issues only when they expect an unfavorable federal constitutional result. Federal assumption of the dominant role in the federal system--and particularly

in the protection of individual rights--has rendered the primacy model obsolete. When federal protections are extensive and well articulated, state court decisionmaking that eschews consideration of, or reliance on, federal doctrine not only will often be an inefficient route to an inevitable result, but also will lack the cogency that a reasoned reaction to the federal view could provide, particularly when parallel federal issues have been exhaustively discussed by the Supreme Court and commentators. In a community that perceives the Supreme Court to be the primary interpreter of constitutional rights, reliance on Supreme Court reasoning can help to legitimate state constitutional decisions that build on the federal base. When a state court diverges from the federal view, a reasoned explanation of the divergence may be necessary if the decision is to command respect.

For state constitutional law to assume a realistic role, state courts must acknowledge the dominance of federal law and focus directly on the gap-filling potential of state constitutions. This interstitial role recognizes federal doctrine as a settled floor of rights and asks whether and how to criticize, amplify, or supplement this doctrine to yield more extensive constitutional protections. The state

court's role is not to construct a complete system of fundamental rights from the ground up. [Footnotes omitted.]

Developments in the Law--The Interpretation of State Constitutional Rights, 95 HARV.L.REV. at 1356-1358; see also Stewart G. Pollack, State Constitutions as Separate Sources of Fundamental Rights, 35 RUTGERS L.REV. 707, 718.

It cannot be denied that there are rights protected by state constitutions that extend beyond those guaranteed by the United States Constitution. Many state constitutional provisions simply have no federal analogue. Three of the most important decisions this Court has ever issued were based upon such provisions. *Carrollton-Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.,* 826 S.W.2d 489 (Tex.1992); *Edgewood Indep. Sch. Dist. v. Kirby,* 804 S.W.2d 491 (Tex.1991); *Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d 391 (Tex.1989). In construing state constitutional provisions which have no federal counterpart, reference to federal law is usually of little utility.

When state and federal provisions overlap or correspond, state law, as well as federal law and the law of other states, may be helpful in analyzing their proper application. To ignore all federal constitutional law in construing state constitutional provisions guaranteeing rights common to both is as wrong as ignoring state constitutional provisions altogether. If nothing else, it is inefficient to blaze a trail through the wilderness when there is a perfectly good highway there already, built at considerable expense, and well traveled. But the problems of the Court's method run even deeper. The Court does not merely ignore federal law; it rejects it. And the rejection has a disturbing tone to it. "[O]ur concerns are Texas concerns," the Court asserts, a viewpoint that cannot be very comforting to out-of-state parties litigating in Texas courts.

2

The Court's claim that Texas courts have "recognized the importance of our state constitution" for more than a century, ante, at 13, cannot be disputed. Certainly, if state courts have not recognized the importance of our state constitution, they should have. This does not mean, of course, that any Texas court has ever employed the constitutional analysis used by the Court today. If the Court's new analytical method had really been followed in Texas for 100 years, as the Court means to suggest, it would hardly need the major defense the Court attempts to provide in this case. Today's opinion is significant only because the Court's methodology has not previously been the accepted model in Texas. In five of the cases the Court cites, we applied provisions of our constitution which have no federal counterpart: *In re Baby McLean,* 725 S.W.2d 696, 698 (Tex.1987) (article I, section 3a,

equal rights

amendment); *LeCroy v. Hanlon,* 713 S.W.2d 335, 341-42 (Tex.1986) (article I, section 13, open courts); [12] *Nelson v. Krusen,* 678 S.W.2d 918, 922 (Tex.1984) (open courts); *Sax v. Votteler,* 648 S.W.2d 661, 664 (Tex.1983) (open courts); *Bell v. Indian Live-Stock Co.,* 11 S.W. 344, 345 (Tex.1889) (article 16, section 28, protecting current wages for personal service from garnishment). *Travelers' Ins. Co. v. Marshall,* 124 Tex. 45, 76 S.W.2d 1007 (1934), analyzed both state and federal constitutional law, as many other cases from this Court have. Supra note 6. In Tucker, as we have noted, the Court referred to article I, section 8 and the First Amendment as "like" provisions, and Hajek relies entirely on Tucker. In *Whitworth v. Bynum,* 699 S.W.2d 194, 197 (Tex.1985), the Court applied state equal protection guarantees to declare our Guest Statute unconstitutional, but drew upon federal principles of analysis. Foster was decided by the Court of Criminal Appeals at a time when the First Amendment had not clearly been applied to the states. *Kemper v. State,* 63 Tex.Cr.R. 138 S.W. 1025, 1044-1045 (App.1911), cited by the Court for the proposition that even an opinion of the United States Supreme Court should be questioned by Texas courts if it improperly disregards the rights of Texans, was explicitly overruled on this very point one year later in *Robertson v. State,* 63 Tex.Cr.R. 216, 142 S.W. 533, 546 (App.1912) (holding that the right to confrontation under article I, section 10 of the state constitution shares a common heritage and interpretation with the Sixth Amendment, and deferring to the Supreme Court's interpretation that of right). And *McCormick and Heitman v. State,* 815 S.W.2d 681 (Tex.Crim.App.1991), consider both federal and state law in construing constitutional rights. None of the Texas cases the Court cites uses the method it endorses.

The Court's method is especially problematic in a case involving freedom of speech. As one commentator states:

There are good reasons for the state courts to look to federal law for guidance in the first amendment area, an area in which the issues now being addressed are intricate and difficult. The state courts are wrestling with essentially the same questions as the federal courts, and all approach those issues without a clear constitutional mandate. The states would therefore be foolish to ignore the convenient resource presented by the federal experience; an argument is no less persuasive because it relies upon or quotes an argument made elsewhere. Commentators who condemn state judiciaries for referring to federal doctrine when interpreting their own charters would force an irrational chauvinism on the state courts.

Developments in the Law--The Interpretation of State Constitutional Rights, 95 HARV.L.REV. at 1419

(emphasis added).

3

One argument the Court makes for its new method--avoidance of "unnecessary" federal review--is more subtle and requires more attention. The Court contends that its approach is more efficient because if a case is decided on state constitutional grounds, the United States Supreme Court cannot review it, and thus that Court's workload is reduced and the parties' dispute more quickly resolved. As evidence of the savings to be achieved using its approach, the Court cites a total of four decisions by state courts in the past seventeen years in which review by the United States Supreme Court could have been avoided. Even if it is assumed that all four cases could have been decided on state constitutional grounds unreviewable by the Supreme Court, reducing that Court's workload by four cases in 17 years would not measurably improve its efficiency. Nor do delays in so few cases over so long a period indicate a problem of any magnitude. Efficiency is not a very compelling basis for the Court's argument.

**Page 42**

But the Court has more serious reasons for wanting to avoid "unnecessary" federal review. The Court argues that enforcing state constitutional rights both protects values fundamental to the people of that state and commends them to the rest of the nation. The people of a state speak through their state constitution, the argument runs, and that voice should rule in the state and be heard in the nation. This argument, though true in some respects, is mostly a rhetorical appeal to state pride. More importantly, it understates the Court's goal. If a state constitutional provision has no federal counterpart, it must be given effect so long as that can be done without infringing upon the federal constitution. If state and federal constitutional provisions overlap, both must be considered; if they conflict, the state provision must give way. The undeniable fact that the people of a state are entitled to a voice in their government does not mean that the voice of the nation of which the state is a part can be ignored. The goal of the Court's methodology is not merely to augment a state's voice in national affairs, but to still the national voice in state affairs. The approach adopted by the Court is not limited to producing state participation in the national debate over fundamental issues; it seeks state autonomy.

That autonomy, the Court recognizes, is accomplished not by the state constitution itself, but by the interpretation of the constitution by the state's highest court. And this brings us to what lies at the very heart of the Court's position: the Justices of this Court, and not the United States Supreme Court, should determine the people's fundamental rights, and if our determinations are unsatisfactory, we can be replaced. By way of illustration, the Court cites Ex parte Rodriguez, 39 Tex.

706 (1873), as an unpopular decision resulting in the removal of the Justices of this Court by the Governor. This is the real sense in which federal review is "unnecessary".

There are several difficulties with the Court's position. First, it weakens the validity of constitutionalism and the rule of law. The essence of constitutionalism is that certain principles, endorsed by the people, become fundamental rules of law. How these rules apply in changing circumstances is often disputed, and the judiciary in this country has taken upon itself the ultimate responsibility of resolving those disputes, beginning with *Marbury v. Madison, 5 U.S. (1 Cranch)* 137, 2 L.Ed. 60 (1803). The people and the other branches of government have acquiesced in this delegation of responsibility in part, I think, because of their perception that the judiciary is bound in its construction and application of constitutional provisions by definite rules of law which preclude judges from substituting their personal policies for constitutional principles in the guise of construing those principles. Adherence to these rules is essential to the validity and the credibility of constitutionalism. For this reason, constitutional construction must be founded upon a careful construction of each provision's language, purpose, history and intent, as well as upon precedent, theory and fundamental values. If the analytical process is inadequate or flawed, the result may appear to be based primarily on the judge's policy preferences and not the constitutional principle itself. Chief Justice Hughes' observation cannot be avoided altogether: to some extent, at least, the constitution is what the judges say it is. CHARLES EVANS HUGHES, THE SUPREME COURT OF THE UNITED STATES 120 (1928). The statement continues to be true, not because of the fact that judges construe constitutions, but because of the way in which they do.

The Court decries the prospect that our constitution should "veer in meaning each time the United States Supreme Court issue[s] a new decision", but cites with approval the change in constitutional construction occasioned by the Governor's removal of the justices of this Court following Rodriguez. The problem is the same. If a court's constitutional determinations are not in a very real sense mandated by factors distinct from the personal policy views of the justices, constitutionalism is reduced to judicial tyranny. It is no answer to say that "unsatisfactory" constructions of the constitution can be corrected

**Page 43**

simply by removing the judges. This is not the way to amend the constitution. And while it might correct the result in particular cases for a time, it leaves the process of constitutionalism itself fatally flawed. Substituting one judge for another in order to change the meaning of the constitution concedes that the constitution has no

meaning apart from judges' views. The importance of individual judicial views cannot be denied, but they do not substitute for rules of law. Thus, constitutional construction must not be reduced to the issue of who is doing the construction, "we" or "they". Yet this is the result of the Court's approach, carried to its logical extreme.

The second difficulty with the Court's view that we should define fundamental constitutional rights without interference from outside the state is that it is premised on a one-dimensional view of those rights which is rarely accurate. If relator were constitutionally entitled to say whatever she pleased, this would be an easy case. But her right to speak freely is not absolute, under either the First Amendment or article I, section 8. In this case, relator's right conflicts with the district court's interest in protecting minor litigants, and the issue is whether the district court's interest warrants the restriction imposed on relator's right. This tension among competing rights and interests gives constitutional construction a multi-dimensional aspect. Thus, the Court's view that federal constitutional rights, which states cannot diminish, are a "federal safety net" is overly simplistic. Federal constitutional construction does not merely set minimum standards for protected rights which the states are free to increase; it strikes a balance among competing rights and interests that is itself of constitutional significance. While states may have more latitude in adjusting this balance than they do in reducing guaranteed protections, that latitude is not unlimited. State courts are not free from federal constitutional considerations in determining fundamental rights. The delicate balance among those rights and other interests must also be maintained.

Finally, the we-better-than-they argument evinces an inappropriate chauvinism toward the federal courts and other state courts. The concept of freedom of speech in this country did not originate in any one state, nor does any one court have a monopoly on its application. As it happens, the federal courts have been at construing the First Amendment much longer and far more often than Texas courts have had occasion to consider article I, section 8. The federal courts' experience in defining the contours of freedom of speech ought to be invaluable. To ignore it simply because we can is both imprudent and arrogant.

4

Having reviewed the Court's decision, the basis offered for it, and the defense of its new analytical method, I return to the question posed at the beginning: why should the Court go so far out of its way to invalidate the gag orders in this case on state constitutional grounds? The answer has nothing to do with the result in this case. We are unanimous in our judgment as to the outcome. The answer is not that relator's state and federal constitutional rights are different. So far as this case is concerned, they are identical. The Court's motives are ulterior. One commentator has observed that "some critics have argued that virtually all New Federalism proponents are motivated by the bare desire to achieve a liberal political agenda". Gardner, supra note 10, at 772. Whether the agenda is "liberal" or "conservative" or something else altogether makes no difference. The vice is that a non-legal influence has been brought to bear on judicial decision making. This is not "new federalism"; it is "new judicialism". The Court by its opinion today is vulnerable to this charge.

II

Relator complains that she and others have been denied access to court files concerning the pending litigation. She requests that the district court be ordered not to deny her access to these records. There are several affidavits before us, some tending to substantiate relator's position

**Page 44**

and others contradicting it. Our record contains no written order restricting access to court files, and relator does not claim that any such written order exists.

The Court rightly concludes that we cannot resolve factual disputes in a mandamus proceeding and therefore cannot grant relator's request for relief. The Court is not content to leave the matter at that, however, lest any doubt linger as to the result it intends. Thus, it adds that if the district court did restrict access to its files, it abused its discretion and violated TEX.R.CIV.P. 76a; that "there should be no impediment to viewing the court records"; that the district court should make all its records open and available to the public; and that if "[r]elator should find her access to the records in any way obstructed," she may seek additional relief. Ante, at 24. This last statement assumes that relator's access to court files has been restricted, contrary to the Court's conclusion that it cannot and has not made that determination. This rather obvious flaw aside, the Court's writing strike me as fairly heavyhanded nudging.

Rule 121(a)(2)(C), TEX.R.APP.P., requires that a certified or sworn copy of the order complained of be attached to a petition for mandamus. No such order is attached to relator's petition in this case, nor, as noted above, is one alleged to exist. If relator believed that her access to court records had been informally restricted by the district court, she should have moved for access, requested a hearing, and either obtained a ruling from the court or a record reflecting the court's refusal to rule. Without a written order or a court's refusal to issue one, this Court should neither issue mandamus nor comment on the merits of relator's complaint.

III

I agree with the Court that the district court did not abuse its discretion in removing relator as guardian ad litem of the minor plaintiffs. A guardian ad litem may be appointed for a ward only if the ward's next friend or guardian has an interest adverse to the ward's. TEX.R.CIV.P. 173. [13] A court has no discretion to appoint a guardian ad litem for a person whose next friend or guardian has no such adverse interest, even if the court finds that appointment of a guardian ad litem would be in the person's best interest. Indeed, the next friend or guardian has a right to represent the person without the imposition of a guardian ad litem unless a conflict of interests exists. If the conflict of interest which occasioned the appointment of a guardian ad litem disappears, then it seems to me the guardian ad litem must be removed. It makes little sense that a guardian ad litem cannot be appointed without a conflict of interests between the ward and his next friend or guardian, but may continue to serve after the conflict disappears. See *In re Judicial Settlement of the First Intermediate Account of Proceedings of Manufacturers Hanover Trust Co.,* 83 A.D.2d 808, 442 N.Y.S.2d 7 (1981) (removal of guardian ad litem permissible to save expenses when court determines that the father has no conflict with the minor); *United States v. Noble,* 269 F.Supp. 814, 816 (E.D.N.Y.1967).

The best interest of a ward is sufficient cause for the trial court to replace one guardian ad litem with another. A particular guardian ad litem must be removed or replaced if the ward's best interest requires. See *Barrow v. Durham,* 574 S.W.2d 857, 861 (Tex.Civ.App.--Corpus Christi 1978), aff'd, 600 S.W.2d 756 (Tex.1980) (if guardian's interests are adverse to those of child, then it is abuse of discretion for trial judge not to appoint a new guardian ad litem); *Peters v. Allen,* 296 S.W. 929, 932 (Tex.Civ.App.--San Antonio 1927, no writ) ("if the trial court sees that the ward's interest is not properly protected, it

**Page 45**

is the court's duty to promptly interpose in the ward's behalf to remedy the error, and, if necessary, remove the guardian ad litem and appoint another"); see also *In re Estate of Lacy,* 54 Cal.App.3d 172, 126 Cal.Rptr. 432, 441 (1975) (guardian ad litem who became co-beneficiary of will with minor had adverse interest and should be replaced); *In re Guardianship of Lauderdale,* 15 Wash.App. 321, 549 P.2d 42, 46 (1976) (guardian ad litem cannot represent two minors with conflicting interests). However, the best interests of the ward are not a necessary cause for removal of a guardian ad litem altogether.

The law presumes that it is not in the ward's best interests for a guardian ad litem to supplant an otherwise qualified parent, next friend or guardian. Even if the guardian ad litem were a more effective representative for the ward, the rights of parents, next friends and guardians cannot be set aside in this manner. Furthermore, the service of a guardian ad litem is a burden on the parties to a case. That burden is necessary when the ward's rights cannot legally be served by a parent, next friend or guardian with conflicting interests. The burden is unjustified, however, when those conflicting interests do not exist.

In the present case, the district court determined that no further conflicts of interest exist among the minor plaintiffs and their parents, next friends or guardians who would otherwise represent them in the litigation. The court explicitly stated in its order removing the guardian that because there was "no apparent conflicting or adverse interests between the Next Friends and minors ... the appointment and retention of a Guardian Ad Litem [was] not necessary." All the parties in this latter category have settled their claims in the litigation; only the minors' claims remain. Not only are the parents and others now qualified to represent the minor children, they are entitled to do so without interference from a guardian ad litem. [14] Therefore, I agree with the Court that the trial court correctly dismissed the guardian ad litem in this case.

\* \* \* \* \* \*

For these reasons, I concur only in the Court's judgment.

---------

Notes:

[1] The constitution now explicitly protects Texans' "right, in a peaceable manner, to assemble together for their common good; and apply to those invested with the powers of government for redress of grievances or other purposes, by petition, address or remonstrance." Tex. Const. art. I, § 27.

[2] Joseph W. McKnight, *Stephen Austin's Legalistic Concerns,* 89 Sw.Hist.Q. 239, 246-47, 263-64 (1986).

[3] Eugene C. Barker, *Stephen F. Austin, in The Handbook of Texas* 84 (Walter Prescott Webb ed. 1952); Robert E. Hall, *Remonstrance--Citizen's Weapon Against Government's Indifference,* 68 Tex.L.Rev. 1409, 1417, 1421 (1990) (hereinafter Hall, *Remonstrance* ).

[4] *See* Hall, *Remonstrance,* at 1412-21; Robert A. Calvert and Arnoldo De Leon, *The History of Texas* 56-58 (1990); John Sayles,*Introduction* to *Texas Constitutions* 129-35 (4th ed. 1893); T.R. Fehrenbach, *Fire and Blood: A History of Mexico* 378-379 (1973); Arvel Ponton III, *Sources of Liberty in the Texas Bill of Rights,* 20 St. Mary's L.J. 93, 100 (1988) (hereinafter Ponton, *Sources of Liberty* ).

[5] Lorenzo de Zavala had ample reason to be concerned with freedom of expression at the time of his drafting substantial portions of the 1836 Constitution. He was in

hiding from a wide-scale manhunt ordered by Santa Anna because of his letters and speeches criticizing the Mexican government. Raymond Estep, *Lorenzo de Zavala and the Texas Revolution,* 57 Sw.Hist.Q. 322 (1954). *See also* Calvert & De Leon at 65.

[6] The decision of the delegates to replace the 1836 language with the free speech provision of the Tennessee Constitution was later reversed. *Journals of the Convention* 74-75 (1845), *reprinted in Journals of the Convention* (Shoal Creek Publishers 1974).

[7] Not even conventional limits on free speech curbed the sweeping scope of the free speech guarantee; the delegates defeated a provision to deem libelous speech injurious to female reputation, without inquiry into its truth. Ponton, *Sources of Liberty,* at 106 n. 102, quoting *Debates of the 1845 Constitutional Convention* 94 (1846).

[8] As the break with the Union loomed, Governor Sam Houston and others argued for independence rather than alliance with the Confederacy. Mark E. Nackman, *A Nation Within A Nation: The Rise of Texas Nationalism* 127-31 (1975).

[9] *Seeinfra,* text accompanying notes 38-41.

[10] *The Convention and its Work,* Galveston Daily News, Aug. 24, 1875 at 1, col. 2. ("to agree upon ... the Bill of Rights, ought not to be difficult. There is nothing new in the fundamental province of reason and conscience and justice."). This newspaper's reports of the 1875 convention are significant not only as the report of the leading paper in one of the state's first major cities, but also because it printed bulk copies of the constitution and the official journal of the convention.

[11] The first report of the Bill of Rights committee "[found] the members discordant." *Second Dispatch,* Galveston Daily News, Sept. 15, 1875 at 1, col. 4.

[12] *Constitutional Convention, Forty-Third Day,* Galveston Daily News, Oct. 23, 1875 at 1, col. 3.

[13] *See Journal of the Constitutional Convention* 62 (1875) (proposal of Delegate Brady). Like the First Amendment, this proposal was framed purely as a negative restriction on enactment of laws restraining speech. Along with other proposals, it was rejected in favor of including an affirmative grant of the liberty to speak and publish. *See* Galveston Daily News, Oct. 13, 1875 at 1, col. 3 (recording the rejection of an alternative free speech provision in favor of the language of the 1845 Constitution).

[14] This condemnation of prior restraints is understandable:

Prior restraints fall on speech with a brutality and a finality all their own.... [T]he violator of a statute

punishing speech criminally knows that he will go before a jury, and may be willing to take his chance, counting on a possible acquittal. A prior restraint, therefore, stops more speech more effectively. A criminal statute chills, prior restraint freezes.

Alexander M. Bickel, *The Morality of Consent* 61 (1975).

[15] *See, e.g.,Chaplinsky v. New Hampshire,* 315 U.S. 568, 569, 62 S.Ct. 766, 768, 86 L.Ed. 1031 (1942) (upholding conviction of a Jehovah's Witness for calling a city marshal a "damned fascist" and a "racketeer").

[16] Concerned that public prejudice could prevent impanelling of a jury, a trial judge issued an order restraining the news media from publishing any information about a murder suspect in *Nebraska Press Ass'n v. Stuart,* 427 U.S. at 542-43, 96 S.Ct. at 2794-95. The United States Supreme Court invalidated the order as an unconstitutional prior restraint, noting that: (1) the underlying basis was too speculative; (2) less restrictive alternatives were not investigated; (3) no evidence was presented that the prior restraint would have in fact achieved its purpose; and (4) the order was overbroad. *Id.* at 562-69, 96 S.Ct. at 2804-08. These conclusions are quite fact specific, *id.* at 569, 96 S.Ct. at 2807, and thus only serve to reinforce a presumption that prior restraints, including those directed at media publication, are unconstitutional.

In *Bernard v. Gulf Oil Co.,* 619 F.2d 459 (5th Cir.1980), the federal authority upon which the concurrence rests almost its entire analysis, the trial judge prohibited the plaintiffs and their attorneys in a class action from communicating with any potential class members without court approval. The Fifth Circuit held that, in the context of Rule 23(d) of the Federal Rules of Civil Procedure, the order was violative of the First Amendment. *Id.* at 475-78.

The majority recognized that as to the first prong of its test, "[a]t least three [Supreme Court] justices may have rejected even that standard as overly lenient." *Id.* at 473. A concurrence characterized the "majority's first amendment analysis [as a] needless excursion into a difficult and little-explored area of constitutional law." *Id.* at 481 (Tjoflat, J., concurring). If anything, the admittedly unsettled nature of the federal law reflected in these writings supports development of an independent standard under the Texas Constitution. *See alsoinfra,* text accompanying notes 59-63.

[17] The only other factors to be considered under *Nebraska Press* are the extent of pretrial news coverage and the effectiveness of the restraining order. We note that to the extent that this opinion cites any federal law, such precedent is used only for guidance, and in no way necessitates the result reached by this court today.

[18] That standard has been largely developed in the context of criminal rather than civil proceedings,

weighing the press' First Amendment rights against an accused's Sixth Amendment right to a fair trial. *See* Sheryl A. Bjork, Comment, *Indirect Gag Orders and the Doctrine of Prior Restraint,* 44 U. Miami L.Rev. 165, 166 (1989). For instance, the first element in this test, the extent of pretrial news coverage, usually has little bearing on a civil proceeding.

[19] *Nebraska Press,* a splintered decision with five separate opinions, has been appropriately criticized for failing to provide a comprehensive guarantee of free expression. *See* Stephen R. Barnett, *The Puzzle of Prior Restraint,* 29 Stan.L.Rev. 539, 541 (1977); Benno C. Schmidt, Jr., *Nebraska Press Association: An Expansion of Freedom and Contraction of Theory,* 29 Stan.L.Rev. 431, 461 (1977). Nor are we the first state to recognize the inadequacy of the federal approach. *See State v. Coe,* 101 Wash.2d 364, 679 P.2d 353, 358-59 (1984). *See also infra,* note 32.

[20] Neither *Nebraska Press* nor any other ruling of the United States Supreme Court has specifically considered such an order. Indeed, there is a confusing split of federal authority on this matter. *SeeIn re Dow Jones,* 842 F.2d 603, 608-10 (2d.Cir.), *cert. denied, sub nom.Dow Jones & Co., Inc. v. Simon,* 488 U.S. 946, 109 S.Ct. 377, 102 L.Ed.2d 365 (1988) (gag orders on trial participants are subject to a lesser degree of scrutiny than are prior restraints); *In re Russell,* 726 F.2d 1007, 1010 (4th Cir.1984) (relying on *Nebraska Press* to uphold a gag order on trial participants); *but seeJournal Publishing Co. v. Mechem,* 801 F.2d 1233, 1236 (10th Cir.1986) (gag orders on trial participants constitute prior restraint). The end result has been an increase in the number of gag orders on parties to ongoing litigation. Bjork, *Indirect Gag Orders,* at 174 & n. 71.

[21] From 1970 to 1989, approximately six hundred published opinions relied on state constitutional grounds to provide protections broader than federally interpreted guarantees under the United States Constitution. Linda B. Matarese, *Other Voices: The Role of Justices Durham, Kaye and Abrahamson in Shaping the "New Judicial Federalism",* 2 Emerging Issues in St. Const.L. 239, 246 (1989).

[22] *See* Peter J. Galie, *State Supreme Courts, Judicial Federalism and the Other Constitutions,* 71 Judicature 100, 100 n. 10 (1987) (of approximately three hundred articles, "all but a handful are favorable."); Judith S. Kaye, *A Midpoint Perspective on Directions in State Constitutional Law,* 1 Emerging Issues in St. Const.L. 17, 17 (1988).

Many of the articles listed by the concurrence as opposed to this method in fact support judicial reliance on state constitutions. *See, e.g.,* Robert F. Utter, *Swimming in the Jaws of the Crocodile: State Court Comment on Federal Constitutional Issues when Disposing of Cases on State Constitutional Grounds,* 63 Tex.L.Rev. 1025, 1050 (1985) (hereinafter Utter, *State Court Comment* ) (while noting the usefulness of "comment" on federal law, concluding that "a state supreme court should ... embark upon the interpretation of its own constitution, relying on it to protect the rights of its citizens"); Donald E. Wilkes, Jr., *First Things Last: Amendomania and State Bills of Rights,* 54 Miss.L.Rev. 233, 257 (1984) (describing as "alarming" the attempt "to curtail state court protection of individual rights"); Robert F. Williams, *State Constitutional Law Process,* 24 Wm. & Mary L.Rev. 169, 190 (1983) (urging state courts "to develop truly independent state constitutional jurisprudence"); *Developments in the Law--The Interpretation of State Constitutional Rights,* 95 Harv.L.Rev. 1324, 1498 (1982) ("It is vital that the [United States] Supreme Court's interpretation of the federal Constitution control federal constitutional law; it is not only unnecessary but also irrational that it control state law as well."); Ronald K.L. Collins, Commentary, *Reliance on State Constitutions--Away from a Reactionary Approach,* 9 Hastings Const. L.Q. 1, 2 (1981) (the "rediscovery of state constitutions is certainly a good omen for a nation conceived in federalism"); Martha Craig Daughtrey, *State Court Activism and Other Symptoms of the New Federalism,* 45 Tenn.L.Rev. 731, 736 (1978) (praising the "growing number of high state courts" that have accorded broader protections than are available under the federal Constitution). *See also infra,* notes 33 & 36.

[23] *See, e.g.,City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 293, 102 S.Ct. 1070, 1076, 71 L.Ed.2d 152 (1982) (acknowledging that the Texas Constitution could provide broader protections than federal Constitution); *Carreras v. City of Anaheim,* 768 F.2d 1039, 1042-43 (9th Cir.1985) (finding a restraining order overbroad under the California Constitution). *Farmers New World Life Ins. Co. v. Bountiful City,* 803 P.2d 1241 (Utah 1990) (looking to federal law only after finding no inverse condemnation under the state constitution); *Mountain States Tel. & Tel. Co. v. Arizona Corp. Comm'n,* 160 Ariz. 350, 773 P.2d 455, 461 (1989); *In re T.W.,* 551 So.2d 1186, 1190 (Fla.1989); *O'Neill v. Oakgrove Constr.,* 71 N.Y.2d 521, 528 N.Y.S.2d 1, 6, 523 N.E.2d 277, 282 (1988) (Kaye, J., concurring); *State v. Jewett,* 146 Vt. 221, 500 A.2d 233, 238 (1985) (federal law considered but required briefing of the state constitutional issue before the case could be decided); *State v. Koppel,* 127 N.H. 286, 499 A.2d 977, 979 (1985); *State v. Beno,* 116 Wis.2d 122, 341 N.W.2d 668 (1984) (following the state constitution even though recognizing the existence of a closely corresponding federal speech and debate clause found in U.S. Const. Art. 1, § 6, cl. 1); *People v. Rolfingsmeyer,* 101 Ill.2d 137, 77 Ill.Dec. 787, 790-92, 461 N.E.2d 410, 413-15 (1984) (Simon, J., concurring); *State v. Hunt,* 91 N.J. 338, 450 A.2d 952, 959 (1982) (Pashman, J., concurring); *Ravin v. State,* 537 P.2d 494, 513-15 (Alaska 1975) (Boochever, J., concurring); *Burrows v. Superior Court of San Bernardino County,* 13 Cal.3d 238, 118 Cal.Rptr. 166, 529 P.2d 590 (1975); *Freedman v. New Jersey State Police,* 135 N.J.Super.

297, 343 A.2d 148, 150 (1975); William J. Brennan, Jr., *The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights,* 61 N.Y.U.L.Rev. 535 (1986) (hereinafter Brennan, *Revival of State Constitutions* ); Stewart G. Pollock, *Adequate and Independent State Grounds as a Means of Balancing the Relationship Between State and Federal Courts,* 63 Tex.L.Rev. 977 (1985) (hereinafter Pollock, *Independent State Grounds* ); Hans A. Linde, *E Pluribus--Constitutional Theory and State Courts,* 18 Ga.L.Rev. 165 (1983) (hereinafter Linde, *E Pluribus* ); Hans A. Linde, *First Things First: Rediscovering the State's Bills of Rights,* 9 U.Balt.L.Rev. 379, 383 (1980). *See also Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887, 894, 903 (1991) (looking to federal law first but then relying on the state constitution); *State v. Larocco,* 794 P.2d 460 (Utah 1990) (federal law examined but rejected as inadequate); *City of Hillsboro v. Purcell,* 306 Or. 547, 761 P.2d 510 (1988) (discussing federal law but then deciding the case under the state constitution); *Colorado Civil Rights Comm'n v. Traveler's Ins. Co.,* 759 P.2d 1358, 1362-63 (Colo.1988) (reversing the lower court for relying on federal law when the state constitution contained unique provisions).

[24] In 1889, for instance, this court applied the state constitution to protect non-residents from wage garnishment, concluding that "[w]e do not consider it necessary to discuss the effect which the adoption of the Fourteenth amendment to the constitution of the United States had with reference to state statutes discriminating in favor of its own citizens." *Bell v. Indian Live-Stock Co.,* 11 S.W. 344, 345 (Tex.1889).

[25] The experience of finding state constitutionally guaranteed free speech prior to the application of the First Amendment to the states was shared by many sister states. *See* Utter, *State Court Comment,* at 1033 (free speech rights "received attention in state courts before their interpretation by the federal courts."). The First Amendment was not applied to the states until *Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), and prior restraints were not considered in the context of gag orders until *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Twenty-eight years earlier, a Texas court had addressed the issue of gag orders in *Ex Parte Foster,* 71 S.W. 593.

[26] This approach was again applied to invalidate a similar statute in *Nelson v. Krusen,* 678 S.W.2d 918, 921 (Tex.1984) ("Our disposition of the Nelson's open courts argument makes consideration of the other constitutional claims unnecessary.").

[27] The recent increase in cases by this court which rely solely on the Texas Constitution has received national attention. *See* Ken Gormley, *Significant Developments in State Constitutional Law,* 2 Emerging Issues in St. Const.L. 1, 29 (1989).

What the concurrence really urges today is that we overrule the enlightened thinking of *LeCroy* regarding the "independent vitality" of our constitution and discard an entire series of rulings by this court.

[28] *See also Whitworth v. Bynum,* 699 S.W.2d 194, 197 (Tex.1985) ( "[h]aving decided the statute to be unconstitutional under the Texas Constitution," the court found addressing the federal constitutional question unnecessary); *Hajek v. Bill Mowbray Motors, Inc.,* 647 S.W.2d 253 (Tex.1983) (per curiam) (relying solely on the Texas Constitution to invalidate a temporary injunction against driving a car with a lemon painted on it and a message disparaging the dealership which sold the car, and reversing a court of appeals opinion which relied solely on federal law).

[29] *See also, Olson v. State,* 484 S.W.2d 756, 762 (Tex.Crim.App.1972) (opinion on motion for rehearing) ("as to the true scope of the Texas Constitution, we must ultimately follow our own lights").

[30] *See also Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347-48, 94 S.Ct. 2997, 3010-11, 41 L.Ed.2d 789 (1974) (explicitly leaving the states free to develop their own standard of liability for a publisher of defamatory falsehoods about private individuals); *Branzburg v. Hayes,* 408 U.S. 665, 706, 92 S.Ct. 2646, 2669, 33 L.Ed.2d 626 (1972) ("It goes without saying, of course, that we are powerless to bar state courts from responding in their own way and construing their own constitutions so as to recognize a newsman's privilege."). The concurrence, though urging adherence to federal precedent, fails to acknowledge that the federal courts have encouraged state courts to embark upon independent analysis of their own constitutions.

[31] *See also People v. Scott,* 79 N.Y.2d 474, 505, 583 N.Y.S.2d 920, 939, 593 N.E.2d 1328, 1347 (1992) (Kaye, J., concurring) ("Time and time again in recent years, the Supreme Court as well as its individual Justices have reminded state courts not merely of their right but also of their responsibility to interpret their own constitutions...."); Stanley H. Friedelbaum, *Supreme Courts in Conflict: The Drama of Disagreement,* 17 Intergovernmental Perspective 27, 27 (1991) (the renewed emphasis on state constitutional law met with broad approval from all members of the U.S. Supreme Court).

[32] *See, e.g., Barron v. Florida Freedom Newspapers, Inc.,* 531 So.2d 113 (Fla.1988) (dissolving a protective order in a marital dissolution proceeding primarily on state constitutional grounds); *State v. Coe,* 101 Wash.2d 364, 679 P.2d 353 (1984) (trial court order restraining the press violates the state constitution); *State ex rel. Herald Mail Co. v. Hamilton,* 165 W.Va. 103, 267 S.E.2d 544 (1980) (relying on the state constitution to disallow a trial court order closing the court during portions of the pretrial of a murder case.); *Phoenix Newspapers, Inc. v.*

*Superior Court,* 101 Ariz. 257, 418 P.2d 594 (1966) (striking down prior restraint against press reporting); *Dailey v. Superior Court,* 112 Cal. 94, 44 P. 458 (1896) (voiding injunction against performance of play depicting story of case then on trial).

[33] "No set of legal institutions or prescriptions exists apart from the narratives that locate it and give it meaning. For every constitution there is an epic...." Robert M. Cover, *Foreword: Nomos and Narrative,* 97 Harv.L.Rev. 4, 4 (1983).

The opposite view taken by the concurrence receives support from Professor Gardner, who argues that "Americans are now a people who are so alike from state to state; and whose identity is so much associated with national values and institutions, that the notion of significant local variations in character and identity is just too implausible to take seriously." James A. Gardner, *The Failed Discourse of State Constitutionalism,* 90 Mich.L.Rev. 761, 818 (1992) (hereinafter Gardner, *Failed Discourse* ). He adds his "belief" that "few Americans identify themselves with a community purporting to embrace an entire state." *Id.* at 835. When contrasted with the just pride that our citizens feel in being Texans, perhaps this very writing by an Associate Professor at the Western New England College School of Law demonstrates how truly diverse this nation remains. Texans value our institutions and heritage, and our citizens would certainly dispute that their concerns are identical to those of the people of Rhode Island or North Dakota. Unlike the concurrence, we share the view of Woodrow Wilson, who observed that ours is "a singularly various country." Woodrow Wilson, *The Political Thought of Woodrow Wilson* 130-31 (E. David Cronon, ed. 1965) (hereinafter Woodrow Wilson, *Political Thought* ).

[34] *The Constitutional Convention,* Galveston Daily News, May 14, 1875 at 1, col. 1.

[35] For discussions of some of those differences, see Ponton, *Sources of Liberty;* James C. Harrington, *Reemergence of Texas Constitutional Protection,* 2 Emerging Issues in St. Const.L. 101, 106 & n. 22 (1989).

[36] The few existing critics of state constitutionalism, *see supra,* note 22, have challenged the legitimacy of those constitutions on the basis that they actually lack meaningful, independent identities. *See generally,* Gardner, *Failed Discourse.* Gardner suggests that:

If we are to take seriously the notion that the state constitution reveals the character of the people, we may be forced to the unappetizing conclusion that the people of New York, or California, *or Texas* are simply a frivolous people who are unable to distinguish between things that are truly important and things that are not.... A people who are frivolous, or fickle, or unreflective, are a people not worthy of respect.

*Id.* at 819-20 (emphasis added). He continues that "[t]he stories to which [state constitutions] lend themselves are not stories of principle and integrity, but stories of expediency and compromise at best, foolishness and inconstancy at worst." *Id.* at 822. Rather than lending credence to this position with a lengthy response, we let our opinion today stand as an example of the effective role that a carefully crafted and well-grounded state constitution can play. To accept the proposition that our constitution is simply a thing of frivolity is to erase well over a century of history and of law as well as to undermine the very foundation of this court.

[37] Having a constitutional convention "without consulting the national authority" might give the United States Congress "a pretext to charge us with bad faith, with a violation of the conditions upon which the Reconstruction laws were declared inoperative," wrote one Waco citizen. Galveston Daily News, Jan. 8, 1874 at 2, col. 6.

[38] Earning the nickname of the "Semicolon Court," Calvert & De Leon at 146, the court was harshly attacked:

[T]he rule is ... imperative that *constitutions and statutes are to be liberally and scrupulously construed with reference to that supreme consideration--the free and effective expression of the will of the body of electors.*

*A Principle That Should Govern,* Galveston Daily News, Jan. 3, 1874 at 1, col. 1 (emphasis added).

[39] Galveston Daily News, Jan. 14, 1874, at 1, col. 2.

[40] Delegate Flournoy echoed these sentiments. In describing the former section one, which allowed the state to change its laws only "subject to the national authority," he stated:

[It] embrace[d] in the constitution a mere useless insult to the great mass of the people of Texas, but also ... assert[ed] a fundamental principle of government utterly at war with the whole theory of American republicanism....

[I]t is an abandonment of the elementary law of State government in this Union to place the right of local self government subject to the national authority.... [T]o declare that the national authority (which means, if anything, the party temporarily in power) shall authorize or inhibit the people of Texas from managing their local affairs is a step toward centralism ... further than the people of any State have ever dreamed of going.

Address of Delegate Flournoy, *in Ratify,* Galveston Daily News, Dec. 19, 1875, at 2, col. 5.

[41] Pollock, *Independent State Grounds,* at 984 (1985).

[42] *See* Hans A. Linde, *Does the "New Federalism"*

*Have a Future?,* 4 Emerging Issues in St. Const.L. 251, 252-53 (1991) (hereinafter Linde, *New Federalism* ).

[43] *Id.* at 253.

[44] *See, e.g.,White v. State,* 521 S.W.2d 255 (Tex.Crim.App.1974), *rev'd,* 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975), *on remand,* 543 S.W.2d 366 (Tex.Crim.App.1976) (noting that search was invalid under state constitution, but that the argument was waived); *State v. Hershberger,* 444 N.W.2d 282 (Minn.1989), *vacated,* 495 U.S. 901, 110 S.Ct. 1918, 109 L.Ed.2d 282 (1990), *on remand,* 462 N.W.2d 393 (Minn.1990) (finding slow-moving vehicle sign requirement on Amish carriages in violation of state free exercise rights); *Upton,* 466 U.S. 727, 104 S.Ct. 2085, *on remand,Commonwealth v. Upton,* 394 Mass. 363, 476 N.E.2d 548 (1985); *State v. Kennedy,* 295 Or. 260, 666 P.2d 1316 (1983) (affirming criminal conviction despite prosecutorial misconduct under state constitution on remand from the Supreme Court); *State v. Opperman,* 89 S.D. 25, 228 N.W.2d 152 (1975), *rev'd,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), *on remand,* 247 N.W.2d 673 (S.D.1976) (finding a search unconstitutional under state law).

[45] Linde, *E Pluribus,* at 199.

[46] A.E. Dick Howard, *The Renaissance of State Constitutional Law,* 1 Emerging Issues in St. Const.L. 1, 14 (1988).

[47] Ronald K.L. Collins, *Forward, Reliance on State Constitutions--Beyond the "New Federalism",* 8 U. Puget Sound L.Rev. vi, xi (1985). One example of this popular constitutionalism is *Hewitt v. Saif,* 294 Or. 33, 653 P.2d 970, 975 (1982), which declined to follow federal equal protection analysis because it involved "outmoded" national stereotypes of the roles of men and women which were no longer applicable in Oregon.

[48] As one former president observed:

We know that ... it would be folly to apply uniform rules of development to all parts of the country, that our strength has been in the elasticity of our institutions, in the almost infinite adaptability of our laws, that our vitality has consisted largely in the dispersion of political authority, in the necessity that communities should take care of themselves and work out their own order and progress."

Woodrow Wilson, *Political Thought,* at 130-31.

[49] Federalism is not a one-way street. Just as we have sometimes looked to federal law for guidance, the United States Supreme Court has in the past looked to state constitutional jurisprudence in developing its own law. In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the court applied the approach of several state courts to race-based peremptory challenges,

noting that at least two federal courts of appeal had already "follow[ed] the lead of a number of state courts construing their State's Constitution." *Id.* at 82 n. 1, 106 S.Ct. at 1715 n. 1. *See alsoMapp v. Ohio,* 367 U.S. 643, 651, 81 S.Ct. 1684, 1689, 6 L.Ed.2d 1081 (1961) (holding evidence seized in violation of the federal constitution inadmissible, and noting that over half the states had already adopted this approach).

[50] One of the few possible criticisms of reliance on state constitutions is the notion that a crisis in national stability will result. *See* Gardner, *Failed Discourse,* at 818, 827 (raising the specter of the Civil War and of the breakup of the former Soviet Union). The approach we utilize today has not before and will not contribute to the demise of this nation, for Texas and other states have long applied different laws, yet the Union survives. Diversity is precisely what our federalism intends, even though the result is sometimes "untidy." Pollock, *Independent State Grounds,* at 979. Even our system of lawyer licensing recognizes the need for attorneys to be expert in the law of their own state. If our sole, supreme value were uniformity, this court could close its doors, and Texas attorneys could simply take a federal bar examination.

[51] *See alsoLeCroy,* 713 S.W.2d at 339; *Sax v. Votteler,* 648 S.W.2d 661; *In re Baby McLean,* 725 S.W.2d at 698 (concluding that because the Texas Equal Rights Amendment of 1972 was worded differently than the earlier enacted federal provision, it may have intended different results).

[52] Our analysis of the history of Texas and its constitution thus in no way detracts either from the dignity of the text itself or from the realities of the present. Rather, we use history to assist in an understanding of the generalities and ambiguities sometimes present in a constitution.

[53] *See, e.g.,Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887, 895 (1991) (federal precedent may be cited, but it is not binding on the state court). As Justice Brennan summarized this approach:

[S]tate court judges ... do well to scrutinize constitutional decisions by federal courts, for only if they are found to be logically persuasive and well-reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees, may they properly claim persuasive weight as guideposts when interpreting counterpart state guarantees.

William J. Brennan, *State Constitutions and the Protection of Individual Rights,* 90 Harv.L.Rev. 489, 502 (1977).

[54] "We do not think that an opinion, even though it be by the Supreme Court of the United States," which improperly disregards the rights of Texans, should "be 'seriously regarded' by the courts of Texas." *Kemper v.*

*State,* 63 Tex.Cr.R. 1, 138 S.W. 1025, 1044-45 (App.1911) (rejecting the federal rule allowing introduction at trial of evidence obtained at a preliminary investigation from an unavailable witness). In reconsidering and overruling the substantive rule of *Kemper* in *Robertson v. State,* 63 Tex.Cr.R. 216, 142 S.W. 533 (App.1912), the Court of Criminal Appeals did not simply "defer[ ] to the Supreme Court's interpretation," 834 S.W.2d at 41, but rather relied on the particular state constitutional language involved and considered rulings in other state and federal courts. Louisiana, also following this approach, rejected federal equal protection analysis because "[t]he federal three level system is in disarray and has failed to provide a theoretically sound framework for constitutional adjudication." *Sibley v. Bd. of Supervisors of Louisiana State University,* 477 So.2d 1094, 1107 (La.1985) (plurality opinion).

[55] For various attempts at an adequate "plain statement," see *Long v. State,* 742 S.W.2d 302, 323 n. 22 (Tex.Crim.App.1987) (en banc); *State v. Kennedy,* 295 Or. 260, 666 P.2d 1316, 1321 (1983); *State v. Ball,* 124 N.H. 226, 471 A.2d 347, 352 (1983). *See also supra,* note 17.

[56] *See, e.g.,Strahler v. St. Luke's Hosp.,* 706 S.W.2d 7, 10-11 (Mo.1986) (en banc) (following this court's methodology and result in *Sax* in striking down a statute of limitations under the Missouri Constitution); *Mountain States Tel. & Tel. Co. v. Arizona Corp. Comm'n,* 160 Ariz. 350, 773 P.2d 455, 460 (1989) (following the Texas Court of Criminal Appeals' approach in *McCormick* and *Foster* in striking down prior restraints against newspapers under their own state constitution); *Coleman v. Utah State Land Bd.,* 795 P.2d 622, 632 n. 2 (Utah 1990) (looking to other states' constitutions to help determine whether the Utah Constitution's provisions are self-executing); *Horton v. Meskill,* 172 Conn. 615, 376 A.2d 359, 373 (1977) (examining the law of other states rather than the Supreme Court's opinion in *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), in striking down state's school financing).

[57] *SeeBarrio v. San Manuel Div. Hosp.,* 143 Ariz. 101, 692 P.2d 280, 283 (1984); *Gray v. Dep't of Employment Sec.,* 681 P.2d 807, 825 n. 2 (Utah 1984) (Durham, J., concurring and dissenting); *State v. Opperman,* 247 N.W.2d 673 (S.D.1976). For cases which ordered further briefing, see *State v. Jewett,* 146 Vt. 221, 500 A.2d 233, 234 (1985); *State v. Kennedy,* 295 Or. 260, 666 P.2d 1316, 1321 (1983).

[58] Legal academia may have unwittingly contributed to the common failure of counsel to brief thoroughly state constitutional issues by sometimes viewing them as the "bush league of constitutional law." Linde,*New Federalism,* at 251.

[59] *See supra,* notes 16, 19 & 20.

[60] *Bernard v. Gulf Oil Co.,* 596 F.2d 1249 (1979), *reversed in part,* 619 F.2d 459.

[61] 619 F.2d at 466.

[62] The Supreme Court declined to "decide what standards are mandated by the First Amendment in this kind of case." 452 U.S. at 104, 101 S.Ct. at 2201-02.

[63] *SeeKleiner v. First Nat. Bank of Atlanta,* 751 F.2d 1193 (11th Cir.1985) (upholding the validity of a gag order under *Bernard* because it regulated only commercial speech); *Domingo v. New England Fish Co.,* 727 F.2d 1429 (9th Cir.1984); *Kilgo v. Bowman Transp., Inc.,* 88 F.R.D. 592 (N.D.Ga.1980). Like *Bernard,* each of these three considered gag orders only in the limited context of the federal rules governing class action suits.

[64] *See supra,* text accompanying note 52.

[65] [W]e ordinarily look to such things as the language of the constitutional provision itself, its purpose, the historical context in which it was written, the intention of the framers, the application in prior judicial decisions, the relation of the provision to the law as a whole, the understanding of other branches of government, the law in other jurisdictions, *including federal law,* constitutional and legal theory, and fundamental values including justice and social policy.

834 S.W.2d at 30 (emphasis added).

[66] None of the cases cited by the concurrence support the claim that "we ordinarily look to ... federal law" in interpreting our constitution. 834 S.W.2d at 30. Rather, each relied principally on the same factors as did *Brown v. Meyer,* 787 S.W.2d 42, 45 (Tex.1990): we rest "upon the language and prior construction *of our own constitution.*"

[67] The assertion that "[n]ot before today has this Court insisted that the [state and federal speech] provisions are different in substance," 834 S.W.2d at 35, utterly ignores the host of cases cited in today's opinion, including the significant observation by this court in *LeCroy* that our constitution "has independent vitality." 713 S.W.2d at 339.

[68] The concurrence's selective presentation of the record and argument overlooks both counsel's written and oral pleas for relief under both constitutions. A violation of Relator's state constitutional rights was encompassed by several of her written filings. Relator's Second Request for Emergency Interim Relief, at 2; Petition for Writ of Mandamus and Request for Emergency Relief at 1; Brief of Arguments and Authorities in Support of Relator's Petition for Writ of Mandamus at 7.

At oral argument, Relator contended that "[t]he gag order

itself goes far beyond any of the *well established principles established by this court under article I, section eight of the Texas Constitution,* and the First Amendment." Responding to Justice Hecht (prior to the "colloquy" quoted in the concurrence) counsel again stated that "what the First Amendment teaches us and what the Texas Constitution says *even more for us* is you let the speaker speak at his or her own peril." (emphasis added).

In truth, the parties presented us with as much--or as little--state constitutional law as they did federal. Indeed, there is no preargument mention of *Bernard,* upon which near exclusive reliance is now placed by the concurrence.

[69] The Reporter believed, however, that the record was not sealed to the lawyers or parties in the case.

[70] *SeeZukerman v. Piper Pools, Inc.,* 232 N.J.Super. 74, 556 A.2d 775, 786 (1989) ("removal must be for good cause ... of misconduct or inability to serve the best interests of the ward"); *Dicupe v. City of New York,* 124 A.D.2d 542, 507 N.Y.S.2d 687, 689 (1986) ("If the court believed that the [ad litem] was not acting in the child's best interest ... it could have replaced him as a guardian."); *Ford v. Moore,* 79 A.D.2d 403, 436 N.Y.S.2d 882, 884 (1981) (noting power to remove an ad litem "where the interests of the infant will ... be promoted.").

[1] The guardian proposed an alternative structure to the settlement that called for creation of a trust over which the guardian would act as trustee for a fee $200 per hour. The guardian requested payment of $879,351.03 for her services for the preceding eighteen months and expenses and $294,592.00 for her future services. The court determined that the guardian's opposition to the proposed settlement was not in the children's best interest.

[2] The Court states that there is a confusing split of federal authority on this matter, citing three cases: *In re Dow Jones & Co., Inc.,* 842 F.2d 603, 608-610 (2d Cir.), *cert. denied sub nom.Dow Jones & Co., Inc. v. Simon,* 488 U.S. 946, 109 S.Ct. 377, 102 L.Ed.2d 365 (1988); *Journal Publ. Co. v. Mechem,* 801 F.2d 1233, 1236 (10th Cir.1986) (holding to the contrary); *In re Russell,* 726 F.2d 1007, 1010 (4th Cir.), *cert. denied sub nom.Russell v. Flannery,* 469 U.S. 837, 105 S.Ct. 134, 83 L.Ed.2d 74 (1984). None of these cases is apposite here. *Dow Jones* and *Russell* were criminal cases, in which the use of gag orders involves different considerations, as explained in *Nebraska Press.* The complaints in *Dow Jones* and *Mechem* were not by persons subject to gag orders but by members of the press, also involving different considerations.

[3] Rule 3.07(a) of the Texas Disciplinary Rules of Professional Conduct states: "In the course of representing a client, a lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicatory proceeding. A lawyer shall not counsel or assist another person to make such a statement." SUPREME COURT OF TEXAS, TEXAS DISCIPLINARY RULES OF PROFESSIONAL CONDUCT, TEX. GOV'T CODE tit. 2, subtit. G--App. A, art. 10, § 9, Rule 3.07.

I do not suggest that relator should be disciplined, only that the rules of professional conduct address the propriety of attorneys' extrajudicial statements during pending litigation. *Cf.Gentile v. State Bar of Nevada,* 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991).

[4] Until encouraged at oral argument to raise state constitutional claims, relator centered her contentions on the First Amendment and mentioned the Texas Constitution only once. That single reference occurs in her original brief, where she stated that the gag orders "cannot withstand State or Federal Constitutional scrutiny." Relator never cited article I, section 8, or any case construing it.

To evade this fact, the Court states that this opinion's description of the record is a "selective presentation" which "overlooks" that some of the papers relator filed in this proceeding "encompassed" state constitutional claims, and cites three references. *Ante,* at 23 n. 68. One of them, relator's second request for emergency interim relief, was filed after oral argument, when relator had been urged to raise a state claim. Another, relator's original petition in this Court, states only that the gag orders "violate[ ] her own Constitutional rights", without mentioning the Texas Constitution. The last reference is to relator's brief, which I have quoted above. About the most that can be said is that the contentions relator made in the papers filed before oral argument are not inconsistent with a claim under the Texas Constitution.

Apart from the colloquy quoted, the Texas Constitution was referred to at oral argument exactly three times, twice by relator's counsel, and then once by counsel for some of the real parties in interest, as follows:

"The gag order goes far beyond any of the well established principles established by this Court under article I, section 8 of the Texas Constitution, and the First Amendment, and the decisions of the U.S. Supreme Court implementing it."

"And what the First Amendment teaches us and what the Texas Constitution says even more for us is you let the speaker speak at his or her peril."

"I think that in terms of the Texas Constitution and the U.S. Constitution that there are cases and instances in which a judge in the course of a trial can say, "I don't want y'all talking to the newspapers."

[5] The Court correctly states that the parties have not devoted much more attention to First Amendment arguments and did not cite *Bernard* before oral argument. *Ante,* at 23 n. 68. The fact remains that the parties' free speech contentions and arguments have focused on the First Amendment, not article I, section 8.

[6] The Court is mistaken in its assertion that none of these cases recognizes federal law as a consideration in construing state constitutional provisions. *Ante,* at 22 n. 66. Six of them--*Project Principle, Spring Branch, Tarrant County, Werblud,Travelers,* and *Mellinger*--cite extensively to federal law in applying state constitutional provisions. This list is illustrative only, not exhaustive.

[7] Contrary to the Court's assertion, *ante,* at 8 n. 13, page 1, column 3 of the Oct. 13, 1875, edition of the *Galveston Daily News* does not "record[ ] the rejection" of First Amendment language.

[8] ALA.CONST. art. I, § 8 (1819): "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

CONN.CONST. art. I, § 5 (1818): "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

DEL.CONST. art. I, § 5 (1831): "... any citizen may print on any subject, being responsible for the abuse of that liberty."

ILL.CONST. art. XIII, § 22 (1818): "The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty."

IND.CONST. art. I, § 9 (1816): "The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely and fully speak, write and print on any subject, being responsible for the abuse of that liberty."

KY.CONST. art. X, § 7 (1799): "The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely and fully speak, write, and print on any subject, being responsible for the abuse of that liberty."

LA.CONST. art. VI, § 21 (1812): "The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty."

ME.CONST. art. I, § 4 (1820): "Every citizen may freely speak, write, and publish his sentiments on any subject, being responsible for the abuse of this liberty."

MO.CONST. art. XIII, § 16 (1820): "That the free communication of thoughts and opinions is one of the invaluable rights of man, and that every person may freely speak, write, and print on any subject, being responsible for the abuse of that liberty...."

N.Y.CONST. art. VII, § 8 (1821): "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right...."

OHIO CONST. art. VIII, § 6 (1802): "Every citizen has an indisputable right to speak, write, or print upon any subject as he thinks proper, being liable for the abuse of that liberty."

PA. CONST. art. IX, § 7 (1790): "The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty."

TENN. CONST. art. XI, § 19 (1796): "The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty."

*See* BENJAMIN PERLEY POORE, THE FEDERAL AND STATE CONSTITUTIONS, COLONIAL CHARTERS AND OTHER ORGANIC LAWS OF THE UNITED STATES, Vol. 1 & 2 (2d ed. 1878).

[9] *Casso v. Brand,* 776 S.W.2d 551, 556 (Tex.1989); *O'Quinn v. State Bar of Texas,* 763 S.W.2d 397, 402 (Tex.1988); *Channel 4, KGBT v. Briggs,* 759 S.W.2d 939, 944 (Tex.1988) (GONZALEZ, J., concurring); *Texas State Employees Union v. Texas Dep't of Mental Health & Mental Retardation,* 746 S.W.2d 203, 205 (Tex.1987) (provision neither applied nor discussed); *Ex parte Price,* 741 S.W.2d 366, 369 (Tex.1987) (GONZALEZ, J., concurring); *LeCroy v. Hanlon,* 713 S.W.2d 335, 338 (Tex.1986) (provision neither applied nor discussed); *Hajek v. Bill Mowbray Motors, Inc.,* 647 S.W.2d 253, 255 (Tex.1983) (per curiam) (provision held violated without discussion, citing *Tucker* ); *Ex parte Pruitt,* 551 S.W.2d 706, 710 (Tex.1977) (provision neither applied nor discussed); *Houston Chronicle Publ. Co. v. City of Houston,* 536 S.W.2d 559, 561 (Tex.1976) (provision held not violated without discussion); *City of Fort Worth v. Craik,* 411 S.W.2d 541, 542-543 (Tex.1967) (provision neither applied nor discussed); *Ex parte Jimenez,* 159 Tex. 183, 317 S.W.2d 189, 194 (1958) (provision held not violated without discussion); *Ex parte Twedell,* 158 Tex. 214, 309 S.W.2d 834, 839 (1958) (provision neither applied nor discussed); *Dallas General Drivers v. Wamix, Inc.,* 156 Tex. 408, 295 S.W.2d 873, 879-880 (1956) (provision held violated based upon *Tucker* without further discussion); *Best Motor Lines v. International Bhd. of Teamsters,* 150 Tex. 95, 237 S.W.2d 589, 592 (1951) (provision mentioned only in defendant's answer with no application or

discussion); *Ex parte Thomas,* 141 Tex. 591, 174 S.W.2d 958, 960-961 (1943), *rev'd sub nom.Thomas v. Collins,* 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945) (provision held not violated without discussion); *Travelers' Ins. Co. v. Marshall,* 124 Tex. 45, 76 S.W.2d 1007, 1010 (1934) (provision only mentioned and not applied); *Ex parte Tucker,* 220 S.W. 75, 76 (Tex.1920); *St. Louis Southwestern Ry. v. Griffin,* 106 Tex. 477, 171 S.W. 703, 705 (1914); *St. Louis Southwestern Ry. v. Hixon,* 104 Tex. 267, 137 S.W. 343, 344-345 (1911) (provision neither applied nor discussed).

[10] *See* Ronald L. Collins, *Reliance on State Constitutions--Away from a Reactionary Approach,* 9 HASTINGS CONST. L.Q. 1 (1981); George Deukmejian & Clifford K. Thompson, Jr., *All Sail and No Anchor--Judicial Review Under the California Constitution,* 6 HASTINGS CONST. L.Q. 975 (1979); James A. Gardner, *The Failed Discourse of State Constitutionalism,* 90 MICH.L.REV. 761, 764 (1992); Paul S. Hudnut, *State Constitutions and Individual Rights: The Case for Judicial Restraint,* 63 DENVER L.REV. 85, 90-98 (1985); Matthew W. Paul and Jeffrey L. Van Horn, *Heitman v. State: The Question Left Unanswered,* 23 ST. MARY'S L.J. 929, 971-974 (1992); Robert F. Utter, *Swimming in the Jaws of the Crocodile: State Court Comment on Federal Constitutional Issues when Disposing of Cases on State Constitutional Grounds,* 63 TEX.L.REV. 1025, 1027 (1985); Donald E. Wilkes, Jr., *First Things Last: Amendomania and State Bills of Rights,* 54 MISS. L.J. 223, 229 (1984); Robert F. Williams, *State Constitutional Law Processes,* 24 WM. & MARY L.REV. 169, 189-90 (1983); Jeffrey White, Note, *State Constitutional Guarantees as Adequate State Ground: Supreme Court Review and Problems of Federalism,* 13 AM.CRIM.L.REV. 737, 741-749 (1976); *Developments in the Law--The Interpretation of State Constitutional Rights,* 95 HARV.L.REV. 1324, 1331 (1982).

[11] The authorities the Court cites do not all support its approach of trying to construe a state constitutional provision without regard to federal law.

*City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 293, 102 S.Ct. 1070, 1076-77, 71 L.Ed.2d 152 (1982), does not hold that the Texas Constitution *does* afford broader protections than the U.S. Constitution, only that it *might:* "the language of the Texas constitutional provision [guaranteeing due course of law and equal protection] is different from, and *arguably* significantly broader than, the language of the corresponding federal provisions" (emphasis added).

Several of the cases cited, some only to separate opinions, expressly consider federal as well as state constitutional law: *Ravin v. State,* 537 P.2d 494, 500, 504 (Alaska 1975); *People v. Brisendine,* 13 Cal.3d 528, 119 Cal.Rptr. 315, 531 P.2d 1099 (1975); *Burrows v. Superior Court of San Bernardino County,* 13 Cal.3d 238, 118 Cal.Rptr. 166, 171, 529 P.2d 590, 595 (1974); *People v. Rolfingsmeyer,* 101 Ill.2d 137, 77 Ill.Dec. 787, 789, 461 N.E.2d 410, 412 (1984); *State v. Hunt,* 91 N.J. 338, 450 A.2d 952, 955 (1982); *O'Neill v. Oakgrove Constr., Inc.,* 71 N.Y.2d 521, 528 N.Y.S.2d 1, 2, 523 N.E.2d 277, 278 (1988) ("Our decision is based on an adequate and independent ground under our State Constitution. Nevertheless, we are noting our agreement with the Federal courts that have reached the same result under the Federal Constitution in order that we might express our own view of the federal guarantee of a free press which, of course, we are also bound to uphold. This practice is in accord with our proper role in helping to expound the Federal, as well as our State, Constitution and, as some of the commentators have explained, it contributes to the development of a body of case law of potential use to federal and other state courts...."); *City of Hillsboro v. Purcell,* 306 Or. 547, 761 P.2d 510, 512-13 (1988); *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887, 892-893 (1991); *Farmers New World Life Ins. Co. v. Bountiful City,* 803 P.2d 1241, 1247 (Utah 1990); *State v. Larocco,* 794 P.2d 460, 464-65 (Utah 1990); *State v. Jewett,* 146 Vt. 221, 500 A.2d 233, 235 (1985) ("It would be a serious mistake for this Court to use its state constitution chiefly to evade the impact of the decisions of the United States Supreme Court. Our decisions must be principled, not result-oriented.").

Three cases involved state constitutional provisions without a federal counterpart. *Colorado Civil Rights Comm.,* 759 P.2d 1358, 1363-65 (Colo.1988) (equal rights amendment); *In re T.W.,* 551 So.2d 1186, 1190 (Fla.1989) (express constitutional provision guaranteeing an independent right to privacy); *State v. Beno,* 116 Wis.2d 122, 341 N.W.2d 668, 674-75 (1984) (federal constitutional provision by its express language could not apply to state legislators).

Even Justice Brennan, often credited with founding state constitutionalism theory, does not argue that state courts should ignore the federal constitution. William J. Brennan, Jr., *The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights,* 61 N.Y.U.L.REV. 535 (1986).

Stewart G. Pollock, *Adequate and Independent State Grounds as a Means of Balancing the Relationship Between State and Federal Courts,* 63 TEX.L.REV. 977 (1985), describes the method the Court uses but does not indorse it.

[12] The Court cites *LeCroy* for the proposition that our constitution "has independent vitality." *Ante,* at 11. I fully agree that it does. That observation, however, says nothing about gag orders.

[13] "When a minor, lunatic, idiot or a non-compos mentis may be a defendant to a suit and has no guardian within this State, or where such person is a party to a suit either as plaintiff, defendant or intervenor and is

represented by a next friend or a guardian who appears to the court to have an interest adverse to such minor, lunatic, idiot or non-compos mentis, the court shall appoint a guardian ad litem for such person and shall allow him a reasonable fee for his services to be taxed as a part of the costs."

[14] *Urbish v. 127th Judicial Dist. Court,* 708 S.W.2d 429, 432 (Tex.1986), does not require a different result. In *Urbish* the Court held that the best interests of a child determine which of the divorced parents should represent the child in pending litigation. I agree with the holding in *Urbish,* but consider it inapposite in the present case, where the issue is not which parent will represent the child, but whether the parents or a third party will represent the child.

---------

**Page 75**

**220 S.W. 75 (Tex. 1920)**

**110 Tex. 335**

**Ex parte TUCKER.**

**No. 3358.**

**Supreme Court of Texas**

**March 31, 1920**

Original application by George Tucker for writ of habeas corpus. Writ issued, and relator discharged.

PHILLIPS, C.J.

The District Court of Anderson County, in a suit of the Palestine Telephone Company against the International Brotherhood of Electrical Workers' Department, Local No. 388 of Palestine, and other organizations, in Palestine, their officers and members, enjoined the defendants from, among other things, 'vilifying, abusing, or using opprobrious epithets to or concerning any party or parties in the employment of plaintiff,' and 'from any and all conduct' toward such employees, or concerning them, 'which might be calculated to provoke or inspire a breach of the peace.'

The relator was an officer and member of one of the defendant organizations.

The plaintiff in the cause, later, filed an

**Page 76**

affidavit charging him with a violation of the injunction in having applied, in a conversation

**[110 Tex. 337]** with one Duncan, slanderous epithets to the female telephone operators in its employ. The relator, on the hearing, denied having used the language charged or the making of any remark reflecting upon such employees, but the court found him guilty of the charge and adjudged him in contempt. It appears from the record here that the relator was indicted for slander for the use of the same language charged against him in the contempt proceedings.

The existence of any power in a court of equity to supervise one person's opinion of another, or to dictate what one person may say of another, is plainly and emphatically refuted by the 8th section of the Bill of Rights.

That section, in part, reads:

'Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press.'

The purpose of this provision is to preserve what we call 'liberty of speech' and 'the freedom of the press,' and at the same time hold all persons accountable to the law for the misuse of that liberty or freedom. Responsibility for the abuse of the privilege is as fully emphasized by its language as that the privilege itself shall be free from all species of restraint. But the abuse of the privilege, the provision commands, shall be dealt with in no other way. It is not to be remedied by denial of the right to speak, but only by appropriate penalties for what is wrongfully spoken. Punishment for the abuse of the right, not prevention of its exercise, is what the provision contemplates. There can be no liberty in the individual to speak, without the unhindered right to speak. It cannot co-exist with a power to compel his silence or fashion the form of his speech. Responsibility for the abuse of the right, in its nature pre-supposes freedom in the exercise of the right. It is a denial of the authority, anywhere, to prevent its exercise.

It has never been the theory of free institutions that the citizen could say only what courts or legislatures might license him to say, or that his sentiments on any subject or concerning any person should be supervised before he could utter them. Nothing could be more odious, more violative or destructive of freedom, than a system of only licensed speech or licensed printing. The experience of the English nation and some of the American colonies under the tyranny of such systems is the reason this provision in the Bill of Rights is one common to the Constitutions of the American States, and for its incorporation, in like words, in the First Amendment to the Federal Constitution. Hallam characterized the liberty of the press as finally gained in England, as but exemption from a licenser.

The theory of the provision is that no man or set of men are to be found, so infallible in mind and characte as to be clothed with

**[110 Tex. 338]** an absolute authority of determining what other men may think, speak, write or publish; that freedom of speech is essential to the nature of a free state; that the ills suffered from its abuse are less than would be imposed by its suppression; and, therefore, that every person shall be left at liberty to speak his mind on all subjects, and for the abuse of the privilege be responsible in civil damages and subject to the penalties of the criminal law.

Let it once be admitted that courts may arrogate the authority of deciding what the individual may say and may not say, what he may write and may not write, and by an injunction writ require him to adapt the expression

of his sentiments to only what some judge may deem fitting and proper, and there may be readily brought about the very condition against which the constitutional guaranty was intended as a permanent protection. Liberty of speech will end where such control of it begins.

The courts of this country, to their credit, have steadily refused to recognize that the powers of equity may be so used. Pomeroy's Equitable Remedies, Sections 481, 629; Story's Equity, Section 1279; High on Injunctions, Section 1093; Newell on Slander and Libel, Section 265.

There can be no justification for the utterance of a slander. It cannot be too strongly condemned. The law makes it a crime. But there is no power in courts to make one person speak only well of another. The Constitution leaves him free to speak well or ill; and if he wrongs another by abusing this privilege, he is responsible in damages or punishable by the criminal law.

Equity will protect the exercise of natural and contractual rights from interference by attempts at intimidation or coercion. Verbal or written threats may assume that character. When they do, they amount to conduct, or threatened conduct, and for that reason may properly be restrained. Cases of that sort, or of analogous nature, are not to be confounded with this one.

That part of the injunction which attempted to control the relator in his speech, was beyond the power of the court to issue and therefore void.

The relator is discharged.

GREENWOOD, J., took no part in this decision.

**ALEXANDER**

**v.**

**UNITED STATES**

**No. 91-1526**

**United States Supreme Court**

**June 28, 1993**

Argued January 12, 1993

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHT CIRCUIT

Syllabus

After a full criminal trial, petitioner, the owner of numerous businesses dealing in sexually explicit materials, was convicted of, *inter alia,* violating federal obscenity laws and the Racketeer Influenced and Corrupt Organizations Act (RICO). The obscenity convictions, based on a finding that seven items sold at several stores were obscene, were the predicates for his RICO convictions. In addition to imposing a prison term and fine, the District Court ordered petitioner, as punishment for the RICO violations, to forfeit his businesses and almost $9 million acquired through racketeering activity. In affirming the forfeiture order, the Court of Appeals rejected petitioner's arguments that RICO's forfeiture provisions constitute a prior restraint on speech and are overbroad. The court also held that the forfeiture did not violate the Eighth Amendment, concluding that proportionality review is not required of any sentence less than life imprisonment without the possibility of parole. It did not consider whether the forfeiture was disproportionate or "excessive."

*Held:*

1. RICO's forfeiture provisions, as applied here, did not violate the First Amendment. Pp. 549-558.

(a) The forfeiture here is a permissible criminal punishment, not a prior restraint on speech. The distinction between prior restraints and subsequent punishments is solidly grounded in this Court's cases. The term "prior restraint" describes orders *forbidding* certain communications that are issued before the communications occur. See, *e. g., Near v. Minnesota ex rel. Olson,* 283 U.S. 697. However, the order here imposes no legal impediment to petitioner's ability to engage in any expressive activity; it just prevents him from financing those activities with assets derived from his prior racketeering offenses. RICO is oblivious to the expressive or nonexpressive nature of the assets forfeited. Petitioner's assets were forfeited because they were directly related to past racketeering violations, and thus they differ from material seized or restrained on suspicion of being obscene without a prior judicial obscenity determination, as occurred in, *e. g., Marcus v. Search Warrant of Kansas City, Mo., Property,* 367 U.S. 717. Nor were his assets ordered forfeited without the requisite procedural safeguards.

*Fort Wayne Books, Inc. v. Indiana,* 489 U.S. 46, distinguished. His claim is also inconsistent with *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, in which the Court rejected a claim that the closure of an adult bookstore under a general nuisance statute was an improper prior restraint. His definition of prior restraint also would undermine the time-honored distinction between barring future speech and penalizing past speech. Pp. 549-554.

(b) Since the RICO statute does not criminalize constitutionally protected speech, it is materially different from the statutes at issue in this Court's overbreadth cases. Cf., *e. g., Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.,* 482 U.S. 569, 574-575. In addition, the threat of forfeiture has no more of a "chilling" effect on free expression than threats of a prison term or large fine, which are constitutional under *Fort Wayne Books.* Nor can the forfeiture be said to offend the First Amendment based on *Arcara's* analysis that criminal sanctions with some incidental effect on First Amendment activities are subject to First Amendment scrutiny where it was the expressive conduct that drew the legal remedy, 478 U.S., at 706-707. While the conduct drawing the legal remedy here may have been expressive, "obscenity" can be regulated or actually proscribed consistent with the Amendment, see, *e. g., Roth v. United States,* 354 U.S. 476, 485. Pp. 554-558.

2. The case is remanded for the Court of Appeals to consider petitioner's claim that the forfeiture, considered atop his prison term and fine, is "excessive" within the meaning of the Excessive Fines Clause of the Eighth Amendment. The Court of Appeals rejected petitioner's Eighth Amendment challenge with a statement that applies only to the Amendment's prohibition against "cruel and unusual punishments." The Excessive Fines Clause limits the Government's power to extract payments as punishment for an offense, and the *in personam* criminal forfeiture at issue here is clearly a form of monetary punishment no different, for Eighth Amendment purposes, from a traditional "fine." The question whether the forfeiture was excessive must be considered in light of the extensive criminal activities that

petitioner apparently conducted through his enormous racketeering enterprise over a substantial period of time rather than the number of materials actually found to be obscene. Pp. 558-559.

943 F.2d 825, vacated and remanded.

Rehnquist, C. J., delivered the opinion of the Court, in which White, O'Connor, Scalia, and Thomas, JJ., joined. Souter, J., filed an opinion concurring in the judgment in part and dissenting in part, *post,* p. 559. Kennedy, J., filed a dissenting opinion, in which Blackmun and Stevens, JJ., joined, and in Part II of which Souter, J., joined, *post,* p. 560.

**Page 546**

*John H. Weston* argued the cause for petitioner. With him on the briefs was *G. Randall Garrou.*

*Solicitor General Starr* argued the cause for the United States. With him on the brief were *Assistant Attorney General Mueller, Deputy Solicitor General Bryson,* and *Paul J. Larkin, Jr.*[*]

Chief Justice Rehnquist delivered the opinion of the Court.

After a full criminal trial, petitioner Ferris J. Alexander, owner of more than a dozen stores and theaters dealing in sexually explicit materials, was convicted on, *inter alia,* 17 obscenity counts and 3 counts of violating the Racketeer Influenced and Corrupt Organizations Act (RICO). The obscenity convictions, based on the jury's findings that four magazines and three videotapes sold at several of petitioner's stores were obscene, served as the predicates for his three RICO convictions. In addition to imposing a prison term and fine, the District Court ordered petitioner to forfeit, pursuant to 18 U.S.C. § 1963 (1988 ed. and Supp. III), certain assets that were directly related to his racketeering activity as punishment for his RICO violations. Petitioner argues that this forfeiture violated the First and Eighth Amendments to the Constitution. We reject petitioner's

**Page 547**

claims under the First Amendment but remand for reconsideration of his Eighth Amendment challenge.

Petitioner was in the so-called "adult entertainment" business for more than 30 years, selling pornographic magazines and sexual paraphernalia, showing sexually explicit movies, and eventually selling and renting videotapes of a similar nature. He received shipments of these materials at a warehouse in Minneapolis, Minnesota, where they were wrapped in plastic, priced, and boxed. He then sold his products through some 13 retail stores in several different Minnesota cities, generating millions of dollars in annual revenues. In 1989, federal authorities filed a 41-count indictment

against petitioner and others, alleging, *inter alia,* operation of a racketeering enterprise in violation of RICO. The indictment charged 34 obscenity counts and 3 RICO counts, the racketeering counts being predicated on the obscenity charges. The indictment also charged numerous counts of tax evasion and related offenses that are not relevant to the questions before us.

Following a 4-month jury trial in the United States District Court for the District of Minnesota, petitioner was convicted of 17 substantive obscenity offenses: 12 counts of transporting obscene material in interstate commerce for the purpose of sale or distribution, in violation of 18 U.S.C. § 1465; and 5 counts of engaging in the business of selling obscene material, in violation of 18 U.S.C. § 1466 (1988 ed. and Supp. III). He also was convicted of 3 RICO offenses that were predicated on the obscenity convictions: one count of receiving and using income derived from a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(a); one count of conducting a RICO enterprise, in violation of § 1962(c); and one count of conspiring to conduct a RICO enterprise, in violation of § 1962(d). As a basis for the obscenity and RICO convictions, the jury determined that four magazines and three videotapes were obscene. Multiple copies of these magazines and videos, which graphically depicted

**Page 548**

a variety of "hard core" sexual acts, were distributed throughout petitioner's adult entertainment empire.

Petitioner was sentenced to a total of six years in prison, fined $100,000, and ordered to pay the cost of prosecution, incarceration, and supervised release. In addition to these punishments, the District Court reconvened the same jury and conducted a forfeiture proceeding pursuant to § 1963(a)(2). At this proceeding, the Government sought forfeiture of the businesses and real estate that represented petitioner's interest in the racketeering enterprise, § 1963(a)(2)(A), the property that afforded petitioner influence over that enterprise, § 1963(a)(2)(D), and the assets and proceeds petitioner had obtained from his racketeering offenses, §§ 1963(a)(1), (3). The jury found that petitioner had an interest in 10 pieces of commercial real estate and 31 current or former businesses, all of which had been used to conduct his racketeering enterprise. Sitting without the jury, the District Court then found that petitioner had acquired a variety of assets as a result of his racketeering activities. The court ultimately ordered petitioner to forfeit his wholesale and retail businesses (including all the assets of those businesses) and almost $9 million in moneys acquired through racketeering activity.[1]

The Court of Appeals affirmed the District Court's forfeiture order. *Alexander v. Thornburgh,* 943 F.2d 825 (CA81991). It rejected petitioner's argument that the application of RICO's forfeiture provisions constituted a

prior restraint on speech and hence violated the First Amendment. Recognizing the well-established distinction between prior restraints and subsequent criminal punishments, the Court of Appeals found that the forfeiture here was "a criminal

**Page 549**

penalty imposed following a conviction for conducting an enterprise engaged in racketeering activities," and not a prior restraint on speech. *Id.,* at 834. The court also rejected petitioner's claim that RICO's forfeiture provisions are constitutionally overbroad, pointing out that the forfeiture order was properly limited to assets linked to petitioner's past racketeering offenses. *Id.,* at 835. Lastly, the Court of Appeals concluded that the forfeiture order does not violate the Eighth Amendment's prohibition against "cruel and unusual punishments" and "excessive fines." In so ruling, however, the court did not consider whether the forfeiture in this case was grossly disproportionate or excessive, believing that the Eighth Amendment " 'does not require a proportionality review of any sentence less than life imprisonment without the possibility of parole.' " *Id.,* at 836 (quoting *United States v. Pryba,* 900 F.2d 748, 757 (CA4), cert. denied, 498 U.S. 924(1990)). We granted certiorari, 505 U.S. 1217 (1992).

Petitioner first contends that the forfeiture in this case, which effectively shut down his adult entertainment business, constituted an unconstitutional prior restraint on speech, rather than a permissible criminal punishment. According to petitioner, forfeiture of expressive materials and the assets of businesses engaged in expressive activity, when predicated solely upon previous obscenity violations, operates as a prior restraint because it prohibits future presumptively protected expression in retaliation for prior unprotected speech. Practically speaking, petitioner argues, the effect of the RICO forfeiture order here was no different from the injunction prohibiting the publication of expressive material found to be a prior restraint in *Near v. Minnesota ex rel. Olson,* 283 U.S. 697 (1931). As petitioner puts it, see Brief for Petitioner 25, the forfeiture order imposed a complete *ban* on his future expression because of previous unprotected speech. We disagree. By lumping the forfeiture imposed in this case after a full criminal trial with an injunction enjoining future speech, petitioner stretches the term "prior

**Page 550**

restraint" well beyond the limits established by our cases. To accept petitioner's argument would virtually obliterate the distinction, solidly grounded in our cases, between prior restraints and subsequent punishments.

The term "prior restraint" is used "to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." M. Nimmer, Nimmer

on Freedom of Speech § 4.03, p. 4-14 (1984) (emphasis added). Temporary restraining orders and permanent injunctions—*i. e.,* court orders that actually forbid speech activities—are classic examples of prior restraints. See *id.,* § 4.03, at 4-16. This understanding of what constitutes a prior restraint is borne out by our cases, even those on which petitioner relies. In *Near v. Minnesota ex rel. Olson, supra,* we invalidated a court order that perpetually enjoined the named party, who had published a newspaper containing articles found to violate a state nuisance statute, from producing any future "malicious, scandalous or defamatory" publication. *Id.,* at 706. *Near,* therefore, involved a true restraint on future speech—a permanent injunction. So, too, did *Organization for a Better Austin v. Keefe,* 402 U.S. 415 (1971), and *Vance v. Universal Amusement Co.,* 445 U.S. 308 (1980) *(per curiam),* two other cases cited by petitioner. In *Keefe,* we vacated an order " *enjoining* petitioners from distributing leaflets anywhere in the town of Westchester, Illinois." 402 U.S., at 415 (emphasis added). And in *Vance,* we struck down a Texas statute that authorized courts, upon a showing that obscene films had been shown in the past, to issue an injunction of indefinite duration prohibiting the future exhibition of films that have not yet been found to be obscene. 445 U.S., at 311. See also *New York Times Co. v. United States,* 403 U.S. 713, 714 (1971) *(per curiam)* (Government sought to enjoin publication of the Pentagon Papers).

By contrast, the RICO forfeiture order in this case does not *forbid* petitioner to engage in any expressive activities

**Page 551**

in the future, nor does it require him to obtain prior approval for any expressive activities. It only deprives him of specific assets that were found to be related to his previous racketeering violations. Assuming, of course, that he has sufficient untainted assets to open new stores, restock his inventory, and hire staff, petitioner can go back into the adult entertainment business tomorrow, and sell as many sexually explicit magazines and videotapes as he likes, without any risk of being held in contempt for violating a court order. Unlike the injunctions in *Near, Keefe,* and *Vance,* the forfeiture order in this case imposes no legal impediment to—no prior restraint on—petitioner's ability to engage in any expressive activity he chooses. He is perfectly free to open an adult bookstore or otherwise engage in the production and distribution of erotic materials; he just cannot finance these enterprises with assets derived from his prior racketeering offenses.

The constitutional infirmity in nearly all of our prior restraint cases involving obscene material, including those on which petitioner and the dissent rely, see *post,* at 570-571, 577, was that the government had seized or otherwise restrained materials suspected of being obscene without a prior judicial determination that they were in

fact so. See, *e. g., Marcus v. Search Warrant of Kansas City, Mo., Property,* 367 U.S. 717 (1961); *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58 (1963); *Quantity of Copies of Books v. Kansas,* 378 U.S. 205 (1964); *Roaden v. Kentucky,* 413 U.S. 496(1973); *Vance, supra.* In this case, however, the assets in question were ordered forfeited not because they were believed to be obscene, but because they were directly related to petitioner's past racketeering violations. The RICO forfeiture statute calls for the forfeiture of assets because of the financial role they play in the operation of the racketeering enterprise. The statute is oblivious to the expressive or nonexpressive nature of the assets forfeited; books, sports cars, narcotics, and cash are all forfeitable alike under RICO.

**Page 552**

Indeed, a contrary scheme would be disastrous from a policy standpoint, enabling racketeers to evade forfeiture by investing the proceeds of their crimes in businesses engaging in expressive activity.

Nor were the assets in question ordered forfeited without according petitioner the requisite procedural safeguards, another recurring theme in our prior restraint cases. Contrasting this case with *Fort Wayne Books, Inc. v. Indiana,* 489 U.S. 46 (1989), aptly illustrates this point. In *Fort Wayne Books,* we rejected on constitutional grounds the pre- trial seizure of certain expressive material that was based upon a finding of "no more than *probable cause to believe* that a RICO violation had occurred." *Id.,* at 66 (emphasis in original). In so holding, we emphasized that there had been no prior judicial "determination that the seized items were 'obscene' or that a RICO violation *ha[d] occurred.* " *Ibid.* (emphasis in original). "[M]ere probable cause to believe a legal violation ha[d] transpired," we said, "is not adequate to remove books or films from circulation." *Ibid.* Here, by contrast, the seizure was not premature, because the Government established beyond a reasonable doubt the basis for the forfeiture. Petitioner had a full criminal trial on the merits of the obscenity and RICO charges during which the Government proved that four magazines and three videotapes were obscene and that the other forfeited assets were directly linked to petitioner's commission of racketeering offenses.

Petitioner's claim that the RICO forfeiture statute operated as an unconstitutional prior restraint in this case is also inconsistent with our decision in *Arcara v. Cloud Books, Inc.,* 478 U.S. 697 (1986). In that case, we sustained a court order, issued under a general nuisance statute, that closed down an adult bookstore that was being used as a place of prostitution and lewdness. In rejecting out-of-hand a claim that the closure order amounted to an improper prior restraint on speech, we stated:

**Page 553**

"The closure order sought in this case differs from a prior restraint in two significant respects. First, the order would impose no restraint at all on the dissemination of particular materials, since respondents are free to carry on their bookselling business at another location, even if such locations are difficult to find. Second, the closure order sought would not be imposed on the basis of an advance determination that the distribution of particular materials is prohibited—indeed, the imposition of the closure order has nothing to do with any expressive conduct at all." *Id.,* at 705-706, n. 2

This reasoning applies with equal force to this case, and thus confirms that the RICO forfeiture order was not a prior restraint on speech, but a punishment for past criminal conduct. Petitioner attempts to distinguish *Arcara* on the ground that obscenity, unlike prostitution or lewdness, has " 'a significant expressive element.' " Brief for Petitioner 16 (quoting *Arcara, supra,* at 706). But that distinction has no bearing on the question whether the forfeiture order in this case was an impermissible prior restraint.

Finally, petitioner's proposed definition of the term "prior restraint" would undermine the time-honored distinction between barring speech in the future and penalizing past speech. The doctrine of prior restraint originated in the common law of England, where prior restraints of the press were not permitted, but punishment after publication was. This very limited application of the principle of freedom of speech was held inconsistent with our First Amendment as long ago as *Grosjean v. American Press Co.,* 297 U.S. 233, 246 (1936). While we may have given a broader definition to the term "prior restraint" than was given to it in English common law,[2] our decisions have steadfastly preserved the

**Page 554**

distinction between prior restraints and subsequent punishments. Though petitioner tries to dismiss this distinction as "neither meaningful nor useful," Brief for Petitioner 29, we think it is critical to our First Amendment jurisprudence. Because we have interpreted the First Amendment as providing greater protection from prior restraints than from subsequent punishments, see *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 558-559 (1975), it is important for us to delineate with some precision the defining characteristics of a prior restraint. To hold that the forfeiture order in this case constituted a prior restraint would have the exact opposite effect: It would blur the line separating prior restraints from subsequent punishments to such a degree that it would be impossible to determine with any certainty whether a particular measure is a prior restraint or not.

In sum, we think that fidelity to our cases requires us to analyze the forfeiture here not as a prior restraint, but under normal First Amendment standards. So analyzing it, we find that petitioner's claim falls well short of the

mark. He does not challenge either his 6-year jail sentence or his $100,000 fine as violative of the First Amendment. The first inquiry that comes to mind, then, is why, if incarceration for six years and a fine of $100,000 are permissible forms of punishment under the RICO statute, the challenged forfeiture of certain assets directly related to petitioner's racketeering activity is not. Our cases support the instinct from which

**Page 555**

this question arises; they establish quite clearly that the First Amendment does not prohibit either stringent criminal sanctions for obscenity offenses or forfeiture of expressive materials as punishment for criminal conduct.

We have in the past rejected First Amendment challenges to statutes that impose severe prison sentences and fines as punishment for obscenity offenses. See, *e. g., Ginzburg v. United States,* 383 U.S. 463, 464-465, n. 2 (1966); *Smith v. United States,* 431 U.S. 291, 296, n. 3 (1977); *Fort Wayne Books,* 489 U.S., at 59, n. 8. Petitioner does not question the holding of those cases; he instead argues that RICO's forfeiture provisions are constitutionally overbroad because they are not limited solely to obscene materials and the proceeds from the sale of such materials. Petitioner acknowledges that this is an unprecedented use of the overbreadth principle. See Brief for Petitioner 36. The "overbreadth" doctrine, which is a departure from traditional rules of standing, permits a defendant to make a facial challenge to an overly broad statute restricting speech, even if he himself has engaged in speech that could be regulated under a more narrowly drawn statute. See, *e. g., Broadrick v. Oklahoma,* 413 U.S. 601, 612-613 (1973); *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 798-801 (1984). But the RICO statute does not criminalize constitutionally protected speech and therefore is materially different from the statutes at issue in our overbreadth cases. Cf., *e. g., Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.,* 482 U.S. 569, 574-575 (1987).

Petitioner's real complaint is not that the RICO statute is overbroad, but that applying RICO's forfeiture provisions to businesses dealing in expressive materials may have an improper "chilling" effect on free expression by deterring others from engaging in protected speech. No doubt the monetarily large forfeiture in this case may induce cautious booksellers to practice self-censorship and remove marginally protected materials from their shelves out of fear that

**Page 556**

those materials could be found obscene and thus subject them to forfeiture. But the defendant in *Fort Wayne Books* made a similar argument, which was rejected by the Court in this language:

"[D]eterrence of the sale of obscene materials is a legitimate end of state antiobscenity laws, and our cases have long recognized the practical reality that 'any form of criminal obscenity statute applicable to a bookseller will induce some tendency to self-censorship and have some inhibitory effect on the dissemination of material not obscene.' " 489 U.S., at 60 (quoting *Smith v. California,* 361 U.S. 147, 154-155 (1959)).

*Fort Wayne Books* is dispositive of any chilling argument here, since the threat of forfeiture has no more of a chilling effect on free expression than the threat of a prison term or a large fine. Each racketeering charge exposes a defendant to a maximum penalty of 20 years' imprisonment and a fine of up to $250,000. 18 U.S.C. § 1963(a) (1988 ed. and Supp.III). See Brief for United States 19. Needless to say, the prospect of such a lengthy prison sentence would have a far more powerful deterrent effect on protected speech than the prospect of any sort of forfeiture. Cf. *Blanton v. North Las Vegas,* 489 U.S. 538, 542 (1989) (loss of liberty is a more severe form of punishment than any monetary sanction). Similarly, a fine of several hundred thousand dollars would certainly be just as fatal to most businesses—and, as such, would result in the same degree of self-censorship—as a forfeiture of assets. Yet these penalties are clearly constitutional under *Fort Wayne Books.*

We also have rejected a First Amendment challenge to a court order closing down an entire business that was engaged in expressive activity as punishment for criminal conduct. See *Arcara,* 478 U.S., at 707. Once again, petitioner does not question the holding of that case; in fact, he concedes that expressive businesses and assets can be forfeited

**Page 557**

under RICO as punishment for, say, narcotic offenses. See Brief for Petitioner 11 ("[F]orfeiture of a media business purchased by a drug cartel would be constitutionally permissible"). Petitioner instead insists that the result here should be different because the RICO predicate acts were obscenity offenses. In *Arcara,* we held that criminal and civil sanctions having some incidental effect on First Amendment activities are subject to First Amendment scrutiny "only where it was conduct with a significant expressive element that drew the legal remedy in the first place, as in [ *United States v.* ] *O'Brien,* [391 U.S. 367 (1968),] or where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity, as in *Minneapolis Star* [ *& Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575 (1983)]." 478 U.S., at 706-707 (foot- note omitted). Applying that standard, we held that prostitution and lewdness, the criminal conduct at issue in *Arcara,* involve neither situation, and thus concluded that the First Amendment was not implicated by the enforcement of a general health regulation resulting in the closure of an adult bookstore. *Id.,* at 707. Under our analysis in *Arcara,* the forfeiture in this case cannot be

said to offend the First Amendment. To be sure, the conduct that "drew the legal remedy" here—racketeering committed through obscenity violations—may be "expressive," see *R. A. V. v. St. Paul,* 505 U.S. 377, 385 (1992), but our cases clearly hold that "obscenity" can be regulated or actually proscribed consistent with the First Amendment, see, *e. g., Roth v. United States,* 354 U.S. 476, 485 (1957); *Miller v. California,* 413 U.S. 15, 23(1973).

Confronted with our decisions in *Fort Wayne Books* and *Arcara* —neither of which he challenges—petitioner's position boils down to this: Stiff criminal penalties for obscenity offenses are consistent with the First Amendment; so is the forfeiture of expressive materials as punishment for criminal conduct; but the combination of the two somehow results

**Page 558**

in a violation of the First Amendment. We reject this counterintuitive conclusion, which in effect would say that the whole is greater than the sum of the parts.

Petitioner also argues that the forfeiture order in this case—considered atop his 6-year prison term and $100,000 fine—is disproportionate to the gravity of his offenses and therefore violates the Eighth Amendment, either as a "cruel and unusual punishment" or as an "excessive fine."[3] Brief for Petitioner 40. The Court of Appeals, though, failed to distinguish between these two components of petitioner's Eighth Amendment challenge. Instead, the court lumped the two together, disposing of them both with the general statement that the Eighth Amendment does not require any proportionality review of a sentence less than life imprisonment without the possibility of parole. 943 F.2d, at 836. But that statement has relevance only to the Eighth Amendment's prohibition against cruel and unusual punishments. Unlike the Cruel and Unusual Punishments Clause, which is concerned with matters such as the duration or conditions of confinement, "[t]he Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." *Austin v. United States, post,* at 609-610 (emphasis and internal quotation marks omitted); accord, *Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 265 (1989) ("[A]t the time of the drafting and ratification of the [Eighth] Amendment, the word 'fine' was understood to mean a payment to a sovereign as punishment for some offense"); *id.,* at 265, n. 6. The *in personam* criminal forfeiture at issue here is clearly a form of monetary punishment no different, for Eighth Amendment purposes, from a traditional "fine." Accord,

**Page 559**

*Austin, supra.* [4] Accordingly, the forfeiture in this case should be analyzed under the Excessive Fines Clause.

Petitioner contends that forfeiture of his entire business was an "excessive" penalty for the Government to exact "[o]n the basis of a few materials the jury ultimately decided were obscene." Brief for Petitioner 40. It is somewhat misleading, we think, to characterize the racketeering crimes for which petitioner was convicted as involving just a few materials ultimately found to be obscene. Petitioner was convicted of creating and managing what the District Court described as "an enormous racketeering enterprise." App. to Pet. for Cert. 160. It is in the light of the extensive criminal activities which petitioner apparently conducted through this racketeering enterprise over a substantial period of time that the question whether the forfeiture was "excessive" must be considered. We think it preferable that this question be addressed by the Court of Appeals in the first instance.

For these reasons, we hold that RICO's forfeiture provisions, as applied in this case, did not violate the First Amendment, but that the Court of Appeals should have considered whether they resulted in an "excessive" penalty within the meaning of the Eighth Amendment's Excessive Fines Clause. Accordingly, we vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

Justice Souter, concurring in the judgment in part and dissenting in part.

I agree with the Court that petitioner has not demonstrated that the forfeiture at issue here qualifies as a prior restraint as we have traditionally understood that term. I

**Page 560**

also agree with the Court that the case should be remanded for a determination whether the forfeiture violated the Excessive Fines Clause of the Eighth Amendment. Nonetheless, I agree with Justice Kennedy that the First Amendment forbids the forfeiture of petitioner's expressive material in the absence of an adjudication that it is obscene or otherwise of unprotected character, and therefore I join Part II of his dissenting opinion.

Justice Kennedy, with whom Justice Blackmun and Justice Stevens join, and with whom Justice Souter joins as to Part II, dissenting.

The Court today embraces a rule that would find no affront to the First Amendment in the Government's destruction of a book and film business and its entire inventory of legitimate expression as punishment for a single past speech offense. Until now I had thought one could browse through any book or film store in the United States without fear that the proprietor had chosen each item to avoid risk to the whole inventory and indeed

to the business itself. This ominous, onerous threat undermines free speech and press principles essential to our personal freedom.

Obscenity laws would not work unless an offender could be arrested and imprisoned despite the resulting chill on his own further speech. But, at least before today, we have understood state action directed at protected books or other expressive works themselves to raise distinct constitutional concerns. The Court's decision is a grave repudiation of First Amendment principles, and with respect I dissent.

## I

### A

The majority believes our cases "establish quite clearly that the First Amendment does not prohibit either stringent criminal sanctions for obscenity offenses or forfeiture of expressive materials as punishment for criminal conduct."

**Page 561**

*Ante,* at 2773. True, we have held that obscenity is expression which can be regulated and punished, within proper limitations, without violating the First Amendment. See, *e. g., New York v. Ferber,* 458 U.S. 747 (1982); *Miller v. California,* 413 U.S. 15 (1973); *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 57-58 (1973); *Roth v. United States,* 354 U.S. 476(1957). And the majority is correct to note that we have upheld stringent fines and jail terms as punishments for violations of the federal obscenity laws. See *Fort Wayne Books, Inc. v. Indiana,* 489 U.S. 46, 60 (1989); *Ginzburg v. United States,* 383 U.S. 463, 464-465, n. 2 (1966). But that has little to do with the destruction of protected titles and the facilities for their distribution or publication. None of our cases address that matter, or it would have been unnecessary for us to reserve the specific question four Terms ago in *Fort Wayne Books, Inc. v. Indiana, supra,* at 60, 65.

The fundamental defect in the majority's reasoning is a failure to recognize that the forfeiture here cannot be equated with traditional punishments such as fines and jail terms. Noting that petitioner does not challenge either the 6-year jail sentence or the $100,000 fine imposed against him as punishment for his convictions under the Racketeer Influenced and Corrupt Organizations Act (RICO), the majority ponders why RICO's forfeiture penalty should be any different. See *ante,* at 2773. The answer is that RICO's forfeiture penalties are different from traditional punishments by Congress' own design as well as in their First Amendment consequences.

The federal RICO statute was passed to eradicate the infiltration of legitimate business by organized crime. Pub. L. 91-452, Title IX, 84 Stat. 941, as amended, 18 U.S.C. §§ 1961-1968 (1988 ed. and Supp. III). Earlier steps to combat organized crime were not successful, in large part because traditional penalties targeted individuals engaged in racketeering activity rather than the criminal enterprise itself. Punishing racketeers with fines and jail terms failed to

**Page 562**

break the cycle of racketeering activity because the criminal enterprises had the resources to replace convicted racketeers with new recruits. In passing RICO, Congress adopted a new approach aimed at the economic roots of organized crime:

"What is needed here . . . are new approaches that will deal not only with individuals, but also with the economic base through which those individuals constitute such a serious threat to the economic well-being of the Nation. In short, an attack must be made on their source of economic power itself, and the attack must take place on all available fronts." S. Rep. No. 91-617, p. 79 (1969).

Criminal liability under RICO is premised on the commission of a "pattern of racketeering activity," defined by the statute as engaging in two or more related predicate acts of racketeering within a 10-year period. 18 U.S.C. § 1961(5). A RICO conviction subjects the violator not only to traditional, though stringent, criminal fines and prison terms, but also mandatory forfeiture under § 1963.[*] It is the mandatory forfeiture penalty that is at issue here.

**Page 563**

While forfeiture remedies have been employed with increasing frequency in civil proceedings, forfeiture remedies and penalties are the subject of historic disfavor in our country. Although *in personam* forfeiture statutes were well grounded in the English common law, see *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 682-683 (1974), *in personam* criminal forfeiture penalties like those authorized under § 1963 were unknown in the federal system until the enactment of RICO in 1970. See 1 C. Wright, Federal Practice and Procedure § 125.1, p. 389 (2d ed. 1982). Section 1963's forfeiture penalties are novel for their punitive character as well as for their unprecedented sweep. Civil *in rem* forfeiture is limited in application to contraband and articles put to unlawful use, or in its broadest reach, to proceeds traceable to unlawful activity. See *United States v. Parcel of Land, Rumson, N. J.,* 507 U.S. 111, 118-123 (1993); *The Palmyra,* 12 Wheat. 1, 14-15 (1827). Extending beyond contraband or its traceable proceeds, RICO mandates the forfeiture of property constituting the defendant's "interest in the racketeering enterprise" and property affording the violator a "source of influence" over the RICO enterprise. 18 U.S.C. § 1963(a) (1988 ed. and Supp. III). In a previous decision, we acknowledged the novelty of RICO's penalty scheme, stating that Congress passed RICO to provide "new weapons of

unprecedented scope for an assault upon organized crime and its economic roots." *Russello v. United States,* 464 U.S. 16, 26 (1983).

As enacted in 1970, RICO targeted offenses then thought endemic to organized crime. 18 U.S.C. § 1961(1). When RICO was amended in 1984 to include obscenity as a predicate offense, there was no comment or debate in Congress on the First Amendment implications of the change. Act of Oct. 12, 1984, Pub. L. 98-473, 98 Stat. 2143. The consequence of adding a speech offense to a statutory scheme designed

**Page 564**

to curtail a different kind of criminal conduct went far beyond the imposition of severe penalties for obscenity offenses. The result was to render vulnerable to Government destruction any business daring to deal in sexually explicit materials. The unrestrained power of the forfeiture weapon was not lost on the Executive Branch, which was quick to see in the amended statute the means and opportunity to move against certain types of disfavored speech. The Attorney General's Commission on Pornography soon advocated the use of RICO and similar state statutes to "substantially handicap" or "eliminate" pornography businesses. 1 United States Dept. of Justice, Attorney General's Commission on Pornography, Final Report 498 (1986). As these comments illustrate, the constitutional concerns raised by a penalty of this destructive capacity are distinct from the concerns raised by traditional methods of punishment.

The Court says that, taken together, our decisions in *Fort Wayne Books* and *Arcara v. Cloud Books, Inc.,* 478 U.S. 697(1986), dispose of petitioner's First Amendment argument. See *ante,* at 2774-2775. But while instructive, neither case is dispositive. In *Fort Wayne Books* we considered a state law patterned on the federal RICO statute, and upheld its scheme of using obscenity offenses as the predicate acts resulting in fines and jail terms of great severity. We recognized that the fear of severe penalties may result in some self-censorship by cautious booksellers, but concluded that this is a necessary consequence of conventional obscenity prohibitions. 489 U.S., at 60. In rejecting the argument that the fines and jail terms in *Fort Wayne Books* infringed upon First Amendment principles, we regarded the penalties as equivalent to a sentence enhancement for multiple obscenity violations, a remedy of accepted constitutional legitimacy. *Id.,* at 59-60. We did not consider in *Fort Wayne Books* the First Amendment implications of extensive penal forfeitures, including the official destruction of protected expression. Further, while *Fort Wayne Books* acknowledges that some

**Page 565**

degree of self-censorship may be unavoidable in obscenity regulation, the alarming element of the forfeiture scheme here is the pervasive danger of government censorship, an issue, I submit, the Court does not confront.

In *Arcara,* we upheld against First Amendment challenge a criminal law requiring the temporary closure of an adult bookstore as a penal sanction for acts of prostitution occurring on the premises. We did not subject the closure penalty to First Amendment scrutiny even though the collateral consequence of its imposition would be to affect interests of traditional First Amendment concern. We said that such scrutiny was not required when a criminal penalty followed conduct "manifest[ing] absolutely no element of protected expression." 478 U.S., at 705. That the RICO prosecution of Alexander involved the targeting of a particular class of unlawful speech itself suffices to distinguish the instant case from *Arcara.* There can be little doubt that regulation and punishment of certain classes of unprotected speech have implications for other speech that is close to the proscribed line, speech which is entitled to the protections of the First Amendment. See *Speiser v. Randall,* 357 U.S. 513, 525(1958). Further, a sanction requiring the temporary closure of a bookstore cannot be equated, as it is under the Court's unfortunate analysis, see *ante,* at 2774-2775, with a forfeiture punishment mandating its permanent destruction.

**B**

The majority tries to occupy the high ground by assuming the role of the defender of the doctrine of prior restraint. It warns that we disparage the doctrine if we reason from it. But as an analysis of our prior restraint cases reveals, our application of the First Amendment has adjusted to meet new threats to speech. The First Amendment is a rule of substantive protection, not an artifice of categories. The admitted design and the overt purpose of the forfeiture in this case are to destroy an entire speech business and all its protected

**Page 566**

titles, thus depriving the public of access to lawful expression. This is restraint in more than theory. It is censorship all too real.

Relying on the distinction between prior restraints and subsequent punishments, *ante,* at 2770, 2772, the majority labels the forfeiture imposed here a punishment and dismisses any further debate over the constitutionality of the forfeiture penalty under the First Amendment. Our cases do recognize a distinction between prior restraints and subsequent punishments, but that distinction is neither so rigid nor so precise that it can bear the weight the Court places upon it to sustain the destruction of a speech business and its inventory as a punishment for past expression.

In its simple, most blatant form, a prior restraint is a law which requires submission of speech to an official

who may grant or deny permission to utter or publish it based upon its contents. See *Staub v. City of Baxley,* 355 U.S. 313, 322(1958); *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 503(1952); *A Quantity of Copies of Books v. Kansas,* 378 U.S. 205, 222 (1964) (Harlan, J., dissenting); see also M. Nimmer, Nimmer on Freedom of Speech § 4.03, p. 4-14 (1984). In contrast are laws which punish speech or expression only after it has occurred and been found unlawful. See *Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 440-442 (1957). While each mechanism, once imposed, may abridge speech in a direct way by suppressing it, or in an indirect way by chilling its dissemination, we have interpreted the First Amendment as providing greater protection from prior restraints than from subsequent punishments. See, *e. g., Arcara v. Cloud Books, Inc., supra,* at 705-706; *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 558-559 (1975); *Kingsley Books, Inc. v. Brown, supra,* at 440-442. In *Southeastern Promotions, Ltd. v. Conrad,* we explained that "[b]ehind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech *after*

### Page 567

they break the law than to throttle them and all others beforehand." 420 U.S., at 559.

It has been suggested that the distinction between prior restraints and subsequent punishments may have slight utility, see Nimmer, *supra,* § 4.04, at 4-18 to 4-25, for in a certain sense every criminal obscenity statute is a prior restraint because of the caution a speaker or bookseller must exercise to avoid its imposition. See *Vance v. Universal Amusement Co.,* 445 U.S. 308, 324 (1980) (White, J., joined by Rehnquist, J., dissenting); see also Jeffries, Rethinking Prior Restraint, 92 Yale L. J. 409, 437 (1982). To be sure, the term "prior restraint" is not self-defining. One problem, of course, is that some governmental actions may have the characteristics both of punishment and prior restraint. A historical example is the sentence imposed on Hugh Singleton in 1579 after he had enraged Elizabeth I by printing a certain tract. See F. Siebert, Freedom of the Press in England, 1476-1776, pp. 91-92 (1952). Singleton was condemned to lose his right hand, thus visiting upon him both a punishment and a disability encumbering all further printing. Though the sentence appears not to have been carried out, it illustrates that a prior restraint and a subsequent punishment may occur together. Despite the concurrent operation of the two kinds of prohibitions in some cases, the distinction between them persists in our law, and it is instructive here to inquire why this is so.

Early in our legal tradition the source of the distinction was the English common law, in particular the oft cited passage from William Blackstone's 18th-century Commentaries on the Laws of England. He observed as follows:

"The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no *previous* restraints upon publications, and not in freedom from censure for criminal matter when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public: to forbid this, is to

### Page 568

destroy the freedom of the press: but if he publishes what is improper, mischievous, or illegal, he must take the consequence of his own temerity." 4 W. Blackstone, Commentaries *151-*152.

The English law which Blackstone was compiling had come to distrust prior restraints, but with little accompanying condemnation of subsequent punishments. Part of the explanation for this lies in the circumstance that, in the centuries before Blackstone wrote, prior censorship, including licensing, was the means by which the Crown and the Parliament controlled speech and press. See Siebert, *supra,* at 56-63, 68-74. As those methods were the principal means used by government to control speech and press, it follows that an unyielding populace would devote its first efforts to avoiding or repealing restrictions in that form.

Even as Blackstone wrote, however, subsequent punishments were replacing the earlier censorship schemes as the mechanism for government control over disfavored speech in England. Whether Blackstone's apparent tolerance of subsequent punishments resulted from his acceptance of the English law as it then existed or his failure to grasp the potential threat these measures posed to liberty, or both, subsequent punishment in the broad sweep that he commented upon would be in flagrant violation of the principles of free speech and press that we have come to know and understand as being fundamental to our First Amendment freedoms. Indeed, in the beginning of our Republic, James Madison argued against the adoption of Blackstone's definition of free speech under the First Amendment. Said Madison: "[T]his idea of the freedom of the press can never be admitted to be the American idea of it" because a law inflicting penalties would have the same effect as a law authorizing a prior restraint. 6 Writings of James Madison 386 (G. Hunt ed. 1906).

The enactment of the alien and sedition laws early in our own history is an unhappy testament to the allure that restrictive

### Page 569

measures have for governments tempted to control the speech and publications of their people. And our earliest cases tended to repeat the suggestion by Blackstone that prior restraints were the sole concern of First Amendment protections. See *Patterson v. Colorado ex rel. Attorney General of Colorado,* 205 U.S. 454, 462 (1907); *Robertson v. Baldwin,* 165 U.S. 275, 281 (1897). In time,

however, the Court rejected the notion that First Amendment freedoms under our Constitution are coextensive with liberties available under the common law of England. See *Grosjean v. American Press Co.,* 297 U.S. 233, 248-249 (1936). From this came the conclusion that "[t]he protection of the First Amendment . . . is not limited to the Blackstonian idea that freedom of the press means only freedom from restraint prior to publication." *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, n. 3 (1942).

As our First Amendment law has developed, we have not confined the application of the prior restraint doctrine to its simpler forms, outright licensing or censorship before speech takes place. In considering governmental measures deviating from the classic form of a prior restraint yet posing many of the same dangers to First Amendment freedoms, we have extended prior restraint protection with some latitude, toward the end of declaring certain governmental actions to fall within the presumption of invalidity. This approach is evident in *Near v. Minnesota ex rel. Olson,* 283 U.S. 697(1931), the leading case in which we invoked the prior restraint doctrine to invalidate a state injunctive decree.

In *Near,* a Minnesota statute authorized judicial proceedings to abate as a nuisance a " 'malicious, scandalous and defamatory newspaper, magazine or other periodical.' " *Id.,* at 701-702. In a suit brought by the attorney for Hennepin County it was established that Near had published articles in various editions of The Saturday Press in violation of the statutory standard. *Id.,* at 703-705. Citing the instance of these past unlawful publications, the court enjoined any future

**Page 570**

violations of the state statute. *Id.,* at 705. In one sense the injunctive order, which paralleled the nuisance statute, did nothing more than announce the conditions under which some later punishment might be imposed, for one presumes that contempt could not be found until there was a further violation in contravention of the order. But in *Near* the publisher, because of past wrongs, was subjected to active state intervention for the control of future speech. We found that the scheme was a prior restraint because it embodied "the essence of censorship." *Id.,* at 713. This understanding is confirmed by our later decision in *Kingsley Books v. Brown,* where we said that it had been enough to condemn the injunction in *Near* that Minnesota had "empowered its courts to enjoin the dissemination of future issues of a publication because its past issues had been found offensive." 354 U.S., at 445.

Indeed the Court has been consistent in adopting a speech-protective definition of prior restraint when the state attempts to attack future speech in retribution for a speaker's past transgressions. See *Vance v. Universal Amusement Co.,* 445 U.S. 308 (1980) *(per curiam)* (invalidating as a prior restraint procedure authorizing

state courts to abate as a nuisance an adult theater which had exhibited obscene films in the past because the effect of the procedure was to prevent future exhibitions of pictures not yet found to be obscene). It is a flat misreading of our precedents to declare as the majority does that the definition of a prior restraint includes only those measures which impose a "legal impediment," *ante,* at 2771, on a speaker's ability to engage in future expressive activity. *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70 (1963), best illustrates the point. There a state commission did nothing more than warn booksellers that certain titles could be obscene, implying that criminal prosecutions could follow if their warnings were not heeded. The commission had no formal enforcement powers, and failure to heed its warnings was not a criminal offense. Although

**Page 571**

the commission could impose no legal impediment on a speaker's ability to engage in future expressive activity, we held that scheme was an impermissible "system of prior administrative restraints." *Ibid.* There we said: "We are not the first court to look through forms to the substance and recognize that informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief." *Id.,* at 67. If mere warning against sale of certain materials was a prior restraint, I fail to see why the physical destruction of a speech enterprise and its protected inventory is not condemned by the same doctrinal principles.

One wonders what today's majority would have done if faced in *Near* with a novel argument to extend the traditional conception of the prior restraint doctrine. In view of the formalistic approach the Court advances today, the Court likely would have rejected Near's pleas on the theory that to accept his argument would be to "blur the line separating prior restraints from subsequent punishments to such a degree that it would be impossible to determine with any certainty whether a particular measure is a prior restraint or not." *Ante,* at 2773. In so holding the Court would have ignored, as the Court does today, that the applicability of First Amendment analysis to a governmental action depends not alone upon the name by which the action is called, but upon its operation and effect on the suppression of speech. *Near, supra,* at 708 ("[T]he court has regard to substance and not to mere matters of form, and . . . in accordance with familiar principles. . .statute[s] must be tested by [their] operation and effect"). See also *Smith v. Daily Mail Publishing Co.,* 443 U.S. 97, 101 (1979) (the First Amendment's application to a civil or criminal sanction is not determined solely by whether that action is viewed "as a prior restraint or as a penal sanction"); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S., at 552-553 (challenged action is "indistinguishable in its censoring effect" from official actions consistently identified as prior restraints); *Schneider v. State (Town*

*of Irvington),* 308 U.S. 147, 161 (1939) ("In every case, therefore, where legislative abridgment of [First Amendment] rights is asserted, the courts should be astute to examine the effect of the challenged legislation").

The cited cases identify a progression in our First Amendment jurisprudence which results from a more fundamental principle. As governments try new ways to subvert essential freedoms, legal and constitutional systems respond by making more explicit the nature and the extent of the liberty in question. First in *Near,* and later in *Bantam Books* and *Vance,* we were faced with official action which did not fall within the traditional meaning of the term "prior restraint," yet posed many of the same censorship dangers. Our response was to hold that the doctrine not only includes licensing schemes requiring speech to be submitted to a censor for review prior to dissemination, but also encompasses injunctive systems which threaten or bar future speech based on some past infraction.

Although we consider today a new method of government control with unmistakable dangers of official censorship, the majority concludes that First Amendment freedoms are not endangered because forfeiture follows a lawful conviction for obscenity offenses. But this explanation does not suffice. The rights of free speech and press in their broad and legitimate sphere cannot be defeated by the simple expedient of punishing after in lieu of censoring before. See *Smith v. Daily Mail Publishing Co., supra,* at 101-102; *Thornhill v. Alabama,* 310 U.S. 88, 101-102 (1940). This is so because in some instances the operation and effect of a particular enforcement scheme, though not in the form of a traditional prior restraint, may be to raise the same concerns which inform all of our prior restraint cases: the evils of state censorship and the unacceptable chilling of protected speech.

The operation and effect of RICO's forfeiture remedies are different from a heavy fine or a severe jail sentence because

RICO's forfeiture provisions are different in purpose and kind from ordinary criminal sanctions. See *supra,* at 563-565. The Government's stated purpose under RICO, to destroy or incapacitate the offending enterprise, bears a striking resemblance to the motivation for the state nuisance statute the Court struck down as an impermissible prior restraint in *Near.* The purpose of the state statute in *Near* was "not punishment, in the ordinary sense, but suppression of the offending newspaper or periodical." 283 U.S., at 711. In the context of the First Amendment, it is quite odd indeed to apply a measure implemented not only to deter unlawful conduct by

imposing punishment after violations, but to " 'incapacitate, and . . . directly to remove the corrupting influence from the channels of commerce.' " *Russello v. United States,* 464 U.S., at 28, quoting 116 Cong. Rec. 18955 (1970) (remarks of sponsor Sen. McClellan). The particular nature of Ferris Alexander's activities ought not blind the Court to what is at stake here. Under the principle the Court adopts, any bookstore or press enterprise could be forfeited as punishment for even a single obscenity conviction.

Assuming the constitutionality of the mandatory forfeiture under § 1963 when applied to nonspeech-related conduct, the constitutional analysis must be different when that remedy is imposed for violations of the federal obscenity laws. "Our decisions furnish examples of legal devices and doctrines, in most applications consistent with the Constitution, which cannot be applied in settings where they have the collateral effect of inhibiting the freedom of expression." *Smith v. California,* 361 U.S. 147, 150-151 (1959). The regulation of obscenity, often separated from protected expression only by a "dim and uncertain line," must be accomplished through "procedures that will ensure against the curtailment of constitutionally protected expression." *Bantam Books v. Sullivan,* 372 U.S., at 66. Because freedoms of expression are "vulnerable to gravely damaging yet barely visible encroachments,"

*ibid.,* the government must use measures that are sensitive to First Amendment concerns in its task of regulating or punishing speech. *Speiser v. Randall,* 357 U.S., at 525.

Whatever one might label the RICO forfeiture provisions at issue in this case, be it effective, innovative, or Draconian, § 1963 was not designed for sensitive and exacting application. What is happening here is simple: Books and films are condemned and destroyed not for their own content but for the content of their owner's prior speech. Our law does not permit the government to burden future speech for this sort of taint. Section 1963 requires trial courts to forfeit not only the unlawful items and any proceeds from their sale, but also the defendant's entire interest in the enterprise involved in the RICO violations and any assets affording the defendant a source of influence over the enterprise. 18 U.S.C. §§ 1963(a)(1)-(3) (1988 ed. and Supp. III). A defend- ant's exposure to this massive penalty is grounded on the commission of just two or more related obscenity offenses committed within a 10-year period. Aptly described, RICO's forfeiture provisions "arm prosecutors not with scalpels to excise obscene portions of an adult bookstore's inventory but with sickles to mow down the entire undesired use." *Fort Wayne Books,* 489 U.S., at 85 (Stevens, J., concurring in part and dissenting in part).

What is at work in this case is not the power to

punish an individual for his past transgressions but the authority to suppress a particular class of disfavored speech. The forfeiture provisions accomplish this in a direct way by seizing speech presumed to be protected along with the instruments of its dissemination, and in an indirect way by threatening all who engage in the business of distributing adult or sexually explicit materials with the same disabling measures. Cf. *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 390 (1973) (the special vice of the prior restraint is suppression of speech, either directly or by inducing

**Page 575**

caution in the speaker, prior to a determination that the targeted speech is unprotected by the First Amendment).

In a society committed to freedom of thought, inquiry, and discussion without interference or guidance from the state, public confidence in the institutions devoted to the dissemination of written matter and films is essential. That confidence erodes if it is perceived that speakers and the press are vulnerable for all of their expression based on some errant expression in the past. Independence of speech and press can be just as compromised by the threat of official intervention as by the fact of it. See *Bantam Books, Inc. v. Sullivan, supra,* at 70. Though perhaps not in the form of a classic prior restraint, the application of the forfeiture statute here bears its censorial cast.

*Arcara* recognized, as the Court today does not, the vital difference between a punishment imposed for a speech offense and a punishment imposed for some other crime. Where the government seeks forfeiture of a bookstore because of its owner's drug offenses, there is little reason to surmise, absent evidence of selective prosecution, that abolishing the bookstore is related to the government's disfavor of the publication outlet or its activities. Where, however, RICO forfeiture stems from a previous speech offense, the punishment serves not only the Government's interest in purging organized-crime taint, but also its interest in deterring the activities of the speech-related business itself. The threat of a censorial motive and of ongoing speech supervision by the state justifies the imposition of First Amendment protection. Free speech principles, well established by our cases, require in this case that the forfeiture of the inventory and of the speech distribution facilities be held invalid.

The distinct concern raised by § 1963 forfeiture penalties is not a proportionality concern; all punishments are subject to analysis for proportionality and this concern should be addressed under the Eighth Amendment. See *Austin v.*

**Page 576**

*United States, post,* p. 602. Here, the question is whether, when imposed as punishment for violation of the federal obscenity laws, the operation of RICO's forfeiture provisions is an exercise of Government censorship and control over protected speech as condemned in our prior restraint cases. In my view the effect is just that. For this reason I would invalidate those portions of the judgment which mandated the forfeiture of petitioner's business enterprise and inventory, as well as all property affording him a source of influence over that enterprise.

**II**

Quite apart from the direct bearing that our prior restraint cases have on the entire forfeiture that was ordered in this case, the destruction of books and films that were not obscene and not adjudged to be so is a remedy with no parallel in our cases. The majority says that our cases "establish quite clearly that the First Amendment does not prohibit . . . forfeiture of expressive materials as punishment for criminal conduct." See *ante,* at 2773-2774. But the single case cited in support of this stark new threat to all speech enterprises is *Arcara v. Cloud Books, Inc. Arcara,* as discussed, *supra,* at 565, is quite inapposite. There we found unconvincing the argument that protected bookselling activities were burdened by the closure, saying that the owners "remain free to sell [and the public remains free to acquire] the same materials at another location." 478 U.S., at 705. Alexander and the public do not have those choices here for a simple reason: The Government has destroyed the inventory. Further, the sanction in *Arcara* did not involve a complete confiscation or destruction of protected expression as did the forfeiture in this case. Here the inventory forfeited consisted of hundreds of original titles and thousands of copies, all of which are presumed to be protected speech. In fact, some of the materials seized were the very ones the jury here determined not to be obscene. Even so, all of the inventory was seized and destroyed.

**Page 577**

Even when interim pretrial seizures are used, we have been careful to say that First Amendment materials cannot be taken out of circulation until they have been determined to be unlawful. "[W]hile the general rule under the Fourth Amendment is that any and all contraband, instrumentalities, and evidence of crimes may be seized on probable cause. . ., it is otherwise when materials presumptively protected by the First Amendment are involved." *Fort Wayne Books,* 489 U.S., at 63. See *id.,* at 65-66; *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 326, n. 5 (1979) (the First Amendment imposes special constraints on searches for, and seizures of, presumptively protected materials).

In *Marcus v. Search Warrant,* 367 U.S. 717, 731-733(1961), we invalidated a mass pretrial seizure of allegedly obscene publications achieved through a warrant that was vague and unspecific. The constitutional defect there was that the seizure was imposed without

safeguards necessary to assure nonobscene material the constitutional protection to which it is entitled. In similar fashion we invalidated, in *A Quantity of Copies of Books v. Kansas,* 378 U.S., at 211- 213, a state procedure authorizing seizure of books alleged to be obscene prior to hearing, even though the system involved judicial examination of some of the seized titles. While the force behind the special protection accorded searches for and seizures of First Amendment materials is the risk of prior restraint, see *Maryland v. Macon,* 472 U.S. 463, 470 (1985), in substance the rule prevents seizure and destruction of expressive materials in circumstances such as are presented in this case without an adjudication of their unlawful character.

It follows from the search cases in which the First Amendment required exacting protection, that one title does not become seizable or tainted because of its proximity on the shelf to another. And if that is the rule for interim seizures, it follows with even greater force that protected materials cannot be destroyed altogether for some alleged taint from an owner who committed a speech violation. In attempting

**Page 578**

to distinguish the holdings of *Marcus* and *A Quantity of Books,* the Court describes the constitutional infirmity in those cases as follows: "[T]he government had seized or otherwise restrained materials suspected of being obscene without a prior judicial determination that they were in fact so." *Ante,* at 2772. But the same constitutional defect is present in the case before us today, and the Court fails to explain why it is not fatal to the forfeiture punishment here under review. Thus, while in the past we invalidated seizures which resulted in a temporary removal of presumptively protected materials from circulation, today the Court approves of Government measures having the same permanent effect. In my view, the forfeiture of expressive material here that had not been adjudged to be obscene, or otherwise without the protection of the First Amendment, was unconstitutional.

\*\*\*

Given the Court's principal holding, I can interpose no objection to remanding the case for further consideration under the Eighth Amendment. But it is unnecessary to reach the Eighth Amendment question. The Court's failure to reverse this flagrant violation of the right of free speech and expression is a deplorable abandonment of fundamental First Amendment principles. I dissent from the judgment and from the opinion of the Court.

---------------

Notes:

[*] Briefs of *amici curiae* urging reversal were filed for the American Booksellers Foundation for Free Expression et al. by *Michael A. Bamberger;* for the American Civil Liberties Union et al. by *Marvin E. Frankel, Steven R. Shapiro,* and *Marjorie Heins;* for the American Library Association et al. by *Bruce J. Ennis, Jr.,* and *David W. Ogden;* for Feminists for Free Expression by *Helen M. Mickiewicz;* and for the Video Software Dealers Association by *Charles B. Ruttenberg, James P. Mercurio,* and *Theodore D. Frank.*

Briefs of *amici curiae* urging affirmance were filed for Christian Legal Defense by *Wendell R. Bird* and *David J. Myers;* for the National Family Legal Foundation et al. by *James P. Mueller* and *Len L. Munsil;* for Morality in Media, Inc., by *Paul J. McGeady;* and for the Religious Alliance Against Pornography et al. by *H. Robert Showers.*

[*] Section 1963(a) provides that in imposing sentence on one convicted of racketeering offenses under § 1962, the district court *shall order* forfeiture of three classes of assets:

"(1) any interest the person has acquired or maintained in violation of section 1962;

"(2) any—

"(A) interest in;

"(B) security of;

"(C) claim against; or

"(D) property or contractual right of any kind affording a source of influence over;

"any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962; and

"(3) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962." 18 U.S.C. §§ 1963(a)(1)-(3).

[1] Not wishing to go into the business of selling pornographic materials—regardless of whether they were legally obscene—the Government decided that it would be better to destroy the forfeited expressive materials than sell them to members of the public. See Brief for United States 26-27, n. 11.

[2] The doctrine of prior restraint has its roots in the 16th- and 17th- century English system of censorship. Under that system, all printing presses and printers were licensed by the government, and nothing could lawfully be published without the prior approval of a government or church censor. See generally T. Emerson, System of Freedom of Expression 504 (1970). Beginning with *Near v. Minnesota ex rel. Olson,* 283 U.S. 697 (1931), we

expanded this doctrine to include not only licensing schemes requiring speech to be submitted to an administrative censor for prepublication review, but also injunctions against future speech issued by judges. See *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 389-390 (1973) ("[T]he protection against prior restraint at common law barred only a system of administrative censorship. . . . [T]he Court boldly stepped beyond this narrow doctrine in *Near* "). Quite obviously, however, we have never before countenanced the essentially limitless expansion of the term that petitioner proposes.

[3] This sense of disproportionality animates much of petitioner's First Amendment arguments as well. Questions of proportionality, however, should be dealt with directly and forthrightly under the Eighth Amendment and not be allowed to influence *sub silentio* courts' First Amendment analysis.

[4] Unlike *Austin,* this case involves *in personam* criminal forfeiture not *in rem* civil forfeiture, so there was no threshold question concerning the applicability of the Eighth Amendment.

---------------

**427 U.S. 539 (1976)**

**96 S.Ct. 2791, 49 L.Ed.2d 683**

**Nebraska Press Assn.**

**v.**

**Stuart**

**No. 75-817**

**United States Supreme Court**

**June 30, 1976**

Argued April 19, 1976

CERTIORARI TO THE SUPREME COURT OF NEBRASKA

Syllabus

Respondent Nebraska state trial judge, in anticipation of a trial for a multiple murder which had attracted widespread news coverage, entered an order which, as modified by the Nebraska Supreme Court, restrained petitioner newspapers, broadcasters, journalists, news media associations, and national newswire services from publishing or broadcasting accounts of confessions or admissions made by the accused to law enforcement officers or third parties, except members of the press, and other facts "strongly implicative"

[96 S.Ct. 2792] of the accused. The modification of the order had occurred in the course of an action by petitioners, which had sought a stay of the trial court's original order and in which the accused and the State of Nebraska intervened. This Court granted certiorari to determine whether the order violated the constitutional guarantee of freedom of the press. The order expired by its own terms when the jury was impaneled. Respondent was convicted; his appeal is pending in the Nebraska Supreme Court.

*Held:*

[96 S.Ct. 2794] 1. The case is not moot simply because the order has expired, since the controversy between the parties is "capable of repetition, yet evading review." Pp. 546-547.

2. While the guarantees of freedom of expression are not an absolute prohibition under all circumstances, the barriers to prior restraint remain high and the presumption against its use continues intact. Although it is unnecessary to establish a priority between First Amendment rights and the Sixth Amendment right to a fair trial under all circumstances, as the authors of the Bill of Rights themselves declined to do, the protection against prior restraint should have particular force as applied to reporting of criminal proceedings. Pp. 556-562.

3. The heavy burden imposed as a condition to securing a prior restraint was not met in this case. Pp. 562-570.

(a) On the pretrial record, the trial judge was justified in concluding that there would be intense and pervasive pretrial publicity concerning the case, and he could also reasonably

conclude, based on common human experience, that publicity might impair the accused's right to a fair trial. His conclusion as to the impact of such publicity on prospective jurors was of necessity speculative, however, dealing as he was with factors unknown and unknowable. Pp. 562-563.

(b) There is no finding that measures short of prior restraint on the press and speech would not have protected the accused's rights; the Nebraska Supreme Court no more than implied that alternative measures might not suffice, and the record lacks evidence that would support such a finding. Pp. 563-565.

(c) It is not clear that prior restraint on publication would have effectively protected the accused's rights, in view of such practical problems as the limited territorial jurisdiction of the trial court issuing the restraining order, the difficulties inherent in predicting what information will in fact undermine the jurors' impartiality, the problem of drafting an order that will effectively keep prejudicial information from prospective jurors, and the fact that in this case the events occurred in a small community where rumors would travel swiftly by word of mouth. Pp. 565-567.

(d) To the extent that the order prohibited the reporting of evidence adduced at the open preliminary hearing held to determine whether the accused should be bound over for trial, it violated the settled principle that "there is nothing that proscribes the press from reporting events that transpire in the courtroom," *Sheppard v. Maxwell*, 384 U.S. 333, 362-363, and the portion of the order restraining publication of other facts "strongly implicative" of the accused is too vague and too broad to survive the scrutiny given to restraints on First Amendment rights. Pp. 567-568.

194 Neb. 783, 236 N.W.2d 794, reversed.

BURGER, C.J., delivered the opinion of the Court, in which WHITE, BLACKMUN, POWELL, and

REHNQUIST, JJ., joined. WHITE, J., *post,* p. 570, and POWELL, J., *post,* p. 571, filed concurring opinions. BRENNAN, J., filed an opinion concurring in the judgment, in which STEWART and MARSHALL, JJ., joined, *post,* p. 572. STEVENS, J., filed an opinion concurring in the judgment, *post,* p. 617.

## Page 541

BURGER, J., lead opinion

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

The respondent State District Judge entered an order restraining the petitioners from publishing or broadcasting accounts of confessions or admissions made by the accused or facts "strongly implicative" of the accused in a widely reported murder of six persons. We granted certiorari to decide whether the entry of such an order on the showing made before the state court violated the constitutional guarantee of freedom of the press.

## Page 542

I

On the evening of October 18, 1975, local police found the six members of the Henry Kellie family murdered in their home in

[96 S.Ct. 2795] Sutherland, Neb. a town of about 850 people. Police released the description of a suspect, Erwin Charles Simants, to the reporters who had hastened to the scene of the crime. Simants was arrested and arraigned in Lincoln County Court the following morning, ending a tense night for this small rural community.

The crime immediately attracted widespread news coverage, by local, regional, and national newspapers, radio and television stations. Three days after the crime, the County Attorney and Simants' attorney joined in asking the County Court to enter a restrictive order relating to "matters that may or may not be publicly reported or disclosed to the public," because of the "mass coverage by news media" and the

reasonable likelihood of prejudicial news which would make difficult, if not impossible, the impaneling of an impartial jury and tend to prevent a fair trial.

The County Court heard oral argument, but took no evidence; no attorney for members of the press appeared at this stage. The County Court granted the prosecutor's motion for a restrictive order and entered it the next day, October 22. The order prohibited everyone in attendance from

releas[ing] or authoriz[ing] the release for public dissemination in any form or manner whatsoever any

testimony given or evidence adduced;

the order also required members of the press to observe the Nebraska Bar-Press Guidelines.[1]

## Page 543

Simants' preliminary hearing was held the same day, open to the public but subject to the order. The County Court bound over the defendant for trial to the State District Court. The charges, as amended to reflect the autopsy findings, were that Simants had committed the murders in the course of a sexual assault.

Petitioners -- several press and broadcast associations, publishers, and individual reporters -- moved on October 23 for leave to intervene in the District Court, asking that the restrictive order imposed by the County Court be vacated. The District Court conducted a hearing, at which the County Judge testified and newspaper articles about the Simants case were admitted in evidence. The District Judge granted petitioners' motion to intervene and, on October 27, entered his own restrictive order. The judge found, "because of the nature of the crimes charged in the complaint that there, is a clear and present danger that pretrial publicity could impinge upon the defendant's right to a fair trial." The order applied only until the jury was impaneled, and specifically prohibited petitioners from reporting five subjects: (1) the existence or contents of a confession Simants had made to law enforcement officers, which had been introduced in open court at arraignment; (2) the fact or nature of statements Simants had made to other persons; (3) the contents of a note he had written the night of the crime; (4) certain aspects of the medical testimony at the preliminary hearing; and (5) the identity of the

## Page 544

victims of the alleged sexual assault and the nature of the assault. It also prohibited reporting the exact nature of the restrictive order itself. Like the County Court's order, this order incorporated the Nebraska Bar-Press Guidelines. Finally, the order set out a plan for attendance, seating, and courthouse traffic control during the trial.

Four days later, on October 31, petitioners asked the District Court to stay its order. At the same time, they applied to

[96 S.Ct. 2796] the Nebraska Supreme Court for a writ of mandamus, a stay, and an expedited appeal from the order. The State of Nebraska and the defendant Simants intervened in these actions. The Nebraska Supreme Court heard oral argument on November 25, and issued its per curiam opinion December 1. *State v. Simants,* 194 Neb. 783, 236 N.W.2d 794 (1975).[2]

## Page 545

The Nebraska Supreme Court balanced the "heavy presumption against . . . constitutional validity" that an order restraining publication bears, *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971), against the importance of the defendant's right to trial by an impartial jury. Both society and the individual defendant, the court held, had a vital interest in assuring that Simants be tried by an impartial jury. Because of the publicity surrounding the crime, the court determined that this right was in jeopardy. The court noted that Nebraska statutes required the District Court to try Simants within six months of his arrest, and that a change of venue could move the trial only to adjoining counties, which had been subject to essentially the same publicity as Lincoln County. The Nebraska Supreme Court held that "[u]nless the absolutist position of the relators was constitutionally correct, it would appear that the District Court acted properly." 194 Neb. at 797, 236 N.W.2d at 803.

The Nebraska Supreme Court rejected that "absolutist position," but modified the District Court's order to accommodate the defendant's right to a fair trial and the petitioners' interest in reporting pretrial events. The order as modified prohibited reporting of only three matters: (a) the existence and nature of any confessions or admissions made by the defendant to law enforcement officers, (b) any confessions or admissions made to any third parties, except members of the press, and (c) other facts "strongly implicative" of the accused. The Nebraska Supreme Court did not rely on the Nebraska Bar Press Guidelines. *See* n. 1, *supra.* After construing Nebraska law to permit closure in certain circumstances, the court remanded the case to the District Judge for reconsideration of the issue whether pretrial hearings should be closed to the press and public.

**Page 546**

We granted certiorari to address the important issues raised by the District Court order as modified by the Nebraska Supreme Court, but we denied the motion to expedite review or to stay entirely the order of the State District Court pending Simants' trial. 423 U.S. 1027 (1975). We are informed by the parties that, since we granted certiorari, Simants has been convicted of murder and sentenced to death. His appeal is pending in the Nebraska Supreme Court.

II

The order at issue in this case expired by its own terms when the jury was impaneled on January 7, 1976. There were no restraints

**[96 S.Ct. 2797]** on publication once the jury was selected, and there are now no restrictions on what may be spoken or written about the Simants case. Intervenor Simants argues that for this reason the case is moot.

Our jurisdiction under Art. III, § 2, of the Constitution extends only to actual cases and controversies. *Indianapolis School Comm'rs v. Jacobs*, 420 U.S. 128 (1975); *Sosna v. Iowa*, 419 U.S. 393, 397-403 (1975). The Court has recognized, however, that jurisdiction is not necessarily defeated simply because the order attacked has expired, if the underlying dispute between the parties is one "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911).

The controversy between the parties to this case is "capable of repetition" in two senses. First, if Simants' conviction is reversed by the Nebraska Supreme Court and a new trial ordered, the District Court may enter another restrictive order to prevent a resurgence of prejudicial publicity before Simants' retrial. Second, the State of Nebraska is a party to this case; the Nebraska Supreme Court's decision authorizes state prosecutors to

**Page 547**

seek restrictive orders in appropriate cases. The dispute between the State and the petitioners who cover events throughout the State is thus "capable of repetition." Yet, if we decline to address the issues in this case on grounds of mootness, the dispute will evade review, or at least considered plenary review in this Court, since these orders are by nature short-lived. *See, e.g., Weinstein v. Bradford*, 423 U.S. 147 (1975); *Sosna v. Iowa, supra; Roe v. Wade*, 410 U.S. 113, 125 (1973); *Moore v. Ogilvie*, 394 U.S. 814, 816 (1969); *Carroll v. Princess Anne*, 393 U.S. 175, 178-179 (1968). We therefore conclude that this case is not moot, and proceed to the merits.

III

The problems presented by this case are almost as old as the Republic. Neither in the Constitution nor in contemporaneous writings do we find that the conflict between these two important rights was anticipated, yet it is inconceivable that the authors of the Constitution were unaware of the potential conflicts between the right to an unbiased jury and the guarantee of freedom of the press. The unusually able lawyers who helped write the Constitution and later drafted the Bill of Rights were familiar with the historic episode in which John Adams defended British soldiers charged with homicide for firing into a crowd of Boston demonstrators; they were intimately familiar with the clash of the adversary system and the part that passions of the populace sometimes play in influencing potential jurors. They did not address themselves directly to the situation presented by this case; their chief concern was the need for freedom of expression in the political arena and the dialogue in ideas. But they recognized that there were risks to private rights from an unfettered press. Jefferson, for example,

**Page 548**

writing from Paris in 1786 concerning press attacks on

John Jay, stated:

In truth, it is afflicting that a man who has past his life in serving the public . . . should yet be liable to have his peace of mind so much disturbed by any individual who shall think proper to arraign him in a newspaper. It is, however, an evil for which there is no remedy. Our liberty depends on the freedom of the press, and that cannot be limited without being lost. . . .

9 Papers of Thomas Jefferson 239 (J. Boyd ed.1954). *See also* F. Mott, Jefferson and the Press 21, 38-46 (1943).

The trial of Aaron Burr in 1807 presented Mr. Chief Justice Marshall, presiding as a trial judge, with acute problems in selecting an unbiased jury. Few people in the area of Virginia from which jurors were drawn had not formed some opinions concerning

**[96 S.Ct. 2798]** Mr. Burr or the case, from newspaper accounts and heightened discussion both private and public. The Chief Justice conducted a searching *voir dire* of the two panels eventually called, and rendered a substantial opinion on the purposes of *voir dire* and the standards to be applied. *See* 1 Causes Celebres, Trial of Aaron Burr for Treason 40427, 473481 (1879); *United States v. Burr,* 25 F.Cas. 49 (No. 14,692g) (CC Va. 1807). Burr was acquitted, so there was no occasion for appellate review to examine the problem of prejudicial pretrial publicity. Mr. Chief Justice Marshall's careful *voir dire* inquiry into the matter of possible bias makes clear that the problem is not a new one.

The speed of communication and the pervasiveness of the modern news media have exacerbated these problems, however, as numerous appeals demonstrate. The trial of Bruno Hauptmann in a small New Jersey community for

**Page 549**

the abduction and murder of the Charles Lindberghs' infant child probably was the most widely covered trial up to that time, and the nature of the coverage produced widespread public reaction. Criticism was directed at the "carnival" atmosphere that pervaded the community and the courtroom itself. Responsible leaders of press and the legal profession -- including other judges -- pointed out that much of this sorry performance could have been controlled by a vigilant trial judge and by other public officers subject to the control of the court. *See generally* Hudson, Freedom of the Press Versus Fair Trial: The Remedy Lies With the Courts, 1 Val.U.L.Rev. 8, 114 (1966); Hallam, Some Object Lessons on Publicity in Criminal Trials, 24 Minn.L.Rev. 453 (1940); Lippmann, The Lindbergh Case in Its Relation to American Newspapers, in Problems of Journalism 154-156 (1936).

The excesses of press and radio and lack of responsibility of those in authority in the *Hauptmann*

case and others of that era led to efforts to develop voluntary guidelines for courts, lawyers, press, and broadcasters. *See generally* J. Lofton, Justice and the Press 117-130 (1966).[3] The effort was renewed in 1965, when the American Bar Association embarked on a project to develop standards for all aspects of criminal justice, including guidelines to accommodate the right to a fair trial and the rights of a free press. *See* Powell, The Right to a

**Page 550**

Fair Trial, 51 A.B.A.J. 534 (1965). The resulting standards, approved by the Association in 1968, received support from most of the legal profession. American Bar Association Project on Standards for Criminal Justice, Fair Trial and Free Press (Approved Draft 1968). Other groups have undertaken similar studies. *See* Report of the Judicial Conference Committee on the Operation of the Jury System, "Free Press-Fair Trial" Issue, 45 F.R.D. 391 (1968); Special Committee on Radio, Television, and the Administration of Justice of the Association of the Bar of the City of New York, Freedom of the Press and Fair Trial (1967). In the wake of these efforts, the cooperation between bar associations and members of the press led to the adoption of voluntary guidelines like Nebraska's. *See* n. 1, *supra;* American Bar Association Legal Advisory Committee on Fair Trial and Free Press, The Rights of Fair Trial and Free Press 1-6 (1969).

In practice, of course, even the most ideal guidelines are subjected to powerful strains when a case such as Simants' arises, with reporters from many parts of the country on the scene. Reporters from distant places are unlikely to consider themselves bound by local standards. They report to editors outside the area covered by the guidelines,

**[96 S.Ct. 2799]** and their editors are likely to be guided only by their own standards. To contemplate how a state court can control acts of a newspaper or broadcaster outside its jurisdiction, even though the newspapers and broadcasts reach the very community from which jurors are to be selected, suggests something of the practical difficulties of managing such guidelines.

The problems presented in this case have a substantial history outside the reported decisions of courts, in the efforts of many responsible people to accommodate the competing interests. We cannot resolve all of them, for

**Page 551**

it is not the function of this Court to write a code. We look instead to this particular case and the legal context in which it arises.

IV

The Sixth Amendment in terms guarantees "trial, by

an impartial jury . . ." in federal criminal prosecutions. Because "trial by jury in criminal cases is fundamental to the American scheme of justice," the Due Process Clause of the Fourteenth Amendment guarantees the same right in state criminal prosecutions. *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968).

In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors. . . . "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136. In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as "indifferent as he stands unsworne." Co.Litt. 155b. His verdict must be based upon the evidence developed at the trial.

*Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

In the overwhelming majority of criminal trials, pretrial publicity presents few unmanageable threats to this important right. But when the case is a "sensational" one, tensions develop between the right of the accused to trial by an impartial jury and the rights guaranteed others by the First Amendment. The relevant decisions of this Court, even if not dispositive, are instructive by way of background.

In *Irvin v. Dowd, supra,* for example, the defendant was convicted of murder following intensive and hostile news coverage. The trial judge had granted a defense motion for a change of venue, but only to an

**Page 552**

adjacent county, which had been exposed to essentially the same news coverage. At trial, 430 persons were called for jury service; 268 were excused because they had fixed opinions as to guilt. Eight of the 12 who served as jurors thought the defendant guilty, but said they could nevertheless render an impartial verdict. On review, the Court vacated the conviction and death sentence and remanded to allow a new trial for, "[w]ith his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion. . . ." 366 U.S. at 728.

Similarly, in *Rideau v. Louisiana*, 373 U.S. 723 (1963), the Court reversed the conviction of a defendant whose staged, highly emotional confession had been filmed with the cooperation of local police and later broadcast on television for three days while he was awaiting trial, saying "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Id.* at 726. And in *Estes v. Texas*, 381 U.S. 532 (1965), the Court held that the defendant had not been afforded due process where the volume of trial publicity, the judge's failure to control the proceedings, and the telecast of a hearing and of the trial itself "inherently prevented a sober search for the truth." *Id.* at 551. *See also Marshall*

*v. United States*, 360 U.S. 310 (1959)

In *Sheppard v. Maxwell*, 384 U.S. 333 (1966), the Court focused sharply on the impact of pretrial

**[96 S.Ct. 2800]** publicity and a trial court's duty to protect the defendant's constitutional right to a fair trial. With only Mr. Justice Black dissenting, and he without opinion, the Court ordered a new trial for the petitioner, even though the first trial had occurred 12 years before. Beyond doubt, the press had shown no responsible concern for the constitutional guarantee of a fair trial; the community

**Page 553**

from which the jury was drawn had been inundated by publicity hostile to the defendant. But the trial judge

did not fulfill his duty to protect [the defendant] from the inherently prejudicial publicity which saturated the community and to control disruptive influences in the courtroom.

*Id.* at 363. The Court noted that "unfair and prejudicial news comment on pending trials has become increasingly prevalent," *id.* at 362, and issued a strong warning:

Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, *the trial courts must take strong measures to ensure that the balance is never weighed against the accused.* . . . Of course, there is nothing that proscribes the press from reporting events that transpire in the courtroom. But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should *continue the case* until the threat abates, *or transfer it* to another county not so permeated with publicity. In addition, *sequestration of the jury* was something the judge should have raised *sua sponte* with counsel. If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered. But we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. *Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the*

**Page 554**

*court should be permitted to frustrate its function.* Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and

worthy of disciplinary measures.

*Id.* at 362-363 (emphasis added). Because the trial court had failed to use even minimal efforts to insulate the trial and the jurors from the "deluge of publicity," *id.* at 357, the Court vacated the judgment of conviction and a new trial followed, in which the accused was acquitted.

Cases such as these are relatively rare, and we have held in other cases that trials have been fair in spite of widespread publicity. In *Stroble v. California*, 343 U.S. 181 (1952), for example, the Court affirmed a conviction and death sentence challenged on the ground that pretrial news accounts, including the prosecutor's release of the defendant's recorded confession, were allegedly so inflammatory as to amount to a denial of due process. The Court disapproved of the prosecutor's conduct, but noted that the publicity had receded some six weeks before trial, that the defendant had not moved for a change of venue, and that the confession had been found voluntary and admitted in evidence at trial. The Court also noted the thorough examination of jurors on *voir dire* and the careful review of the facts by the state courts, and held that petitioner had failed to demonstrate a denial of due process. *See also Murphy v. Florida*, 421 U.S. 794 (1975); *Beck v. Washington*, 369 U.S. 541 (1962).

Taken together, these cases demonstrate that pretrial publicity even pervasive, adverse publicity -- does not inevitably lead to an unfair trial. The capacity of the jury eventually impaneled to decide the case fairly is influenced by the tone and

**[96 S.Ct. 2801]** extent of the publicity,

**Page 555**

which is in part, and often in large part, shaped by what attorneys, police, and other officials do to precipitate news coverage. The trial judge has a major responsibility. What the judge says about a case, in or out of the courtroom, is likely to appear in newspapers and broadcasts. More important, the measures a judge takes or fails to take to mitigate the effects of pretrial publicity -- the measures described in *Sheppard* -- may well determine whether the defendant receives a trial consistent with the requirements of due process. That this responsibility has not always been properly discharged is apparent from the decisions just reviewed.

The costs of failure to afford a fair trial are high. In the most extreme cases, like *Sheppard* and *Estes,* the risk of injustice was avoided when the convictions were reversed. But a reversal means that justice has been delayed for both the defendant and the State; in some cases, because of lapse of time retrial is impossible or further prosecution is gravely handicapped. Moreover, in borderline cases in which the conviction is not reversed, there is some possibility of an injustice unredressed. The "strong measures" outlined in *Sheppard v. Maxwell* are means by which a trial judge can try to avoid exacting

these costs from society or from the accused.

The state trial judge in the case before us acted responsibly, out of a legitimate concern, in an effort to protect the defendant's right to a fair trial.[4] What we must decide is not simply whether the Nebraska courts erred

**Page 556**

in seeing the possibility of real danger to the defendant's rights, but whether in the circumstances of this case the means employed were foreclosed by another provision of the Constitution.

V

The First Amendment provides that "Congress shall make no law . . . abridging the freedom . . . of the press," and it is

no longer open to doubt that the liberty of the press, and of speech, is within the liberty safeguarded by the due process clause of the Fourteenth Amendment from invasion by state action.

*Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 707 (1931). *See also Grosjean v. American Press Co.*, 297 U.S. 233, 244 (1936). The Court has interpreted these guarantees to afford special protection against orders that prohibit the publication or broadcast of particular information or commentary -- orders that impose a "previous" or "prior" restraint on speech. None of our decided cases on prior restraint involved restrictive orders entered to protect a defendant's right to a fair and impartial jury, but the opinions on prior restraint have a common thread relevant to this case.

In *Near v. Minnesota ex rel. Olson, supra,* the Court held invalid a Minnesota statute providing for the abatement as a public nuisance of any "malicious, scandalous and defamatory newspaper, magazine or other periodical." Near had published an occasional weekly newspaper described by the County Attorney's complaint as "largely devoted to malicious, scandalous and defamatory articles" concerning political and other public figures. 283 U.S. at 703. Publication was enjoined pursuant to the statute. Excerpts from Near's paper, set out in the dissenting opinion of Mr. Justice Butler, show beyond question that one of its principal characteristics was blatant anti-Semitism. *See id.* at 723, 724-727, n. 1.

**Page 557**

Mr. Chief Justice Hughes, writing for the Court, noted that freedom of the press is not an absolute right, and the State may punish its abuses. He observed that the statute was "not aimed at the redress of individual or private wrongs." *Id.* at 708, 709.

**[96 S.Ct. 2802]** He then focused on the statute:

[T]he operation and effect of the statute in substance is that public authorities may bring the owner or publisher of a newspaper or periodical before a judge upon a charge of conducting a business of publishing scandalous and defamatory matter . . . and unless the owner or publisher is able . . . to satisfy the judge that the [matter is] true and . . . published with good motives . . . his newspaper or periodical is suppressed. . . . This is of the essence of censorship.

*Id.* at 713. The Court relied on *Patterson v. Colorado ex rel. Attorney General* , 205 U.S. 454, 462 (1907):

[T]he main purpose of [the First Amendment] is "to prevent all such *previous restraints* upon publications as had been practiced by other governments."[5]

The principles enunciated in *Near* were so universally accepted that the precise issue did not come before us again until *Organization for a Better Austin v. Keefe,*

**Page 558**

402 U.S. 415 (1971). There the state courts had enjoined the petitioners from picketing or passing out literature of any kind in a specified area. Noting the similarity to *Near v. Minnesota,* a unanimous Court held:

Here, as in that case, the injunction operates not to redress alleged private wrongs, but to suppress, on the basis of previous publications, distribution of literature "of any kind" in a city of 18,000.

\* \* \* \*

Any prior restraint on expression comes to this Court with a "heavy presumption" against its constitutional validity. *Carroll v. Princess Anne*, 393 U.S. 175, 181 (1968); *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70 (1963). Respondent thus carries a heavy burden of showing justification for the imposition of such a restraint. He has not met that burden. . . . Designating the conduct as an invasion of privacy, the apparent basis for the injunction here, is not sufficient to support an injunction against peaceful distribution of informational literature of the nature revealed by this record.

402 U.S. at 418-420.

More recently in *New York Times Co. v. United States*, 403 U.S. 713 (1971), the Government sought to enjoin the publication of excerpts from a massive, classified study of this Nation's involvement in the Vietnam conflict, going back to the end of the Second World War. The dispositive opinion of the Court simply concluded that the Government had not met its heavy burden of showing justification for the prior restraint.

Each of the six concurring Justices and the three dissenting Justices expressed his views separately, but

every member of the Court, tacitly or explicitly, accepted the *Near* and *Keefe* condemnation of prior restraint as presumptively unconstitutional.

*Pittsburgh Press Co. v. Human Rel.*

**Page 559**

*Comm'n,* 413 U.S. 376, 396 (1973) (BURGER, C.J., dissenting). The Court's conclusion in *New York Times* suggests that the burden on the Government is not reduced by the temporary nature of a restraint; in that case the Government asked for a temporary restraint solely to permit it to study and

**[96 S.Ct. 2803]** assess the impact on national security of the lengthy documents at issue.

The thread running through all these cases is that prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights. A criminal penalty or a judgment in a defamation case is subject to the whole panoply of protections afforded by deferring the impact of the judgment until all avenues of appellate review have been exhausted. Only after judgment has become final, correct or otherwise, does the law's sanction become fully operative.

A prior restraint, by contrast and by definition, has an immediate and irreversible sanction. If it can be said that a threat of criminal or civil sanctions after publication "chills" speech, prior restraint "freezes" it at least for the time.[6]

The damage can be particularly great when the prior restraint falls upon the communication of news and commentary on current events. Truthful reports of public judicial proceedings have been afforded special protection against subsequent punishment. *See Cox Broadcasting Corp v. Cohn*, 420 U.S. 469, 492-493(1975); *see also, Craig v. Harney*, 331 U.S. 367, 374 (1947). For the same reasons the protection against prior restraint should have particular force as applied to reporting of criminal proceedings, whether the crime in question is a single isolated act or a pattern of criminal conduct.

A responsible press has always been regarded as

**Page 560**

the handmaiden of effective judicial administration, especially in the criminal field. Its function in this regard is documented by an impressive record of service over several centuries. The press does not simply publish information about trials, but guards against the miscarriage of justice by subjecting the police,

prosecutors, and judicial processes to extensive public scrutiny and criticism.

> *Sheppard v. Maxwell,* 384 U.S. at 350. The extraordinary protections afforded by the First Amendment carry with them something in the nature of a fiduciary duty to exercise the protected rights responsibly -- a duty widely acknowledged but not always observed by editors and publishers. It is not asking too much to suggest that those who exercise First Amendment rights in newspapers or broadcasting enterprises direct some effort to protect the rights of an accused to a fair trial by unbiased jurors.

> Of course, the order at issue like the order requested in *New York Times* -- does not prohibit, but only postpones, publication. Some news can be delayed, and most commentary can even more readily be delayed without serious injury, and there often is a self-imposed delay when responsible editors call for verification of information. But such delays are normally slight, and they are self-imposed. Delays imposed by governmental authority are a different matter.

> We have learned, and continue to learn, from what we view as the unhappy experiences of other nations where government has been allowed to meddle in the internal editorial affairs of newspapers. Regardless of how beneficent-sounding the purposes of controlling the press might be, we . . . remain intensely skeptical about those measures that would allow government to insinuate itself into the editorial

**Page 561**

> rooms of. this Nation's press.

> *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 259 (1974) (WHITE, J., concurring). *See also Columbia Broadcasting v. Democratic Comm.*, 412 U.S. 94 (1973). As a practical matter, moreover, the element of time is not unimportant if press coverage is to fulfill its traditional function of bringing news to the public promptly.

The authors of the Bill of Rights did not undertake to assign priorities as

**[96 S.Ct. 2804]** between First Amendment and Sixth Amendment rights, ranking one as superior to the other. In this case, the petitioners would have us declare the right of an accused subordinate to their right to publish in all circumstances. But if the authors of these guarantees, fully aware of the potential conflicts between them, were unwilling or unable to resolve the issue by assigning to one priority over the other, it is not for us to rewrite the Constitution by undertaking what they declined to do. It is unnecessary, after nearly two centuries, to establish a priority applicable in all circumstances. Yet it is nonetheless clear that the barriers to prior restraint remain high unless we are to abandon what the Court has said for nearly a quarter of our national existence and implied throughout all of it. The history of even wartime suspension of categorical guarantees, such as habeas corpus or the right to trial by civilian courts, *see* Ex parte Milligan, 4 Wall. 2 (1867), cautions against suspending explicit guarantees.

The Nebraska courts in this case enjoined the publication of certain kinds of information about the Simants case. There are, as we suggested earlier, marked differences in setting and purpose between the order entered here and the orders in *Near, Keefe,* and *New York Times,* but as to the underlying issue the right of the press to be free from prior restraints on publication -- those

**Page 562**

cases form the backdrop against which we must decide this case.

VI

We turn now to the record in this case to determine whether, as Learned Hand put it, "the gravity of the `evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." *United States v. Dennis,* 183 F.2d 201, 212 (CA2 1950), *aff'd,* 341 U.S. 494 (1951); *see also* L. Hand, The Bill of Rights 58-61 (1958). To do so, we must examine the evidence before the trial judge when the order was entered to determine (a) the nature and extent of pretrial news coverage; (b) whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity; and (c) how effectively a restraining order would operate to prevent the threatened danger. The precise terms of the restraining order are also important. We must then consider whether the record supports the entry of a prior restraint on publication, one of the most extraordinary remedies known to our jurisprudence.

A

In assessing the probable extent of publicity, the trial judge had before him newspapers demonstrating that the crime had already drawn intensive news coverage, and the testimony of the County Judge, who had entered the initial restraining order based on the local and national attention the case had attracted. The District Judge was required to assess the probable publicity that would be given these shocking crimes prior to the time a jury was selected and sequestered. He then had to examine the probable nature of the publicity and determine how it would affect prospective jurors.

Our review of the pretrial record persuades us that the trial judge was justified in concluding that there would

**Page 563**

be intense and pervasive pretrial publicity concerning this

case. He could also reasonably conclude, based on common human experience, that publicity might impair the defendant's right to a fair trial. He did not purport to say more, for he found only "a clear and present danger that pretrial publicity *could* impinge upon the defendant's right to a fair trial." (Emphasis added.) His conclusion as to the impact of such publicity on prospective jurors was, of necessity, speculative, dealing as he was with factors unknown and unknowable.

B

We find little in the record that goes to another aspect of our task, determining whether measures short of an order restraining all publication would have insured the defendant a

**[96 S.Ct. 2805]** fair trial. Although the entry of the order might be read as a judicial determination that other measures would not suffice, the trial court made no express findings to that effect; the Nebraska Supreme Court referred to the issue only by implication. *See* 194 Neb. at 797-798, 236 N.W.2d at 803.

Most of the alternatives to prior restraint of publication in these circumstances were discussed with obvious approval in *Sheppard v. Maxwell,* 384 U.S. at 357-362: (a) change of trial venue to a place less exposed to the intense publicity that seemed imminent in Lincoln County;[7] (b) postponement of the trial to allow

**Page 564**

public attention to subside; (c) searching questioning of prospective jurors, as Mr. Chief Justice Marshall used in the *Burr* case, to screen out those with fixed opinions as to guilt or innocence; (d) the use of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court. Sequestration of jurors is, of course, always available. Although that measure insulates jurors only after they are sworn, it also enhances the likelihood of dissipating the impact of pretrial publicity and emphasizes the elements of the jurors' oaths.

This Court has outlined other measures short of prior restraints on publication tending to blunt the impact of pretrial publicity. *See Sheppard v. Maxwell, supra* at 361-362. Professional studies have filled out these suggestions, recommending that trial courts in appropriate cases limit what the contending lawyers, the police, and witnesses may say to anyone. *See* American Bar Association Project on Standards for Criminal Justice, Fair Trial and Free Press 2-15 (App.Draft 168).[8]

**Page 565**

We have noted earlier that pretrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically and in every kind of criminal case

to an unfair trial. The decided cases

cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process.

*Murphy v. Florida,* 421 U.S. at 799. Appellate evaluations as to the impact of publicity take into account what other measures were used to mitigate the adverse effects of publicity. The more difficult prospective or predictive assessment that a trial judge must make also calls for a judgment as to whether other precautionary steps will suffice.

**[96 S.Ct. 2806]** We have therefore examined this record to determine the probable efficacy of the measures short of prior restraint on the press and speech. There is no finding that alternative measures would not have protected Simants' rights, and the Nebraska Supreme Court did no more than imply that such measures might not be adequate. Moreover, the record is lacking in evidence to support such a finding.

C

We must also assess the probable efficacy of prior restraint on publication as a workable method of protecting Simants' right to a fair trial, and we cannot ignore the reality of the problems of managing and enforcing pretrial restraining orders. The territorial jurisdiction of the issuing court is limited by concepts of sovereignty, *see, e.g., Hanson v. Denckla*, 357 U.S. 235 (1958); *Pennoyer v. Neff*, 95 U.S. 714 (1878). The need for *in*

**Page 566**

*personam* jurisdiction also presents an obstacle to a restraining order that applies to publication at large a distinguished from restraining publication within a given Jurisdiction.[9] *See generally* American Bar Association, Legal Advisory Committee on Fair Trial and Free Press, Recommended Court Procedure to Accommodate Rights of Fair Trial and Free Press (Rev. Draft, Nov.1975); Rendleman, Free Press-Fair Trial: Review of Silence Orders, 52 N.C.L.Rev. 127, 149-155 (1973).[10]

The Nebraska Supreme Court narrowed the scope of the restrictive order, and its opinion reflects awareness of the tensions between the need to protect the accused as fully as possible and the need to restrict publication as little as possible. The dilemma posed underscores how

**Page 567**

difficult it is for trial judges to predict what information will, in fact, undermine the impartiality of jurors, and the difficulty of drafting an order that will effectively keep prejudicial information from prospective jurors. When a

restrictive order is sought, a court can anticipate only part of what will develop that may injure the accused. But information not so obviously prejudicial may emerge, and what may properly be published in these "gray zone" circumstances may not violate the restrictive order and yet be prejudicial.

Finally, we note that the events disclosed by the record took place in a community of 850 people. It is reasonable to assume that, without any news accounts being printed or broadcast, rumors would travel swiftly by word of mouth. One can only speculate on the accuracy of such reports, given the generative propensities of rumors; they could well be more damaging than reasonably accurate news accounts. But plainly a whole community cannot be restrained from discussing a subject intimately affecting life within it.

[96 S.Ct. 2807] Given these practical problems, it is far from clear that prior restraint on publication would have protected Simants' rights.

D

Finally, another feature of this case leads us to conclude that the restrictive order entered here is not supportable. At the outset, the County Court entered a very broad restrictive order, the terms of which are not before us; it then held a preliminary hearing open to the public and the press. There was testimony concerning at least two incriminating statements made by Simants to private persons; the statement -- evidently a confession -- that he gave to law enforcement officials was also introduced. The State District Court's later order was entered after this public hearing and, as modified by the

**Page 568**

Nebraska Supreme Court, enjoined reporting of (1) "[c]onfessions or admissions against interest made by the accused to law enforcement officials"; (2) "[c]onfessions or admissions against interest, oral or written, if any, made by the accused to third parties, excepting any statements, if any, made by the accused to representatives of the news media"; and (3) all "[o]ther information strongly implicative of the accused as the perpetrator of the slayings." 194 Neb. at 801, 236 N.W.2d at 805.

To the extent that this order prohibited the reporting of evidence adduced at the open preliminary hearing, it plainly violated settled principles: "[T]here is nothing that proscribes the press from reporting events that transpire in the courtroom." *Sheppard v. Maxwell,* 384 U.S. at 362-363. *See also Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975); *Craig v. Harney*, 331 U.S. 367 (1947). The County Court could not know that closure of the preliminary hearing was an alternative open to it until the Nebraska Supreme Court so construed state law; but once a public hearing had been held, what transpired there could not be subject to prior restraint.

The third prohibition of the order was defective in another respect as well. As part of a final order, entered after plenary review, this prohibition regarding "implicative" information is too vague and too broad to survive the scrutiny we have given to restraints on First Amendment rights. *See, e.g., Hynes v. Mayor of Oradell*, 425 U.S. 610 (1976); *Buckley v. Valeo*, 424 U.S. 1, 762 (1976); *NAACP v. Button*, 371 U.S. 415 (1963). The third phase of the order entered falls outside permissible limits.

E

The record demonstrates, as the Nebraska courts held, that there was indeed a risk that pretrial news accounts,

**Page 569**

true or false, would have some adverse impact on the attitudes of those who might be called as jurors. But, on the record now before us, it is not clear that further publicity, unchecked, would so distort the views of potential jurors that 12 could not be found who would, under proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court. We cannot say on this record that alternatives to a prior restraint on petitioners would not have sufficiently mitigated the adverse effects of pretrial publicity so as to make prior restraint unnecessary. Nor can we conclude that the restraining order actually entered would serve its intended purpose. Reasonable minds can have few doubts about the gravity of the evil pretrial publicity can work, but the probability that it would do so here was not demonstrated with the degree of certainty our cases on prior restraint require.

Of necessity, our holding is confined to the record before us. But our conclusion is not simply a result of assessing the adequacy of the showing made in this case; it results in part from the problems inherent in meeting the heavy burden of demonstrating,

[96 S.Ct. 2808] in advance of trial, that without prior restraint a fair trial will be denied. The practical problems of managing and enforcing restrictive orders will always be present. In this sense, the record now before us is illustrative, rather than exceptional. It is significant that, when this Court has reversed a state conviction because of prejudicial publicity, it has carefully noted that some course of action short of prior restraint would have made a critical difference. *See Sheppard v. Maxwell, supra* at 363; *Estes v. Texas,* 381 U.S. at 550-551; *Rideau v. Louisiana,* 373 U.S. at 726; *Irwin v. Dowd,* 366 U.S. at 728. However difficult it may be, we need not rule out the possibility of showing the kind of threat to fair trial rights that would possess

**Page 570**

the requisite degree of certainty to justify restraint. This Court has frequently denied that First Amendment rights

are absolute and has consistently rejected the proposition that a prior restraint can never be employed. *See New York Times Co. v. United States*, 403 U.S. 713 (1971); *Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931).

Our analysis ends as it began, with a confrontation between prior restraint imposed to protect one vital constitutional guarantee and the explicit command of another that the freedom to speak and publish shall not be abridged. We reaffirm that the guarantees of freedom of expression are not an absolute prohibition under all circumstances, but the barriers to prior restraint remain high, and the presumption against its use continues intact. We hold that, with respect to the order entered in this case prohibiting reporting or commentary on judicial proceedings held in public, the barriers have not been overcome; to the extent that this order restrained publication of such material, it is clearly invalid. To the extent that it prohibited publication based on information gained from other sources, we conclude that the heavy burden imposed as a condition to securing a prior restraint was not met, and the judgment of the Nebraska Supreme Court is therefore

*Reversed.*

WHITE, J., concurring

MR. JUSTICE WHITE, concurring.

Technically, there is no need to go farther than the Court does to dispose of this case, and I join the Court's opinion. I should add, however, that, for the reasons which the Court itself canvasses, there is grave doubt in my mind whether orders with respect to the press such as were entered in this case would ever be justifiable.

**Page 571**

It may be the better part of discretion, however, not to announce such a rule in the first case in which the issue has been squarely presented here. Perhaps we should go no further than absolutely necessary until the federal courts, and ourselves, have been exposed to a broader spectrum of cases presenting similar issues. If the recurring result, however, in case after case is to be similar to our judgment today, we should at some point announce a more general rule, and avoid the interminable litigation that our failure to do so would necessarily entail.

POWELL, J., concurring

MR. JUSTICE POWELL, concurring.

Although I join the opinion of the Court, in view of the importance of the case, I write to emphasize the unique burden that rests upon the party, whether it be the State or a defendant, who undertakes to show the necessity for prior restraint on pretrial publicity. *

In my judgment, a prior restraint properly may issue only when it is shown to be necessary to prevent the dissemination of prejudicial publicity that otherwise poses a high likelihood of preventing, directly and irreparably, the impaneling of a jury meeting

**[96 S.Ct. 2809]** the Sixth Amendment requirement of impartiality. This requires a showing that (i) there is a clear threat to the fairness of trial, (ii) such a threat is posed by the actual publicity to be restrained, and (iii) no less restrictive alternatives are available. Notwithstanding such a showing, a restraint may not issue unless it also is shown that previous publicity or publicity from unrestrained sources will not render the restraint inefficacious. The threat to the fairness

**Page 572**

of the trial is to be evaluated in the context of Sixth Amendment law on impartiality, and any restraint must comply with the standards of specificity always required in the First Amendment context.

I believe these factors are sufficiently addressed in the Court's opinion to demonstrate beyond question that the prior restraint here was impermissible.

BRENNAN, J., concurring

MR. JUSTICE BRENNAN, with whom MR. JUSTICE STEWART and MR. JUSTICE MARSHALL join, concurring in the judgment.

The question presented in this case is whether, consistently with the First Amendment, a court may enjoin the press, in advance of publication,[1] from reporting or commenting on information acquired from public court proceedings, public court records, or other sources about pending judicial proceedings. The Nebraska Supreme Court upheld such a direct prior restraint on the press, issued by the judge presiding over a sensational state murder trial, on the ground that there existed a

clear and present danger that pretrial publicity could substantially impair the right of the defendant [in the murder trial] to a trial by an impartial jury unless restraints were imposed.

*State v. Simants,* 194 Neb. 783, 794, 236 N.W.2d 794, 802 (1975). The right to a fair trial by a jury of one's peers is unquestionably one of the most precious and sacred safeguards enshrined in the Bill of Rights. I would hold, however, that resort to prior restraints on the freedom of the press is a constitutionally impermissible method for enforcing that right; judges have at their disposal a broad spectrum of devices for ensuring that fundamental fairness is accorded the

accused without necessitating so drastic an incursion on the equally fundamental and salutary constitutional mandate that discussion of public affairs in a free society cannot depend on the preliminary grace of judicial censors.

I

The history of the current litigation highlights many of the dangers inherent in allowing any prior restraint on press reporting and commentary concerning the operations of the criminal justice system.

This action arose out of events surrounding the prosecution of respondent intervenor Simants for the premeditated mass murder of the six members of the Kellie family in Sutherland, Neb. on October 18, 1975. Shortly after the crimes occurred, the community of 850 was alerted by a special announcement over the local television station. Residents were requested by the police to stay off the streets and exercise caution as to whom they admitted into their houses, and rumors quickly spread that a sniper was loose in Sutherland. When an investigation implicated Simants as a suspect, his name and description were provided to the press and then disseminated to the public.

Simants was apprehended on the morning of October 19, charged with six counts of premeditated murder, and arraigned before the County Court of Lincoln County, Neb. Because several journalists were in attendance and "proof concerning bail . . . would be prejudicial to the rights of the defendant to later obtain a fair trial," App. 7, a portion of the bail hearing was closed, over Simants' objection, pursuant to the request of the Lincoln County Attorney. At the hearing, counsel was appointed for Simants, bail was denied, and October 22 was set as the date for a preliminary hearing

**[96 S.Ct. 2810]** to determine whether Simants should be bound over for trial in

the District Court of Lincoln County, Neb. News of Simants' apprehension, which was broadcast over radio and television and reported in the press, relieved much of the tension that had built up during the night. During the period from October 19 until the first restrictive order was entered three days later, representatives of the press made accurate factual reports of the events that transpired, including reports of incriminating statements made by Simants to various relatives.

On the evening of October 21, the prosecution filed a motion that the County Court issue a restrictive order enjoining the press from reporting significant aspects of the case. The motion, filed without further evidentiary

support, stated:

The State of Nebraska hereby represents unto the Court that, *by reason of the nature of the above-captioned case,* there has been, and no doubt there will continue to be, mass coverage by news media not only locally, but nationally as well; that a preliminary hearing on the charges has been set to commence at 9:00 a.m. on October 22, 1975; and there is a *reasonable likelihood of prejudicial news which would make difficult, if not impossible, the impaneling of an impartial jury* and tend to prevent a fair trial should the defendant be bound over to trial in the District Court if testimony of witnesses at the preliminary hearing is reported to the public.

Wherefore the State of Nebraska moves that the Court forthwith enter a Restrictive Order setting forth the matters that may or may not be publicly reported or disclosed to the public with reference to said case or with reference to the preliminary hearing thereon, and to whom said order shall apply.

App. 8. (Emphasis supplied.)

Half an hour later, the County Court Judge heard

argument on the prosecution motion. Defense counsel joined in urging imposition of a restrictive order, and further moved that the preliminary hearing be closed to both the press and the public. No representatives of the media were notified of or called to testify at the hearing, and no evidence of any kind was introduced.

On October 22, when the autopsy results were completed, the County Attorney filed an amended complaint charging that the six premeditated murders had been committed by Simants in conjunction with the perpetration of or attempt to perpetrate a sexual assault. About the same time, at the commencement of the preliminary hearing, the County Court entered a restrictive order premised on its finding that there was

a reasonable likelihood of prejudicial news which would make difficult, if not impossible, the impaneling of an impartial jury in the event that the defendant is bound over to the District Court for trial. . . .

Amended Pet. for Cert. 1a. Accordingly, the County Court ordered that all parties to the case, attorneys, court personnel, public officials, law enforcement officials, witnesses, and "any other person present in Court" during the preliminary hearing, were not to

release or authorize the release for public dissemination in any form or manner whatsoever any testimony given or evidence adduced during the preliminary hearing.

*Id.* at 2a. The court further ordered that no law enforcement official, public officer, attorney, witness, or

"news media"

disseminate any information concerning this matter apart from the preliminary hearing other than as set forth in the Nebraska Bar-Press Guidelines for Disclosure and Reporting of Information Relating to Imminent or Pending Criminal Litigation.

*Ibid.*[2] The

**[96 S.Ct. 2811]** order was to

**Page 576**

remain in effect "until modified or rescinded by a higher court or until the defendant is ordered released from these charges." *Id.* at 3a. The court also denied the defense request to close the preliminary hearing,[3] and an open hearing was then held, at which time various witnesses testified, disclosing significant factual information concerning the events surrounding the alleged crimes. Upon completion of the hearing, the County Court bound the defendant over for trial in the District Court, since it found that the offenses charged in the indictment had been committed, and that there was probable cause to believe that Simants had committed them.

The next day, petitioners -- Nebraska newspaper publishers, broadcasters, journalists, and media associations,

**Page 577**

and national newswire services that report from and to Nebraska -- sought leave from the District Court to intervene in the criminal case and vacation of the County Court's restrictive order as repugnant to the First and Sixth Amendments to the United States Constitution as well as relevant provisions of the Nebraska Constitution. Simants' attorney moved that the order be continued, and that future pretrial hearings in the case be closed. The District Court then held an evidentiary hearing, after which it denied the motion to close any hearings, granted petitioners' motion to intervene, and adopted on an interim basis the County Court's restrictive order. The only testimony adduced at the hearing with respect to the need for the restrictive order was that of the County Court Judge, who stated that he had premised his order on his awareness of media publicity, "[c]onversation around the courthouse," and "statements of counsel. "App. 64, 65. In addition, several newspaper clippings pertaining to the case were introduced as exhibits before the District Court.

Without any further hearings, the District Court, on October 27, terminated the County Court's order and substituted its own. The court found that,

*because of the nature of the crimes charged* in the complaint . . . , there is a *clear and present danger* that pretrial publicity *could impinge upon the defendant's*

*right to a fair trial,* and that an order setting forth the limitations of pretrial publicity is appropriate. . . .

Amended Pet. for Cert. 9a (emphasis supplied). Respondent Stuart, the District Court Judge, then "adopted" as his order the Nebraska Bar-Press Guidelines as "clarified" by him in certain respects.[4]

**Page 578**

**[96 S.Ct. 2812]** On October 31, petitioners sought a stay of the order from the District Court and immediate relief from the Nebraska Supreme Court by way of mandamus, stay, or expedited appeal. When neither the District Court nor the Nebraska Supreme Court acted on these motions,

**Page 579**

petitioners on November 5 applied to MR. JUSTICE BLACKMUN, as Circuit Justice, for a stay of the District Court's order. Five days later, the Nebraska Supreme Court issued a per curiam statement that, to avoid being put in the position of "exercising parallel jurisdiction with the Supreme Court of the United States," it would continue the matter until this Court "made known whether or not it will accept jurisdiction in the matter." *Id.* at 19a-20a.

On November 13, MR. JUSTICE BLACKMUN filed an in-chambers opinion in which he declined to act on the stay "at least for the immediate present." 423 U.S. 1319, 1326. He observed:

[I]f no action on the [petitioners'] application to the Supreme Court of Nebraska could be anticipated before December 1, [as was indicated by a communication from that court's clerk before the court issued the per curiam statement,] . . . a definitive decision by the State's highest court on an issue of profound constitutional implications, demanding immediate resolution, would be delayed for a period so long that the very day-to-day duration of that delay would constitute and aggravate a deprival of such constitutional rights, if any, that the [petitioners] possess and may properly assert. Under those circumstances, I would not hesitate promptly to act.

*Id.* at 1324-1325. However, since the Nebraska Supreme Court had indicated in its per curiam statement that it was only declining to act because of uncertainty as to what this Court would do, and since it was deemed appropriate for the state court to pass initially on the validity of the restrictive order, MR. JUSTICE BLACKMUN, "without prejudice to the [petitioners] to reapply to me should prompt action not be forthcoming," *id.* at 1326, denied the stay

[o]n the expectation . . . that the Supreme Court of Nebraska, forthwith and without delay will entertain the

**Page 580**

[petitioners'] application made to it, and will promptly decide it in the full consciousness that "time is of the essence."

> *Id.* at 1325.

When, on November 18, the Supreme Court of Nebraska set November 25 as the date to hear arguments on petitioners' motions, petitioners reapplied to MR. JUSTICE BLACKMUN for relief. On November 20, MR. JUSTICE BLACKMUN, concluding that each passing day constituted an irreparable infringement on First Amendment values and that the state courts had delayed adjudication of petitioners' claims beyond "tolerable limits," 423 U.S. 1327, 1329, granted a partial stay of the District Court's order. First, the "wholesale incorporation" of the Nebraska Bar-Press Guidelines was stayed on the ground that they "constitute a `voluntary code' which was not intended to be mandatory"

**[96 S.Ct. 2813]** and which was "sufficiently riddled with vague and indefinite admonitions -- understandably so in view of the basic nature of `guidelines,'" that they did "not provide the substance of a permissible court order in the First Amendment area." *Id.* at 1330, 1331. However, the state courts could

reimpose particular provisions included in the Guidelines so long as they are deemed pertinent to the facts of this particular case and so long as they are adequately specific and in keeping with the remainder of this order.

> *Id.* at 1331. Second, the portion of the District Court order prohibiting reporting of the details of the crimes, the identities of the victims, and the pathologist's testimony at the preliminary hearing was stayed because there was "[n]o persuasive justification" for the restraint; such "facts in themselves do not implicate a particular putative defendant," *ibid.,* and,

until the bare facts concerning the crimes are related to a particular accused, . . . their being reported in the media [does not appear to] irreparably infringe the accused's right

**Page 581**

to a fair trial of the issue as to whether he was the one who committed the crimes.

> *Id.* at 1332. Third, believing that prior restraints of this kind "are not necessarily and in all cases invalid," MR. JUSTICE BiACKMUN concluded that

certain facts that strongly implicate an accused may be restrained from publication by the media prior to his trial. A confession or statement against interest is the paradigm,

> *id.* at 1332-1333, and other such facts would include "those associated with the circumstances of his arrest,"

those

that are not necessarily implicative, but that are highly prejudicial, as, for example, facts associated with the accused's criminal record, if he has one,

and "statements as to the accused's guilt by those associated with the prosecution." *Id.* at 1333.[5] Finally, the restrictive order's limitation on disclosure of the nature of the limitations themselves was stayed "to the same extent" as the limitations. *Ibid.*[6]

The following day petitioners filed a motion that the Court vacate MR. JUSTICE BLACKMUN's order to the extent it permitted the imposition of any prior restraint on publication. Meanwhile, on November 25, the Supreme Court of Nebraska heard oral argument as scheduled,

**Page 582**

and, on December 1, filed a per curiam opinion.[7] Initially, the court held that it was improper for petitioners or any other third party to intervene in a criminal case, and that the appeal from that case must therefore be denied. However, the court concluded that it had jurisdiction over petitioners' mandamus action against respondent Stuart, and that respondents Simants and State of Nebraska had properly intervened in that action.[8] Addressing the merits of the prior restraint issued by

**[96 S.Ct. 2814]** the District Court, the Nebraska Supreme Court acknowledged that this Court

has not yet had occasion to speak definitively where a clash between these two preferred rights [the First Amendment freedom of speech and of the press and the Sixth Amendment right to trial by an impartial jury] was sought to be accommodated by a prior restraint on freedom of the press.

> 194 Neb. at 791, 236 N.W.2d at 800. However, relying on dictum in *Branzburg v. Hayes*, 408 U.S. 665 (1972),[9] and our statement in *New York Times Co. v. United States*, 403 U.S. 713 (1971), that a prior restraint on the

**Page 583**

media bears "`a heavy presumption against its constitutional validity,'" *id.* at 714, the court discerned an "implication"

that, if there is only a presumption of unconstitutionality, then there must be some circumstances under which prior restraints may be constitutional, for otherwise there is no need for a mere presumption.

> 194 Neb. at 793, 236 N.W.2d at 801. The court then concluded that there was evidence "to overcome the heavy presumption" in that the State's obligation to

accord Simants an impartial jury trial "may be impaired" by pretrial publicity, and that pretrial publicity "might make it difficult or impossible" to accord Simants a fair trial. *Id.* at 794, 797, 236 N.W.2d at 802, 803.[10] Accordingly, the court held, *id.* at 801, 236 N.W.2d at 805:

[T]he order of the District Court of October 27, 1975, is void insofar as it incorporates the voluntary guidelines and in certain other respects in that it impinges too greatly upon freedom of the press. The guidelines were not intended to be contractual, and cannot be enforced as if they were.

The order of the District Court of October 27, 1975, is vacated, and is modified and reinstated in the

**Page 584**

following respects: it shall be effective only as to events which have occurred prior to the filing of this opinion, and only as it applies to the relators herein, and only insofar as it restricts publication of the existence or content of the following, if any such there be: (1) Confessions or admissions against interest made by the accused to law enforcement officials. (2) Confessions or admissions against interest, oral or written, if any, made by the accused to third parties, excepting any statements, if any, made by the accused to representatives of the news media. (3) Other information strongly implicative of the accused as the perpetrator of the slayings.[11]

On December 4, petitioners applied to this Court for a stay of that order and moved that their previously filed papers be treated as a petition for a writ of certiorari. On December 8, we granted the latter

**[96 S.Ct. 2815]** motion and deferred consideration of the petition for a writ and application for a stay pending responses from respondents on the close of business the following day. 423 U.S. 1011.[12] On December 12, we granted the petition for a writ of certiorari, denied the motion to expedite, and denied the application for a stay. 423 U.S. 1027.[13]

**Page 585**

II

A

The Sixth Amendment to the United States Constitution guarantees that,

[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed. . . .

The right to a jury trial, applicable to the States through the Due Process Clause of the Fourteenth Amendment, *see, e.g., Duncan v. Louisiana*, 391 U.S. 145 (1968), is essentially

**Page 586**

the right to a "fair trial by a panel of impartial, `indifferent' jurors," *Irvin v. Dowd*, 366 U.S. 717, 722 (1961), jurors who are "`indifferent as [they] stand unsworn.'" *Reynolds v. United States*, 98 U.S. 145, 154 (1879), quoting E. Coke, A Commentary upon Littleton 155b (19th ed. 1832). *See also, e.g., Ristaino v. Ross*, 424 U.S. 589, 597 n. 9 (1976); *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Irvin v. Dowd, supra* at 722; *In re Murchison*, 349 U.S. 133, 136 (1955); *In re Oliver*, 333 U.S. 257 (1948). So basic to our jurisprudence is the right to a fair trial that it has been called "the most fundamental of all freedoms." *Estes v. Texas*, 381 U.S. 532, 540 (1965). It is a right essential to the preservation and enjoyment of all other rights, providing a necessary means of safeguarding personal liberties against government oppression. *See, e.g., Rideau v. Louisiana, supra* at 726-727. *See generally Duncan v. Louisiana, supra* at 149-158.

The First Amendment to the United States Constitution, however, secures rights equally fundamental in our jurisprudence, and its ringing proclamation that "Congress

**[96 S.Ct. 2816]** shall make no law . . . abridging the freedom of speech, or of the press . . ." has been both applied through the Fourteenth Amendment to invalidate restraints on freedom of the press imposed by the States, *see, e.g., Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974); *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931), and interpreted to interdict such restraints imposed by the courts, *see, e.g., New York Times Co. v. United States*, 403 U.S. 713 (1971); *Craig v. Harney*, 331 U.S. 367 (1947); *Bridges v. California*, 314 U.S. 252 (1941). Indeed, it has been correctly perceived that a

responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field. . . . The

**Page 587**

press does not simply publish information about trials, but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism.

*Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966). *See also, e.g., Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491-496 (1975). Commentary and reporting on the criminal justice system is at the core of First Amendment values, for the operation and integrity of that system is of crucial import to citizens concerned with the administration of government. Secrecy of judicial action

can only breed ignorance and distrust of courts and suspicion concerning the competence and impartiality of judges; free and robust reporting, criticism, and debate can contribute to public understanding of the rule of law and to comprehension of the functioning of the entire criminal justice system, as well as improve the quality of that system by subjecting it to the cleansing effects of exposure and public accountability. *See, e.g., In re Oliver, supra,* at 270-271; L. Brandeis, Other People's Money 62 (1933) ("Sunlight is said to be the best of disinfectants; electric light the most efficient policeman").

No one can seriously doubt, however, that uninhibited prejudicial pretrial publicity may destroy the fairness of a criminal trial, *see, e.g., Sheppard v. Maxwell, supra,* and the past decade has witnessed substantial debate, colloquially known as the Free Press/Fair Trial controversy, concerning this interface of First and Sixth Amendment rights. In effect, we are now told by respondents that the two rights can no longer coexist when the press possesses and seeks to publish "confessions or admissions against interest" and other information "strongly implicative"[14] of a criminal defendant as the

**Page 588**

perpetrator of a crime, and that one or the other right must therefore be subordinated. I disagree. Settled case law concerning the impropriety and constitutional invalidity of prior restraints on the press compels the conclusion that there can be no prohibition on the publication by the press of any information pertaining to pending judicial proceedings or the operation of the criminal justice system, no matter how shabby the means by which the

**[96 S.Ct. 2817]** information is obtained.[15] This does not imply, however, any subordination of Sixth Amendment rights, for an accused's right to a fair trial may be adequately assured through methods that do not infringe First Amendment values.

B

[I]t has been generally, if not universally, considered that it is the chief purpose of the [First Amendment's] guaranty to prevent previous restraints upon publication.

**Page 589**

*Near v. Minnesota ex rel. Olson,* 283 U.S. at 713. *See also, e.g., id.* at 716-717; *Patterson v. Colorado ex rel. Attorney General*, 205 U.S. 454, 462 (1907); *Grosjean v. American Press Co.*, 297 U.S. 233, 249 (1936).[16] Prior restraints are "the essence of censorship," *Near v. Minnesota ex rel. Olson, supra* at 713, and "[o]ur distaste for censorship -- reflecting the natural distaste of a free people -- is deep-written in our law." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553 (1975).

The First Amendment thus accords greater protection against prior restraints than it does against subsequent punishment for a particular speech, *see, e.g., Carroll v. Princess Anne*, 393 U.S. 175, 180-181 (1968); *Near v. Minnesota ex rel. Olson, supra;*

a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of free-wheeling censorship are formidable.

*Southeastern Promotions, Ltd. v. Conrad, supra* at 559. A commentator has cogently summarized many of the reasons for this deep-seated American hostility to prior restraints:

A system of prior restraint is in many ways more inhibiting than a system of subsequent punishment: it is likely to bring under government scrutiny a far wider range of expression; it shuts off communication before it takes place; suppression by a stroke of the pen is more likely to be applied than suppression through a criminal process; the procedures

**Page 590**

do not require attention to the safeguards of the criminal process; the system allows less opportunity for public appraisal and criticism; the dynamics of the system drive toward excesses, as the history of all censorship shows.

T. Emerson, The System of Freedom of Expression 506 (1970).[17]

Respondents correctly contend that "the [First Amendment] protection even as to previous restraint is not absolutely unlimited." *Near v. Minnesota ex rel. Olson, supra* at 716. However, the exceptions to the rule have been confined to "exceptional cases." *Ibid.* The Court in *Near,* the first case in which we were faced with a prior restraint against the press, delimited three such possible exceptional circumstances. The first two exceptions were that "the primary requirements of decency may be

**[96 S.Ct. 2818]** enforced against obscene publications," and that

[t]he security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government [for] [t]he constitutional guaranty of free speech does not "protect a man from an injunction against uttering words that may have all the effect of force. . . ."

*Ibid.* These exceptions have since come to be interpreted as situations in which the "speech" involved is not encompassed within the meaning of the First Amendment. *See, e.g., Roth v. United States*, 354 U.S.

476, 481 (1957); *Miller v. California* , 413 U.S. 15 (1973); *Chaplinsky v. New Hampshire* , 315 U.S. 568 (1942). *See also New York Times Co. v. United States,* 403 U.S. at 726 n. (BRENNAN, J., concurring); *id.* at 731 n. 1 (WHITE, J., concurring).

**Page 591**

And even in these situations, adequate and timely procedures are mandated to protect against any restraint of speech that does come within the ambit of the First Amendment. *See, e.g., Southeastern Promotions, Ltd. v. Conrad, supra; United States v. Thirty-seven Photographs*, 402 U.S. 363 (1971); *Freedman v. Maryland*, 380 U.S. 51 (1965); *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58 (1963); *Speiser v. Randall* , 357 U.S. 513 (1958); *Kingsley Books, Inc. v. Brown,* 354 U.S. 436 (1957). Thus, only the third category in *Near* contemplated the possibility that speech meriting and entitled to constitutional protection might nevertheless be suppressed before publication in the interest of some overriding countervailing interest:

"When a nation is at war, many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no Court could regard them as protected by any constitutional right." *Schenck v. United States* , 249 U.S. 47, 52. No one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops.

283 U.S. at 716.

Even this third category, however, has only been adverted to in dictum, and has never served as the basis for actually upholding a prior restraint against the publication of constitutionally protected materials. In *New York Times Co. v. United States, supra,* we specifically addressed the scope of the "military security" exception alluded to in *Near,* and held that there could be no prior restraint on publication of the "Pentagon Papers" despite the fact that a majority of the Court believed that release of the documents, which were

**Page 592**

classified "Top Secret-Sensitive" and which were obtained surreptitiously, would be harmful to the Nation and might even be prosecuted after publication as a violation of various espionage statutes. To be sure, our brief per curiam declared that "`[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity,'" *id.* at 714, quoting *Bantam Books, Inc. v. Sullivan, supra* at 70, and that the "Government `thus carries a heavy burden of showing justification for the imposition of such a restraint.'" 403 U.S. at 714, quoting *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). This does not mean, as the Nebraska Supreme Court

assumed,[18] that prior restraints can be justified on an *ad hoc* balancing approach that concludes that the "presumption" must be overcome in light of some perceived "justification." Rather, this language refers to the fact that, as a matter of procedural safeguards and burden of proof, prior restraints, even

**[96 S.Ct. 2819]** within a recognized exception to the rule against prior restraints, will be extremely difficult to justify; but, as an initial matter, the purpose for which a prior restraint is sought to be imposed "must fit within one of the narrowly defined exceptions to the prohibition against prior restraints." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. at 559; *see also, e.g.,, id.* at 555; *Pittsburgh Press Co. v. Human Rel. Comm'n* , 413 U.S. 376, 382 (1973); *Organization for a Better Austin v. Keefe, supra* at 419-420; *cf., e.g., Healy v. James* , 408 U.S. 169 (1972); *Freedman v. Maryland,* 380 U.S. at 58-59. Indeed, two Justices in *New York Times* apparently controverted the existence of even a limited "military security" exception to the rule against prior restraints on the publication of otherwise protected material, *see* 403 U.S.

**Page 593**

at 714 (Black, J.,. concurring); *id.* at 720 (Douglas, J., concurring). And a majority of the other Justices who expressed their views on the merits made it clear that they would take cognizance only of a "single, extremely narrow class of cases in which the First Amendment's ban on prior judicial restraint may be overridden." *Id.* at 726 (BRENNAN, J., concurring). Although variously expressed, it was evident that even the exception was to be construed very, very narrowly: when disclosure "will *surely result in direct, immediate, and irreparable damage* to our Nation or its people," *id.* at 730 (STEWART, J., joined by WHITE, J., concurring) (emphasis supplied) or when there is

governmental allegation and proof that publication must *inevitably, directly, and immediately* cause the occurrence of an event kindred to imperiling the safety of a transport already at sea. . . . [But] [i]n no event may mere conclusions be sufficient.

*Id.* at 726-727 (BRENNAN, J., concurring) (emphasis supplied). *See also id.* at 730-731 (WHITE, J., joined by STEWART, J., concurring) ("concededly extraordinary protection against prior restraints enjoyed by the press under our constitutional system" is not overcome even by a showing that "revelation of these documents will do substantial damage to public interests").[19] It is thus clear that, even within the sole possible exception to the prohibition against prior restraints on publication of constitutionally protected materials,

**Page 594**

the obstacles to issuance of such an injunction are

formidable. What respondents urge upon us, however, is the creation of a new, potentially pervasive exception to this settled rule of virtually blanket prohibition of prior restraints.[20]

**[96 S.Ct. 2820]** I would decline this invitation. In addition to the almost insuperable presumption against the constitutionality of prior restraints even under a recognized exception, and however laudable the State's motivation for imposing restraints in this case,[21] there are compelling

**Page 595**

reasons for not carving out a new exception to the rule against prior censorship of publication.

1

Much of the information that the Nebraska courts

**Page 596**

enjoined petitioners from publishing was already in the public domain, having been revealed in open court proceedings or through public documents. Our prior cases have foreclosed any serious contention that further disclosure of such information can be suppressed before publication or even punished after publication.

A trial is a public event. What transpires in the court room is public property. . . . Those who see and hear what transpired can report it with impunity. There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it.

*Craig v. Harney,* 331 U.S. at 374. Similarly, *Estes v. Texas,* 381 U.S. at 541-542, a case involving the Sixth Amendment right to a fair trial, observed:

[R]eporters of all media . . . are plainly free to report whatever occurs in open court through their respective media. This was settled in *Bridges v. California*, 314 U.S. 252 (1941),

**[96 S.Ct. 2821]** and *Pennekamp v. Florida*, 328 U.S. 331 (1946), which we reaffirm.

*See also id.* at 583-585 (Warren, C.J., concurring). And *Sheppard v. Maxwell,* 384 U.S. at 362-363, a case that detailed numerous devices that could be employed for ensuring fair trials, explicitly reiterated that, "[o]f course, there is nothing that proscribes the press from reporting events that transpire in the courtroom." *See also id.* at 350; *Stroble v. California* , 343 U.S. 181, 193 (1952). The continuing vitality of these statements was reaffirmed only last Term in *Cox Broadcasting Corp. v. Cohn,* a case involving a suit for damages brought after publication under state law recognizing the privacy

interest of its citizens. In holding that

**Page 597**

a "State may [not] impose sanctions on the accurate publication of the name of a rape victim obtained from public records," 420 U.S. at 491, we observed:

[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. *Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations.* Without the information provided by the press, most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally. *With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice.See Sheppard v. Maxwell* , 384 U.S. 333, 350 (1966).

Appellee has claimed in this litigation that the efforts of the press have infringed his right to privacy by broadcasting to the world the fact that his daughter was a rape victim. *The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions, however, are, without question, events of legitimate concern to the public, and consequently fall within the responsibility of the press to report the operations of government.*

*The special protected nature of accurate reports of judicial proceedings has repeatedly been recognized.*

*Id.* at 491-492 (emphasis supplied).

**Page 598**

By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served. *Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media.* The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business. In preserving that form of government the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection.

*Id.* at 495 (emphasis supplied). *See also id.* at 496. Prior restraints are particularly anathematic to the First Amendment, and any immunity from punishment subsequent to publication of given material applies *a fortiori* to immunity from suppression of that material before publication. Thus, in light of *Craig,* which involved a contempt citation for a threat to the administration of justice, and *Cox Broadcasting,* which similarly involved an attempt to establish civil liability after

[96 S.Ct. 2822] publication, it should be clear that no injunction against the reporting of such information can be permissible.

2

The order of the Nebraska Supreme Court also applied, of course to "confessions" and other information "strongly implicative" of the accused which were obtained from sources other than official records or open

**Page 599**

court proceedings. But for the reasons that follow -- reasons equally applicable to information obtained by the press from official records or public court proceedings -- I believe that the same rule against prior restraints governs any information pertaining to the criminal justice system, even if derived from nonpublic sources and regardless of the means employed by the press in its acquisition.

The only exception that has thus far been recognized even in dictum to the blanket prohibition against prior restraints against publication of material which would otherwise be constitutionally shielded was the "military security" situation addressed in *New York Times Co. v. United States.* But unlike the virtually certain, direct, and immediate harm required for such a restraint under *Near* and *New York Times,* the harm to a fair trial that might otherwise eventuate from publications which are suppressed pursuant to orders such as that, under review must inherently remain speculative.

A judge importuned to issue a prior restraint in the pretrial context will be unable to predict the manner in which the potentially prejudicial information would be published, the frequency with which it would be repeated or the emphasis it would be given, the context in which or purpose for which it would be reported, the scope of the audience that would be exposed to the information,[22]

**Page 600**

or the impact, evaluated in terms of current standards for assessing juror impartiality,[23] the information would have on that audience. These considerations would render speculative the prospective impact on a fair trial of reporting even an alleged confession or other information "strongly implicative" of the accused. Moreover, we can

take judicial notice of the fact that, given the prevalence of plea bargaining, few criminal cases proceed to trial, and the judge would thus have to predict what the likelihood was that a jury would even have to be impaneled.[24] Indeed, even in cases that do proceed to trial, the material sought to be suppressed before trial will often be admissible and may be admitted in

[96 S.Ct. 2823] any event.[25]

**Page 601**

And, more basically, there are adequate devices for screening from jury duty those individuals who have, in fact, been exposed to prejudicial pretrial publicity.

Initially, it is important to note that, once the jury is impaneled, the techniques of sequestration of jurors and control over the courtroom and conduct of trial should prevent prejudicial publicity from infecting the fairness of judicial proceedings.[26] Similarly, judges may stem much of the flow of prejudicial publicity at its source, before it is obtained by representatives of the press.[27] But even if the press nevertheless obtains potentially prejudicial information and decides to publish that information,

**Page 602**

the Sixth Amendment rights of the accused may still be adequately protected. In particular, the trial judge should employ the *voir dire* to probe fully into the effect of publicity. The judge should broadly explore such matters as the extent to which prospective jurors had read particular news accounts or whether they had heard about incriminating data such as an alleged confession or statements by purportedly reliable sources concerning the defendant's guilt. *See, e.g., Ham v. South Carolina*, 409 U.S. 524, 531-534 (1973) (opinion of MARSHALL, J.); *Swain v. Alabama*, 380 U.S. 202, 209-222 (1965). Particularly in cases of extensive publicity, defense counsel should be accorded more latitude in personally asking or tendering searching questions that might root out indications of bias, both to facilitate intelligent exercise of peremptory challenges and to help uncover factors that would dictate disqualification for cause. Indeed, it may sometimes be necessary to question on *voir dire* prospective jurors individually or in small groups, both to maximize the likelihood that members of the venire will respond honestly to questions concerning bias, and to avoid contaminating unbiased members of the venire when other members disclose prior knowledge of prejudicial information. Moreover, *voir dire* may indicate the need to grant a brief continuance[28] or to grant a change of

[96 S.Ct. 2824] venue,[29] techniques that can effectively

**Page 603**

mitigate any publicity at a particular time or in a particular locale. Finally, if the trial court fails or refuses to utilize these devices effectively, there are the "palliatives" of reversals on appeal and directions for a new trial. *Sheppard v. Maxwell,* 384 U.S. at 363.[30] We have indicated that, even in a case involving outrageous publicity and a "carnival atmosphere" in the courtroom, "these procedures would have been sufficient to guarantee [the defendant] a fair trial. . . ." *Id.* at 358. *See generally id.* at 358-363; *cf. Times-Picayune Pub. Corp. v. Schulingkamp*, 419 U.S. 1301, 1308, and n. 3 (1974) (POWELL, J., in chambers). For this reason, the one thing *Sheppard* did not approve was "any direct limitations on the freedom traditionally exercised by the news media." 384 U.S. at 350.[31] Indeed, the

### Page 604

traditional .techniques approved in *Sheppard* for ensuring fair trials would have been adequate in every case in which we have found that a new trial was required due to lack of fundamental fairness to the accused.

For these reasons alone, I would reject the contention that speculative deprivation of an accused's Sixth Amendment right to an impartial jury is comparable to the damage to the Nation or its people that *Near* and *New York Times* would have found sufficient to justify a prior restraint on reporting. Damage to that Sixth Amendment right could never be considered so direct, immediate and irreparable, and based on such proof, rather than speculation, that prior restraints on the press could be justified on this basis.

### C

There are additional, practical reasons for not starting down the path urged by respondents.[32] The exception

### Page 605

to the prohibition

**[96 S.Ct. 2825]** of prior restraints adumbrated in *Near* and *New York Times* involves no judicial weighing of the countervailing public interest in receiving the suppressed information; the direct, immediate, and irreparable harm that would result from disclosure is simply deemed to outweigh the public's interest in knowing, for example, the specific details of troop movements during wartime. As the Supreme Court of Nebraska itself admitted,[33] however, any attempt to impose a prior restraint on the reporting of information concerning the operation of the criminal justice system will inevitably involve the courts in an *ad hoc* evaluation of the need for the public to receive particular information that might nevertheless implicate the accused as the perpetrator of a crime. For example, disclosure of the

### Page 606

circumstances surrounding the obtaining of an involuntary confession or the conduct of an illegal search resulting in incriminating fruits may be the necessary predicate for a movement to reform police methods, pass regulatory statutes, or remove judges who do not adequately oversee law enforcement activity; publication of facts surrounding particular plea-bargaining proceedings or the practice of plea bargaining generally may provoke substantial public concern as to the operations of the judiciary or the fairness of prosecutorial decisions; reporting the details of the confession of one accused may reveal that it may implicate others as well, and the public may rightly demand to know what actions are being taken by law enforcement personnel to bring those other individuals to justice; commentary on the fact that there is strong evidence implicating a government official in criminal activity goes to the very core of matters of public concern, and even a brief delay in reporting that information shortly before an election may have a decisive impact on the outcome of the democratic process, *see Carroll v. Princess Anne,* 393 U.S. at 182; dissemination of the fact that indicated individuals who had been accused of similar misdeeds in the past had not been prosecuted or had received only mild sentences may generate crucial debate on the functioning of the criminal justice system; revelation of the fact that despite apparently overwhelming evidence of guilt, prosecutions were dropped or never commenced against large campaign contributors or members of special interest groups may indicate possible corruption among government officials; and disclosure of the fact that a suspect has been apprehended as the perpetrator of a heinous crime may be necessary to calm community fears that the actual perpetrator is still at large. *Cf. Times-Picayune Pub. Corp. v. Schulingkamp,* 419 U.S. at 1302

### Page 607

(POWELL, J., in chambers).[34] In all of these situations, judges would be forced to

**[96 S.Ct. 2826]** evaluate whether the public interest in receiving the information outweighed the speculative impact on Sixth Amendment rights.

These are obviously only some examples of the problems that plainly would recur, not in the almost theoretical situation of suppressing disclosure of the location of troops during wartime, but on a regular basis throughout the courts of the land. Recognition of any judicial authority to impose prior restraints on the basis of harm to the Sixth Amendment rights of particular defendants, especially since that harm must remain speculative, will thus inevitably interject judges at all levels into censorship roles that are simply inappropriate and impermissible under the First Amendment. Indeed, the potential for arbitrary and excessive judicial

utilization of any such power would be exacerbated by the fact that judges and committing magistrates might in some cases be determining the propriety of publishing information that reflects on their competence, integrity, or general performance on the bench.

There would be, in addition, almost intractable procedural difficulties associated with any attempt to impose prior restraints on publication of information relating to pending criminal proceedings, and the ramifications of these procedural difficulties would accentuate the burden on First Amendment rights. The incentives and dynamics of the system of prior restraints would inevitably lead to overemployment of the technique. In order to minimize pretrial publicity against

**Page 608**

his clients and preempt "ineffective assistance of counsel" claims, counsel for defendants might routinely seek such restrictive orders. Prosecutors would often acquiesce in such motions to avoid jeopardizing a conviction on appeal. And, although judges could readily reject many such claims as frivolous, there would be a significant danger that judges would nevertheless be predisposed to grant the motions, both to ease their task of ensuring fair proceedings and to insulate their conduct in the criminal proceeding from reversal. We need not raise any specter of floodgates of litigation or drain on judicial resources to note that the litigation with respect to these motions will substantially burden the media. For, to bind the media, they would have to be notified and accorded an opportunity to be heard. *See, e.g., Carroll v. Princess Anne, supra; McKinney v. Alabama*, 424 U.S. 669 (1976). This would at least entail the possibility of restraint proceedings collateral to every criminal case before the courts, and there would be a significant financial drain on the media involuntarily made parties to these proceedings. Indeed, small news organs on the margin of economic viability might choose not to contest even blatantly unconstitutional restraints or to avoid all crime coverage, with concomitant harm to the public's right to be informed of such proceedings.[35] Such acquiescence might also mean that significant erroneous precedents will remain unchallenged, to be relied on for even broader restraints in the future. Moreover, these collateral restraint proceedings would be unlikely to result in equal treatment of all

**Page 609**

organs of the media[36] and, even if all the press could be brought into the proceeding, would often be ineffective, since disclosure

**[96 S.Ct. 2827]** of incriminating material may transpire before an effective restraint could be imposed.[37]

To be sure, because the decision to impose such restraints even on the disclosure of supposedly narrow categories of information would depend on the facts of each case, and because precious First Amendment rights are at stake, those who could afford the substantial costs would seek appellate review. But that review is often inadequate, since delay inherent in judicial proceedings could itself destroy the contemporary news value of the information the press seeks to disseminate.[38] As one commentator has observed:

Prior restraints fall on speech with a brutality and a finality all their own. Even if they are ultimately lifted they cause irremediable loss -- a loss in the immediacy, the impact, of speech. . . . Indeed, it is the hypothesis of the First Amendment that injury is inflicted on our society when we stifle the immediacy of speech.

A. Bickel, The Morality of Consent 61 (1975).[39]

**Page 610**

And, as noted, given the significant financial disincentives, particularly on the smaller organs of the media,[40] to challenge any

**[96 S.Ct. 2828]** restrictive orders once they are imposed

**Page 611**

by trial judges, there is the distinct possibility that many erroneous impositions would remain uncorrected. ,[41]

III

I unreservedly agree with Mr. Justice Black that

free speech and fair trials are two of the most cherished policies of our civilization, and it would be a trying task to choose between them.

*Bridges v. California,* 314 U.S. at 260. But I would reject the notion that a

**Page 612**

choice is necessary, that there is an inherent conflict that cannot be resolved without essentially abrogating one right or the other. To hold that courts cannot impose any prior restraints on the reporting of or commentary upon information revealed in open court proceedings, disclosed in public documents, or divulged by other sources with respect to the criminal justice system is not, I must emphasize, to countenance the sacrifice of precious Sixth Amendment rights on the altar of the First Amendment. For although there may in some instances be tension between uninhibited and robust reporting by the press and fair trials for criminal defendants, judges possess adequate tools short of injunctions against reporting for relieving that tension. To be sure, these alternatives may require greater sensitivity and effort on the part of judges conducting criminal trials than would the stifling of publicity through the simple expedient of issuing a restrictive order on the press; but that sensitivity and effort is required in order to ensure the full enjoyment

and proper accommodation of both First and Sixth Amendment rights.

There is, beyond peradventure, a clear and substantial damage to freedom of the press whenever even a temporary restraint is imposed on reporting of material concerning the operations of the criminal justice system, an institution of such pervasive influence in our constitutional scheme. And the necessary impact of reporting even confessions can never be so direct, immediate, and irreparable that I would give credence to any notion that prior restraints may be imposed on that rationale. It may be that such incriminating material would be of such slight news value or so inflammatory in particular cases that responsible organs of the media, in an exercise of self-restraint, would choose not to publicize that material, and not make the judicial task of safeguarding

## Page 613

precious rights of criminal defendants more difficult. Voluntary codes such as the Nebraska Bar-Press Guidelines are a commendable acknowledgment by the media that constitutional prerogatives bring enormous responsibilities, and I would encourage continuation of such voluntary cooperative efforts between the bar and the media. However, the press may be arrogant, tyrannical, abusive, and sensationalist, just as it may be incisive, probing, and informative. But at least in the context of prior restraints on publication, the decision of what, when, and how to publish is for editors, not judges. *See, e.g., Near v. Minnesota ex rel. Olson,* 283 U.S. at 720; *Cox Broadcasting Corp. v. Cohn,* 420 U.S. at 496; *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. at 258; *id.* at 259 (WHITE, J., concurring); *cf. New York Times Co. v. Sullivan,* 376 U.S. at 269-283. Every restrictive order imposed on the press in this case was accordingly

**[96 S.Ct. 2829]** an unconstitutional prior restraint on the freedom of the press, and I would therefore reverse the judgment of the Nebraska Supreme Court and remand for further proceedings not inconsistent with this opinion.

APPENDIX TO OPINION OF BRENNAN, J.,

CONCURRING IN JUDGMENT

NEBRASKA BAR-PRESS GUIDELINES FOR DISCLOSURE

AND REPORTING OF INFORMATION RELATING TO

IMMINENT OR PENDING CRIMINAL LITIGATION

These voluntary guidelines reflect standards which bar and news media representatives believe are a reasonable means of accommodating, on a voluntary basis, the correlative constitutional rights of free speech and free press with the right of an accused to a fair trial. They

## Page 614

are not intended to prevent the news media from inquiring into and reporting on the integrity, fairness, efficiency and effectiveness of law enforcement, the administration of justice, or political or governmental questions whenever involved in the judicial process.

As a voluntary code, these guidelines do not necessarily reflect in all respects what the members of the bar or the news media believe would be permitted or required by law.

Information Generally Appropriate for

Disclosure, Reporting

Generally, it is appropriate to disclose and report the following information:

1. The arrested person's name, age, residence, employment, marital status and similar biographical information.

2. The charge, its text, any amendments thereto, and, if applicable, the identity of the complainant.

3. The amount or conditions of bail.

4. The identity of and biographical information concerning the complaining party and victim, and, if a death is involved, the apparent cause of death unless it appears that the cause of death may be a contested issue.

5. The identity of the investigating and arresting agencies and the length of the investigation.

6. The circumstances of arrest, including time, place, resistance, pursuit, possession of and all weapons used, and a description of the items seized at the time of arrest. It is appropriate to disclose and report at the time of seizure the description of physical evidence subsequently seized other than a confession, admission or statement. It is appropriate to disclose and report the subsequent finding of weapons, bodies, contraband, stolen property and similar physical items if, in view

## Page 615

of the time and other circumstances, such disclosure and reporting are not likely to interfere with a fair trial.

7. Information disclosed by the public records, including all testimony and other evidence adduced at the trial.

Information Generally Not Appropriate for

Disclosure, Reporting

Generally, it is not appropriate to disclose or report the following information because of the risk of prejudice to the right of an accused to a fair trial:

1. The existence or contents of any confession, admission or statement given by the accused, except it may be stated that the accused denies the charges made against him. This paragraph is not intended to apply to statements made by the accused to representatives of the news media or to the public.

2. Opinions concerning the guilt, the innocence or the character of the accused.

3. Statements predicting or influencing the outcome of the trial.

4. Results of any examination or tests or the accused's refusal or failure to submit to an examination or test.

5. Statements or opinions concerning the credibility or anticipated testimony of prospective witnesses.

**[96 S.Ct. 2830]** 6. Statements made in the judicial proceedings outside the presence of the jury relating to confessions or other matters which, if reported, would likely interfere with a fair trial.

Prior Criminal Records

Lawyers and law enforcement personnel should not volunteer the prior criminal records of an accused except to aid in his apprehension or to warn the public of any dangers he presents. The news media can obtain prior criminal records from the public records of the courts,

**Page 616**

police agencies and other governmental agencies and from their own files. The news media acknowledge, however, that publication or broadcast of an individual's criminal record can be prejudicial, and its publication or broadcast should be considered very carefully, particularly after the filing of formal charges and as the time of the trial approaches, and such publication or broadcast should generally be avoided because readers, viewers and listeners are potential jurors and an accused is presumed innocent until proven guilty.

Photographs

1. Generally, it is not appropriate for law enforcement personnel to deliberately pose a person in custody for photographing or televising by representatives of the news media.

2. Unposed photographing and televising of an accused outside the courtroom is generally appropriate, and law enforcement personnel should not interfere with

such photographing or televising except in compliance with an order of the court or unless such photographing or televising would interfere with their official duties.

3. It is appropriate for law enforcement personnel to release to representatives of the news media photographs of a suspect or an accused. Before publication of any such photographs, the news media should eliminate any portions of the photographs that would indicate a prior criminal offense or police record.

Continuing Committee for Cooperation

The members of the bar and the news media recognize the desirability of continued joint efforts in attempting to resolve any areas of differences that may arise in their mutual objective of assuring to all Americans both the correlative constitutional rights to freedom

**Page 617**

of speech and press and to a fair trial. The bar and the news media, through their respective associations, have determined to establish a permanent committee to revise these guidelines whenever this appears necessary or appropriate, to issue opinions as to their application to specific situations, to receive, evaluate and make recommendations with respect to complaints and to seek to effect through educational and other voluntary means a proper accommodation of the constitutional correlative rights of free speech, free press and fair trial.

June, 1970

STEVENS, J., concurring

MR. JUSTICE STEVENS, concurring in the judgment.

For the reasons eloquently stated by MR. JUSTICE BRENNAN, I agree that the judiciary is capable of protecting the defendant's right to a fair trial without enjoining the press from publishing information in the public domain, and that it may not do so. Whether the same absolute protection would apply no matter how shabby or illegal the means by which the information is obtained, no matter how serious an intrusion on privacy might be involved, no matter how demonstrably false the information might be, no matter how prejudicial it might be to the interests of innocent persons, and no matter how perverse the motivation for publishing it, is a question I would not answer without further argument. *See Ashwander v. TVA*, 297 U.S. 288, 346-347 (Brandeis, J., concurring). I do, however, subscribe to most of what MR. JUSTICE BRENNAN says and, if ever required to face the issue squarely, may well accept his ultimate conclusion.

---------

Notes:

[1] These Guidelines are voluntary standards adopted by members of the state bar and news media to deal with the reporting of crimes and criminal trials. They outline the matters of fact that may appropriately be reported, and also list what items are not generally appropriate for reporting, including confessions, opinions on guilt or innocence, statements that would influence the outcome of a trial, the results of tests or examinations, comments on the credibility of witnesses, and evidence presented in the jury's absence. The publication of an accused's criminal record should, under the Guidelines, be "considered very carefully." The Guidelines also set out standards for taking and publishing photographs, and set up a joint bar-press committee to foster cooperation in resolving particular problems that emerge.

[2] In the interim, petitioners applied to MR. JUSTICE BLACKMUN as Circuit Justice for a stay of the State District Court's order. He postponed ruling on the application out of deference to the Nebraska Supreme Court, 423 U.S. 1319 (Nov. 13, 1975) (in chambers); when he concluded that the delay before that court had "exceed[ed] tolerable limits," he entered an order. 423 U.S. 1327, 1329 (Nov. 20, 1975) (in chambers). We need not set out in detail MR. JUSTICE BLACKMUN's careful decision on this difficult issue. In essence he stayed the order insofar as it incorporated the admonitory Bar-Press Guidelines and prohibited reporting of some other matters. But he declined

at least on an application for a stay and at this distance, [to] impose a prohibition upon the Nebraska courts from placing any restrictions at all upon what the media may report prior to trial.

*Id.* at 1332. He therefore let stand that portion of the District Court's order that prohibited reporting the existence or nature of a confession, and declined to prohibit that court from restraining publication of facts that were so "highly prejudicial" to the accused or "strongly implicative" of him that they would "irreparably impair the ability of those exposed to them to reach an independent and impartial judgment as to guilt." *Id.* at 1333. Subsequently, petitioners applied for a more extensive stay; this was denied by the full Court. 423 U.S. 1027 (1975).

[3] The Warren Commission conducting an inquiry into the murder of President Kennedy implied grave doubts whether, after the dissemination of "a great deal of misinformation" prejudicial to Oswald, a fair trial could be had. Report of the President's Commission on the Assassination of President John F. Kennedy 231 (1964). Probably the same could be said in turn with respect to a trial of Oswald's murderer even though a multitude were eyewitnesses to the guilty act. *See generally id.* at 231-242; Jaffe, Trial by Newspaper, 40 N.Y.U.L.Rev. 504 (1965); Powell, The Right to a Fair Trial, 51

A.B.A.J. 534 (1965).

[4] The record also reveals that counsel for both sides acted responsibly in this case, and there is no suggestion that either sought to use pretrial news coverage for partisan advantage. A few days after the crime, newspaper accounts indicated that the prosecutor had announced the existence of a confession; we learned at oral argument that these accounts were false, although, in fact, a confession had been made. Tr. of Oral Arg. 337, 59.

[5] In *Near v. Minnesota,* Mr. Chief Justice Hughes was also able to say:

There is also the conceded authority of courts to punish for contempt when publications directly tend to prevent the proper discharge of judicial functions.

283 U.S. at 715. A subsequent line of cases limited sharply the circumstances under which courts may exact such punishment. *See Craig v. Harney*, 331 U.S. 367 (1947); *Pennekamp v. Florida*, 328 U.S. 331 (1946); *Bridges v. California* , 314 U.S. 252 (1941). Because these cases deal with punishment based on contempt, however, they deal with problems substantially different from those raised by prior restraint. *See also* Barist, The First Amendment and Regulation of Prejudicial Publicity -- An Analysis, 36 Ford.L.Rev. 425, 433-442 (1968).

[6] *See* A. Bickel, The Morality of Consent 61 (1975).

[7] The respondent and intervenors argue here that a change of venue would not have helped, since Nebraska law permits a change only to adjacent counties, which had been as exposed to pretrial publicity in this case as Lincoln County. We have held that state laws restricting venue must on occasion yield to the constitutional requirement that the State afford a fair trial. *Groppi v. Wisconsin*, 400 U.S. 505 (1971). We note also that the combined population of Lincoln County and the adjacent counties is over 80,000, providing a substantial pool of prospective jurors.

[8] Closing of pretrial proceedings with the consent of the defendant when required is also recommended in guidelines that have emerged from various studies. At oral argument, petitioners' counsel asserted that judicially imposed restraints on lawyers and others would be subject to challenge as interfering with press rights to news sources. Tr. of Oral Arg. 7-8. *See, e.g., Chicago Council of Lawyers v. Bauer,* 522 F.2d 242 (CA7 1975), *cert. denied sub nom. Cunningham v. Chicago Council of Lawyers, post,* p. 912. We are not now confronted with such issues.

We note that, in making its proposals, the American Bar Association recommended strongly against resort to direct restraints on the press to prohibit publication. American Bar Association Project on Standards for Criminal Justice, Fair Trial and Free Press 68-73

(App.Draft 1968). Other groups have reached similar conclusions. *See* Report of the Judicial Conference Committee on the Operation of the Jury System, "Free Press-Fair Trial" Issue, 45 F.R.D. 391, 401 403 (1968); Special Committee on Radio, Television, and the Administration of Justice of the Association of the Bar of the City of New York, Freedom of the Press and Fair Trial 111 (1967).

[9] Here, for example, the Nebraska Supreme Court decided that the District Court had no jurisdiction of the petitioners except by virtue of their voluntary submission to the jurisdiction of that court when they moved to intervene. Except for the intervention which placed them within reach of the court, the Nebraska Supreme Court conceded, the petitioners "could have ignored the [restraining] order. . . ." *State v. Simants,* 194 Neb. 783, 795, 236 N.W.2d 794, 802 (1975).

[10] Assuming, *arguendo,* that these problems are within reach of legislative enactment, or that some application of evolving concepts of long-arm jurisdiction would solve the problems of personal jurisdiction, even a cursory examination suggests how awkwardly broad prior restraints on publication, directed not at named parties but at large, would fit into our jurisprudence. The British experience is in sharp contrast for a variety of reasons; Great Britain has a smaller and unitary court system permitting the development of a manageable system of prior restraints by the application of the constructive contempt doctrine. *Cf.* n. 5, *supra* at 557; *see generally Maryland v. Baltimore Radio Show,* 338 U.S. 912, 921-936 (1950) (App. to opinion of Frankfurter, J., respecting denial of certiorari); Gillmor, Free Press and Fair Trial in English Law, 22 Wash. & Lee L.Rev. 17 (1965). Moreover, any comparison between the two systems must take into account that, although England gives a very high place to freedom of the press and speech, its courts are not subject to the explicit strictures of a written constitution.

[*] In *Times-Picayune Pub. Corp. v. Schulingkamp*, 419 U.S. 1301, 1307 (1974), an in-chambers opinion, I noted that there is a heavy presumption against the constitutional validity of a court order restraining pretrial publicity.

[1] In referring to the "press" and to "publication" in this opinion, I of course use those words as terms of art that encompass broadcasting by the electronic media as well.

[2] A copy of the "Nebraska Bar-Press Guidelines," ostensibly a voluntary code formulated by representatives of the media and the bar, was attached to the order. The Guidelines, which are similar to voluntary codes adhered to by the press in several States, are attached as an appendix to this opinion.

Excepted from the scope of the County Court's order were: (1) factual statements of the accused's name, age, residence, occupation, and family status; (2) the circumstances of the arrest (time and place, identity of the arresting and investigating officers and agencies, and the length of the investigation); (3) the nature, substance, and text of the charge; (4) quotations from, or any reference without comment to, public records or communications heretofore disseminated to the public; (5) the scheduling and result of any stage of the judicial proceeding held in open court; (6) a request for assistance in obtaining evidence; and (7) a request for assistance in obtaining the names of possible witnesses. The court also ordered that a copy of the preliminary hearing proceedings was to be made available to the public at the expiration of the order.

[3] The court apparently believed that a public preliminary hearing was required by state law. The Nebraska Supreme Court subsequently held that the pertinent state statute did not require that pretrial hearings be open to the public. Both petitioners and the State of Nebraska agree that the question whether preliminary hearings may be closed to the public consistently with the "Public Trial" Clause of the Sixth Amendment is not before us, and it is therefore one on which I would express no views.

[4] The Nebraska Bar-Press Guidelines, *see* appendix to this opinion, were "clarified" as follows, Amended Pet. for Cert. 10a-11a:

1. It is hereby stated the trial of the case commences when a jury is empaneled to try the case, and that all reporting prior to that event, specifically including the preliminary hearing is "pretrial" publicity.

2. It would appear that defendant has made a statement or confession to law enforcement officials and it is inappropriate to report the existence of such statement or the contents of it.

3. It appears that the defendant may have made statements against interest to James Robert Boggs, Amos Simants and Grace Simants, and may have left a note in the William Boggs residence, and that the nature of such statements, or the fact that such statements were made, or the nature of the testimony of these witnesses with reference to such statements in the preliminary hearing will not be reported.

4. The non-technical aspects of the testimony of Dr. Miles Foster may be reported within the guidelines and at the careful discretion of the press. The testimony of this witness dealing with technical subjects, tests or investigations performed or the results thereof, or his opinions or conclusions as a result of such tests or investigations will not be reported.

5. The general physical facts found at the scene of the crime may be reported within the guidelines and at the careful discretion of the press. However, the identity of the person or persons allegedly sexually assaulted or the details of any alleged assault by the defendant will not be

reported.

6. The exact nature of the limitations of publicity as entered by this order will not be reported. That is to say, the fact of the entering of this order limiting pretrial publicity and the adoption of the Bar-Press Guidelines may be reported, but specific reference to confessions, statements against interest, witnesses or type of evidence to which this order will apply will not be reported.

An additional portion of the order relating to the press' accommodations in the courtroom and the taking of photographs in the courthouse was not contested below, and is not before this Court. The full order, including its references to confessions, was read in open court.

[5] MR. JUSTICE BLACKMUN's view of the burden of proof for imposing such restraints was as follows:

The accused, and the prosecution if it joins him, bears the burden of showing that publicizing particular facts will irreparably impair the ability of those exposed to them to reach an independent and impartial judgment as to guilt.

423 U.S. at 1333.

[6] The in-chambers opinion also stayed any prohibition concerning reporting of the pending application for relief in the Supreme Court of Nebraska, but permitted a prohibition of reporting of the two in-chambers opinions to the extent they contained "facts properly suppressed." *Id.* at 1334. Nothing in the opinion was to be

deemed as barring what the District Judge may impose by way of restriction on what the parties and officers of the court may say to any representative of the media.

*Ibid.*

[7] Two justices of the Supreme Court of Nebraska dissented on jurisdictional grounds similar to those that formed the predicate for that court's earlier per curiam statement, and two other justices who agreed with those jurisdictional claims nevertheless joined the per curiam to avoid a procedural deadlock.

[8] These rulings resulted in the paradoxical situation that "[p]etitioners could have ignored the [County Court's] order" because that court had not obtained personal jurisdiction over them and because "courts have no general power in any kind of case to enjoin or restrain 'everybody,'" *State v. Simants,* 194 Neb. 783, 795, 236 N.W.2d 794, 802 (1975). However, because they had improperly intervened in the criminal case (from which they could not appeal), a prior restraint could issue against them. Indeed, the court noted that the prior restraint "applies only to [petitioners]" and not to any other organs of the media. *Id.* at 788, 236 N.W.2d at 798.

[9] *See* n. 21, *infra.*

[10] The evidence relied on by the Nebraska Supreme Court included the following: the fact that, before entry of the restrictive order, certain newspapers had reported information "which, if true, tended clearly to connect the accused with the slayings," 194 Neb. at 796, 236 N.W.2d at 802; the fact that "counsel for the media stated that it is already doubtful that an unbiased jury can be found to hear the Simants case in Lincoln County," *id.* at 797, 236 N.W.2d at 803; the fact that Nebraska law required the trial to transpire within six months of the date the information was filed, *ibid.;* the relatively small population of the counties to which Nebraska law would permit a change of venue, *id.* at 797-798, 236 N.W.2d at 803; the "mere heinousness or enormity of a crime"; and "the trial court's own knowledge of the surrounding circumstances," *id.* at 798, 236 N.W.2d at 803.

[11] The Nebraska Supreme Court also "adopted" American Bar Association Project on Standards for Criminal Justice, Fair Trial and Free Press § 3.1, Pretrial Hearings (App.Draft 1968) which provides for exclusion of the press and public from pretrial hearings under certain circumstances, and remanded the case to the District Court to consider any applications to close future pretrial proceedings under that standard. The constitutionality of closing pretrial proceedings under specific conditions is not before us, and is a question on which I would intimate no views.

[12] JUSTICES STEWART and MARSHALL and I noted that we would have granted the application for a stay.

[13] JUSTICES STEWART and MARSHALL and I dissented from denial of the motions to expedite and to grant a stay; MR. JUSTICE WHITE dissented from the latter motion to the extent the state courts had prohibited the reporting of information publicly disclosed during the preliminary hearing in the underlying criminal proceeding.

Although the order of the Nebraska Supreme Court expired when the jury in *State v. Simants* was impaneled and sequestered on January 7, 1976, this case is not moot. This is a paradigmatic situation of "short term orders, capable of repetition, yet evading review." *E.g., Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911). It is evident that the decision of the Nebraska Supreme Court will subject petitioners to future restrictive orders with respect to pretrial publicity, and that the validity of these orders, which typically expire when the jury is sequestered, generally cannot be fully litigated within that period of time. *See, e.g., Weinstein v. Bradford*, 423 U.S. 147, 149 (1975). *See also Carroll v. Princess Anne*, 393 U.S. 175, 178-179 (1968).

Counsel informs us that Simants has subsequently been tried, convicted, and sentenced to death, and that his appeal is currently pending in the Nebraska Supreme Court. Simants' defense rested on a plea of not guilty by

reason of insanity, and all of the information which remained unreported during the pretrial period was ultimately received in evidence. The trial judge also declined to close further pretrial hearings, granted Simmants' requests to sequester the jury and conduct *voir dire* with no more than four prospective jurors present at one time, and denied Simants' request for a change of venue. A *Jackson v. Denno* (378 U.S. 368 (1964)) hearing and the first day of *voir dire* were also closed to the public. Petitioners have challenged the latter rulings, and that litigation is still pending in the state courts.

[14] The precise scope of these terms is not, of course, self-evident. Almost any statement may be an "admission against interest" if, for example, it can be shown to be false, and thus destructive of the accused's credibility. This would even be true with respect to exculpatory statements made by an accused, such as those relating to alleged alibi defenses. Similarly, there is considerable vagueness in the phrase "strongly implicative" of the accused's guilt. The Nebraska Supreme Court did not elaborate on its meaning, and counsel for the State suggests it only covers the existence of the accused's prior criminal record, if any. Tr. of Oral Arg. 54. Others might view the phrase considerably more expansively. *See supra* at 581; *cf.* 194 Neb. at 789-790, 236 N.W.2d at 799. Indeed, even the fact the accused was indicated might be viewed as "strongly implicative" of his guilt by reporters not schooled in the law, and the threat of contempt for transgression of such directives would thus tend to self-censorship even as to materials not intended to be covered b the restrictive order.

[15] Of course, even if the press cannot be enjoined from reporting certain information, that does not necessarily immunize it from civil liability for libel or invasion of privacy or from criminal liability for transgressions of general criminal laws during the course of obtaining that information.

[16] The only criticism of this statement is that it does not embrace all of the protection accorded freedom of speech and of the press by the First Amendment. *See, e.g., Near v. Minnesota ex rel. Olson,* 283 U.S. at 714-715.

[17] Thus the First Amendment constitutes a direct repudiation of the British system of licensing. *See, e.g., Near v. Minnesota ex rel. Olson, supra* at 713-714; *Grosjean v. American Press Co.*, 297 U.S. 233, 245-250 (1936); *Bridges v. California*, 314 U.S. 252, 263-264 (1941); *Wood v. Georgia*, 370 U.S. 375, 384, and n. 5 (1962).

[18] *See* n. 33, *infra; supra* at 582-583.

[19] The rarity of prior restraint cases of any type in this Court's jurisprudence has also been noted. *See, e.g., New York Times Co. v. United States,* 403 U.S. at 733; *Near v. Minnesota ex rel. Olson,* 283 U.S. at 718 ("The fact that, for approximately one hundred and fifty years, there has

been almost an entire absence of attempts to impose previous restraints upon publications relating to the malfeasance of public officers is significant of the deep=seated conviction that such restraints would violate constitutional right").

[20] The Nebraska Supreme Court denigrated what it termed the "extremist and absolutist" position of petitioners for assuming that "each and every exercise of freedom of the press is equally important" and that "there can be no degree of values for the particular right in which the absolutist has a special interest." 194 Neb. at 799, 800, 236 N.W.2d at 804. This seriously mischaracterizes petitioners' contentions, for petitioners do not assert that First Amendment freedoms are paramount in all circumstances. For example, this case does not involve the question of when, if ever, the press may be held in contempt subsequent to publication of certain material, *see Wood v. Georgia*, 370 U.S. 375 (1962); *Craig v. Harney*, 331 U.S. 367, 376 (1947); *Pennekamp v. Florida*, 328 U.S. 331 (1946); *Bridges v. California*, 314 U.S. 252 (1941). Nor does it involve the question of damages actions for malicious publication of erroneous material concerning those involved in the criminal justice system, *see New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). *See also* Time, Inc. v. Firestone, 424 U.S. 448 (1976); *Gertz v. Robert Welch Inc.,* 418 U.S. 323 (1974). And no contention is made that the press would be immune from criminal liability for crimes committed in acquiring material for publication. However, to the extent petitioners take a forceful stand against the imposition of any prior restraints on publication, their position is anything but "extremist," for the history of the press under our Constitution has been one in which freedom from prior restraint is all but absolute.

[21] One can understand the reasons why the four prior restraint orders issued in this case. The crucial importance of preserving Sixth Amendment rights was obviously of uppermost concern, and the question had not been definitively resolved in this Court. Our language concerning the "presumption" against prior restraints could have been misinterpreted to condone an *ad hoc* balancing approach, rather than merely to state the test for assessing the adequacy of procedural safeguards.and for determining whether the high burden of proof had been met in a case falling within one of the categories that constitute the exceptions to the rule against prior restraints. Indeed, in *Branzburg v. Hayes*, 408 U.S. 665 (1972), there was even an intimation that such restraints might be permissible, since the Court stated that

[n]ewsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded, and *they may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal.*

*Id.* at 684-685 (emphasis supplied). However, the Court in *Branzburg* had taken pains to emphasize that the case, which presented the question whether the First Amendment accorded a reporter a testimonial privilege for an agreement not to reveal facts relevant to a grand jury's investigation of a crime or the criminal conduct of his source, did not involve any "prior restraint or restriction on what the press may publish." *Id.* at 681. It was evident from the full passage in which the sentence appeared, which focused on the fact that there is no "constitutional right of special access [by the press] to information not available to the public generally," *id.* at 684, that the passage is best regarded as indicating that, to the extent newsmen are properly excluded from judicial proceedings, they would probably be unable to report about those proceedings. *See generally id.* at 683-685. *See also id.* at 691 (decision "involves no restraint on what newspapers may publish or on the type or quality of information reporters may seek to acquire"); *Pell v. Procunier*, 417 U.S. 817, 833-834 (1974). It is clear that the passage was not intended to decide the important question presented by this case. In any event, in light of my views respecting prior restraints, it should be unmistakable that the First Amendment stands as an absolute bar even to the imposition of interim restraints on reports or commentary relating to the criminal justice system, and that to the extent anything in *Branzburg* could be read as implying a different result, I think that it should be disapproved. *Cf. New York Times Co. v. United States, supra* at 724-725 (BRENNAN, J., concurring).

[22] It is suggested that prior restraints are really only necessary in "small towns," since media saturation would be more likely and incriminating materials that are published would therefore probably come to the attention of all inhabitants. Of course, the smaller the community, the more likely such information would become available through rumors and gossip, whether or not the press is enjoined from publication. For example, even with the restrictive order in the *Simants* case, all residents of Sutherland had to be excluded from the jury. Indeed, the media in such situations could help dispel erroneous conceptions circulating among the populace. And the smaller the community, the more likely there will be a need for a change of venue in any event when a heinous crime is committed. There is, in short, no justification for conditioning the scope of First Amendment protection the media will receive on the size of the community they serve.

[23] Some exposure to the facts of a case need not, under prevailing law concerning the contours of the Sixth Amendment right to an impartial jury, disqualify a prospective juror or render him incapable of according the accused a fair hearing based solely on the competent evidence adduced in open court.

[E]xposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged [does not] alone presumptively deprive the

defendant of due process.

*Murphy v. Florida*, 421 U.S. 794, 799 (1975). *See also, e.g., id.* at 800, and n. 4; *Beck v. Washington*, 369 U.S. 541, 555-558 (1962); *Irvin v. Dowd*, 366 U.S. 717, 722-723 (1961); *Reynolds v. United States*, 98 U.S. 145, 165-156 (1879).

[24] Of course, judges accepting guilty pleas must guard against the danger that pretrial publicity has effectively coerced the defendant into pleading guilty.

[25] *Cf. Stroble v. California*, 343 U.S. 181, 195 (1952). For example, all of the material that was suppressed in this case was eventually admitted at Simants' trial. Indeed, even if Simants' statements to police officials had been deemed involuntary and thus suppressed, no one has suggested that confessions or statements against interest made by an accused to private individuals, for example, would be inadmissible.

[26] Failure of the trial judge to take such measures was a significant factor in our reversals of the convictions in *Sheppard v. Maxwell*, 384 U.S. 333 (1966), and *Estes v. Texas*, 381 U.S. 532 (1965).

[27] A significant component of prejudicial pretrial publicity may be traced to public commentary on pending cases by court personnel, law enforcement officials, and the attorneys involved in the case. In *Sheppard v. Maxwell, supra,* we observed that

the trial court might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters.

384 U.S. at 361. *See also id.* at 360 ("[T]he judge should have further sought to alleviate this problem [of publicity that misrepresented the trial testimony] by imposing control over the statements made to the news media by counsel, witnesses, and especially the Coroner and police officers"); *id.* at 359, 363. As officers of the court, court personnel and attorneys have a fiduciary responsibility not to engage in public debate that will redound to the detriment of the accused or that will obstruct the fair administration of justice. It is very doubtful that the court would not have the power to control release of information by these individuals in appropriate cases, *see In re Sawyer*, 360 U.S. 622 (1959), and to impose suitable limitations whose transgression could result in disciplinary proceedings. *Cf. New York Times Co. v. United States,* 403 U.S. at 728-730 (STEWART, J., joined by WHITE, J., concurring). Similarly, in most cases, courts would have ample power to control such actions by law enforcement personnel.

[28] Excessive delay, of course, would be impermissible in light of the Sixth Amendment right to a speedy trial. *See, e.g., Barker v. Wingo*, 407 U.S. 514 (1972). However, even short continuances can be effective in attenuating the impact of publicity, especially as other

news crowds past events off the front pages. And somewhat substantial delays designed to ensure fair proceedings need not transgress the speedy trial guarantee. *See Groppi v. Wisconsin*, 400 U.S. 505, 510 (1971); *cf.* 18 U.S.C. § 3161(h)(8) (1970 ed., Supp. IV).

[29] In *Rideau v. Louisiana*, 373 U.S. 723 (1963), we held that it was a denial of due process to deny a request for a change of venue that was necessary to preserve the accused's Sixth Amendment rights. And state statutes may not restrict changes of venue if to do so would deny an accused a fair trial. *Groppi v. Wisconsin, supra.*

[30] To be sure, as the Supreme Court of Nebraska contended, society would be paying a heavy price if an individual who is in fact guilty must be released. But in no decision of this Court has it been necessary to release an accused on the ground that an impartial jury could not be assembled; we remanded for further proceedings, assuming that a retrial before an impartial forum was still possible.

As to the contention that pretrial publicity may result in conviction of an innocent person, surely the trial judge has adequate means to control the *voir dire,* the conduct of trial, and the actions of the jury, so as to preclude that untoward possibility. Indeed, where the evidence presented at trial is insufficient, the trial judge has the responsibility not even to submit the case to the jury.

[31] Although various committees that have recently analyzed the "Free Press/Fair Trial" issue have differed over the devices that they believed could properly be employed to ensure fair trials, they have unanimously failed to embrace prior restraints on publication as within the acceptable methods. *See, e.g.,* Report of the Judicial Conference Committee on the Operation of the Jury System, "Free Press-Fair Trial" Issue, 45 F.R.D. 396, 401-402 (1968) (Judicial Conference Committee headed by Judge Kaufman); Special Committee on Radio, Television, and the Administration of Justice of the Association of the Bar of the City of New York, Freedom of the Press and Fair Trial: Final Report with Recommendations 10-11 (1967); American Bar Association Project on Standards for Criminal Justice, Fair Trial and Free Press 68-73 (App.Draft 1968); *see also* American Bar Association, Legal Advisory Committee on Fair Trial and Free Press, Recommended Court Procedure to Accommodate Rights of Fair Trial and Free Press 7 (Rev. Draft, Nov.1975).

[32] I include these additional considerations, many of which apply generally to any system of prior restraints, only because of the fundamentality of the Sixth Amendment right invoked as the justification for imposition of the restraints in this case; the fact that there are such overwhelming reasons for precluding any prior restraints even to facilitate preservation of such a fundamental right reinforces the longstanding constitutional doctrine that there is effectively an absolute prohibition against prior restraints of publication of *any* material otherwise covered within the meaning of the free press guarantee of the First Amendment. *See supra* at 588-594.

[33] For example, in addition to numerous comments about accommodating First and Sixth Amendment rights in each case, the court observed:

That the press be absolutely free to report corruption and wrongdoing, actual or apparent, or incompetence of public officials of whatever branch of government is vastly important to the future of our state and nation cannot be denied as anyone who is familiar with recent events must be well aware. Prior restraint of the press, however slight, in such instances is unthinkable. *Near v. Minnesota ex rel. Olson, supra.* In these instances and many others no preferred constitutional rights collide.

In cases where equally important constitutional rights may collide then it would seem that, under some circumstances, rare though they will be, that an accommodation of some sort must be reached.

194 Neb. at 798-799, 236 N.W.2d at 803-804. Thus, at least when reporting of information "strongly implicative" of the accused also reflects on official actions, a particularized analysis of the need to disseminate the information is contemplated even by those who believe prior restraints might sometimes be justifiable with respect to commentary on the criminal justice system.

[34] Prior restraints may also effectively curtail the incentives for independent investigative work by the media which could otherwise uncover evidence of guilt or exonerating evidence that nevertheless threatens the Sixth Amendment rights of others by strongly implicating them in illegal activity.

[35] Indeed, to the extent media notified of the restraint proceedings choose not to appear in light of the cost and time potentially involved in overturning any restraint ultimately imposed, there will be no presentation of the countervailing public interest in maintaining a free flow of information, as opposed to the interests of prosecution, defense, and judges in maintaining fair proceedings.

[36] For example, in this case the restraints only applied to petitioners, who improperly intervened in the criminal case, and thus subjected themselves to the court's jurisdiction. The numerous *amici,* however, were not subject to the restraining orders and were free to disseminate prejudicial information in the same areas in which petitioners were precluded from doing so.

[37] *Cf. New York Times Co. v. United States,* 403 U.S. at 733 (WHITE, J., joined by STEWART, J., concurring).

[38] In this case, prior restraints were in effect for over 11 weeks, and yet by the time those restraints expired,

appellate review had not yet been exhausted. Moreover, appellate courts might not accord these cases the expedited hearings they so clearly would merit. *See* Tr. of Oral Arg. 43-48.

[39] As we observed in *Bridges v. California,* 314 U.S. at 268, which held that the convictions of a newspaper publisher and editor for contempt, based on editorial comment concerning pending cases, were violative of the First Amendment:

It must be recognized that public interest is much more likely to be kindled by a controversial event of the day than by a generalization, however penetrating, of the historian or scientist. Since they punish utterances made during the pendency of a case, the judgments below therefore produce their restrictive results at the precise time when public interest in the matters discussed would naturally be at its height. Moreover, the ban is likely to fall not only at a crucial time but upon the most important topics of discussion.

No suggestion can be found in the Constitution that the freedom there guaranteed for speech and the press bears an inverse ratio to the timeliness and importance of the ideas seeking expression. Yet, it would follow as a practical result of the decisions below that anyone who might wish to give public expression to his views on a pending case involving no matter what problem of public interest, just at the time his audience would be most receptive, would be as effectively discouraged as if a deliberate statutory scheme of censorship had been adopted. . . .

This unfocussed threat is, to be sure, limited in time, terminating as it does upon final disposition of the case. But this does not change its censorial quality. An endless series of moratoria on public discussion, even if each were very short, could hardly be dismissed as an insignificant abridgment of freedom of expression. And to assume that each would be short is to overlook the fact that the "pendency" of a case is frequently a matter of months or even years rather than days or weeks.

*Id.* at 269. *See also id.* at 277-278; *Carroll v. Princess Anne,* 393 U.S. at 182; *Wood v. Georgia,* 370 U.S. at 392; *Pennekamp v. Florida,* 328 U.S. at 346-347.

[40] The editor and publisher of *amicus* Anniston (Ala.) Star poignantly depicted in a letter to counsel the likely plight of such small, independent newspapers if the power to impose prior restraints against pretrial publicity were recognized:

Small town dailies would be the unknown, unseen and friendless victims if the Supreme Court upholds the order of Judge Stuart. If the already irresistible powers of the judiciary are swollen by absorbing an additional function, that of government censor, the chilling effect upon vigorous public debate would be deepest in the thousands of small towns where independent, locally owned, daily and weekly newspapers are published.

Our papers are not read in the White House, the Congress, the Supreme Court or by network news executives. The causes for which we contend and the problems we face are invisible to the world of power and intellect. We have no in-house legal staff. We retain no great, national law firms. We do not have spacious profits with which to defend ourselves and our principles, all the way to the Supreme Court, each and every time we feel them to be under attack.

Our only alternative is obedient silence. You hear us when we speak now. Who will notice if we are silenced? The small town press will be the unknown soldier of a war between the First and Sixth Amendments, a war that should never have been declared, and can still be avoided.

Only by associating ourselves in this brief with our stronger brothers are we able to raise our voices on this issue at all, but I am confident that the Court will listen to us because we represent the most defenseless among the petitioners.

Brief for Washington Post Co. *et al.* as *Amici Curiae* 31-32.

[41] There is also the danger that creation of a second "narrow" category of exceptions to the rule against prior restraints would be interpreted as a license to create further "narrow" exceptions when some "justification" for overcoming a mere "presumption" of unconstitutionality is presented. Such was the reasoning which eventuated in this litigation in the first place. *See supra* at 582-583.

---------

**372 U.S. 58 (1963)**

**83 S.Ct. 631, 9 L.Ed.2d 584**

**Bantam Books, Inc.**

**v.**

**Sullivan**

**No. 118**

**United States Supreme Court**

**February 18, 1963**

Argued December 3, 1962

APPEAL FROM THE SUPERIOR COURT OF RHODE ISLAND

Syllabus

The Rhode Island Legislature created a Commission

to educate the public concerning any book . . . or other thing containing obscene, indecent or impure language, or manifestly tending to the corruption of the youth as defined [in other sections] and to investigate and recommend the prosecution of all violations of said sections.

The Commission's practice was to notify a distributor that certain books or magazines distributed by him had been reviewed by the Commission and had been declared by a majority of its members to be objectionable for sale, distribution or display to youths under 18 years of age. Such notices requested the distributor's "cooperation," and advised him that copies of the lists of "objectionable" publications were circulated to local police departments, and that it was the Commission's duty to recommend prosecution of purveyors of obscenity. Four out-of-state publishers of books widely distributed in the State sued in a Rhode Island court for injunctive relief and a declaratory judgment that the law and the practices thereunder were unconstitutional. The court found that the effect of the Commission's notices was to intimidate distributors and retailers and that they had resulted in the suppression of the sale of the books listed. In this Court, the State Attorney General conceded that the notices listed several publications that were not obscene within this Court's definition of the term.

*Held:* The system of informal censorship disclosed by this record violates the Fourteenth Amendment. Pp. 59-72.

(a) The Fourteenth Amendment requires that

regulation by the States of obscenity conform to procedures that will ensure against the curtailment of constitutionally protected expression, which is often separated from obscenity only by a dim and uncertain line. Pp. 65-66.

(b) Although the Rhode Island Commission is limited to informal sanctions, the record amply demonstrates that it deliberately set about to achieve the suppression of publications deemed "objectionable," and succeeded in its aim. Pp. 66-67.

(c) The acts and practices of the members and Executive Secretary of the Commission were performed under color of state law,

and so constituted acts of the State within the meaning of the Fourteenth Amendment. P. 68.

(d) The Commission's practice provides no safeguards whatever against the suppression of nonobscene and constitutionally protected matter, and it is a form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon criminal sanctions, which may be applied only after a determination of obscenity has been made in a criminal trial hedged about with the procedural safeguards of the criminal process. Pp. 68-70

(e) What Rhode Island has done, in fact, has been to subject the distribution of publications to a system of prior administrative restraints without any provision for notice and hearing before publications are listed as "objectionable" and without any provision for judicial review of the Commission's determination that such publications are "objectionable." Pp. 70-72.

Reversed and cause remanded.

BRENNAN, J., lead opinion

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The Rhode Island Legislature created the "Rhode Island Commission to Encourage Morality in Youth," whose members and Executive Secretary are the appellees herein, and gave the Commission, *inter alia,*

. . . the duty . . . to educate the public concerning any book, picture, pamphlet, ballad, printed paper or other thing containing obscene, indecent or impure language, or manifestly tending to the corruption of the youth as defined

in sections 13, 47, 48 and 49 of chapter 610 of the general laws, as amended, and to investigate and recommend the prosecution of all violations of said sections. . . .[1]

The

[83 S.Ct. 634] appellants brought this action in

**Page 61**

the Superior Court of Rhode Island (1) to declare the law creating the Commission in violation of the First and Fourteenth Amendments, and (2) to declare unconstitutional and enjoin the acts and practices of the appellees thereunder. The Superior Court declined to declare the law creating the Commission unconstitutional on its face, but granted the appellants an injunction against the acts and practices of the appellees in performance of their duties. The Supreme Court of Rhode Island affirmed the Superior Court with respect to appellants first prayer, but reversed the grant of injunctive relief. ___ R.I. ___, 176 A.2d 393 (1961).[2] Appellants brought this appeal, and we noted probable jurisdiction, 370 U.S. 933.[3]

Appellants are four New York publishers of paperback books which have for sometime been widely distributed in Rhode Island. Max Silverstein & Sons is the exclusive wholesale distributor of appellants publications throughout most of the State. The Commission's practice has been to notify a distributor on official Commission stationery that certain designated books or magazines distributed by him had been reviewed by the Commission and had been declared by a majority of its members to be objectionable for sale, distribution or display to youths under 18 years of age. Silverstein had received at least 35 such notices

[83 S.Ct. 635] at the time this suit was brought. Among

**Page 62**

the paperback books listed by the Commission as "objectionable" were one published by appellant Dell Publishing Co., Inc., and another published by appellant Bantam Books, Inc.[4]

The typical notice to Silverstein either solicited or thanked Silverstein, in advance, for his "cooperation" with the Commission, usually reminding Silverstein of the Commission's duty to recommend to the Attorney General prosecution of purveyors of obscenity.[5] Copies of the

**Page 63**

lists of "objectionable" publications were circulated to local police departments, and Silverstein was so informed in the notices.

Silverstein's reaction on receipt of a notice was to take steps to stop further circulation of copies of the listed publications. He would not fill pending orders for such publications, and would refuse new orders. He instructed his field men to visit his retailers and to pick up all unsold copies, and would then promptly return them to the publishers. A local police officer usually visited Silverstein shortly after Silverstein's receipt of a notice to learn what action he had taken. Silverstein was usually able to inform the officer that a specified number of the total of copies received from a publisher had been returned. According to the testimony, Silverstein acted as he did on receipt of the notice "rather than face the possibility of some sort of a court action against ourselves, as well as the people that we supply." His "cooperation" was given to avoid becoming involved in a "court proceeding" with a "duly authorized organization."

The Superior Court made fact findings and the following two, supported by the evidence and not rejected by the Supreme Court of Rhode Island, are particularly relevant:

8. The effect of the said notices (those received by Silverstein, including the two listing publications

**Page 64**

of appellants) were [*sic*] clearly to intimidate the various book and magazine wholesale distributors and retailers and to cause them, by reason of such intimidation and threat of prosecution, (a) to refuse to take new orders for the proscribed publications, (b) to cease selling any of the copies on hand, (c) to withdraw from retailers all unsold copies, and (d) to return all unsold copies to the publishers.

9. The activities of the Respondents (appellees here) have resulted in the suppression of the sale and circulation of the books listed in said notices. . . .

In addition to these findings, it should be noted that the Attorney General of Rhode Island conceded on oral argument in this Court that the books listed in the notices included several that were not obscene within this Court's definition of the term.

Appellants argue that the Commission's activities under Resolution 73, as amended, amount to a scheme of governmental censorship devoid of the constitutionally required safeguards for state regulation of obscenity, and thus abridge First Amendment liberties, protected by the Fourteenth Amendment from infringement by the States. We agree that the activities of the Commission are unconstitutional, and therefore reverse the Rhode Island court's judgment and remand the case for further proceedings not inconsistent with this opinion.[6]

**Page 65**

We held in *Alberts v. California,* decided with *Roth*

*v. United States*, 354 U.S. 476, 485, that "obscenity is not within the area of

**[83 S.Ct. 637]** constitutionally protected speech or press," and may therefore be regulated by the States. But this principle cannot be stated without an important qualification:

. . . [I]n *Roth* itself, we expressly recognized the complexity of the test of obscenity fashioned in that case and the vital necessity in its application of safeguards to prevent denial of "the protection of freedom of speech and press for material which does not treat

**Page 66**

sex in a manner appealing to prurient interest." [354 U.S. at 488]. . . . It follows that, under the Fourteenth Amendment, a State is not free to adopt whatever procedures it pleases for dealing with obscenity . . . without regard to the possible consequences for constitutionally protected speech.

*Marcus v. Search Warrant*, 367 U.S. 717, 730-731.

Thus, the Fourteenth Amendment requires that regulation by the States of obscenity conform to procedures that will ensure against the curtailment of constitutionally protected expression, which is often separated from obscenity only by a dim and uncertain line. It is characteristic of the freedoms of expression in general that they are vulnerable to gravely damaging, yet barely visible, encroachments. Our insistence that regulations of obscenity scrupulously embody the most rigorous procedural safeguards, *Smith v. California*, 361 U.S. 147; *Marcus v. Search Warrant, supra,* is therefore but a special instance of the larger principle that the freedoms of expression must be ringed about with adequate bulwarks. *See, e.g.,* Thornhill v. Alabama, 310, U.S. 88; *Winters v. New York*, 333 U.S. 507; *NAACP v. Button*, 371 U.S. 415.

[T]he line between speech unconditionally guaranteed and speech which may legitimately be regulated . . . is finely drawn. . . . The separation of legitimate from illegitimate speech calls for . . . sensitive tools. . . .

*Speiser v. Randall*, 357 U.S. 513, 525.

But, is it contended, these salutary principles have no application to the activities of the Rhode Island Commission, because it does not regulate or suppress obscenity, but simply exhorts booksellers and advises them of their legal rights. This contention, premised on the Commission's want of power to apply formal legal sanctions, is untenable. It is true that appellants books have not

**Page 67**

been seized or banned by the State, and that no one has

been prosecuted for their possession or sale. But though the Commission is limited to informal sanctions -- the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation -- the record amply demonstrates that the Commission deliberately set about to achieve the suppression of publications deemed "objectionable," and succeeded in its aim.[7] We are not the first court to look through forms

**[83 S.Ct. 638]** to the substance and recognize that informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief.[8]

**Page 68**

It is not as if this were not regulation by the State of Rhode Island. The acts and practices of the members and Executive Secretary of the Commission disclosed on this record were performed under color of state law, and so constituted acts of the State within the meaning of the Fourteenth Amendment. *Ex parte Young*, 209 U.S. 123. *Cf. Terry v. Adams*, 345 U.S. 461. These acts and practices directly and designedly stopped the circulation of publications in many parts of Rhode Island. It is true, as noted by the Supreme Court of Rhode Island, that Silverstein was "free" to ignore the Commission's notices, in the sense that his refusal to "cooperate" would have violated no law. But it was found as a fact -- and the finding, being amply supported by the record, binds us -- that Silverstein's compliance with the Commission's directives was not voluntary. People do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around, and Silverstein's reaction, according to uncontroverted testimony, was no exception to this general rule. The Commission's notices, phrased virtually as orders, reasonably understood to be such by the distributor, invariably followed up by police visitations, in fact stopped the circulation of the listed publications *ex proprio vigore.* It would be naive to credit the State's assertion that these blacklists are in the nature of mere legal advice when

**Page 69**

they plainly serve as instruments of regulation independent of the laws against obscenity.[9] *Cf. Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123.

Herein lies the vice of the system. The Commission's operation is a form of effective state regulation superimposed upon the State's criminal regulation of obscenity and making such regulation largely unnecessary. In thus obviating the need to employ criminal sanctions, the State

**Page 70**

has at the same time eliminated the safeguards of the criminal process. Criminal sanctions may be applied only

after a determination of obscenity has been made in a criminal trial hedged about with the procedural safeguards of the criminal process. The Commission's practice is in striking contrast, in that it provides no safeguards whatever against the suppression of nonobscene, and therefore constitutionally protected, matter. It is a form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law.

What Rhode Island has done, in fact, has been to subject the distribution of publications to a system of prior administrative restraints, since the Commission is not a judicial body and its decisions to list particular publications as objectionable do not follow judicial determinations that such publications may lawfully be banned. Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity. *See Near v. Minnesota* , 283 U.S. 697; *Lovell v. City of Griffin* , 303 U.S. 444, 451; *Schneider v. New Jersey*, 308 U.S. 147, 164; *Cantwell v. Connecticut*, 310 U.S. 296, 306; *Niemotko v. Maryland*, 340 U.S. 268, 273; *Kunz v. New York*, 340 U.S. 290, 293; *Staub v. City of Baxley* , 355 U.S. 313, 321. We have tolerated such a system only where it operated under judicial superintendence and assured an almost immediate judicial determination of the validity of the restraint.[10] *Kingsley*

**Page 71**

*Books, Inc. v. Brown,* 354 U.S. 436. The system at bar includes no such saving features. On the contrary, its capacity for suppression of constitutionally protected

**[83 S.Ct. 640]** publications is far in excess of that of the typical licensing scheme held constitutionally invalid by this Court. There is no provision whatever for judicial superintendence before notices issue or even for judicial review of the Commission's determinations of objectionableness. The publisher or distributor is not even entitled to notice and hearing before his publications are listed by the Commission as objectionable. Moreover, the Commission's statutory mandate is vague and uninformative, and the Commission has done nothing to make it more precise. Publications are listed as "objectionable," without further elucidation. The distributor is left to speculate whether the Commission considers this publication obscene or simply harmful to juvenile morality. For the Commission's domain is the whole of youthful morals. Finally, we not that although the Commission's supposed concern is limited to youthful readers, the "cooperation" it seeks from distributors invariably entails the complete suppression of the listed publications; adult readers are equally deprived of the opportunity to purchase the publications in the State. *Cf. Butler v. Michigan*, 352 U.S. 380.

The procedures of the Commission are radically deficient. They fall far short of the constitutional

requirements of governmental regulation of obscenity. We hold that the system of informal censorship disclosed by this record violates the Fourteenth Amendment.

In holding that the activities disclosed on this record are constitutionally proscribed, we do not mean to suggest that private consultation between law enforcement officers and distributors prior to the institution of a judicial proceeding can never be constitutionally permissible. We do not hold that law enforcement officers must renounce all informal contacts with persons suspected of violating

**Page 72**

valid laws prohibiting obscenity. Where such consultation is genuinely undertaken with the purpose of aiding the distributor to comply with such laws and avoid prosecution under them, it need not retard the full enjoyment of First Amendment freedoms. But that is not this case. The appellees are not law enforcement officers; they do not pretend that they are qualified to give or that they attempt to give distributors only fair legal advice. Their conduct as disclosed by this record shows plainly that they went for beyond advising the distributors of their legal rights and liabilities. Their operation was in fact a scheme of state censorship effectuated by extra-legal sanctions; they acted as an agency not to advise but to suppress.

*Reversed and remanded.*

MR. JUSTICE BLACK concurs in the result.

DOUGLAS, J., concurring

MR. JUSTICE DOUGLAS, concurring.

While I join the opinion of the Court, I adhere to the views I expressed in *Roth v. United States*, 354 U.S. 476, 508-514, respecting the very narrow scope of governmental authority to suppress publications on the grounds of obscenity. Yet as my Brother BRENNAN makes clear, the vice of Rhode Island's system is apparent whatever one's view of the constitutional status of "obscene" literature. This is censorship in the raw; and, in my view, the censor and First Amendment rights are incompatible. If a valid law has been violated, authors and publishers and vendors can be made to account. But they would then have on their side all the procedural safeguards of the Bill of Rights, including trial by jury. From the viewpoint of the State, that is a more cumbersome procedure, action on the majority vote of the censors being far easier. But the Bill of Rights was designed to fence in the Government

**Page 73**

and make its intrusions on liberty difficult and its interference with freedom of expression well-nigh

impossible.

All nations have tried censorship, and only a few have rejected it. Its abuses

[83 S.Ct. 641] mount high. Today Iran censors news stories in such a way as to make false or misleading some reports of reputable news agencies. For the Iranian who writes the stories and lives in Teheran goes to jail if he tells the truth. Thus censorship in Teheran has as powerful extra-legal sanctions as censorship in Providence.

The Providence regime is productive of capricious action. A five-to-four vote makes a book "obscene." The wrong is compounded when the issue, though closely balanced in the minds of sophisticated men, is resolved against freedom of expression and on the side of censorship. Judges, to be sure, often disagree as to the definition of obscenity. But an established administrative system that bans book after book, even though they muster four votes out of nine, makes freedom of expression much more precarious than it would be if unanimity were required. This underlines my Brother BRENNAN's observation that the Providence regime "provides no safeguards whatever against the suppression of nonobscene, and therefore constitutionally protected, matter." Doubts are resolved against, rather than for, freedom of expression.

The evils of unreviewable administrative action of this character are as ancient as dictators. George Kennan, Siberia and the Exile System (U. of Chi.1958) p. 60, gives insight into it:

Mr. Borodin, another Russian author and a well known contributor to the Russian magazine *Annals of the Fatherland,* was banished to the territory of Yakutsk on account of the alleged "dangerous" and "pernicious" character of a certain manuscript found in his house by the police during a search. This

### Page 74

manuscript was a spare copy of an article upon the economic condition of the province of Viatka, which Mr. Borodin had written and sent to the above-named magazine, but which, up to that time, had not been published. The author went to Eastern Siberia in a convict's gray overcoat with a yellow ace of diamonds on his back, and three or four months after his arrival in Yakutsk he had the pleasure of reading in the *Annals of the Fatherland* the very same article for which he had been exiled. The Minister of the Interior had sent him to Siberia merely for having in his possession what the police called a "dangerous" and "pernicious" manuscript, and then the St. Petersburg committee of censorship had certified that another copy of that same manuscript was perfectly harmless, and had allowed it to be published, without the change of a line, in one of the most popular and widely circulated magazines in the empire.

Thus, under the Czars, an all-powerful elite condemned to the Siberia of that day an author whom a minority applauded. Administrative fiat is as dangerous today as it was then.

CLARK, J., concurring

MR. JUSTICE CLARK, concurring in the result.

As I read the opinion of the Court, it does much fine talking about freedom of expression and much condemning of the Commission's overzealous efforts to implement the State's obscenity laws for the protection of Rhode Island's youth, but, as if shearing a hog, comes up with little wool. In short, it creates the proverbial tempest in a teapot over a number of notices sent out by the Commission asking the cooperation of magazine distributors in preventing the sale of obscene literature to juveniles.

### Page 75

The storm was brewed from certain inept phrases in the notices wherein the Commission assumed the prerogative of issuing an "order" to the police that certain publications which it deemed obscene are "not to be sold, distributed or displayed to youths under eighteen years of age" and stated that "[t]he Attorney General will act for us in case of non-compliance." But, after all this expostulation, the

[83 S.Ct. 642] Court, being unable to strike down Rhode Island's statute, *see Alberts v. California*, 354 U.S. 476 (1957), drops a demolition bomb on "the Commission's practice" without clearly indicating what might be salvaged from the wreckage. The Court, in condemning the Commission's practice, owes Rhode Island the duty of articulating the standards which must be met, lest the Rhode Island Supreme Court be left at sea as to the appropriate disposition on remand.

In my view, the Court should simply direct the Commission to abandon its delusions of grandeur and leave the issuance of "orders" to enforcement officials and "the State's criminal regulation of obscenity" to the prosecutors, who can substitute prosecution for "thinly veiled threats" in appropriate cases. *See Alberts v. California, supra.* As I read the opinion, this is the extent of the limitations contemplated by the Court, leaving the Commission free, as my Brother HARLAN indicates, to publicize its findings as to the obscene character of any publication; to solicit the support of the public in preventing obscene publications from reaching juveniles; to furnish its findings to publishers, distributors and retailers of such publications and to law enforcement officials; and, finally, to seek the aid of such officials in prosecuting offenders of the State's obscenity laws. This Court has long recognized that "the primary requirements of decency may be enforced against obscene

publications." *Near v. Minnesota* , 283 U.S. 697, 716 (1931); *see* Kingsley Books, Inc.

**Page 76**

*v. Brown,* 354 U.S. 436 (1957). Certainly, in the face of rising juvenile crime and lowering youth morality, the State is empowered consistent with the Constitution to use the above procedures in attempting to dispel the defilement of its youth by obscene publications. With this understanding of the Court's holding, I join in its judgment, believing that the limitations as outlined would have little bearing on the efficacy of Rhode Island's law.

HARLAN, J., dissenting

MR. JUSTICE HARLAN, dissenting.

The Court's opinion fails to give due consideration to what I regard as the central issue in this case -- the accommodation that must be made between Rhode Island's concern with the problem of juvenile delinquency and the right of freedom of expression assured by the Fourteenth Amendment.

Three reasons, as I understand the Court's opinion, are given for holding the particular procedures adopted by the Rhode Island Commission under this statute, though not the statute itself, unconstitutional: (1) the Commission's activities, carried on under color of state law, amount to a scheme of governmental censorship; (2) its procedures lack adequate safeguards to protect nonobscene material against suppression; and (3) the group's operations in the field of youth morality may entail depriving the adult public of access to constitutionally protected material.

In my opinion, none of these reasons is of overriding weight in the context of what is obviously not an effort by the State to obstruct free expression, but an attempt to cope with a most baffling social problem.

I

This Rhode Island Commission was formed for the laudable purpose of combatting juvenile delinquency. While there is as yet no consensus of scientific opinion on the

**Page 77**

causal relationship between youthful reading or viewing of "the obscene" and delinquent behavior, *see* Green, Obscenity, Censorship, and Juvenile Delinquency, 14 U. of Toronto L.J. 229 (1962), Rhode Island's approach to the problem is not without respectable support, *see* S.Rep.No.2381, 84th Cong., 2d Sess. (1956); Kefauver, Obscene and Pornographic Literature

[83 S.Ct. 643] and Juvenile Delinquency, 24 Fed.Prob. No. 4, p. 3 (Dec. 1960). The States should have a wide range of choice in dealing with such problems, *Alberts v. California,* decided with *Roth v. United States* , 354 U.S. 476 (separate opinion of the writer, at 500-502), and this Court should not interfere with state legislative judgments on them except upon the clearest showing of unconstitutionality.

I can find nothing in this record that justifies the view that Rhode Island has attempted to deal with this problem in an irresponsible way. I agree with the Court that the tenor of some of the Commission's letters and reports is subject to serious criticism, carrying as they do an air of authority which that body does not possess and conveying an impression of consequences which by no means may follow from noncooperation with the Commission. But these are things which could surely be cured by a word to the wise. They furnish no occasion for today's opaque pronouncements which leave the Commission in the dark as to the permissible constitutional scope of its future activities.

Given the validity of state obscenity laws, *Alberts v. California, supra,* I think the Commission is constitutionally entitled (1) to express its views on the character of any published reading or other material; (2) to endeavor to enlist the support of law enforcement authorities, or the cooperation of publishers and distributors, with respect to any material the Commission deems obscene; and (3) to notify publishers, distributors, and members of the public

**Page 78**

with respect to its activities in these regards; but that it must take care to refrain from the kind of overbearing utterances already referred to and others that might tend to give any person an erroneous impression as to either the extent of the Commission's authority or the consequences of a failure to heed its warnings. Since the decision of the Court does not require reinstatement of the broad injunction issued by the trial court,[1] and since the majority's opinion rests on the invalidity of the particular procedures the Commission has pursued, I find nothing in that opinion denying the Commission the right to conduct the activities, just enumerated, which I believe it is constitutionally entitled to carry on.

II

It is said that the Rhode Island procedures lack adequate safeguards against the suppression of the nonobscene, in that the Commission may pronounce publications obscene without any prior judicial determination or review. But the Commission's pronouncement in any given instance is not self-executing. Any affected distributor or publisher wishing to stand his ground on a particular publication may test the Commission's views by way of a declaratory judgment action[2] or suit for injunctive relief or by simply refusing to accept the Commission's

opinion and awaiting criminal prosecution in respect of the questioned work.

That the Constitution requires no more is shown by this Court's decision in *Times Film Corp. v. Chicago*, 365 U.S. 43. There, the petitioner refused to comply

[83 S.Ct. 644] with a Chicago ordinance requiring that all motion pictures be examined and licensed by a city official prior to exhibition. It was contended that regardless of the obscenity *vel non* of any particular picture and the licensing standards employed, this requirement in itself amounted to an unconstitutional prior restraint on free expression. Stating that there is no "absolute freedom to exhibit, at least once, any and every kind of motion picture," 365 U.S. at 46, this Court rejected that contention and remitted the petitioner to a challenge of an application of the city ordinance to specific films. The Court thus refused to countenance a "broadside attack" on a system of regulation designed to prevent the dissemination of obscene matter.

Certainly, with respect to a sophisticated publisher or distributor,[3] and shorn of embellishing mandatory language, this Commission's advisory condemnation of particular publications does not create as great a danger of restraint on expression as that involved in Times Film, where exhibition of a film without a license was made a crime.[4] Nor can such danger be regarded as greater than that involved in the pre-adjudication impact of the sequestration procedures sustained by this Court in *Kingsley Books, Inc. v. Brown,* 354 U.S. 436. For

here, the Commission's action is attended by no legal sanctions, and leaves distribution of the questioned material entirely undisturbed.

This case bears no resemblance to what the Court refused to sanction in *Marcus v. Search Warrant* , 367 U.S. 717. There, police officers, pursuant to Missouri procedures, seized in a one-day foray under search warrants some 11,000 copies of 280 publications found at the appellants various places of business and believed by the officers to be obscene. The state court later found that only 100 out of the 280 publications actually were obscene. In holding

that Missouri's procedures, as applied . . . , lacked the safeguards which due process demands to assure nonobscene material the constitutional protection to which it is entitled,

367 U.S. at 731, the Court emphasized the historical connection between the search and seizure power and the stifling of liberty of expression. The Missouri warrants gave the broadest discretion to each executing officer, and left to his *ad hoc* judgment on the spot, with little or

no opportunity for discriminating deliberation, which publications should be seized as obscene. Since "there was no step in the procedure before seizure designed to focus searchingly on the question of obscenity," 367 U.S. at 732, it was to be expected that much of the material seized under these procedures would turn out not to be obscene, as indeed was later found by the state court in that very case.

No such hazards to free expression exist in the procedures I regard as permissible in the present case. Of cardinal importance, dissemination of a challenged publication is not physically or legally impeded in any way. Furthermore, the advisory condemnations complained of are the product not of hit-or-miss police action, but of a deliberative body whose judgments are limited by standards

embraced in the State's general obscenity statute, the constitutionality of which is not questioned in this case.

The validity of the foregoing considerations is not, in my opinion, affected by the state court findings that one of appellants distributors was led to withdraw publications, thought obscene by the Commission, because of fear of criminal prosecution. For this record lacks an element without which those findings

[83 S.Ct. 645] are not of controlling constitutional significance in the context of the competing state and individual interests here at stake: there is no showing that Rhode Island has put any roadblocks in the way of any distributor's or publisher's recourse to the courts to test the validity of the Commission's determination respecting any publication, or that the purpose of these procedures was to stifle freedom of expression.

It could not well be suggested, as I think the Court concedes, that a prosecutor's announcement that he intended to enforce strictly the obscenity laws or that he would proceed against a particular publication unless withdrawn from circulation amounted to an unconstitutional restraint upon freedom of expression, still less that such a restraint would occur from the mere existence of a criminal obscenity statute. Conceding that the restrictive effect of the Commission's procedures on publishers, and *a fortiori* on independent distributors, may be greater than in either of those situations, I do not believe that the differences are of constitutional import in the absence of either of the two factors indicated in the preceding paragraph. The circumstance that places the Commission's permissible procedures on the same constitutional level as the illustrations just given is the fact that in each instance the courts are open to the person affected, and that any material, however questionable, may be freely sponsored, circulated, read, or viewed until judicially condemned.

In essence, what the Court holds is that these publishers or their distributors need not, with respect to any material challenged by the Commission, vindicate their right to its protection in order to bring the Constitution to their aid. The effect of this holding is to cut into this effort of the State to get at the juvenile delinquency problem, without this Court or any other ever having concretely focused on whether any of the specific material called in question by the Commission is or is not entitled to protection under constitutional standards established by our decisions.[5]

This seems to me to weight the accommodation which should be made between the competing interests that this case presents entirely against the legitimate interests of the State. I believe that the correct course is to refuse to countenance this "broadside attack" on these state procedures and, with an appropriate caveat as to the character of some of the Commission's past utterances, to remit the appellants to their remedies respecting particular publications challenged by the Commission, as was done in the *Times Film* case. Putting these publishers and their distributors to the pain of vindicating challenged materials is not to place them under unusual hardship, for, as this Court has said in another context, "Bearing the discomfiture and cost" even of "a prosecution for crime [though] by an innocent person is one of the painful obligations of citizenship." *Cobbledick v. United States*, 309 U.S. 323, 325.

### III

The Court's final point -- that the Commission's activities may result in keeping from the adult public protected material, even though suppressible so far as youth is concerned

-- requires little additional comment. It is enough to say that such a determination should not be made at large, as has been done here. It should await a case when circumspect judgment can be brought to bear upon particular judicially suppressed publications.

Believing that the Commission, once advised of the permissible constitutional

**[83 S.Ct. 646]** scope of its activities, can be counted on to conduct itself accordingly, I would affirm the judgment of the Rhode Island Supreme Court. *Cf. United States v. Haley*, 371 U.S. 18.

---------

Notes:

[1] Resolution No. 73 H 1000, R.I.Acts and Resolves, January Session 1956, 1102-1103. The resolution created

a "commission to encourage morality in youth," to be composed of nine members appointed by the Governor of the State. The members were to serve for staggered, five-year terms. They were to receive no compensation, but their expenses, as well as the expenses incurred in the operation of the Commission generally, were to be defrayed out of annual appropriations. The original mandate of the Commission was superseded in part by Resolution No. 95 S. 444 R.I.Acts and Resolves, January Session 1959, 880, which reads as follows:

It shall be the duty of said commission to educate the public concerning any book, picture, pamphlet, ballad, printed paper or other thing containing obscene, indecent or impure language, as defined in chapter 11-31 of the general laws, entitled "Obscene and objectionable publications and shows," and to investigate and recommend the prosecution of all violations of said sections, and it shall be the further duty of said commission to combat juvenile delinquency and encourage morality in youth by (a) investigating situations which may cause, be responsible for or give rise to undesirable behavior of juveniles, (b) educate the public as to these causes and (c) recommend legislation, prosecution and/or treatment which would ameliorate or eliminate said causes.

The Commission's activities are not limited to the circulation of lists of objectionable publications. For example, the annual report of the Commission issued in January 1960, recites in part:

In September, 1959, because of the many complaints from outraged parents at the type of films being shown at the Rhode Island Drive-Ins and also the lack of teen-age supervision while parked, this Commission initiated and completed a survey on the Drive-In Theatres in the State. High points of the survey note that there are II (2) Drive-in theatres in Rhode Island which operate through summer months and remain open until November and then for week-ends during the winter, providing car heaters.

* * * *

Acting on its power to investigate causes of delinquency, the Commission has met with several state officials for a discussion of juvenile drinking, the myriad and complex causes of delinquency, and legal aspects of the Commission's operations. It also held a special meeting with Rhode Island police and legal officials in September, 1959, for a discussion on the extent of delinquency in Rhode Island and the possible formation of statewide organization to combat it.

[2] The action was brought pursuant to Title 9, c. 30, Gen.Laws R.I., 1956 ed., as amended (Uniform Declaratory Judgments Act).

[3] Our appellate jurisdiction is properly invoked, since the state court judgment sought to be reviewed upheld a

state statute against the contention that, on its face and applied, the statute violated the Federal Constitution. 28 U.S.C. § 1257(2). *Dahnke-Walker Milling Co. v. Bondurant*, 257 U.S. 282.

[4] Peyton Place, by Grace Metalious, published (in paperback edition) by appellant Dell Publishing Co., Inc.; The Bramble Bush, by Charles Mergendahl, published (in paperback edition) by appellant Bantam Books, Inc. Most of the other 106 publications which, as of January, 1960, had been listed as objectionable by the Commission were issues of such magazines as "Playboy," "Rogue," "Frolic," and so forth. The Attorney General of Rhode Island described some of the 106 publications as "horror" comics which he said were not obscene as this Court has defined the term.

[5] The first notice received by Silverstein reads, in part, as follows:

This agency was established by legislative order in 1956 with the immediate charge to prevent the sale, distribution or display of indecent and obscene publications to youths and [*sic*] eighteen years of age.

The Commissions (sic) have reviewed the following publications, and by majority vote have declared they are completely objectionable for sale, distribution or display for youths under eighteen years of age.

The Chiefs of Police have been given the names of the aforementioned magazines with the order that they are not to be sold, distributed or displayed to youths and [*sic*] eighteen years of age.

The Attorney General will act for us in case of noncompliance.

The Commissioners trust that you will cooperate with this agency in their work. . . .

Another list will follow shortly.

Thanking you for your anticipated cooperation, I am,

Sincerely yours

Albert J. McAloon

Executive Secretary

Another notice received by Silverstein reads in part:

This list should be used as a guide in judging other similar publications not named.

Your cooperation in removing the listed and other objectionable publications from your newsstands [*sic*] will be appreciated. Cooperative action will eliminate the necessity of our recommending prosecution to the Attorney General's department.

An undated "News Letter" sent to Silverstein by the Commission reads in part:

The lists (of objectionable publications) have been sent to distributors and police departments. To the present, cooperation has been gratifying.

[6] Appellants standing has not been, nor could it be, successfully questioned. The appellants have in fact suffered a palpable injury as a result of the acts alleged to violate federal law, and at the same time their injury has been a legal injury. *See Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 151-152 (concurring opinion). The finding that the Commission's notices impaired sales of the listed publications, which include two books published by appellants, establishes that appellants suffered injury. It was a legal injury, although more needs be said to demonstrate this. The Commission's notices were circulated only to distributors and not, so far as appears, to publishers. The Commission purports only to regulate distribution; it has made no claim to having jurisdiction of out-of-state publishers. However, if this were a private action, it would present a claim, plainly justiciable, of unlawful interference in advantageous business relations. *American Mercury, Inc., v. Chase,* 13 F.2d 224 (D.C.D.Mass.1926). *Cf.* 1 Harper and James, Torts (1956), §§ 6.11-6.12. *See also Pocket Books, Inc. v. Walsh,* 204 F.Supp. 297 (D.C.D.Conn.1962). It makes no difference, so far as appellants' standing is concerned, that the allegedly unlawful interference here is the product of state action. *See Pierce v. Society of Sisters*, 268 U.S. 510; *Truax v. Raich*, 239 U.S. 33; *Terrace v. Thompson*, 263 U.S. 197, 214-216; *Columbia Broadcasting System v. United States*, 316 U.S. 407, 422-423. Furthermore, appellants are not in the position of mere proxies arguing another's constitutional rights. The constitutional guarantee of freedom of the press embraces the circulation of books, as well as their publication, *Lovell v. City of Griffin*, 303 U.S. 444, 452, and the direct and obviously intended result of the Commission's activities was to curtail the circulation in Rhode Island of books published by appellants. Finally, pragmatic considerations argue strongly for the standing of publishers in cases such as the present one. The distributor who is prevented from selling a few titles is not likely to sustain sufficient economic injury to induce him to seek judicial vindication of his rights. The publisher has the greater economic stake, because suppression of a particular book prevents him from recouping his investment in publishing it. Unless he is permitted to sue, infringements of freedom of the press may too often go unremedied. *Cf. NAACP v. State of Alabama ex rel. Patterson*, 357 U.S. 449, 459.

[7] For discussions of the problem of "informal censorship," *see* Lockhart and McClure, Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn.L.Rev. 5, 6-9 and n. 7-22 (1960); Note, Extra-legal Censorship of Literature, 33 N.Y.U.L.Rev. 989 (1958);

Note, Entertainment: Public Pressures and the Law, 71 Harv.L.Rev. 326, 344-347 (1957); Note, Regulation of Comic Books, 68 Harv.L.Rev. 489, 494-499 (1955); Comment, Censorship of Obscene Literature by Informal Governmental Action, 22 Univ. of Chi.L.Rev. 216 (1954); Lockhart and McClure, Literature, the Law of Obscenity, and the Constitution, 38 Minn.L.Rev. 295, 309-316 (1954).

[8] Threats of prosecution or of license revocation, or listings or notifications of supposedly obscene or objectionable publications or motion pictures, on the part of chiefs of police or prosecutors, have been enjoined in a number of cases. *See Kingsley International Pictures Corp. v. Blanc,* 396 Pa. 448, 153 A.2d 243 (1959); *Bunis v. Conway,* 17 A.D.2d 207, 234 N.Y.S.2d 435 (1962) (dictum); *Sunshine Book Co. v. McCaffrey,* 4 A.D.2d 643, 168 N.Y.S.2d 268 (1957); *Random House, Inc., v. Detroit,* No. 555684 Chancery, Cir.Ct., Wayne County, Mich., March 29, 1957; *HMH Publishing Co. v. Garrett,* 151 F.Supp. 903 (D.C.N.D.Ind.1957); *New American Library of World Literature v. Allen,* 114 F.Supp. 823 (D.C.N.D.Ohio 1953); *Bantam Books, Inc. v. Melko,* 25 N.J.Super. 292, 96 A.2d 47 (Chancery 1953), *modified on other grounds,* 14 N.J. 524, 103 A.2d 256 (1954); *Dearborn Publishing Co. v. Fitzgerald,* 271 F. 479 (D.C.N.D.Ohio 1921); *Epoch Producing Corp. v. Davis,* 19 Ohio N.P. (N.S.) 465 (C.P.1917). *Cf. In re Louisiana News Co.,* 187 F.Supp. 241 (D.C.E.D.La.1960); *Roper v. Winner,* 244 S.W.2d 355, 357 (Tex.Civ.App.1951); *American Mercury, Inc. v. Chase,* 13 F.2d 224 (D.C.D.Mass.1926). Relief has been denied in the following cases: *Pocket Books, Inc. v. Walsh,* 204 F.Supp. 297 (D.C.D.Conn.1962); *Dell Publishing Co. v. Beggans,* 110 N.J.Eq. 72, 158 A. 765 (Chancery 1932). *See also Magtab Publishing Corp. v. Howard,* 169 F.Supp. 65 (D.C.W.D.La.1959). None of the foregoing cases presents the precise factual situation at bar, and we intimate no view one way or the other as to their correctness.

[9] We note that the Commission itself appears to have understood its function as the proscribing of objectionable publications, and not merely the giving of legal advice to distributors. *See* the first notice received by Silverstein, quoted in note 5, *supra.* The minutes of one of the Commission's meetings read in part:

. . . Father Flannery [a member of the Commission] noted that he had been called about magazines proscribed by the Commission remaining on sale after lists had been scent [*sic*] to distributors and police, to which Mr. McAloon suggested that it could be that the same magazines were seen, but that it probably was not the same edition proscribed by the Commission.

Father Flannery questioned the statewide compliance by the police, or anyone else, to get the proscribed magazines off the stands. Mr. McAloon showed the Commissioners the questionnaires sent to the chiefs of

police from this office and returned to us.

The minutes of another meeting read in part:

. . . Mr. Sullivan [member of the Commission] suggested calling the Cranston Chief of Police to inquire the reason Peyton Place was still being sold, distributed and displayed since the Police departments had been advised of the Commission's vote.

Of course, it is immaterial whether, in carrying on the function of censor, the Commission may have been exceeding its statutory authority. Its acts would still constitute state action. *Ex parte Young*, 209 U.S. 123. The issue of statutory authority was not raised or argued in this litigation.

Our holding that the scheme of informal censorship here constitutes state action is in no way inconsistent with *Standard Computing Scale Co. v. Farrell*, 249 U.S. 571. In that case, it was held that a bulletin of specifications issued by the State Superintendent of Weights and Measures could not be deemed state action for Fourteenth Amendment purposes because the bulletin was purely advisory; the decision turned on the fact that the bulletin was not coercive in purport.

[10] Nothing in the Court's opinion in *Times Film Corp. v. Chicago*, 365 U.S. 43, is inconsistent with the Court's traditional attitude of disfavor toward prior restraints of expression. The only question tendered to the Court in that case was whether a prior restraint was necessarily unconstitutional under all circumstances. In declining to hold prior restraints unconstitutional *per se,* the Court did not uphold the constitutionality of any specific such restraint. Furthermore, the holding was expressly confined to motion pictures.

[1] The appellees were enjoined

from directly or indirectly notifying book and magazine wholesale distributors and retailers that the Commission has found objectionable any specific book or magazine for sale, distribution or display; said injunction . . . (to) apply whether such notification is given directly to said book and magazine wholesale distributors and retailers, or any of them, either orally or in writing, or through the publication of lists or bulletins, and irrespective of the manner of dissemination of such lists or bulletins.

[2] Rhode Island Gen.Laws (Supp.1961), Tit. 9, c. 30 (Uniform Declaratory Judgments Act.).

[3] The publishers and distributors involved in this case are all, so far as this record shows, substantial business concerns, presumably represented by competent counsel, as were the appellants here.

[4] It seems obvious that in a nonlicensing context the force of *Times Film* is not lessened by the circumstance that in this case books rather than motion pictures are

involved.

[5] In their Reply Brief (p. 4), appellants acknowledge: "We have never attempted to deal with the question of obscenity or nonobscenity of Appellants books."

---------

**443 S.W.3d 87 (Tex. 2014)**

**57 Tex.Sup.J. 1428**

**ROBERT KINNEY, PETITIONER,**

**v.**

**ANDREW HARRISON BARNES (A/K/A A. HARRISON BARNES, A. H. BARNES, ANDREW H. BARNES, HARRISON BARNES), BCG ATTORNEY SEARCH, INC., EMPLOYMENT CROSSING, INC. AND JD JOURNAL, INC., RESPONDENTS**

**No. 13-0043**

**Supreme Court of Texas**

**August 29, 2014**

Argued January 9, 2014

Petition for certiorari filed at, 11/26/2014

ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS.

For Electronic Frontier Foundation, Amicus Curiae: Marc A. Fuller, Vinson & Elkins LLP, Dallas, TX.

For Texas Apartment Association, Amicus Curiae: Brian J. Levy, Attorney-At-Law, Houston, TX; John Sepehri, Texas Apartment Assocation, Austin, TX.

For Kinney, Robert, Petitioner: Andrew J. Sarne, Kane Russell Coleman & Logan PC, Houston, TX; Greggory A. Teeter, Thomas J. Henry Injury Attorneys, Corpus Christi, TX; Martin J. Siegel, Law Offices Of Martin J. Siegel, PC, Houston, TX; Stewart Edmond Hoffer, Hicks Thomas LLP, Houston, TX.

For Barnes, Andrew Harrison, Respondent: Anthony T. Ricciardelli, Attorney at Law, Plano, TX; Dale Lynn Roberts, Eleanor Ruffner, Fritz, Byrne, Head & Harrison, PLLC, Austin, TX; Michael R. Parker, Harrison Barnes PLC, Malibu, CA.

**OPINION**

Debra H. Lehrmann, Justice

A hallmark of the right to free speech under both the U.S. and Texas Constitutions is the maxim that prior restraints are a heavily disfavored infringement of that right. So great is our reticence to condone prior restraints that we refuse to allow even unprotected speech to be banned if restraining such speech would also chill a substantial amount of protected speech. This danger is before the Court today, as we are asked whether a permanent injunction restraining future speech is a constitutionally permissible remedy for defamation following an adjudication on the merits. On the one hand, it is well settled that defamation is an abuse of the privilege to speak freely; our holding today does not disturb that. On the other, it is also well settled that prior restraints are rarely permitted in Texas due to their capacity to chill protected speech.

The issue at hand is more specifically presented as whether a permanent injunction is an unconstitutional prior restraint where the injunction (1) requires the removal or deletion of speech that has been adjudicated defamatory, and (2) prohibits future speech that is the same or similar to the speech that has been adjudicated defamatory. We hold that, while the former does not enjoin future speech and thus is not a prior restraint, the latter constitutes a prior restraint that impermissibly risks chilling constitutionally protected speech. Because the court of appeals failed to recognize this distinction in affirming summary judgment for the defendant, we reverse the court of appeals' judgment and remand the case to the trial court for further proceedings.

**I. Background**

BCG Attorney Search, Inc. employed Robert Kinney as a legal recruiter until 2004, when he left and started a competing firm. Several years later, BCG's President, Andrew Barnes, posted a statement on the websites JDJournal.com and Employmentcrossing.com implicating Kinney in a kickback scheme during his time with BCG. Describing allegations in a lawsuit Barnes had previously filed against Kinney in California, Barnes stated:

The complaint also alleges that when Kinney was an employee of BCG Attorney Search in 2004, he devised an unethical kickback scheme, attempting to pay an associate under the table at Preston, Gates and Ellis (now K& L Gates) to hire one of his candidates. Barnes says that when he discovered this scheme, he and other BCG Attorney Search recruiters immediately fired Kinney. The complaint in the action even contains an email from Kinney where he talks about paying the bribe to an associate at Preston Gates in return for hiring a candidate.

The posted statements prompted Kinney to sue Barnes, BCG, and two other companies Barnes owned (Employment Crossing, Inc. and JD Journal, Inc.) for defamation in Travis County. Kinney did not seek

damages in his petition, requesting only a permanent injunction following a trial on

**Page 90**

the merits.[1] Specifically, Kinney sought an order requiring Barnes to (a) remove the allegedly defamatory statements from Barnes's websites, (b) contact third-party republishers of the statements to have them remove the statements from their publications, and (c) conspicuously post a copy of the permanent injunction, a retraction of the statements, and a letter of apology on the home pages of Barnes's websites for six months. Kinney has since abandoned his demand for an apology and retraction.

Barnes filed a motion for summary judgment on the ground that the relief sought would constitute an impermissible prior restraint on speech under the Texas Constitution. The trial court granted the motion, and the court of appeals affirmed without addressing whether Barnes's statements were defamatory. We too will limit our review to the constitutionality of Kinney's requested relief and assume only for purposes of that analysis that the complained-of statements are defamatory.

## II. Discussion

" Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press." Tex. Const. art. I, § 8. Enshrined in Texas law since 1836,[2] this fundamental right recognizes the " transcendent importance of such freedom to the search for truth, the maintenance of democratic institutions, and the happiness of individual men." Tex. Const. art. I, § 8 interp. commentary (West 2007). Commensurate with the respect Texas affords this right is its skepticism toward restraining speech. While abuse of the right to speak subjects a speaker to proper penalties, we have long held that " pre-speech sanctions" are presumptively unconstitutional. *Davenport v. Garcia*, 834 S.W.2d 4, 9 (Tex. 1992); *see also Ex parte Tucker*, 110 Tex. 335, 220 S.W. 75, 76 (Tex. 1920).

The First Amendment of the U.S. Constitution is similarly suspicious of prior restraints, which include judicial orders " forbidding certain communications" that are " issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993) (citation and internal quotation marks omitted). The U.S. Supreme Court has long recognized that " prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *see also id.* (" If it can be said that a threat of criminal or civil sanctions after publication 'chills' speech, prior restraint 'freezes' it at least for the time." (quoting A. Bickel, the

Morality of Consent 61 (1975))). As such, they " bear[] a heavy presumption against [their] constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). This cornerstone of First Amendment protections has been reaffirmed time and again by the Supreme Court,[3] this Court,[4] Texas courts

**Page 91**

of appeals,[5] legal treatises,[6] and even popular culture.[7]

Nevertheless, freedom of speech is " not an absolute right, and the state may punish its abuse." *Near v. Minnesota*, 283 U.S. 697, 708, 51 S.Ct. 625, 75 L.Ed. 1357 (1931) (citation and internal quotation marks omitted). To that end, the common law has long recognized a cause of action for damages to a person's reputation inflicted by the publication of false and defamatory statements. *Neely v. Wilson*, 418 S.W.3d 52, 60 (Tex. 2013) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 11, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)); *see also Ex parte Tucker*, 220 S.W. at 76 (" There can be no justification for the utterance of a slander. It cannot be too strongly condemned." ). The U.S. Supreme Court and this Court have been firm in the conviction that a defamer cannot use her free-speech rights as an absolute shield from punishment.

This case asks us to examine these conflicting principles, and involves a two-part inquiry. First, we examine whether a permanent injunction against defamatory speech, following a trial on the merits, is a prior restraint. Kinney contends that such a " post-trial remedial injunction" is not properly characterized as a prior restraint at all, much less one that is constitutionally impermissible. Barnes maintains that a permanent injunction against future speech, whether issued before or after the conclusion of a defamation trial, is necessarily a prior restraint. If the permanent injunction is a prior restraint, we must then determine whether it overcomes the heavy presumption against its constitutionality. Kinney argues that defamatory speech is not protected and that enjoining its continuation is therefore permissible. Barnes responds that the presumption cannot be overcome because such injunctions pose too great a risk to free speech.

We first acknowledge the parties' arguments regarding whether Article I, Section 8 of the Texas Constitution affords greater free-speech protection than the First Amendment of the U.S. Constitution. *Compare* Tex. Const. art. I, § 8 (" Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press." ), *with* U.S. Const. Amend. 1 (" Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ." ). Barnes argues that we have

consistently interpreted Texas's constitutional recognition of free-speech rights more broadly

Page 92

than its federal counterpart. *See Davenport*, 834 S.W.2d at 8-9 (" [O]ur free speech provision is broader than the First Amendment." ). In *Operation Rescue--National v. Planned Parenthood of Houston and Southeast Texas, Inc.*, however, we clarified that " Article I, Section 8 *may* be more protective of speech in some instances than the First Amendment, but if it is, it must be because of the text, history, and purpose of the provision, not just simply *because*." 975 S.W.2d 546, 559 (Tex. 1998) (first emphasis added) (internal citation omitted). We further concluded: " We know of nothing to suggest that injunctions restricting speech should be judged by a different standard under the state constitution than the First Amendment." *Id.*

We need not determine whether the Texas Constitution provides greater protection than the First Amendment on the specific issue presented to us, as the U.S. Supreme Court has not definitively addressed it. Rather, we reiterate the unremarkable proposition that in interpreting our own constitution, we " should borrow from well-reasoned and persuasive federal procedural and substantive precedent when this is deemed helpful, but should never feel compelled to parrot the federal judiciary." *Davenport*, 834 S.W.2d at 20. We look to federal cases for guidance, not as binding authority. *Id.*

**A. Classification of a Post-Adjudication Permanent Injunction Against Defamatory Speech as a Prior Restraint**

The first issue we must dispose of is whether a permanent injunction prohibiting future speech related to statements that have been adjudicated defamatory is a prior restraint. If it is not, then our constitutional concerns regarding the use of prior restraints are inapplicable. This question highlights the distinction Kinney emphasizes between permanent injunctions on speech adjudicated defamatory and pretrial temporary injunctions on allegedly defamatory speech. Kinney argues that this distinction is meaningful. We disagree--as to the question presented, it is a distinction without a difference.

We have squarely held that a temporary injunction prohibiting allegedly defamatory speech is an unconstitutional prior restraint, but we have not specifically addressed the propriety of a post-adjudication permanent injunction in a defamation case. *See Hajek v. Bill Mowbray Motors, Inc.*, 647 S.W.2d 253, 255 (Tex. 1983) (per curiam). In *Hajek*, the plaintiff sought and obtained a temporary injunction restraining the defendant from driving his car around the community with a message painted on all four sides that Bill Mowbray Motors sold him a " lemon." *Id.* at 254. We reversed, holding that the injunction was a prior restraint in

violation of the Texas Constitution. *Id.* at 255. Accordingly, we overturned the lower courts' decisions granting the injunction.

Our decision in *Hajek* rested on the well-settled legal principles laid out in *Ex parte Tucker*. In that case, the trial court enjoined the members of a worker's union from " vilifying, abusing, or using . . . epithets" against their employer. 110 Tex. 335, 220 S.W. 75, 75 (Tex. 1920). In overturning the injunction, we relied on the dichotomy between the Texas Constitution's affirmative grant of the liberty to speak without fear of curtailment and the commensurate responsibility inherent in that right. *Id.* at 76. We stated that " the abuse of the privilege . . . is not to be remedied by denial of the right to speak, but only by appropriate penalties for what is wrongfully spoken." *Id.* Accordingly, we held that the injunction was beyond the power of the trial court to issue. *Id.*

Page 93

Kinney contends that *Hajek* and *Tucker* classify as prior restraints only temporary injunctions against speech that is alleged, but not proven, to be defamatory, and that these cases therefore do not apply to a post-adjudication permanent injunction. But our holding that the injunctions were prior restraints did not rest on their pretrial issuance. Rather, we took issue with the trial courts' decision to remedy the defendants' abuse of their liberty to speak by preventing their future exercise of that liberty. *Id.*; *Hajek*, 647 S.W.2d at 255.

In this case, Kinney's request for injunctive relief may be broken down into two categories. First, as reflected in the pleadings, Kinney would have the trial court order Barnes to remove the statements at issue from his websites (and request that third-party republishers of the statements do the same) upon a final adjudication that the statements are defamatory. Such an injunction does not prohibit future speech, but instead effectively requires the erasure of past speech that has already been found to be unprotected in the context in which it was made. As such, it is accurately characterized as a remedy for one's abuse of the liberty to speak and is not a prior restraint. *See Hajek*, 647 S.W.2d at 255.[8]

As Kinney confirmed at oral argument, however, his request is not so limited. Kinney would also have the trial court permanently enjoin Barnes from making similar statements (in any form) in the future. That is the essence of prior restraint and conflates the issue of whether an injunction is a prior restraint with whether it is constitutional. As Professor Chemerinsky has aptly explained:

Courts that have held that injunctions are not prior restraints if they follow a trial, or if they are directed to unprotected speech, are confusing the question of whether the injunction is a prior restraint with the issue of whether the injunction should be allowed. Injunctions are

inherently prior restraints because they prevent future speech.

Erwin Chemerinsky, *Injunctions in Defamation Cases*, 57 Syracuse L. Rev. 157, 165 (2007); *see also Oakley, Inc. v. McWilliams* , 879 F.Supp.2d 1087, 1089 (C.D. Cal. 2012) (" Injunctions against any speech, even libel, constitute prior restraints: they prevent[] speech before it occurs, by requiring court permission before that speech can be repeated." (citation and internal quotation marks omitted)). Even in the few cases in which the Supreme Court has upheld a content-based injunction against speech, it has not been because the injunction was not a prior restraint, but because under the circumstances the restraint was deemed constitutionally permissible. *See Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 441-42, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957) (beginning its analysis with the notion that " 'the protection even as to previous restraint is not absolutely unlimited,'" while recognizing that " the limitation [on such protection] is the exception" (quoting *Near*, 283 U.S. at 716)). Accordingly, we hold that an injunction against future speech based on an adjudication that the same or

**Page 94**

similar statements have been adjudicated defamatory is a prior restraint.[9]

However, " [l]abeling respondents' action a prior restraint does not end the inquiry." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). Notably, the U.S. Supreme Court has never approved a prior restraint in a defamation case. Chemerinsky, 57 Syracuse L. Rev. at 167; *see, e.g., Near*, 283 U.S. at 706 (invalidating statute allowing courts to enjoin publication of future issues of newspaper because previous editions were found to be " 'chiefly devoted to malicious, scandalous and defamatory articles'" ). However, the Court has not decided whether the First Amendment prohibits the type of injunction at issue in this case, leaving that question unsettled.[10] Turning to the issue of whether the injunction against future speech sought by Kinney, though a prior restraint, is nevertheless permissible under the Texas Constitution, we hold that it is not.

**B. Prior Restraints on Future Speech Related to Statements That Have Been Adjudicated Defamatory Violate the Texas Constitution**

Again, prior restraints bear a heavy presumption against their constitutionality. *Davenport v. Garcia* , 834 S.W.2d 4, 9 (Tex. 1992); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). The proponent of such restraints thus " carries a heavy burden of showing justification for the imposition of such a restraint." *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971). While prior restraints are plainly disfavored, however, the phrase

itself is not a " self-wielding sword," but a demand for individual analyses of how prior restraints will operate. *Kingsley Books* , 354 U.S. at 441-42. In examining the propriety of injunctive relief, then, we bear in mind the category of speech sought to be enjoined and the effect of such relief on a person's liberty to speak freely.[11]

**1. Texas Law Comports with the Traditional Rule That Injunctive Relief Is Not Available in Defamation Actions**

**Page 95**

" The traditional rule of Anglo-American law is that equity has no jurisdiction to enjoin defamation." Chemerinsky, 57 Syracuse L. Rev. at 167 (explaining that the rule dates back to eighteenth-century England and was adopted " with remarkable uniformity" by nineteenth- and twentieth-century American courts); *see also, e.g., Kramer v. Thompson* , 947 F.2d 666, 677 (3d Cir. 1991) (" [T]he maxim that equity will not enjoin a libel has enjoyed nearly two centuries of widespread acceptance at common law." ). Our treatment of the temporary injunctions in *Ex parte Tucker* and *Hajek*, and more recent decisions on prior restraints, leave no doubt that the current state of Texas law is in accordance with this traditional rule with regard to future speech.

We have indicated that a prior restraint may be permissible " only when essential to the avoidance of an impending danger," *Davenport*, 834 S.W.2d at 9, and only when it is the least restrictive means of preventing that harm, *Ex parte Tucci*, 859 S.W.2d 1, 6 (Tex. 1993); *see also Hajek*, 647 S.W.2d at 255; *Ex parte Tucker*, 220 S.W. at 76.[12] We explained in *Tucker* the significant distinction between curtailing a person's liberty of speech, which the Texas Constitution forbids, and penalizing a person's abuse of that liberty, which the Constitution allows:

The purpose of [Article I, Section 8] is to preserve what we call 'liberty of speech' and 'the freedom of the press,' and at the same time hold all persons accountable to the law for the misuse of that liberty or freedom. Responsibility for the abuse of the privilege is as fully emphasized by its language as that the privilege itself shall be free from all species of restraint. But the abuse of the privilege, the provision commands, shall be dealt with in no other way. It is not to be remedied by denial of the right to speak, but only by appropriate penalties for what is wrongfully spoken. Punishment for the abuse of the right, not prevention of its exercise, is what the provision contemplates. There can be no liberty in the individual to speak, without the unhindered right to speak. It cannot co-exist with a power to compel his silence or fashion the form of his speech. Responsibility for the abuse of the right, in its nature pre-supposes freedom in the exercise of the right. It is a denial of the authority, anywhere, to prevent its exercise.

220 S.W. at 76. Citing *Tucker*, we plainly stated in *Hajek* that " [d]efamation alone is not a sufficient justification for restraining an individual's right to speak freely." 647 S.W.2d at 255. Our courts of appeals have continued to recognize that the appropriate remedy for defamation is damages, not injunctive relief. *See, e.g., Cullum v. White*, 399 S.W.3d 173, 189 (Tex.App.--San Antonio 2011, no pet.); *Brammer v. KB Home Lone Star, LP*, 114 S.W.3d 101, 108 (Tex.App.--Austin 2003, no pet.) (" Although the specific damages sustained from defamation and business disparagement-related activity is often difficult to measure, it is nonetheless well established that this type of harm does not rise to the level necessary for the prior restraint to withstand constitutional scrutiny." ).

**2. Injunctions Cannot Effectively Remedy the Harm Caused by Defamation Without Chilling Protected Speech**

**Page 96**

Contending that *Hajek* " ignored decades of intervening precedent from the U.S. Supreme Court," Kinney relies on Supreme Court case law upholding injunctions in the context of obscenity and commercial speech to argue that post-trial injunctions against defamatory speech are consistent with the First Amendment. In *Kingsley Books*, for example, the Supreme Court considered a New York statute that allowed municipalities to bar the continued sale of written and printed materials adjudicated obscene. 354 U.S. at 437. The Supreme Court upheld the statute, holding that it " studiously withholds restraint upon matters not already published and not yet found offensive." *Id.* at 445. By contrast, the Court held, the statute struck down in *Near v. Minnesota* had empowered the courts " to enjoin the dissemination of future issues of a publication because its past issues had been found offensive." *Id.*

And in *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations* , the Supreme Court upheld an administrative order prohibiting a newspaper from continuing to run gender-specific help-wanted ads pursuant to the enforcement of a local anti-discrimination law. 413 U.S. 376, 379, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). The Court concluded that the speech at issue constituted illegal commercial speech, holding that the injunction " d[id] not endanger arguably protected speech" and was therefore permissible. *Id.* at 390.

Even after these decisions, several courts addressing the issue presented here have continued to adhere to the traditional rule that defamation alone will not justify an injunction against future speech. *See Metro. Opera Ass'n v. Local 100*, 239 F.3d 172, 177 (2d Cir. 2001); *Oakley, Inc. v. McWilliams*, 879 F.Supp.2d 1087, 1090 (C.D. Cal. 2012); *Tilton v. Capital Cities/ABC Inc*., 827 F.Supp. 674, 681 (N.D. Okla. 1993) (" The fundamental law of libel in both Oklahoma and Texas is that monetary damages are an adequate and appropriate remedy and that injunctive relief is not available." ); *New Era Publ'ns Int'l v. Henry Holt & Co*., 695 F.Supp. 1493, 1525 (S.D.N.Y. 1988) (" [W]e accept as black letter that an injunction is not available to suppress defamatory speech." ); *Demby v. English*, 667 So.2d 350, 355 (Fla. Ct. App. 1995) (per curiam) (noting that the claim for injunctive relief was " frivolous" in light of the " well-established rule that equity will not enjoin either an actual or a threatened defamation" (citation and internal quotation marks omitted)); *Willing v. Mazzocone*, 482 Pa. 377, 393 A.2d 1155, 1157-58 (Pa. 1978) (holding that a permanent injunction against defamatory speech violated a provision of the Pennsylvania Constitution that is substantially similar to Article I, Section 8 of the Texas Constitution). By contrast, a small number of states have cited the Supreme Court cases referenced above in holding that narrowly drawn, post-trial injunctions against defamatory speech are constitutional. *See Hill v. Petrotech Res. Corp*., 325 S.W.3d 302 (Ky. 2010); *St. James Healthcare v. Cole*, 2008 MT 44, 341 Mont. 368, 178 P.3d 696 (Mont. 2008); *Balboa Island Vill. Inn, Inc. v. Lemen*, 40 Cal.4th 1141, 57 Cal.Rptr.3d 320, 156 P.3d 339 (Cal. 2007); *Retail Credit Co. v. Russell* , 234 Ga. 765, 218 S.E.2d 54 (Ga. 1975); *O'Brien v. Univ. Cmty. Tenants Union, Inc*., 42 Ohio St. 2d 242, 327 N.E.2d 753 (Ohio 1975); *see also Lothschuetz v. Carpenter*, 898 F.2d 1200 (6th Cir. 1990).

In *Balboa*, for example, the trial court found that Lemen had made defamatory statements about the Balboa Village Inn and issued a permanent injunction prohibiting her from engaging in numerous acts, including repeating those statements. 156 P.3d at 342. The California Supreme Court described

**Page 97**

*Kingsley Books* and *Pittsburgh Press* as holding that " an injunctive order prohibiting the repetition of expression that had been judicially determined to be unlawful did not constitute a prohibited prior restraint of speech." *Id.* at 346-47. The court concluded that, while the particular injunction at issue in *Balboa* was overbroad, a court may issue an injunction prohibiting a person from repeating statements that have been adjudicated defamatory following a trial on the merits. *Id.* at 349-50.

We do not read *Kingsley Books* and *Pittsburgh Press* so broadly and decline to extend their holdings to the defamation context. To that end, we agree with the district court in *Oakley* that injunctions against defamation are impermissible because they are necessarily " ineffective, overbroad, or both." 879 F.Supp.2d at 1090. That is, " [a]ny effective injunction will be overbroad, and any limited injunction will be ineffective." Chemerinsky, 57 Syracuse L. Rev. at 171.

On the one hand, for any injunction to have meaning it must be effective in its purpose. *See Neb.*

*Press Ass'n v. Stuart*, 427 U.S. 539, 565, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) (assessing " the probable efficacy of prior restraint on publication as a workable method" of accomplishing its purpose); *N.Y. Times Co. v. United States*, 403 U.S. 713, 744, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (Marshall, J., concurring) (" It is a traditional axiom of equity that a court of equity will not do a useless thing . . . ." ). The narrowest of injunctions in a defamation case would enjoin the defamer from repeating the exact statement adjudicated defamatory. Such an order would only invite the defamer to engage in wordplay, tampering with the statement just enough to deliver the offensive message while nonetheless adhering to the letter of the injunction. Kinney admitted as much at oral argument, agreeing that the injunction he is seeking would extend to speech that was " substantially the same" or made " non-substantive changes" to the statement that has been adjudicated defamatory.

But expanding the reach of an injunction in this way triggers the problem of overbreadth. Overbroad restrictions on speech are unconstitutional because of their potential to chill protected speech. *See Comm'n for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 435 (Tex. 1998) (" An overbroad statute sweeps within its scope a wide range of both protected and non-protected expressive activity." (citation and internal quotation marks omitted)); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 237, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002) (" The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." ). In the defamation context, the concern is that in prohibiting speech found to be defamatory, the injunction unreasonably risks prohibiting nondefamatory speech as well. *See Lawson v. Murray*, 515 U.S. 1110, 1114, 115 S.Ct. 2264, 132 L.Ed.2d 269 (1995) (Scalia, J., concurring in denial of writ of certiorari) (" The danger that speech-restricting injunctions may serve as a powerful means to suppress disfavored views is obvious enough even when they are based on a completed or impending violation of law." ).

The particular difficulty in crafting a proper injunction against defamatory speech is rooted in the contextual nature of the tort. In evaluating whether a statement is defamatory, the court construes it " as a whole in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement." *Musser v. Smith Protective Servs., Inc.*,

**Page 98**

723 S.W.2d 653, 655 (Tex. 1987). Given the inherently contextual nature of defamatory speech, even the most narrowly crafted of injunctions risks enjoining protected speech because the same statement made at a different time and in a different context may no longer be actionable. Untrue statements may later become true; unprivileged statements may later become privileged.

Kinney dismisses this concern, arguing that in such a scenario the defamer " could speak confident in the knowledge that [the enjoined statement is] no longer defamatory." But how confident could such a speaker be when he is bound by an injunction *not* to speak? The California Supreme Court suggested in *Balboa* that " [i]f such a change in circumstances occurs, [the] defendant may move the court to modify or dissolve the injunction." 156 P.3d at 353. We think it is no answer that a person must request the trial court's permission to speak truthfully in order to avoid being held in contempt. *See Pittsburgh Press*, 413 U.S. at 390 (" The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment." ); *see also Balboa*, 156 P.3d at 357 (Kennard, J., dissenting) (" Requiring a citizen to obtain government permission before speaking truthfully is 'the essence of censorship' directly at odds with the 'chief purpose' of the constitutional guarantee of free speech to prevent prior restraints." (quoting *Near*, 283 U.S. at 713, and *Kingsley Books*, 354 U.S. at 445)).

These concerns apply even more forcefully to an injunction that goes beyond restraining verbatim recitations of defamatory statements and encompasses statements that are " substantially similar." Subtle differences in speech will obscure the lines of such an injunction and make it exceedingly difficult to determine whether a statement falls within its parameters. *Balboa*, 156 P.3d at 356 (Kennard, J., dissenting in part); *Oakley*, 879 F.Supp.2d at 1091 (noting that " a 'similar statement' standard would require a court enforcing the injunction to continuously decide whether new statements by a persistent defendant were sufficiently similar" ). For example, let us imagine a trial court enjoins a defendant from repeating the defamatory statement " John Smith sells handguns to minors," as well as similar statements. Can the defamer state more generally that Smith is engaged in the business of illegal gun sales or that Smith's business contributes to the nationwide problems with school shootings? Can the word " handgun" be changed to " shotgun" ?[13]

These uncertainties highlight the inapplicability of the Supreme Court's obscenity cases. A permanent injunction restraining a theater owner from screening a film adjudicated to be obscene clearly applies only to that film, and others may be shown without the fear of contempt sanctions. *See Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 55-56, 93 S.Ct. 2628, 37

**Page 99**

L.Ed.2d 446 (1973) (upholding statute allowing civil injunction restraining exhibition of two films following adjudication that the films were obscene). *Pittsburgh Press*, while it involved commercial speech rather than

obscenity, is similarly distinguishable. In that case, as noted above, the Supreme Court upheld an administrative order prohibiting a newspaper from continuing a practice of running gender-specific help-wanted ads pursuant to the enforcement of a local anti-discrimination law. 413 U.S. at 389-90. The Court stressed, however, that the order upheld could not be punished with contempt proceedings and " d[id] not endanger arguably protected speech" because it did not require speculation as to the effect of publication. *Id.* at 390 & n.14. As discussed above, this certainty does not translate to the defamation context, in which the task of crafting an effective injunction against future speech risks enjoining constitutionally protected speech to an unacceptable degree.

By contrast, no such concerns arise when courts issue speech-related injunctions that are not prior restraints, such as ordering the deletion of defamatory statements posted on a website. There is a legally cogent division between mandatory injunctions calling for the removal of speech that has been adjudicated defamatory and prohibitive injunctions disallowing its repetition. The latter impermissibly chills protected speech; the former does not. The distinction thus arms trial courts with an additional tool to protect defamed parties while ensuring the State does not infringe upon the fundamental right to free speech guaranteed by Article I, Section 8.

Accordingly, we hold that the Texas Constitution does not permit injunctions against future speech following an adjudication of defamation. Trial courts are simply not equipped to comport with the constitutional requirement not to chill protected speech in an attempt to effectively enjoin defamation. Instead, as discussed below, damages serve as the constitutionally permitted deterrent in defamation actions.

### C. Damages Are Generally the Proper Remedy for Defamation

In keeping with Texas's longstanding refusal to allow injunctions in defamation cases, the well-settled remedy for defamation in Texas is an award of damages. *Ex parte Tucker*, 220 S.W. at 75-76; *Cullum*, 399 S.W.3d at 189; *Brammer*, 114 S.W.3d at 108. This can include economic damages like lost income, noneconomic damages like loss of reputation and mental anguish, and even punitive damages upon a finding of actual malice. *Hancock v. Variyam*, 400 S.W.3d 59, 65-66 (Tex. 2013). And imposition of damages has long been held to be an effective tool against defamers. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 277, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (" The fear of damage awards . . . may be markedly more inhibiting than the fear of prosecution under a criminal statute." ).

Kinney raises the concern that a victim of defamatory speech by a judgment-proof, serial defamer can obtain no remedy in damages. Damages may not deter the serial defamer, either because she lacks the funds to pay the damages or because she has so much money that paying a series of fines is immaterial to her. It is also easy to imagine a scenario in which an award of damages, even if collectible, will not provide complete relief to the defamed plaintiff. Imagine a statement falsely accusing a person of pedophilia, for example. Presumably, an order prohibiting the statement from being repeated would be of paramount importance to the plaintiff. This scenario was discussed at length in

**Page 100**

*Balboa*, the logic of which does not escape us. 156 P.3d at 351 (" Thus, a judgment for money damages will not always give the plaintiff effective relief from a continuing pattern of defamation." ). However, the constitutional protections afforded Texas citizens are not tied to their financial status. *See, e.g., id.* at 358 (Kennard, J., concurring) (" [N]either this nor any other court has ever held that a defendant's wealth can justify a prior restraint on the constitutional right to free speech." ). As the Pennsylvania Supreme Court concluded in *Willing*, " [w]e cannot accept . . . that the exercise of the constitutional right to freely express one's opinion should be conditioned upon the economic status of the individual asserting that right." 393 A.2d at 1158. Yet, conditioning the allowance of prior restraints on a defendant's inability to pay a damage award would do just that.

Moreover, the concern that damages will not provide an effective remedy in defamation cases is not a new one, but we have never deemed it sufficient to justify a prior restraint. For example, in defamation *per se* cases, nominal damages, not injunctive relief, are awarded when actual damages are difficult to prove or are not claimed because " 'the action is brought for the purpose of vindicating the plaintiff's character by a verdict of a jury that establishes the falsity of the defamatory matter.'" *Hancock*, 400 S.W.3d at 65 (quoting Restatement (Second) of Torts § 620 cmt. a (1977)). And the Supreme Court has expressly recognized that the potential inadequacy of damages as a remedy for defamation does not open the door to additional relief, stating: " The destruction that defamatory falsehood can bring is, to be sure, often beyond the capacity of the law to redeem. Yet, imperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 22-23, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (citation and internal quotation marks omitted). Applying the same reasoning, we too decline to open the door to prior restraints in this context.

### D. The Advent of the Internet

Finally, we address Kinney's argument that the Internet is a game-changer with respect to the issue presented because it " enables someone to defame his target to a vast audience in a matter of seconds." The

same characteristics that have cemented the Internet's status as the world's greatest platform for the free exchange of ideas, *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997)--the ease and speed by which any person can take on the role of the town crier or pamphleteer--have also ignited the calls for its receiving lesser protection. *See, e.g.*, Lyrissa Barnett Lidsky, *Silencing John Doe: Defamation and Discourse in Cyberspace*, 49 Duke L.J. 855, 863-64 (Feb. 2000).

However, the Supreme Court has steadfastly refused to make free speech protections a moving target, holding that " [w]e must decline to draw, and then redraw, constitutional lines based on the particular media or technology used to disseminate political speech from a particular speaker." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 326, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). And, with respect to the advent of the Internet, the Court has gone further in championing its role as an equalizer of speech and a gateway to amplified political discourse, holding in *Reno* that there is " no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium." 521 U.S. at 870. In this way,

**Page 101**

the Supreme Court has taken a definitive stance guaranteeing equal First Amendment protection for speech over the Internet. The Court has also recognized that damages, while " imperfect," are the remedy the law gives to defamation victims. *Milkovich*, 497 U.S. at 22-23 (citation and internal quotation marks omitted). We are not persuaded that the policy concerns that Kinney raises justify enjoining defamatory speech in a manner that substantially risks chilling constitutionally protected speech.

One final note is warranted in response to Kinney's assertion that the case for injunctive relief is made more compelling by the need to address the phenomena of cyber-bullying and online hate speech. It is enough to say that neither of those is at issue here. Today we simply continue to hold that " [d]efamation *alone* is not a sufficient justification for restraining an individual's right to speak freely." *Hajek*, 647 S.W.2d at 255 (emphasis added). But as discussed above, we have never held that all injunctions against future speech are *per se* unconstitutional, recognizing that they may be warranted to restrain speech that poses a threat of danger. *Id.* We need not and do not address the propriety of a requested injunction against speech that is not at issue, nor should we without analyzing the facts and circumstances underlying such a request.

### III. Conclusion

In evaluating whether state action exceeds constitutional bounds governing freedom of speech,

courts " must give the benefit of any doubt to protecting rather than stifling speech." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 469, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007). We hold that, while a permanent injunction requiring the removal of posted speech that has been adjudicated defamatory is not a prior restraint, an injunction prohibiting future speech based on that adjudication impermissibly threatens to sweep protected speech into its prohibition and is an unconstitutional infringement on Texans' free-speech rights under Article I, Section 8 of the Texas Constitution. Because the trial court concluded that no injunction of any kind would be permissible, the court erred in granting summary judgment to the extent Kinney's requested injunction did not constitute a prior restraint. We therefore reverse the court of appeals' judgment and remand the case to the trial court for further proceedings consistent with this opinion.

---------

Notes:

[1]According to Barnes, Kinney previously filed and nonsuited a defamation suit against the same defendants seeking monetary damages but no injunctive relief.

[2]The provision as currently worded dates back to 1876, but a similar provision was part of the 1836 Texas Independence Constitution. *Davenport v. Garcia*, 834 S.W.2d 4, 7-8 (Tex. 1992).

[3] *See, e.g., Stuart*, 427 U.S. at 561 (" [I]t is . . . clear that the barriers to prior restraint remain high unless we are to abandon what the Court has said for nearly a quarter of our national existence and implied throughout all of it." ); *N.Y. Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (per curiam).

[4] *Davenport*, 834 S.W.2d at 9; *Hajek v. Bill Mowbray Motors, Inc.*, 647 S.W.2d 253, 255 (Tex. 1983) (per curiam); *Ex parte Price*, 741 S.W.2d 366, 369 (Tex. 1987) (Gonzalez, J., concurring) (" Prior restraints . . . are subject to judicial scrutiny with a heavy presumption against their constitutional validity." ).

[5] *Tex. Mut. Ins. Co. v. Sur. Bank, N.A.*, 156 S.W.3d 125, 128 (Tex.App.--Fort Worth 2005, no pet.) (" [P]rior restraints on speech are presumptively unconstitutional." ); *San Antonio Express--News v. Roman*, 861 S.W.2d 265, 267 (Tex.App.--San Antonio 1993, orig. proceeding) (per curiam).

[6] *See* Erwin Chemerinsky, *Injunctions in Defamation Cases*, 57 Syracuse L. Rev. 157, 173 (2007) (" [N]ever in the 216 year history of the First Amendment has the Supreme Court found it necessary to uphold a prior restraint in a defamation case . . . ." ); A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying*

*Lens of 1868*, 56 Buff. L. Rev. 655, 656 (2008).

[7]The Big Lebowski (PolyGram Filmed Entertainment & Working Title Films 1998) (" For your information, the Supreme Court has roundly rejected prior restraint." ).

[8]Of course, the requirements for injunctive relief still must be met. A plaintiff must show that damages are inadequate or cannot otherwise be measured by any pecuniary standard. *Town of Palm Valley v. Johnson*, 87 S.W.3d 110, 111 (Tex. 2001) (per curiam). And aside from constitutional free-speech considerations, we also express no opinion on the propriety of an injunction that would order Barnes to seek removal of the statements from websites over which he has no control. We hold only that the constitutional concerns applicable to prior restraints are not present when the injunction is limited to requiring removal of a published statement that has been adjudicated defamatory.

[9]The lack of a dispositive distinction between temporary and permanent injunctions as to the second category of injunctive relief requested is highlighted by the requirements that must be satisfied to obtain a temporary injunction. An applicant must " plead and prove," among other things, " a probable right to the relief sought." *Butnaru v. Ford Motor Co*., 84 S.W.3d 198, 204 (Tex. 2002). Absent a showing of a likelihood of success on the merits, a temporary injunction may not issue. *In re Newton*, 146 S.W.3d 648, 652 (Tex. 2004). While the standard to prevail at trial is certainly higher, the effect of the permanent injunction is the same: speech is restrained before it occurs.

[10]The issue was presented to the Supreme Court in *Tory v. Cochran*. 544 U.S. 734, 125 S.Ct. 2108, 161 L.Ed.2d 1042 (2005). In that case, noted attorney Johnnie Cochran sued Ulysses Tory, a former client, after Tory began engaging in activities such as picketing Cochran's office and sending the attorney threatening letters due to Tory's dissatisfaction with Cochran's services. *Id*. at 735. Tory indicated that he would continue his activities barring a court order, and the trial court issued a permanent injunction against Tory's defamatory speech. *Id*. Tory appealed, presenting to the Supreme Court the very issue before us today. *Id*. at 737-38. However, Cochran died shortly after oral argument, and the Court sidestepped the question, holding that Cochran's death resulted in the injunction's " los[ing] its underlying rationale" of protecting Cochran from defamation. *Id*. at 738.

[11]The parties dispute whether Kinney waived his argument that defamatory speech is not " protected" speech under the Texas and U.S. Constitutions. We resolve this dispute by stating only that we cannot divorce the type and quality of speech at issue--in this case, defamatory speech--from the constitutionality of restraining it.

[12]Applying that concept in the context of reviewing a gag order, we held in *Davenport* that such an order " will withstand constitutional scrutiny only where there are specific findings supported by evidence that (1) an imminent and irreparable harm to the judicial process will deprive litigants of a just resolution of their dispute, and (2) the judicial action represents the least restrictive means to prevent that harm." 834 S.W.2d at 10.

[13]The *Oakley* court proposed the following conundrum:

If a court enjoined the word " thief," would related words like pilferer, looter, pillager, plunderer, poacher, and rustler also support the finding of willfulness necessary to hold the speaker in contempt? How about bandit? Pirate? What about phrases, e.g., " she was in the habit of converting other people's property to her own property?" Or further into abstraction, " she may take liberties with your property" or " count your silverware after she leaves your home?"

879 F.Supp.2d at 1091.

---------

Page 253

647 S.W.2d 253 (Tex. 1983)

James HAJEK, Petitioner,

v.

BILL MOWBRAY MOTORS, INC., Respondent.

No. C-1806.

Supreme Court of Texas.

March 16, 1983

Page 254

Costilla & Stapleton, Edward A. Stapleton, III, Brownsville, for petitioner.

O'Leary, Sanchez & Benton, Robert A. Whittington, Brownsville, for respondent.

PER CURIAM.

Bill Mowbray Motors, Inc. sued James Hajek for libel and sought a temporary injunction to prevent Hajek from driving his vehicle in the community with a defamatory message painted on all four sides that Mowbray Motors sold him a "lemon." The trial court granted the temporary injunction and the court of appeals affirmed. 645 S.W.2d 827. We reverse the judgments of the courts below and dissolve the temporary injunction.

We must address a preliminary question of this Court's jurisdiction. Prior to 1981, the temporary injunction appeal statute specifically provided, "Such case may be heard in the Court of Civil Appeals or Supreme Court ...," and included other references implying the availability of Supreme Court review. See Tex.Rev.Civ.Stat.Ann. art. 4662 (1925). We construed these provisions as granting jurisdiction to this Court to review orders granting or denying a temporary injunction where the main case out of which the application for injunction grew was a case over which we had jurisdiction. See *Southwest Weather Research, Inc. v. Jones,* 160 Tex. 104, 327 S.W.2d 417, 418-19 (1959); *Weaver v. Board of Trustees of Wilson Independent School Dist.,* 143 Tex. 152, 183 S.W.2d 443 (1944).

In 1981 the legislature amended article 4662 [1] to state that a party only "may appeal from such order or judgment to the Court of Appeals." This amendment limits our jurisdiction over appeals from the granting or denying of a temporary injunction.

Absent a special statute granting jurisdiction, article 1821 makes final in the court of appeals decisions reviewing interlocutory orders made appealable to the court of appeals. The two exceptions are: (1) where there is a dissent upon a question of law material to the decision, and (2) where the court of appeals' holding on a material question of law conflicts with a prior decision of another court of appeals or this *Court. International Harvester Co. v. Stedman,* 159 Tex. 593, 324 S.W.2d 543, 545-46 (1959); *State v. Wynn,* 157 Tex. 200, 301 S.W.2d 76, 78-79 (1957). This general

Page 255

rule now applies to temporary injunctions, since the legislature no longer designates them a special type of interlocutory order appealable to this *Court. Southwest Weather Research, Inc. v. Jones,* supra, 327 S.W.2d at 418.

Hajek urges this Court has jurisdiction because the court of appeals' decision conflicts with *Stansbury v. Beckstrom,* 491 S.W.2d 947 (Tex.Civ.App.--Eastland 1973, no writ). See Article 1728(2). We agree that we have jurisdiction because of this conflict.

The temporary injunction granted by the trial court constitutes a prior restraint on free speech. Our Constitution provides, in part:

Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press. Tex. Const. art. I, § 8.

The language enjoined here evoked no threat of danger to anyone and, therefore, may not be subject to the prior restraint of a temporary injunction. Defamation alone is not a sufficient justification for restraining an individual's right to speak freely. Ex parte Tucker, 110 Tex. 335, 220 S.W. 75, 76 (1920).

Because the decision of the court below conflicts with article I, section 8 of the Texas Constitution and Ex parte Tucker, supra, we grant the application for writ of error and, without oral argument, reverse the judgment of the court of appeals and dissolve the temporary injunction. Rule 483.

---------

Notes:

[1] Statutory references by article numbers alone are to the current Texas Revised Civil Statutes Annotated. References to rules are to the Texas Rules of Civil Procedure.

---------

87 S.W.3d 110 (Tex. 2001)

44 Tex. S.Ct. J. 1186

TOWN OF PALM VALLEY, Texas,

v.

Paul JOHNSON and The Johnson Company d/b/a J Properties, Respondents.

No. 00-0650.

Supreme Court of Texas

September 20, 2001

Robert C. Sheline, Gibbon, Gibbon & Sheline, Harlingen, for petitioner.

Richard D. Schell, Fleuriet Schell Law Firm, Harlingen, for respondent.

PER CURIAM.

A subdivision in the Town of Palm Valley has a street, Lemon Drive, that ends at the subdivision boundary line, which is also the town's boundary line. The adjacent property, which is in the City of Harlingen, is owned by Paul Johnson. Johnson proposed a subdivision of his property with a street connecting to Lemon Drive. In response, Palm Valley built a fence on Lemon Drive one or two feet short of the property line and declared the end of the street to be a cul-de-sac. Johnson sued Palm Valley and obtained a permanent injunction prohibiting any barricade or closure of Lemon Drive to the town boundary. A divided court of appeals affirmed. [1]

The court of appeals' opinion indicates that an injunction may be granted under section 65.011(1), TEX. CIV. PRAC. & REM.CODE, without a showing of irreparable harm. [2] That statute provides:

A writ of injunction may be granted if (1) the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant....

Were the court correct, the statute could be applied in every case to abolish altogether the need to show irreparable harm as a prerequisite to obtaining injunctive relief.

Section 65.011(1) derives, with nonsubstantive changes, from article 2873(1) of

the 1879 Revised Statutes of Texas. [3] In 1897, we said in Sumner v. Crawford, in dicta, that the statute (then article 2989 of the 1895 Revised Statutes of Texas) permitted injunctive relief absent the showing required in equity that no adequate legal remedy existed. [4] Years later, however, in Powers v. Temple Trust Co., we recanted this view of the statute (which had become article 4642 of the 1925 Texas Revised Civil Statutes), reasoning that if injunctive relief could be granted when legal relief was available, the two would simply be alternative remedies at a litigant's option in every case. [5] We concluded:

We do not think it was the intention of the Legislature in the enactment of the injunction statute[ ] ... to simply provide a choice of remedies for litigants, but that the intention was to provide a remedy to cover those injuries for which there was not clear, full, and adequate relief at law.

Thus, although the statute, now section 65.011(1), does not expressly make the lack of an adequate legal remedy a prerequisite for injunctive relief, this requirement of equity continues.

For the same reasons we explained in Powers, the statute does not permit injunctive relief without the showing of irreparable harm otherwise required by equity. If it did, the statutory remedy would simply replace the equitable one, which requires the additional showing. Given our conclusion that the 1879 Legislature intended no such substitution of injunctive remedies, it follows that the statute did not abolish the requirement of a showing of irreparable injury. We disapprove the statements in the court of appeals' opinion that conflict with this construction of section 65.011(1).

We conclude, however, that any error in the court of appeals' opinion did not result in an error in its judgment that should be corrected. Accordingly, Palm Valley's petition for review is denied.

---------

Notes:

[1] 17 S.W.3d 281.

[2] Id. at 286 (citing Hale County v. Davis, 572 S.W.2d 63, 66 (Tex.Civ.App.--Amarillo 1978, writ ref'd n.r.e.)).

[3] "Judges of the district and county courts may, either in term time or vacation, grant writs of injunction, returnable to said courts, in the following cases: 1. Where it shall appear that the party applying for such writ is entitled to the relief demanded, and such relief or any part thereof requires the restraint of some act prejudicial to the

applicant...."

[4] 91 Tex. 129, 41 S.W. 994, 996 (Tex.1897).

[5] 124 Tex. 440, 78 S.W.2d 951, 953-954 (Tex. Comm'n App.1935, opinion adopted) (per curiam) (citing Hill v. Brown, 237 S.W. 252, 254 (Tex. Comm'n App.1922, judgm't adopted)).

---------

Page 704

640 S.W.2d 704 (Tex.App. —Houston [14 Dist.] 1982)

Lillian Taylor SOBEL, et al., Appellant,

v.

Dr. Irving TAYLOR, Appellee.

No. A2967.

Court of Appeals of Texas, Fourteenth District, Houston

July 29, 1982

Page 705

Jonathan B. Shoebotham, Woodard, Hall & Primm, Abe Dunn, Houston, for appellant.

Joe G. Roady, Sheinfeld, Maley & Kay, Margaret G. Mirabal, Lukats & Mirabal, Celia Nathan, Houston, for appellee.

Before BROWN, C.J., and JUNELL and PRICE, JJ.

PRICE, Justice.

Appellants Lillian Taylor Sobel and Saul Taylor appeal from a pre-trial protective order by the District Court regulating control of certain documents pursuant to a motion for Protection of Documents. They also appeal the provision of that same order which enjoined the payment by appellants during the pendency of trial of attorney fees exceeding $25,000.00 in connection with the defense of the case from the assets of the Eva Spero Estate. Appellants contend that both provisions of the order constitute a temporary injunction that was improperly granted for failure to comply with the Texas Rules of Civil Procedure for injunctions. We hold that the order relating to the protection of documents is not an appealable temporary injunction, but rather is a nonappealable pre-trial protective discovery order. We further hold the trial court erroneously granted a temporary injunction for nonpayment of attorney's fees without compliance with Tex.R.Civ.P. 682, 683 and 684. We dissolve that temporary injunction.

This suit was filed in District Court by appellee Dr. Irving Taylor against appellants Lillian Taylor Sobel and Saul Taylor, individually, and as co-trustees of the Eva Spero Trust and as Independent Co-Executors of the Eva Spero Estate. Appellee also sued attorney Abe Dunn and Freda Beier, neither of whom is involved in this appeal. Appellee Irving Taylor, appellants Lillian Taylor Sobel and Saul Taylor and Freda Beier are the children of Eva Spero, deceased. Lillian Taylor Sobel and Saul Taylor were co-trustees of a trust known as the Eva Spero Trust which terminated on her death of August 27, 1975, and are also Independent Co-Executors of the Estate of Eva Spero, deceased.

Page 706

Appellants were sued for alleged breaches of fiduciary duties owed to appellee while appellants were in control of finances and property of their mother during her lifetime under a Power of Attorney and Trust Instrument. Appellee claims appellants were guilty of fraud, breaches of fiduciary duties and self-dealing while acting in their capacities as attorneys in fact and trustees for Eva Spero during her lifetime. Appellee seeks an accounting and asks for actual and exemplary damages, and also seeks rescission of a June 30, 1975, Equalization Agreement between the parties executed during the lifetime of Eva Spero. Appellee additionally alleges breach of fiduciary duties by appellants as Independent Co-Executors and asks for actual and exemplary damages for these actions as well as an accounting. He does not seek removal of appellants as Independent Co-Executors.

Appellants contend the portions of the order appealed from constitute a temporary injunction and was granted in response to the appellee's filing of a Motion For The Protection Of Documents and Motion for Order Directing Non-Payment Of Funds Out Of The Estate. The documents referred to in the appellee's protective motion and the trial court's order are various documents formerly in the custody and control of appellants which were produced pursuant to an order of the trial court for the purpose of inspection and copying by appellee for a period of 45 days.

Hearing was held on September 21, 1981, on Defendant's (Appellant's) Motion To Require Return Of Documents, Plaintiff's (Appellee's) Motion For Protection of Documents and Motion For Order Directing NonPayment Of Funds Out Of Estate as well as appellant's responses to appellee's motions. The portions of the order from which appeal has been perfected read as follows:

* * *

* * *

2. Defendants Lillian Taylor Sobel and Saul Taylor are hereby enjoined, pending trial on the merits or further orders of this Court, from disturbing the present order of such documents and are further directed to make such documents available to the attorney for the Plaintiff upon reasonable notice. The attorneys for the Defendants are directed to maintain the documents in question in their offices in their present order, and to maintain a log reflecting the removal of any documents from the file, the

identity of the person removing same, the identity of the documents so removed and the dates the same are removed from and returned to the file.

3. Defendants Lillian Taylor [sic] and Saul Taylor are further enjoined, pending trial on the merits or further orders of this Court, from paying attorney's fees incurred by them in connection with the defense of this case from the assets of the estate should such attorney's fees in the aggregate exceed $25,000.

In his ninth point of error, appellants assert the trial court did not have jurisdiction to issue the order complained of because the order related to matters incident to the Estate of Eva Spero. Appellants contend that under Tex.Prob.Code Ann. § 5(c) and (d) (Vernon 1980) the issuance of such order was within the exclusive jurisdiction of Probate Court Number 3 of Harris County in which the administration of the Estate of Eva Spero is still pending. This point is first raised on appeal by appellant as fundamental error. Tex.Prob.Code Ann. § 5(c) and (d) (Vernon 1980) provide in pertinent part:

(c) In those counties where there is a statutory probate court, county court at law, or other statutory court exercising the jurisdiction of a probate court, all applications, petitions and motions regarding probate, administrations, guardianships, and mental illness matters shall be filed and heard in such courts and the constitutional county court, rather than in the district courts, unless otherwise provided by the legislature, and the judges of such courts may hear any such matters sitting for the judge of any of such courts... (emphasis added)

(d) All courts exercising original probate jurisdiction shall have the power to hear

**Page 707**

all matters incident to an estate... (emphasis added).

In addition, appellant contends that Tex.Prob.Code Ann. § 5A(b) (Vernon 1980) lends further support for the argument that statutory probate courts have the same powers over independent executors that are exercisable by the district courts and that where the jurisdiction of a statutory probate court is concurrent with that of a district court, "any cause of action appertaining to estates or incident to an estate shall be brought in a statutory probate court rather than in the district court."

We disagree with appellant's contention. We do not believe the suit here is primarily a suit appertaining to or incident to an estate under Section 5 of the Probate Code, and we hold that the District Court has original jurisdiction of this case. The allegations primarily involve alleged acts, misdeeds and misrepresentations which pre-date the death of Eva Spero and allegedly occurred while appellants were acting as attorneys in fact and trustees for Eva Spero. The relief sought primarily is for rescission of an equalization agreement signed prior to the death of Eva Spero, for actual and exemplary damages against appellants, individually, and as co-trustees and for an accounting from them. Appellants were also later Independent Co-Executors and there are some allegations seeking an accounting from them while acting as Independent Co-Executors. This is not the major thrust of appellee's lawsuit, however, and it is not of such nature and magnitude as to vest exclusive jurisdiction of the suit and the order complained of in the Probate Court.

Appellants primarily rely on *Thomas v. Tollon,* 609 S.W.2d 859 (Tex.Civ.App.--Houston [14th Dist.] 1980, writ ref'd n.r.e.) and *Lucik v. Taylor,* 596 S.W.2d 514 (Tex.1980). We believe these cases and the others cited by appellant are distinguishable and not controlling here. Tollon was an appeal from a Plea to the Jurisdiction of the District Court to hear a suit to determine heirship where there was a pending probate proceeding in the Probate Court. Lucik was an injunction by a temporary administrator ordering an individual to deliver assets to him and to enjoin him from disposing of such assets pending the probate proceeding. We overrule appellant's ninth point of error.

Appellant's first through eighth points of error complain of the court's action in granting a temporary injunction without compliance with Tex.R.Civ.P. 682, 683 and 684 relating to necessary pleadings, the evidence required, setting of bond and required contents of the order for temporary injunction. We believe the order is severable and that the portion of the order relating to control of the documents is not a temporary injunction, but rather is a nonappealable interlocutory pre-trial protective discovery order. That part of the order enjoining payment of attorney's fees does amount to a temporary injunction and must be dissolved for noncompliance with the Texas Rules of Civil Procedure for pleadings, evidence, bond and contents of the order.

With respect to the document control, we hold that a portion of the court's order is a nonappealable interlocutory pre-trial protective discovery order and not an appealable temporary injunction order despite the use of the word "enjoined" in the order. As above noted, the order complained of was made in response to the motion for Return of Documents filed by appellants and a Motion for Protection of Documents filed by appellee. Appellants, apparently as a result of a previous court order dated December, 1980, were ordered to produce documents and they were produced and delivered to appellee in a variety of containers and a state of general disarray. They were to be returned in 45 days. When they were not returned, appellants filed a motion to order return of the documents, and made no contention the court did not have jurisdiction to hear it. In its motion for Protection of Documents, appellee contended that its original Motion for Production was filed as a result of the failure of appellants to comply with a subpoena duces

tecum, that the documents produced

**Page 708**

under order were voluminous and that appellee had spent weeks in arranging them chronologically and by subject matter, in such a manner as to be efficiently utilized in the presentation of evidence at trial. While appellee desired and requested that the documents to be held in a disinterested accounting firm office, the trial court ordered a return to the possession of appellants, but placed certain controls and restrictions to insure the order and present identity of all such documents during the pendency of the trial. We believe the trial court had the authority to make this protective order under Tex.R.Civ.P. 167 and Rule 186b.

We do not believe the word "enjoined" requires it to be deemed a "temporary injunction." The nature of a suit is determined by the court, as a matter of law, solely from the facts alleged in the petition, the rights asserted, and the relief sought. *Scott v. Whitaker Pipeline Construction, Inc.,* 517 S.W.2d 406, 409 (Tex.Civ.App.--Austin 1974, no writ). We disagree with appellant's contention that Rule 167 and Rule 186b motions must be restricted to protection from discovery.

On the other hand, with respect to that portion of the trial court's order enjoining payment of attorney's fees from the estate, we hold that it was an order for temporary injunction and must be dissolved. The order was issued on the basis of appellee's Motion for Order Directing Non-Payment of Funds Out of Estate. Appellee concedes this portion of the order is a temporary injunction order. It is not shown to be a sworn motion nor or any affidavits attached. We agree with appellants that appellee failed to follow the proper procedures for injunction in that appellee failed to (1) execute and file a bond prior to issuance of the temporary injunction, (2) present affidavits and a petition containing a plain and intelligible statement of the grounds for such relief, (3) present evidence showing his probable right on final trial to the relief sought, and (4) present evidence showing the probability of injury in the interim, all in violation of Tex.R.Civ.P. 680, 682 and 684. In addition, the trial court failed to fix the amount of security or bond to be given by appellee in its order. We further agree that the trial court erred in failing to set forth in its order the reasons for the granting of the temporary injunction in violation of Tex.R.Civ.P. 683. We have considered all of the authorities cited by appellee including *Jeffries v. Evans Division--Royal Industries,* 510 S.W.2d 579 (Tex.1974). There, the court held the injunction could be remanded to the trial court for determination of a bond, with the injunction otherwise upheld. In Jeffries, however, the only requirement not satisfied for the temporary injunction was the lack of a bond. There, an evidentiary hearing was held, pleadings were proper and an otherwise proper order was issued. Jeffries v. Evans Division--Royal Industries, supra at 579. The temporary injunction granted by the trial court enjoining Lillian Taylor and Saul Taylor "from paying attorneys fees incurred by them in defense of this case from the assets of the estate should such attorneys fees in the aggregate exceed $25,000.00" is dissolved.

**759 S.W.2d 160 (Tex.App. —Houston [1 Dist.] 1988)**

**Lou W. BURTON and Galleria Diplomat Association, Inc., Appellants,**

**v.**

**Jeffrey M. CRAVEY, et al., Appellees.**

**No. 01-88-00270-CV.**

**Court of Appeals of Texas, First District, Houston**

**August 18, 1988**

Rehearing Denied Sept. 8, 1988.

Wade B. Reese, Houston, for appellants.

Lou W. Burton, Houston, pro se.

John K. Grubb, Houston, for appellees.

Before SAM BASS, DUGGAN and LEVY, JJ.

OPINION

DUGGAN, Justice.

This appeal involves the right to inspect records and books of a condominium association. Appellees, a group of dissident owners, filed a petition for writs of mandamus and injunction because of the appellant Galleria Diplomat Association's board of directors' refusal to allow the inspection of records. In a corrected order dated March 2, 1988, the trial court granted the writ of

mandamus, ordering the Association to maintain its books and records at its offices and make these records available for inspection and copying. The trial court also enjoined appellants from interfering with appellees' right to inspect these books and records. The court further ordered the delay of the annual election by the Association's members.

All of the points of error attack the ordered production of records in the possession of appellant Burton, the attorney for the appellant Association. The trial court entered a finding of fact that the Association's Board of Directors hired Burton "to handle numerous matters for the Association and that records of Lou W. Burton relating to Association matters are part of the books and records of the Galleria Diplomat Townhomes Homeowner's Association, Inc. a/k/a the Galleria Diplomat Association, Inc." This finding of fact is not challenged by point of error and is therefore binding on appeal. *Wade v. Anderson,* 602 S.W.2d 347, 349 (Tex.Civ.App.--Beaumont 1980, writ ref'd n.r.e.). The court ordered the production of "all of Lou W. Burton's records and files in any way related to his representation" of the Association.

In their first of three points of error, appellants contend that the trial court erred in ordering the production of Burton's records because the application and proof fail to establish a cause of action or a probable right and a probable injury.

Appellants mischaracterize the nature of the trial court proceedings. For example, they argue that appellees have other adequate remedies under Tex.R.Civ.P. 167, 168 and 737 to pursue inspection. This assertion ignores the fact that a writ of mandamus is the proper remedy to enforce the right of inspection. See 20 R. Hamilton, Texas Business Organizations § 801 (1973). Appellees did not have to establish an independent cause of action; they merely had to establish their statutory right to inspect.

Tex.Prop.Code Ann. § 81.209 (Vernon 1984) provides the following for condominium records:

(a) The administrator or board of administration of a condominium regime or a person appointed by the bylaws of the regime shall keep a detailed written account of the receipts and expenditures related to the building and its administration that specifies the expenses incurred by the regime.

(b) The accounts and supporting vouchers of a condominium regime shall be made available to the apartment owners for examination on working days at convenient, established, and publicly announced hours.

(c) The books and records of a condominium regime must comply with good accounting procedures and must be audited at least once each year by an auditor who is not associated with the condominium regime.

(Emphasis added.)

The Texas Non-Profit Corporation Act, Tex.Rev.Civ.Stat.Ann. art. 1396-2.23 (Vernon 1980), additionally provides:

A. Each corporation shall keep correct and complete books and records of account and shall keep minutes of the proceedings of its members, board of directors, and committees having any authority of the board of directors and shall keep at its registered office or principal office in this State a record of the names and addresses of its members entitled to vote.

B. All books and records of a corporation may be

inspected by any member, or his agent or attorney, for any proper purpose at any reasonable time.

(Emphasis added.)

In their application for writ of mandamus, appellees were attempting to enforce their statutory rights as condominium apartment owners to inspect the "accounts and supporting vouchers of a condominium regime" under Property Code § 81.209, and as corporation members to inspect "all books and records" of a non-profit corporation under article 1396-2.23. The trial court did not err in ordering the production of Burton's records.

Appellants' first point of error is overruled.

**Page 162**

Appellants contend in their second point of error that the trial court erred in ordering production of the records and files of the attorney for the condominium association because the order is overly broad, unduly burdensome, and requires the production of irrelevant information.

Appellees sought the production of records that they were statutorily entitled to inspect. Appellants' complaints about the order appear to be an attempt to engraft discovery notions upon the appellees' statutory right of inspection, which is independent of any right of discovery in litigation. See *San Antonio Models, Inc. v. Peeples,* 686 S.W.2d 666 (Tex.App.--San Antonio 1985, orig. proceeding). The right to inspect under article 1396-2.23 encompasses "all books and records." The trial court found that Burton's files and records relating to the Association were the "books and records" of the Association. This finding is not challenged on appeal. This right of condominium owners to inspect the books and records, like the comparable right to inspect granted shareholders in corporations, is limited by the requirement that the inspection be for any "proper purpose." See R. Hamilton, Texas Business Organizations § 804 (1973); see also Annotation, What Corporate Documents Are Subject to Shareholder's Right to Inspection 88 A.L.R.3d 663 (1978).

Once the trial court found that Burton's files and records relating to the Association were part of the books and records of the Association, appellees were entitled to inspect them for any "proper purpose." Appellants, however, do not contend that the intended inspection is for an improper purpose. There was testimony by appellees that they were concerned about the "substantial" and "inordinate" fees paid to Burton by the Association. Although the parties have presented no cases squarely on point, it would appear that it was the appellant Association's burden of proof to establish the absence of proper purpose. *Uvalde Rock Asphalt Co. v. Loughridge,* 425 S.W.2d 818 (Tex.1968); *Moore v. Rock Creek Oil Corp.,* 59 S.W.2d 815 (Tex.Comm'n App.1933, holding approved); see also, 5A Fletcher, Cyclopedia of the Law of Private Corporations § 2253.1 (1987). The trial court, however, sustained appellees' objections to appellants' attempted inquiries about ulterior or vindictive motives for the inspection of records. Appellants do not complain about the exclusion of this testimony.

Appellants' second point of error is overruled.

Appellants contend in their third point of error that the trial court erred in granting the production order because it requires the inspection of privileged documents.

Again, we note that appellants are attempting to engraft notions borrowed from Texas discovery practice onto a statutory right to inspect. Article 1396-2.23 contains no limitations on the member's right to inspect as long as the books and records are those of the non-profit corporation and the inspection is for "any proper purpose." The trial court found that Burton's records and files relating to the Association were part of the Association's books and records, and appellants have not contended that the intended inspection is for an improper purpose. The only limitation under article 1396-2.23 is "proper purpose." Appellants have failed to prove that the purpose of the inspection was improper.

Moreover, if the attorney-client privilege did apply, we would hold that the trial court did not abuse its discretion in ordering the inspection of Burton's records. The attorney-client privilege is not absolute; appellants' interest in the nondisclosure of communications protected by the privilege would have to be balanced against the inspection rights of the members of the non-profit corporation. See In re LTV Securities Litigation, 89 F.R.D. 595, 609-611 (N.D.Tex.1981). Under the facts of this case, the trial court did not abuse its discretion in ordering the inspection of Burton's records.

Appellants' third point of error is overruled.

The judgment is affirmed.

**686 S.W.2d 666 (Tex.App. —San Antonio 1985)**

**SAN ANTONIO MODELS, INC., Relator,**

**v.**

**Honorable David PEEPLES, District Judge, Respondent.**

**No. 04-84-00549-CV.**

**Court of Appeals of Texas, Fourth District, San Antonio**

**January 30, 1985**

Rehearing Denied Feb. 25, 1985.

Stewart J. Alexander, San Antonio, for relator.

K. Key Hoffman, Jr., San Antonio, Andrew Cline, Bayne, Snell & Krause, San Antonio, for respondent.

Before CANTU, REEVES and TIJERINA, JJ.

ON RELATOR'S PETITION FOR WRIT OF MANDAMUS

CANTU, Justice.

Relator brings this action for a writ of mandamus against Honorable David Peeples, District Judge, and Karen L. Harrell, as respondents, to vacate an order entered by Judge Peeples in a discovery proceeding pending in his court.

K. Dianne Carnes instituted suit against Karen L. Harrell, on September 10, 1984, seeking rescission of an agreement between the two and cancellation of a transfer of 1,000 shares of stock to Harrell. Plaintiff's original petition alleged that prior to April 27, 1984, plaintiff was the sole owner and shareholder of San Antonio Models, Incorporated. Being desirous of bringing other people into the corporation, plaintiff met and had discussions with the defendant and Norma G. Klomann in April of 1984. The petition alleged the following agreement between the three women:

1. Plaintiff would sell 1,000 shares of her stock in the corporation to the corporation for the payment of $1,000.00 to plaintiff.

2. Norma G. Klomann would be issued 1,000 shares of stock in the corporation for the payment of $10,000.00 to the corporation.

3. Defendant would be issued 1,000 shares of stock in the corporation in consideration for:

A. Defendant working for the corporation as she was needed; and

B. Defendant giving her line of custom clothing (Carrie Harrell Designs for San Antonio Models, Inc.) to the corporation to be sold through the corporation along with the corporation's cosmetic line and modeling school and agency services.

Plaintiff states in her petition that she signed, on April 27, 1984, a "Deed of Gift" and a "To Whom It May Concern" letter to the corporation evidencing the transfer of 1,000 shares of stock from San Antonio Models, Incorporated, to the defendant. Plaintiff alleges that defendant stopped reporting for work and never provided her custom line of clothing to the corporation. Plaintiff seeks a rescission of the agreement and cancellation of the transfer of stock based on fraud, misrepresentation, and failure of consideration. Defendant filed a general denial on October 26, 1984.

Attached to the petition for writ of mandamus is a letter, dated November 5, 1984, written by Karen L. Harrell, defendant, to the president of San Antonio Models, Incorporated, demanding inspection of the corporation's books pursuant to article 2.44 of the Texas Business Corporation Act. Also attached to the petition is a letter to defendant from the corporation's attorney, dated November 13, 1984, refusing the demand for inspection based on a failure of good faith and a proper and legitimate purpose.

On November 14, 1984, plaintiff filed a notice duces tecum of intention to take the

oral deposition of Richard D. Harrell [1] and Karen L. Harrell on November 29, 1984. The defendant filed, on November 26, 1984, her notice of intention to take the oral deposition of plaintiff on November 27, 1984. The notice was directed to K. Dianne Carnes, plaintiff and president of San Antonio Models, Incorporated. Attached to the notice was a subpoena duces tecum requesting, among other things, the production of the following items:

Bank account statements, check register, cancelled checks, check stubs, deposit and withdrawal slips and transfer orders of San Antonio Models, Inc. including but not limited to the same records for San Antonio Models School, San Antonio Models Agency, San Antonio Models Cosmetics and any and all enterprises which are a part of San Antonio Models, Inc. from and after March 1, 1984 to and through the present.

All books of account from and including March 1, 1984 to and through the present of San Antonio Models, Inc. as well as of any of the enterprises owned or operated thereby including but not limited to San Antonio Models School, San Antonio Models Agency, and San Antonio Models Cosmetics.

All books of account as well as all records of every kind and character, including memoranda, pertaining and relating to funds of San Antonio Models, Inc. including any of its enterprises utilized or spent by K. Dianne Carnes for her own personal use.

All correspondence, notes, memoranda and any and all other documents of any kind and character pertaining and relating to revenues received by San Antonio Models, Inc. including but not limited to the same records for San Antonio Models School, San Antonio Models Agency, San Antonio Models Cosmetics and any and all enterprises which are a part of San Antonio Models, Inc. and including but not limited to the notebook kept pertaining to San Antonio Models School from and including March 1, 1984 to the present.

All correspondence, notes, memoranda and any and all other documents of any kind and character pertaining and relating to time, monies and other assets expended or contributed by Karen L. Harrell, K. Dianne Carnes and Norma G. Klomann for or to San Antonio Models, Inc. including the same records for San Antonio Models School, San Antonio Models Agency, San Antonio Models Cosmetics and any and all enterprises which are a part of San Antonio Models, Inc. from and including March 1, 1984 to and through the present.

All correspondence, notes, memoranda and any and all other documents of any kind and character pertaining and relating to disbursements in money or assets of every kind and character made by San Antonio Models, Inc. to Karen L. Harrell, K. Dianne Carnes and Norma G. Klomann including but not limited to the same records for San Antonio Models School, San Antonio Models Agency, San Antonio Models Cosmetics and any and all enterprises which are a part of San Antonio Models, Inc. from and including March 1, 1984 to and through the present.

Plaintiff filed a motion to quash defendant's deposition notice for failure to give timely notice and a hearing was set for December 3, 1984. Defendant delivered a response to the motion to quash, along with a motion for attorney's fees, costs and expenses and to compel appearance. An order filed in this case recites that a hearing was held on these motions on December 3, 1984, where evidence and arguments were presented. Plaintiff's motion to quash and defendant's motion for fees, costs and expenses were denied. The motion to compel appearance was continued until December 10, 1984.

Subsequently, on December 7, 1984, K. Dianne Carnes, as plaintiff, filed a motion for protective orders complaining of the above set out items, alleging them to be the business and financial records of a corporation not a party to the lawsuit and that such items were not relevant to the subject matter of the case in that they did not relate to any claims or defenses that were involved in the case, and the items were not reasonably calculated to lead to the discovery of evidence that would be admissible in the case.

An order signed and entered on December 14, 1984, by Judge Carolyn Spears, recites that evidence and arguments were heard on December 10, 1984, on defendant's motion to compel and plaintiff's motion for protective orders. The motion for protective orders was denied and the motion to compel was granted requiring plaintiff to appear and be deposed on December 18, 1984, and to bring with her and produce the matters previously designated for production.

On December 13, 1984, another motion for protective orders was filed, but this time by San Antonio Models, Incorporated, through Norma G. Klomann, an officer and director of the corporation. This motion complained of the same items previously complained of and for the same reasons except that this motion included the charge that the production of these items would be an unreasonable invasion of the corporation's personal, constitutional and property rights. This motion was set for hearing by Judge Spears for December 17, 1984. [2]

An order signed by Judge David Peeples on December 18, 1984, recites that a hearing was held on December 17, 1984, on the corporation's motion for protective orders and that evidence and arguments were heard and that matters of record including pleadings were considered. The court entered the following order:

Movant's motion for protective orders should be denied provided, however, that the production of the documents therein objected to should be limited to documents relating to events on and after March 1, 1984 and it further appearing to the Court and the Court finds that the Order heretofore entered herein [3] compelling K. Dianne Carnes to appear and be deposed should be superseded as to date and time of her appearance at such deposition as hereinafter set forth and it further appearing to the Court and the Court finds that insofar as said corporation is concerned, inspection and copying should be as hereinafter set forth.

It was thereafter ordered that the motion for protective orders filed herein by San Antonio Models, Incorporated be and is hereby denied provided, however, that such documents as are therein objected to, shall be produced only insofar as they relate to events occurring on and after March 1, 1984 and it is further ORDERED

that the prior Order entered herein pursuant to Defendant's, Karen L. Harrell, Motion to compel be and is hereby superseded insofar as the time and date of such deposition....

The order then goes on to set the time and date of the deposition.

San Antonio Models, Incorporated seeks, through its application for writ of mandamus, to have Judge Peeples' order vacated based on two arguments:

1) The private business and financial records are immaterial and irrelevant to the dispute between the two shareholders, and it was a clear abuse of discretion for respondent to order that the records are discoverable, and

2) Because of the fact that relator has previously resisted the one shareholder's attempt to inspect its books and records of account on the basis of lack of proper purpose, relator will be denied its right to a jury trial on the issue of proper

**Page 670**

purpose if relator's books and records of account can be "discovered" by the shareholder at this time.

In support of it's first argument, relator cites to the case of *Maresca v. Marks,* 362 S.W.2d 299 (Tex.1962). In that case, the issue was whether the order of the trial judge requiring disclosure and exposure of information contained in income tax returns which is immaterial and irrelevant to the cause in which discovery is sought is a clear abuse of discretion for correction of which the writ of mandamus may issue. Respondent brought suit against relators for monies owed under an employment contract and for exemplary damages for fraud and deceit. He thereafter sought an order of the trial court requiring relators to produce copies of the personal federal income tax returns of the relators for the years 1960 and 1961. After a hearing on the motion the trial judge ordered the entire income tax returns of all relators submitted to respondent for inspection and copying. The order recites that the trial judge "examined" all the returns

in order to determine what part of such returns, if any, were material and relevant to this cause ... and thereupon concluded that, pursuant to the motion and pleadings, and matters of record before this court, the entire income tax returns in question constitute material evidence relative to the matters alleged and raised in this cause.

* * *

* * *

Mandamus proceedings were initiated and copies of the tax returns in question were included in the petition. The Supreme Court found, after examination of these returns, that certain portions were irrelevant to the

matters in dispute between the parties as shown in the pleadings.

The Court held that the trial judge abused his discretion in ordering relators to produce for respondent's inspection and copying their entire income tax returns for the years in question, without separation of the relevant and material parts from the irrelevant and immaterial parts thereof. The Court did recognize that a writ of mandamus cannot be used to supervise the exercise of discretion by a trial judge in his rulings on the relevancy and materiality of information contained in income tax returns. Extraordinary relief can be afforded, however, in the situation where no discretion has been exercised, i.e., when the order of the trial judge does not separate for protection against discovery those portions of income tax returns plainly irrelevant and immaterial to the matters in controversy.

Unlike Maresca, the trial judge in the instant case did not examine the documents complained of in the motion for protective orders. Both relator and respondent admitted that the corporation did not tender to the court, either for in camera inspection or otherwise, the documents sought to be protected. We believe that the instant case falls more closely in line with the case of *Crane v. Tunks,* 160 Tex. 182, 328 S.W.2d 434 (1959). In Crane, the trial judge's order demanding production of the relator's tax return was vacated by writ of mandamus because he had clearly abused his discretion by ordering production of the return without first inspecting it to determine what portions were relevant and material to the suit. Accordingly, the Supreme Court ordered the judge to inspect the tax returns and make the necessary determination of its relevancy before issuing any further orders concerning the documents.

Before a non-party to a suit may be ordered to produce in accordance with Rule 167 of Texas Rules of Civil Procedure a motion must be filed setting forth with specific particularity the request and necessity therefor. TEX.R.CIV.P. 167(4). Once such a motion is filed it is incumbent upon the trial judge to hold a hearing to determine its relevancy and materiality to the main cause. See *Narro Warehouse, Inc. v. Kelly,* 530 S.W.2d 146, 150 (Tex.Civ.App.--Corpus Christi 1975, writ ref'd n.r.e.). Without a personal inspection of the items sought to be discovered, we fail to see how a trial judge can make a meaningful and just determination of relevancy and materiality,

**Page 671**

and whether, for protection of privacy, certain portions which are plainly irrelevant and immaterial to the matters in controversy ought to be separated.

We hold that the failure of the trial judge to make an in camera examination of the items complained of through the motion for protective orders prior to issuing

an order directing the delivery of such items amounts to arbitrary action and a clear abuse of discretion for which the remedy of mandamus will lie. See Maresca v. Marks, supra; Crane v. Tunks, supra; Narro Warehouse, Inc. v. Kelly, supra.

Relator's second argument on this writ of mandamus is without merit. Relator argues that because relator previously resisted the shareholder's attempt to inspect its books and records of account on the basis of lack of a proper purpose, relator will be denied its right to a jury trial on the issue of proper purpose if relator's books and records of account can be "discovered" by the shareholder at this time. This is not an action under art. 2.44 of the Texas Business Corporation Act but a discovery action under the Texas Rules of Civil Procedure. Respondent has a right to seek discovery of any information which is relevant and material to the cause of action.

We are certain the trial judge will proceed in accordance with the law as we have set it out herein. No writ of mandamus will issue at this time, but in the event the trial judge should fail to so proceed the clerk will issue the necessary writ to insure that this opinion is effective.

---------

Notes:

[1] Richard D. Harrell was attorney for the corporation who prepared the necessary paperwork for the issuance of stock to Karen L. Harrell. The notice duces tecum requested all information regarding the agreement for the issuance of stock by the corporation.

[2] The certified copy of the motion sent up with this application for writ of mandamus reveals that a stamped signature of Judge Spears was used on this motion.

[3] This order is referring back to the order entered by Judge Spears on December 14, 1984, compelling plaintiff to appear and be deposed and produce the items requested.

---------

**363 S.W.3d 788 (Tex.App.-Houston [14 Dist.] 2012)**

**R.M. SPRAGUE, Appellant,**

**v.**

**D.L. SPRAGUE, Appellee.**

**No. 14-08-00700-CV.**

**Court of Appeals of Texas, Fourteenth District, Houston.**

**February 14, 2012**

Rehearing Overruled March 21, 2012.

[Copyrighted Material Omitted]

Pamela E. George, Houston, Richard R. Orsinger, San Antonio, for appellant.

Sallee S. Smyth, Richmond, J. Lindsey Short, Jr., Houston, for appellee.

Panel consists of Chief Justice HEDGES and Justices FROST and CHRISTOPHER.

## OPINION

TRACY CHRISTOPHER, Justice.

In this divorce appeal, appellant Robert (" Bob" ) Sprague challenges the jury's findings and the trial court's property division and post-judgment sanctions, while appellee Deborah Sprague moves that we dismiss

the appeal, arguing that Bob accepted the benefits of the divorce judgment and is estopped from appealing it.

Finding no estoppel, we deny Deborah's motion.

In his appeal of the property-division portion of the divorce decree, Bob contends that the trial court misapplied the law, submitted an erroneous jury charge, improperly disregarded jury findings, and abused its discretion in excluding evidence. He argues that as a result of these alleged errors, the trial court divested him of his separate property. We conclude that the characterization of a lump-sum distribution received during the marriage under two defined-benefit plans is governed by former section 3.007(a) of the Texas Family

Code; we accordingly hold that the trial court did not err in instructing the jury in accordance with the statute or in failing to characterize a larger portion of the lump-sum distribution as Bob's separate property.

On the other hand, we agree that the trial court abused its discretion in excluding all evidence that any portion of the amounts payable to Bob under his employer's " Cash Deferral Program" was Bob's separate property.

Bob also appeals a post-judgment sanctions order and temporary orders pending appeal. We agree that the trial court abused its discretion in sanctioning Bob for a claimed delay in transferring certain funds to Deborah and in awarding Deborah attorneys' fees.

We accordingly reverse the property-division portion of the divorce decree, as well as the post-judgment sanctions order and the associated temporary order pending the appeal of the sanctions order, and we remand the case for (a) a determination of the community- and separate-property interests in the amounts that have been or will be paid to Bob as a result of his participation in his former employer's Cash Deferral Program, and (b) a just and right division of all of the community property.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Bob began working for Shell Oil in July 1967. On January 1, 1984, he was promoted to a position on the " Senior Staff" of the company, and in 1985, Shell merged with Royal Dutch Shell Group. After working for Shell for eighteen years, Bob married Deborah on July 6, 1985; eighteen years later, he retired on June 30, 2003.[1] He receives retirement benefits from Shell through three different plans: the basic pension plan, the Benefit Restoration Plan, and the Senior Staff Plan. Under the basic pension plan, Bob receives monthly payments of $8,755.[2] Bob's benefits under the Benefit Restoration Plan and the Senior Staff Plan were paid in one lump sum of $7,230,035 in the form of a credit to Bob's account in the Senior Staff Savings Fund.

Upon reaching the age of 65 in 2010, Bob also received the first of ten equal annual payments through Shell's Cash Deferral Program. The payments are equal to certain bonuses Bob was awarded in 1985, 1986, and 1987, together with compound interest of 17% on the deferred bonus payments.

### A. Course of Proceedings through Trial

Bob filed for divorce on July 29, 2005, and on September 13, 2007, the trial court issued an agreed docket-control order scheduling the case for trial on

January 22, 2008 and setting a number of discovery

Page 792

deadlines. In accordance with the docket-control order, Bob amended his petition to allege that he owned separate property. He produced the initial and first supplemental report of his forensic-accounting expert, Patrice Ferguson, in accordance with the order, but produced her second supplemental report after the deadlines governing expert reports had passed. He served supplemental discovery responses on December 21, 2007, which was the deadline specified in the docket-control order.

At the January trial setting, the trial court granted Deborah's motion to exclude the second supplemental expert report and continued the trial until March 2008. On the second day of the jury trial in March 2008, Deborah successfully moved to exclude all evidence that any portion of the amounts payable to Bob under Shell's Cash Deferral Program is his separate property.

The jury found that the value of Bob's separate-property interest in the lump-sum distribution of benefits due under Shell's Benefit Restoration Plan and Senior Staff Plan was $1,807,509, an amount that is equal to 25% of the lump-sum distribution. Other findings of the jury are not challenged on appeal. Because the trial court excluded all evidence that any portion of the payments he would receive through the Cash Deferral Program is his separate property, the jury was not asked to determine the value of any such separate-property interest.

### B. Rendition and Sanctions

After receiving the jury's verdict, the trial court issued a letter of rendition on March 31, 2008. Among other things, the trial court ordered that the Shell Senior Staff Savings fund " shall be sufficiently liquidated" to net Deborah $4,561,575 as " expeditiously as possible." On May 2, 2008, Bob's attorney told the court that they had not yet started the liquidation process because they were afraid that the liquidation could be a violation of the temporary injunction in effect. The trial court signed an order authorizing Bob to liquidate an unspecified portion of the funds in the account sufficient to net the amount due to Deborah. The same day that the trial court signed the order, Bob instructed Shell to liquidate $8.2 million from the account. This produced net proceeds of $5,379,200, but due to mail delays, Bob did not receive a check for the funds for nearly a month. The day he received the check, however, he ordered the funds deposited and Deborah's share wire-transferred to her. As a sanction for Bob's alleged delay in complying with the trial court's letter of rendition, Deborah asked the trial court to award her an amount equal to the interest she might otherwise have earned on the funds if they had been transferred to her on the date of rendition. The trial court accordingly ordered Bob to pay Deborah interest of $34,323.70 and to pay her attorney $15,100.00 for the attorneys' fees she incurred in the trial court in obtaining the order. In an associated temporary order pending appeal, the trial court ordered Bob to pay an additional $15,000.00 for attorneys' fees in the event that he unsuccessfully appealed the sanctions order.

### C. Post-Judgment Events

The trial court signed the final decree of divorce on June 16, 2008 and evenly divided the community property, which it found included all of the marital estate with the exception of the property that the parties had stipulated was separate property, and the $1,807,509 portion of the lump-sum retirement benefits that the jury found was Bob's separate property.

Both parties moved for temporary orders pending appeal. Although Bob did not appeal the portion of the property

Page 793

division as it pertained to certain stock and stock options, the trial court ordered Bob to post a $2,675,236 bond or cash equivalent as security for the stock options and stock appreciation rights awarded to Deborah. In addition, the trial court conditionally awarded Deborah $150,000 in attorneys' fees in the event that Bob's appeal of the property division was unsuccessful. While the appeal was pending, Deborah served Bob with discovery to gather evidence in support of a motion to dismiss the appeal. The trial court ordered Bob to comply.

### II. MOTION TO DISMISS

We first address Deborah's motion to dismiss this appeal on the ground that Bob has accepted the benefits awarded to him in the divorce decree. *See Carle v. Carle,* 149 Tex. 469, 472, 234 S.W.2d 1002, 1004 (1950) (explaining that a party who accepts the benefits of a judgment is estopped from appealing it); *Waite v. Waite,* 150 S.W.3d 797, 803 (Tex.App.-Houston [14th Dist.] 2004, pet. denied) (same). Under the acceptance-of-benefits doctrine, " [a] litigant cannot treat a judgment as both right and wrong, and if he has voluntarily accepted the benefits of a judgment, he cannot afterward prosecute an appeal therefrom." *Carle,* 149 Tex. at 472, 234 S.W.2d at 1004. The burden is on the appellee to establish that the appellant has accepted the benefits of a judgment. *Waite,* 150 S.W.3d at 803. If the appellee meets this burden, then the burden shifts to the appellant to show that one of the exceptions to the doctrine applies. *Id.* at 803-04. The doctrine does not apply when the appellant accepted the benefit of the judgment due to economic necessity, *id.* at 803, or when the appeal affects only the appellant's right to further recovery. *Carle,* 149 Tex. at 472, 234 S.W.2d at 1004. The doctrine also does not apply if the " benefit accepted" was cash, the use of which would not prejudice the

appellee. *Demler v. Demler,* 836 S.W.2d 696, 698 (Tex.App.-Dallas 1992, no writ), *disapproved on other grounds, Dallas Mkt. Ctr. Dev. Co. v. Liedeker,* 958 S.W.2d 382, 386 (Tex.1997).

Deborah contends that Bob accepted the benefits of the judgment by liquidating an excessive portion of his Senior Staff Savings Fund and retaining the net proceeds. According to Deborah, this conduct began after the trial court issued its rendition letter on March 31, 2008 requiring Bob to liquidate a portion of the fund sufficient to net $4,561,575 to be transferred to Deborah. Of the approximately $24.5 million in the account at the time of the divorce, Bob ordered $8.2 million liquidated, which resulted in an additional $817,625 being transferred to him. Between that time and the date of Deborah's motion to dismiss in this court, Bob liquidated an additional $8.2 million from the account, placing the net proceeds of $5,330,000 into his checking account.

Deborah also argues that Bob has accepted the benefits of the judgment by retaining one-half of the automatic annual payments that he began receiving at age 65 under the Cash Deferral Program. These payments had been characterized as community property, half of which was awarded to Bob and half of which was to be paid to Deborah. Bob did not transfer half of the funds to Deborah, but paid that portion into the registry of the trial court. He retained the remaining half of this payment.

We conclude, however, that given the facts and procedural posture of this case, the acceptance-of-benefits doctrine does not require us to dismiss the appeal. First, Bob superseded the judgment. *Raymond v. Raymond,* 190 S.W.3d 77, 80 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (when an appealing party posts a

**Page 794**

supersedeas bond [3] to suspend judgment, there is no " acceptance of benefits" ). Second, the temporary orders pending appeal in this case allow the parties to pay attorneys' fees, to use money in their possession for reasonable and necessary living expenses, to manage and invest the financial assets to preserve capital, and to transfer financial assets from one financial account to another. When such temporary orders are in place, the acceptance of benefits doctrine does not apply. *McAlister v. McAlister,* 75 S.W.3d 481, 483-84 (Tex.App.-San Antonio 2002, pet. denied); *Waite,* 150 S.W.3d at 807, n. 13. We accordingly deny Deborah's motion to dismiss.

### III. DIVISION OF PROPERTY

In a divorce decree, the trial court must divide the community property " in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage." TEX. FAM.CODE. ANN. § 7.001 (West 2006). Among these rights is the right to separate property. Under both the Texas Constitution and the Texas Family Code, a person has a separate-property interest in all property that the person " owned or claimed" before the marriage or acquired during the marriage by gift, devise, or descent. TEX. CONST. art. XVI, § 15; TEX. FAM.CODE ANN. § 3.001. Community property, on the other hand, consists of all of the property, other than separate property, acquired by either spouse during marriage, and all property possessed by either spouse during the marriage or at its dissolution is presumed to be community property. TEX. FAM.CODE ANN. §§ 3.002, 3.003(a). A litigant can overcome this presumption by tracing property and presenting clear and convincing evidence that it is one spouse's separate property. *Pearson v. Fillingim,* 332 S.W.3d 361, 363 (Tex.2011). " ' Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (West 2008); *In re J.F.C.,* 96 S.W.3d 256, 264 (Tex.2002).

We will not disturb the property division on appeal unless the appellant demonstrates that the trial court clearly abused its discretion by a division or an order that is manifestly unjust and unfair. *See Stavinoha v. Stavinoha,* 126 S.W.3d 604, 607 (Tex.App.-Houston [14th Dist.] 2004, no pet.). Under this standard, neither legal nor factual insufficiency of the evidence is an independent ground of error, but each instead is a relevant factor in assessing whether the trial court abused its discretion. *Id.* at 608. When we review the legal sufficiency of a separate-property finding, we consider all of the evidence in the light most favorable to the finding and determine whether a reasonable jury could have formed a firm belief or conviction that its finding was true. *Id.* We resolve all conflicts in the evidence in favor of the finding if a reasonable juror could do so, and disregard all contrary evidence unless a reasonable juror could not. *Id.* When we review the factual sufficiency of a separate-property finding, we will uphold the finding unless, " in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed [the] firm belief or conviction" reflected in the finding. *Id.*

**Page 795**

### A. Characterization of Lump-Sum Distribution

The jury found that the value of Bob's separate-property interest in the lump-sum distribution of benefits due under the Benefit Restoration Pension and the Senior Staff Pension Plan was $1,807,509, an amount that is equal to 25% of the lump-sum distribution of $7,230,035. Bob presents three issues challenging the jury's finding. First, he asserts that half of the lump-sum distribution (i.e., $3,615,018) is his separate property because, as a matter of law, the community-property

interest in this benefit must be determined by applying the time-allocation rule established in *Taggart v. Taggart,* 552 S.W.2d 422 (Tex.1977). Second, he contends that the trial court erred in instructing the jury using language based on the language of former provisions of Texas Family Code section 3.007 rather than language drawn from *Taggart.* And third, he argues that the repealed subsections of section 3.007 were applied in a manner that unconstitutionally divested him of his separate property. We address these issues together.

### 1. *Taggart v. Taggart*

Under *Taggart,* courts calculated the community-property interest in retirement benefits by dividing the number of months during which marriage and employment coincided by the number of months of employment. *Id.* at 424. Bob and Deborah were married during half of the time that Bob worked for Shell; thus, if the division of his retirement benefits is governed by *Taggart,* then half of the lump-sum distribution is community property and half is Bob's separate property.

### 2. *Berry v. Berry*

This approach changed when the Texas Supreme Court decided *Berry v. Berry,* 647 S.W.2d 945 (Tex.1983). There, the court stated that *Taggart* addressed the extent of the community interest in retirement benefits, but not the value of the community-property interest. *Id.* at 946. The court explained that when determining the community-property interest, the value of retirement benefits is calculated as of the date of divorce. *Id.* (citing *Herring v. Blakeley,* 385 S.W.2d 843, 845 (Tex.1965)).

The *Berry* court dealt with a concern not addressed in *Taggart,* namely, the effect of pay increases in the later years of employment on defined-benefits that are calculated based not only on length of service, but also on compensation. Retirement benefits calculated this way do not accrue equally across the span of employment if compensation changes; in *Berry,* for example, the value of the payments available under such a defined-benefit plan more than quadrupled in the last third of the employed spouse's career. *Id.* In recognition of this effect, and in an effort to better safeguard the working spouse's separate-property interests, the *Berry* court limited the community's interest to the benefits that accrued during the marriage. To do so, the court calculated the payments that hypothetically would have been due if, on the date that the employed spouse's marital status changed, the benefits were vested and matured and he retired. *Id.* In other words, the *Berry* court " avoided the difficulties of computing a present value by employing a fiction to retire the employee spouse under the plan provisions on the date of divorce." Steven R. Brown, Comment, *An Interdisciplinary Analysis of the Division of Pension Benefits in Divorce and Post-Judgment Partition Actions: Cures for the Inequities in Berry v. Berry,* 37 BAYLOR

L.REV. 107, 136 (1985) (footnote and italics omitted).

### 3. Texas Family Code Section 3.007

In 2005, the Texas legislature passed House Bill 410, codified as sections 3.007 and 3.008 in the Texas Family Code. *See* Act of May 24, 2005, 79th Leg., R.S., ch.

**Page 796**

490, § 1, 2005 Tex. Gen. Laws 1353, 1353. Subsections (a) of section 3.007 provided as follows:

(a) A spouse who is a participant in a defined benefit retirement plan has a separate property interest in the monthly accrued benefit the spouse had a right to receive on normal retirement age, as defined by the plan, as of the date of marriage, regardless of whether the benefit had vested.

*Id.* Although this subsection was repealed in 2009,[4] it applies to suits for divorce that were pending at any time between September 1, 2005 and August 31, 2009.[5]

Because Bob petitioned for divorce in 2005 and the case was pending before these provisions were repealed, the characterization of benefits under the two defined-benefit plans at issue is governed by section 3.007(a).

Bob's arguments to avoid the statute's application can be disposed of quickly. He correctly notes that section 3.007(a) defines the separate-property interest of a " participant" in a defined-benefit plan. Reasoning that this subsection is inapplicable if he was not a " participant" in the plan at the time of his divorce, Bob selectively quotes language from various Shell benefit plans in an attempt to show that Shell used the word " participant" to refer only to current employees, and not to retirees. According to Bob, only those who are " eligible" can participate in these retirement plans, and only " employees" are eligible. He then reasons that one who is no longer an employee is not eligible to participate and therefore cannot be a " participant." Not only would this be an absurd construction of section 3.007(a), but Bob's premises are factually incorrect. Both the Benefit Restoration Plan and the Senior Staff Plan refer to " any participant, including one who is retired." Moreover, his own expert stated that Bob is a " participant." Bob also asserts that, as applied to him, 3.007(a) violates the state constitution and common-law precedent because it divests him of a portion of his separate property. This argument begs the question of whether a portion of the lump-sum distribution characterized as community property actually *is* his separate property. He additionally states that the way in which 3.007(a) was applied in this case conflicts with the express terms of the defined-benefit plans, but he refers us to no language from either plan that purports to mandate the way in which the lump-sum distribution of a defined benefit is

characterized years after it was paid. Bob also argues that the statute as applied would be preempted by ERISA because it would cause a plan administrator to pay other than in accordance with plan documents, but cites no evidence that this is the case.

In an alternate argument, Bob contends that if section 3.007(a) applies, then we should it construe it as a codification of *Taggart,* but the statute will not bear such an interpretation. Under section 3.007(a), the working spouse has a separate-property interest in the " monthly accrued benefit," which requires a determination of the monetary value of the benefit that had accrued on a particular date. Value is stated in dollars and cents. *See Berry,* 647 S.W.2d at 945-46. In section 3.007(a), as in *Berry,* value is determined as of the date that the employed

**Page 797**

spouse's marital status changed. *Compare* TEX. FAM.CODE 3.007(a) (value is determined " as of the date of marriage" ) *with Berry,* 647 S.W.2d at 946-47 (value is determined as of the date of divorce). In contrast, value is not addressed in *Taggart* at all. *See Taggart,* 552 S.W.2d at 424 (reforming the judgment " to adjudge the correct fractional interest" to the non-working spouse). Instead, the *Taggart* formula is used to determine the extent of the community-property interest, which is expressed as a fraction. *Id.* The value of retirement benefits on the date that the working spouse's marital status changed is the central feature of section 3.007(a), but forms no part of the *Taggart* formula. *See id.*

Although section 3.007(a) cannot be read as a codification of *Taggart,* it can be read as the legislature's attempt to extend *Berry* to cases in which employment predates marriage. Like *Berry,* section 3.007(a) requires the court to determine the value of the benefits that had accrued on the date that the working spouse's marital status changed, without regard to vesting. Both *Berry* and section 3.007(a) are consistent with the recognition that larger benefit increases are more likely to occur later in the working spouse's career. The difference between the two is that in *Berry,* marriage preceded employment, whereas section 3.007(a) deals with situations in which employment preceded marriage. *See* House Comm. on Juvenile Justice & Family Issues, Bill Analysis, Tex. H.B. 410, 79th Leg., R.S. (2005) (stating that section 3.007(a) " sets forth a mechanism for Texas courts to apply the *Berry* case in the various situations that may arise" ).

Thus, as we understand it, the legislature's intent in enacting this provision was to require that in those cases in which employment precedes marriage, courts must use the same accrued-benefit method to calculate the value of the separate-property interest that they would use to calculate the community-property interest in cases in which marriage precedes employment. In both, the value of an interest is the amount of the benefits that hypothetically would have been payable if the employed spouse retired on the date of the marital-status change and there had been no further requirements for the benefits to vest or mature. *See* Brown, 37 BAYLOR L.REV. at 122 (" ' Accrual of benefits' refers to the specific dollar amount credited or allocated to the individual plan participant at a given point in time." ).

We therefore conclude that the trial court did not abuse its discretion by instructing the jury in accordance with the statute or by charging the jury to state the amount of Bob's separate-property interest in dollars and cents rather than as a percentage. We overrule Bob's second issue.

### 4. Application to the Lump-Sum Distribution

To evaluate Bob's argument that his separate-property interest in the lump-sum distribution is larger than the $1,807,509 found by the jury, we consider the benefits that had accrued under the two plans involved as of the date of his marriage. *See* TEX. FAM.CODE ANN. § 3.007(a). The lump-sum distribution consisted of payments under the Shell Senior Staff Plan and the Benefit Restoration Plan, both of which are defined-benefit plans; thus, section 3.007(a) applies.

It is undisputed that the Benefit Restoration Plan was created after Bob and Deborah married. Consequently, all of the benefits that this plan provides can be presumed to be community property. *See* TEX. FAM.CODE ANN. § 3.002 (all property acquired during the marriage is presumed to be community property). To overcome this presumption, Bob asserts that the Benefit Restoration Plan simply

**Page 798**

restored benefits that were lost as a result of the 1986 Tax Reform Act. This is so, he argues, because payments under Shell's defined-benefit plans are based in part on the employee's compensation, but the Act imposed a cap on the compensation that could be considered in determining the amount of the defined benefit. After the passage of the 1986 Tax Reform Act, Shell established the Benefit Restoration Plan to return the total amounts payable under its pension plans to the amount that would have been payable without the statutory cap. Shell further made this plan retroactive to 1984. Bob contends that the theories of inception-of-title, replacement-for-loss, mutation, and tracing all support his position that the benefits he became entitled to receive under this plan after his marriage nevertheless are his separate property.

The problem with these arguments is that before his marriage, Bob's salary was already below the cap imposed by the 1986 Tax Reform Act. Because the Act did not reduce the benefits that Bob was entitled to

receive on the date of his marriage, it cannot be said that the Benefit Restoration Plan " restored" anything to him.

As for the Senior Staff Plan, Bob presented no evidence that that this plan existed before Bob's marriage in 1985. Shell's representative dated the plan's inception to the 1990's, and the plan administrator identified 1991 as the year when Bob first began to participate in it. Thus, the benefits it provides also can be presumed to be community property.

In sum, we conclude that section 3.007(a) applies to the characterization of the payments under Bob's defined-benefit plans; that the trial court correctly instructed the jury accordingly; and that the trial court did not abuse its discretion by rejecting Bob's arguments that half of the benefits ultimately paid under these plans are his separate property. Because Bob failed to establish that the value of his separate-property interest is larger than the $1,807,509 found by the jury, we overrule Bob's first and third issues.

**B. Exclusion of Evidence of Separate-Property Interest in the Cash Deferral Program**

In his fourth issue, Bob challenges the trial court's imposition of discovery sanctions excluding all evidence that a portion of the payments due to him under Shell's Cash Deferral Program are his separate property. As a result of his participation in this program, Bob will receive an annual payment of $2,424,154 for ten years, for a total of $24,241,540. Bob argues that the trial court abused its discretion in excluding all evidence of his separate-property interest in these payments, including certain Shell documents, supplemental expert reports, and Bob's testimony on this point.

Under Texas Rule of Civil Procedure 193.6, if a party fails to timely make, amend, or supplement a discovery response, the undisclosed evidence or information is subject to exclusion unless that party proves to the trial court that there was good cause for the failure or that the failure would not unfairly surprise or unfairly prejudice the other parties. TEX.R. CIV. P. 193.6(a), (b). We review the trial court's ruling under this rule for abuse of discretion. *See Fort Brown Villas III Condo. Ass'n v. Gillenwater,* 285 S.W.3d 879, 881 (Tex.2009) (per curiam) (addressing exclusion of testimony of expert who was first designated three days before the end of discovery and more than five months after the expert-designation deadline).

**1. Deadlines for Supplementing Expert Reports and Discovery Responses**

The trial court entered an agreed docket-control order in September 2007, setting the case for trial on January 22, 2008.

**Page 799**

Under the terms of the order, expert reports were due on October 22, 2007 and rebuttal reports were due on November 12, 2007. All discovery was to be supplemented by December 21, 2007. On December 4 and 5, 2007, the parties were deposed, and Bob testified that he did not participate in the Cash Deferral Program until after he was married. On December 6, 2007, Bob's expert witness Patrice Ferguson was deposed. She stated that although she had not yet expressed it in an expert report, she had a preliminary opinion that some of the future payments under the Cash Deferral Program might be Bob's separate property. Counsel for Deborah did not ask for a dollar amount at the deposition because Ferguson characterized her opinion as preliminary.

On December 14, 2007, Ferguson produced a second supplemental expert report identifying for the first time the amount of the future payments under the Cash Deferral Program that Bob claimed as his separate property. Ferguson opined that $1,578,030 of each annual payment is Bob's separate property. On December 21, 2007, Bob incorporated this report by reference in his supplemental responses to discovery concerning the legal theories and factual bases of his claims, and he supplemented his interrogatory answers.

After Bob served the second supplemental expert report and supplemental discovery responses, Deborah's forensic-accounting expert James Penn produced a supplemental rebuttal report on December 28, 2007. Penn disagreed with Ferguson's calculations, acknowledged that part of the payment could be characterized as separate, but concluded that Bob had failed to establish by clear and convincing evidence what portion could be separate. At the January pretrial conference, the court granted Deborah's motion for continuance, setting the case for trial on March 10, 2008. The trial court also struck Ferguson's late-filed expert report, and prevented her from testifying on that issue.[6] Bob argued that resetting the trial date meant that the report was now timely. The court disagreed and noted on the docket sheet, " No deadlines changed at this time." The trial court also stated that although its order would preclude Bob's expert from testifying that Bob had a separate-property interest in the Cash Deferral Program's annual payments, the order did not apply to Bob's own testimony. This ruling changed on the second day of the trial in March 2008, when the trial court sustained objections to Bob's testimony on this issue. Bob made an offer of proof of Ferguson's testimony, his own testimony, and the excluded documents and reports.

**2. Exclusion of Ferguson's Supplemental Report and Testimony**

Bob contends that the trial court abused its discretion in excluding Ferguson's second supplemental expert report and her testimony concerning the additional opinions expressed in that report because (a) the sanction was not warranted by any discovery violation on his part,

(b) his failure to supplement certain discovery before the discovery deadline was excusable for good cause, and (c) any late production of evidence did not unfairly surprise or prejudice Deborah. We disagree.

Bob first argues that because the trial had been reset when the motion was heard, the evidence at issue was no longer subject to automatic exclusion under Rule 193.6. When the date of trial determines the date on which discovery must be supplemented,

**Page 800**

this would be true. *See H.B. Zachry Co. v. Gonzalez,* 847 S.W.2d 246, 246-47 (Tex.1993) (per curiam) (orig. proceeding) (discussing predecessor to Rule 193.6 and holding that party's failure to identify witnesses more than thirty days before trial as required by rule was not a basis for excluding their testimony where the trial was reset to another date more than thirty days later). *See also* TEX.R. CIV. P. 190.3(b)(1)(A) (all discovery must be conducted during the discovery period which continues until 30 days before the date set for trial in cases under the Family Code). However, Rule 190.3 does not apply if there is a written scheduling order under 190.4. *See* TEX.R. CIV. P. 190.3 (specifying that this rule applies only if Rule 190.2 and Rule 190.4 do not). Under Rule 190.4, the trial court may order that discovery be conducted in accordance with a discovery control plan tailored to the circumstances of the specific suit and may change any limitation on the time for or amount of discovery otherwise set forth in the Texas Rules of Civil Procedure. TEX.R. CIV. P. 190.4(a), (b).

Even though the trial court continued the case, the court made clear that the deadlines in the docket-control order remained in place. Under these facts, we conclude that the continuance did not reset the dates in the court order. *In re Carpenter,* No. 05-08-00083-CV, 2008 WL 384569, at *2 (Tex.App.-Dallas Feb. 18, 2008, orig. proceeding [mand. denied] ) (mem. op.) (continuance does not nullify scheduling order set by court order).

Bob's failure to supplement the expert report in a timely manner also is not excusable for good cause. The stated reason for the delay was that his trial counsel did not appreciate the significance of two letters Deborah produced in 2005 until after Bob was deposed in December 2007. By that time, the deadline to supplement his expert's report had passed. Inadvertence of counsel is not good cause for failure to adhere to discovery deadlines. *Alvarado v. Farah Mfg. Co.,* 830 S.W.2d 911, 915 (Tex.1992).

Finally, Bob failed to show that his expert's new opinion did not unfairly surprise or prejudice Deborah. Ferguson did not identify the funds that Bob claimed as his separate property until after she and Bob had been deposed; until that time, it had been unnecessary for Deborah to prepare legal arguments or expert testimony

regarding the character of the bonuses or the interest paid on them&mdash; amounts that together totaled more than $24 million dollars.

We conclude that the trial court did not abuse its discretion in excluding Ferguson's second supplemental expert report and her testimony regarding the opinions expressed in that report. We therefore overrule Bob's fourth issue as it pertains to this report and to Ferguson's testimony.

**3. Exclusion of Bob's Testimony and Documentary Evidence Regarding the Cash Deferral Program**

On the second day of trial, Deborah moved to exclude any evidence of Bob's separate-property interest in the Cash Deferral Program on the ground that he failed to timely supplement his discovery responses. In 2006, Deborah sent Bob an interrogatory asking him to identify the percentage of any property in the entire estate that he claimed as his separate property. Bob answered the interrogatory and supplemented several times. He always indicated that there might be a separate component to the Cash Deferral Program but never identified a percentage.

At trial, Deborah argued that Bob failed to timely supplement discovery because he did not identify the percentage of the payments under the Cash Deferral Program that he claimed as his separate property

**Page 801**

until the December 21, 2007 deadline to supplement discovery. The trial court sustained Deborah's objections to Bob's offered testimony on the subject and to the two letters from Shell [7] on which Bob relied as support for his testimony. The trial court further explained that the ruling applied not only to Shell's letters, but also to " any testimony that would suggest or support a position that any asset in that plan is anything other than community property."

With regard to the exclusion of Bob's testimony and documentary evidence, we agree with Bob that Deborah waived her complaint by failing to obtain a pretrial ruling on the discovery dispute. *See Remington Arms. Co. v. Caldwell,* 850 S.W.2d 167, 170 (Tex.1993) (" the failure to obtain a pretrial ruling on discovery disputes that exist before commencement of trial constitutes a waiver of any claim for sanctions based on that conduct" ); *Mandell v. Mandell,* 214 S.W.3d 682, 691-92 (Tex.App.-Houston [14th Dist.] 2007, no pet.) (holding that appellant who failed to move for the exclusion of evidence until the last business day before a summary-judgment hearing waived his complaint that the summary-judgment motion was based on evidence not produced in response to discovery).

Although Deborah contends that she did obtain a pretrial ruling, this is not supported by the record. At the

hearing on the motion in limine, Bob's attorney expressed concern that part of the motion applied to Bob's own testimony. The next day, the trial court announced its ruling excluding Ferguson's second supplemental report and her testimony as to the characterization of the payments under the Cash Deferral Program and as to the value of Bob's separate-property interest in them. In announcing its ruling, the trial court stated that it was " granting the Motion in Limine with regard to experts" and that its ruling " should not be interpreted to mean that Mr. Sprague could not testify as appropriate, if discovery is in order, and if there are no other valid objections to his testimony." Thus, the record affirmatively shows that Deborah was aware of the dispute concerning Bob's non-expert evidence, but did not obtain a pretrial ruling.

We must reverse the property division if the erroneous exclusion of this evidence probably caused the trial court to render an improper judgment. *See* TEX.R. APP. P. 44.1(a)(1). Even in the absence of expert testimony, a reasonable jury could have found that the excluded evidence clearly and convincingly established that at least some of the funds payable through the Cash Deferral Program were Bob's separate property. We therefore agree that the error was harmful.

Bob asserts that a large part of the payments due under the Cash Deferral Program is attributable to a bonus declared approximately six weeks after his marriage. The evidence supporting Bob's claim included a letter from Shell dated February 21, 1985 offering Bob the option to defer payment of additional compensation if any should be awarded that year in connection with Shell's planned merger. Such compensation would then accrue interest at a rate of 17%, compounded annually, with payments to be made in ten installments beginning when he reached the age of 65. In his offer of proof, Bob testified that he made such an election. The excluded evidence also included a letter from Shell's CEO dated August 20, 1985, notifying Bob that he and the other Senior Staff members had been awarded bonus compensation. Shell's CEO stated, " This bonus will express our thanks to you in a tangible way for your contribution to the Company especially during the

### Page 802

uncertainties of the past 18 months. Also I hope it will further encourage you to devote your maximum efforts towards ensuring the Company's continued success...." Half of the bonus was payable immediately, and to encourage Bob's continued employment, one-quarter was payable in January 1986 and one-quarter payable in January 1987, contingent only upon his continued employment on those dates. Although the amount of the bonus is not stated in the letter, Bob testified that he was awarded $165,000. This is supported by another document from Shell tracking the principal and interest payable on deferred compensation. This document, which was not excluded from evidence, shows that a deferred

award of $82,500 was allocated to Bob on August 21, 1985, and payments of $41,250 were allocated to him in January 1986 and January 1987.[8]

Shell stated that the bonus with which Bob was credited in August 1985 was intended to compensate him for work done in the preceding eighteen months, but 16.5 of those months predated Bob's marriage. Thus, a reasonable jury could find that the value of Bob's separate-property interest in that payment is 16.5/18 x $82,500, or $75,625. According to the same letter from Shell, the payment of $41,250 credited to Bob in January 1986 was paid for his work in the same eighteen-month period and for his continued employment until this portion of the bonus was paid in January 1986. This portion of the bonus was credited on January 6, 1985; thus, it covered a period of 22.5 months, and Bob was single for 16.5 of those months. Based on this evidence, jurors could find that Bob's separate-property interest in that payment is 16.5/22.5 x $41,250, or $30,250. The last payment of $41,250 was credited on January 5, 1987, and was paid to compensate Bob for work performed in the eighteen-month period through August 20, 1985 and for his continued employment through January 5, 1987. Because Bob was single for 16.5 of those months, a jury could find that his separate-property interest in the January 1987 payment is 16.5/34.5 x $41,250, or $19,728.26. Thus, if allowed to consider the excluded evidence, a reasonable jury could have found that the evidence clearly and convincingly established that $125,603.26 of the initial $165,000 bonus is Bob's separate property. This bonus was deferred for payment until Bob reached age 65 and was guaranteed a 17% rate of return.

While Bob argues that he has established his separate property interest as a matter of law, the characterization of payments under the Cash Deferral Program involves questions of fact to be decided by the jury.[9] Because we cannot know how the jury would have weighed the evidence or the credibility of the various witnesses, we cannot determine the extent to which the original awards ultimately will be determined to be Bob's separate property, and thus, we do not reach the question of the proper characterization of the interest on any such payments. We therefore sustain Bob's fourth and fifth issues as they pertain to the non-expert evidence of his separate-property interest in payments under the Cash Deferral Program, and remand for a new trial on that issue.

### IV. POST-JUDGMENT SANCTIONS

Bob contends that if we reverse the property division, then we also must

### Page 803

reverse the trial court's order imposing sanctions for Bob's alleged delay in transferring funds to Deborah after

the court issued its rendition letter. Because this is not necessarily so, we address the substance of his challenge to that order. He argues that the trial court's failure to file findings of fact and conclusions of law is presumed harmful and requires reversal or abatement so that findings can be made. In the alternative, Bob contends the sanction is not supported by legally or factually sufficient evidence or findings.

We begin our review by identifying the legal basis for the trial court's order. Sanctions are available under Chapter 9 of the Civil Practice and Remedies Code in certain suits for damages, but this statute does not apply to actions in which no party asserts a tort claim or a claim for damages based upon personal injury, property damage, or death.[10] Chapter 10 of the Civil Practice and Remedies Code authorizes sanctions against one who signs a frivolous pleading or motion,[11] and Texas Rule of Civil Procedure 13 permits sanctions against one who signs a groundless pleading or motion, but neither was the basis on which sanctions were sought. Discovery abuses also can result in sanctions,[12] as can the failure to deliver copies of pleadings and motions to other parties to an action,[13] but neither were alleged in the motion that was granted here. We conclude that in sanctioning Bob for the delays in transferring funds to Deborah, the trial court must have relied on its inherent power.

Trial courts have inherent power to sanction " to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process, such as any significant interference with the traditional core functions of Texas courts." *McWhorter v. Sheller,* 993 S.W.2d 781, 789 (Tex.App.-Houston [14th Dist.] 1999, pet. denied) (citing *Kutch v. Del Mar Coll.,* 831 S.W.2d 506, 509-10 (Tex.App.-Corpus Christi 1992, no writ)). These core functions include " hearing evidence, deciding issues of fact raised by the pleadings, deciding questions of law, entering final judgment and enforcing that judgment." *Kutch,* 831 S.W.2d at 510. For the trial court to exercise its inherent power to sanction, there must be evidence and factual findings of significant interference with such functions. *McWhorter,* 993 S.W.2d at 789 (citing *Kutch,* 831 S.W.2d at 510). We review the trial court's imposition of sanctions for abuse of discretion. *Id.* at 788.

Although Bob timely filed a request for findings of fact [14] and a reminder that the sanctions findings were past due,[15] the trial court issued none&mdash; nor would the evidence support a finding that Bob engaged in bad-faith abuse of the judicial process. The record instead reveals the following chronology:

In its March 31, 2008 rendition letter, the trial court advised counsel for the parties of its judgment in the case and scheduled a hearing to be held on April 18, 2008 regarding the entry of judgment. In the letter, the trial court ordered that " [t]he Shell Senior Staff Savings Fund shall be sufficiently liquidated to net [Deborah] $4,561,575 ... as expeditiously as possible,

## Page 804

and the court invites counsel to have Shell make a determination of timing on such liquidation so that specific orders may be included in the Decree of Divorce." On April 3, 2008, Bob's attorney Brenda Keen sent an email to Shell's counsel (with a courtesy copy to Deborah's counsel) requesting information about the timing and steps necessary for such liquidation. Shell's attorney advised Keen on April 15, 2008 that in response to his inquiries, he had been directed to the plan administrator's website.

On April 17, 2008, the hearing on the entry of judgment was postponed until May 2, 2008. At the hearing, Deborah's attorney stated that the funds had not yet been received, and Keen explained that, in accordance with the trial court's letter of March 31, 2008, she had asked for information from Shell about the timing of the liquidation. Keen also stated that she had advised Bob not to transfer any funds yet because a temporary injunction was still in effect. The following discussion then occurred:

The Court: Okay, why don't we do this. Why don't we say I am instructing him to do, and I don't want to handwrite an order, I want to leave the language exactly like it is, and I can add notwithstanding any temporary injunctions or whatever you need it to say. If, so that's clear, that his effectuating this transaction is not a violation of the temporary injunction of this court. Does that work?

Ms. Keen: I think we can sit and handwrite that order and submit it to him, and then we will know that he can start that process.

The Court: I will sign that today, and that will take care of that....

The trial court signed a handwritten " Order for Liquidation of Senior Staff Savings" stating that Bob " is authorized to initiate liquidation of a sufficient portion of the Shell Senior Staff Savings Fund to net [Deborah] $4,501,572.00 [16] notwithstanding any temporary orders or injunctions previously entered in this case." The same day that the order was signed, Keen notified Bob of the authorization, and Bob telephoned Fidelity, the plan administrator, and requested liquidation of $8,200,000. This amount was removed from the Senior Staff Savings Fund on May 2, 2008. According to Bob, a Fidelity representative initially told him that the funds would be transferred to his account on May 30, 2008, but on May 5, 2008, a Fidelity representative advised him that it was sending a check to his address of record, and it was expected to arrive the week of May 12, 2008. On May 7, 2008, Bob completed forms to be used by his brokerage to deposit the check and wire transfer funds to Deborah.

On May 27, 2008, Deborah's attorney advised Keen that the funds still had not been received. Keen responded that Bob had not received the check, although Fidelity reported that it mailed the check to him in London on May 7, 2008. On May 28, 2008, Bob received the check for $5,379,200.00, dated May 2, 2008. The envelope indicated the reason for the delay between the time the check was mailed and when it was received: although Fidelity sent the check from an address in Ohio to Bob's home in London, it paid only $0.41 for postage. [17] The same day that Bob

**Page 805**

received the check he sent it to his brokerage in Houston via overnight delivery with instructions to deposit it and wire transfer $4,561,575 to Deborah's account. The brokerage confirmed on May 29, 2008 that it had received the documents, deposited the check, and, after allowing time for the funds to clear, would wire transfer the requested funds to Deborah on June 4, 2008. The money was removed from Bob's account on June 4 and deposited in Deborah's account on June 5, 2008.

Based on our review of the record, we conclude that Bob was not required to begin liquidating funds from the Shell Senior Staff Fund before May 2, 2008, and the delay in transferring funds to Deborah after that date was not attributable to him. As the Texas Supreme Court has observed, " great delay in the delivery of a letter is the probable result of the omission to prepay the postage." *Blake v. Hamburg-Bremen Fire Ins. Co.,* 67 Tex. 160, 164, 2 S.W. 368, 370 (1886). We accordingly reverse the trial court's order of June 20, 2008 imposing sanctions. Our disposition of this issue renders moot the trial court's order of August 27, 2008, conditionally awarding Deborah attorneys' fees in the event of an unsuccessful appeal of the sanctions order.

### V. CONCLUSION

We find no error in the jury charge or in the trial court's failure to characterize as Bob's separate property a larger portion of the lump-sum distribution from two defined-benefit plans. Although the trial court did not abuse its discretion in excluding evidence of the untimely-disclosed opinions of Bob's forensic-accounting expert, we conclude that the trial court reversibly erred in excluding non-expert evidence that would have supported Bob's separate-property claim to some of the amounts payable to him under Shell's Cash Deferral Program, and in sanctioning Bob for a post-rendition delay in transferring funds to Deborah. We accordingly reverse both the property-division portion of the divorce decree and the post-judgment sanctions order. Because we conclude that the trial court did not err in characterizing $1,807,509 of the lump-sum distribution as Bob's separate property, we reverse and remand the case to the trial court for (a) a new trial as to the proper characterization of the amounts payable under the Cash

Deferral Program, and (b) a just and right division of the community estate, in light of the new finding to be made concerning the characterization of the payments under the Cash Deferral Program, and in light of the jury's findings on the remaining issues. Given our disposition of these issues, we do not address Bob's remaining issues.[18]

FROST, J., Concurring.

**Page 806**

KEM THOMPSON FROST, Justice, concurring.

This appeal presents an issue of statutory interpretation regarding subsections (a) and (b) of former Texas Family Code section 3.007, which govern the characterization of property interests in certain employee benefits. [1] Appellant Robert M. Sprague (" Bob" ) and appellee Deborah L. Sprague (" Deborah" ) urge different interpretations of this statute, and the statute's meaning is the principal issue in this case.

Under Texas law, in interpreting section 3.007, this court should begin by examining the text of the statute to glean the intent of the legislature as reflected in the text and in an effort to give meaning to the entire statute. The court then should determine whether the statute is ambiguous based upon the statutory interpretations proffered by the parties or suggested by the text. If the statute is unambiguous, the court must adopt the interpretation supported by the statute's plain language, without relying upon extratextual sources to interpret the statute, unless such an interpretation would lead to absurd results. If the statute is ambiguous, the court should cautiously consult extratextual aids to interpretation in an effort to determine the legislature's intent and give effect to the entire statute. Because the majority does not follow this procedure in interpreting section 3.007, I do not join the part of the majority opinion dealing with the first three issues.

*This court should begin with the text.*

Under his first three issues, Bob raises an issue as to the proper interpretation of subsections (a) and (b) of section 3.007. In his analysis as to what part of Bob's pension benefits is Bob's separate property and what part is community property, Deborah's expert based his testimony on both of these subsections. In interpreting these subsections, this court must begin by examining the text of the statute.[2] But, the majority does not quote, discuss, analyze, or apparently consider the text of subsection (b) at all. [3] The majority quotes subsection (a), but does not discuss or analyze its language in interpreting the statute.[4] The statute at issue reads in its entirety as follows:

(a) A spouse who is a participant in a defined benefit retirement plan has a separate property interest in the monthly accrued benefit the spouse had a right to receive on normal retirement age, as defined by the plan, as of

the date of marriage, regardless of whether the benefit had vested.

 (b) The community property interest in a defined benefit plan shall be determined

**Page 807**

 as if the spouse began to participate in the plan on the date of marriage and ended that participation on the date of dissolution or termination of the marriage, regardless of whether the benefit had vested. [5]

Subsection (a) addresses the separate-property interest of a participant in a defined-benefit retirement plan, and subsection (b) addresses the community-property interest in such a plan.

*This court should address all of the parties' proffered interpretations.*

Bob worked for Shell for approximately eighteen years before he married Deborah on July 6, 1985. He then worked for approximately eighteen more years before retiring on June 30, 2003. Bob petitioned for divorce in 2005, and the trial court granted Bob a divorce in 2008. In one of Bob's arguments regarding the interpretation of subsections (a) and (b), Bob asserts that subsections (a) and (b) do not apply to cases in which the retirement-plan participant has retired before the date of divorce. Bob notes that under subsection (b), the community-property interest in the retirement plan is determined as if the retirement-plan participant (Bob) participated in the plan through the date of divorce. Bob argues that because he retired and stopped accruing pension benefits more than four years before the date of divorce, the methodology for computing the separate-property and community-property interests contained in subsections (a) and (b) cannot apply in the case under review. The majority does not mention or analyze this statutory-interpretation argument.

Deborah argues against this statutory interpretation. Under Deborah's proffered interpretation, subsections (a) and (b) need not both apply in a particular case. Deborah maintains that the proper interpretation of subsections (a) and (b) is as follows: subsection (a) applies only in cases in which a spouse was accruing benefits in a defined-benefit retirement plan when the parties married, and subsection (b) applies only in cases in which a spouse will continue to accrue benefits in a defined-benefit retirement plan after the date of divorce. The majority does not mention or analyze this statutory-interpretation argument.

*This court should determine whether the statute is ambiguous.*

This court's role in interpreting section 3.007 is to determine and give effect to the legislature's intent.[6] After reviewing the statute's text and considering the context and the various possible interpretations of the statute, we must determine if the statute is ambiguous. [7] If the statute is unambiguous, then we must adopt the interpretation supported by the statute's plain language, without relying upon extratextual sources to interpret the statute, except in the rare situation in which such an interpretation would lead to absurd results.[8] We cannot use extratextual sources, such as legislative history, to interpret a statute in a way that contradicts the statute's unambiguous language.[9] But

**Page 808**

 if the statute's meaning is uncertain or if there is more than one reasonable interpretation of the statute, then the statute is ambiguous, and in determining the legislature's intent, we may proceed with caution in consulting extratextual interpretation aids, such as legislative history or an administrative agency's interpretation of the statute.[10]

The majority does not determine whether subsections (a) and (b) are ambiguous. The majority does not state whether the statute's meaning is uncertain or susceptible to more than one reasonable interpretation. The majority does rely upon legislative history in interpreting the statute, but the majority does not indicate whether it has concluded that the statute is ambiguous or whether it is using legislative history in the interpretation of unambiguous provisions.[11] Though the legislative history quoted by the majority may contradict Bob's alternative argument that section 3.007(a) codifies the time-allocation rule of *Taggart v. Taggart,* 552 S.W.2d 422, 424 (Tex.1977), this legislative history does not address Bob's argument that subsections (a) and (b) do not apply to cases in which the retirement-plan participant has retired before the date of divorce.[12]

*This court should conclude that the statute does not apply.*

Using the methodology outlined above, this court should conclude that subsections (a) and (b) are ambiguous. This court also should adopt Bob's interpretation that subsections (a) and (b) do not apply to the case under review because the retirement-plan participant retired before the date of divorce. Under this statutory interpretation, the determination of Bob's separate-property interest in his pension benefits would be based upon the common law. Under a common-law analysis, this court should conclude that the *Taggart* time-allocation rule does not apply to this case. Thus, the legal insufficiency, factual insufficiency, charge error, and constitutional arguments under Bob's first three issues lack merit.

Because the majority fails to conduct the statutory analysis for subsections (a) and (b) of section 3.007, I do not join this part of its opinion. I respectfully concur in the judgment as to the first three issues and I join the

remainder of the majority's opinion.

---------

Notes:

[1] Deborah retired from Shell before the marriage.

[2] The characterization of this benefit is not challenged on appeal.

[3] Deborah argues that the bond is insufficient but she has not asked the trial court or this court to increase it.

[4] *See* Act of May 29, 2009, 81st Leg., R.S., ch. 768, § 11(1), 2009 Tex. Gen. Laws 1950, 1953.

[5] *Id.* § 13(a), 2009 Tex. Gen. Laws 1950, 1953. In the current version of section 3.007 of the Texas Family Code, there are no subsections (a) and (b). Inasmuch as there is no chance of confusion, we will refer to the repealed provisions simply as section 3.007(a) and section 3.007(b).

[6] The trial court signed a written order excluding the report and expert testimony on February 18, 2008.

[7] It was Deborah who originally produced these letters to Bob in 2005.

[8] There is no dispute regarding the amount of the Cash Deferral Program payments that are associated with each bonus; both forensic-accounting experts used the same numbers.

[9] The bonus we have discussed was not the only bonus that Bob elected to defer. It was simply the most well-documented, and thus, the one that most readily demonstrates how the erroneous exclusion of Bob's separate-property evidence was harmful.

[10] *See* TEX. CIV. PRAC. & REM.CODE ANN. § 9.002 (West Supp. 2011).

[11] *Id.* § 10.001 (West 2002).

[12] *See* TEX.R. CIV. P. 215.1-5.

[13] *See* TEX.R. CIV. P. 21b.

[14] *See* TEX.R. CIV. P. 296 (requests for findings of fact must be filed within twenty days after the judgment is signed).

[15] *See* TEX.R. CIV. P. 297 (notice of past due findings of fact and conclusions of law must be filed within thirty days after filing the original request).

[16] Although there is a discrepancy of $60,003 between the amount referred to in the trial court's order of May 2, 2008 and its rendition letter of March 31, 2008, Bob actually transferred to Deborah the larger amount identified in the rendition letter.

[17] We take judicial notice that on May 7, 2008, the postage for a one-ounce domestic first-class letter was $0.41 but the postage for a one-ounce letter sent to Great Britain via first-class mail international was $0.90. *Compare* New Standards for Domestic Mailing Services, 72 Fed.Reg. 15,365, 15,369 (Mar. 30, 2007) (postal rate for first-class domestic mail) *with* International Product and Price Changes, 72 Fed.Reg. 16,603, 16,607, 16,614 (Apr. 4, 2007) (postal rate for first-class mail international).

[18] In Bob's sixth issue, he argues that the trial court erred in making findings of fact contrary to those made by the jury. Specifically, the jury found that Bob was not guilty of cruel treatment toward Deborah of a nature that rendered further living together insupportable, and found that the tax liability that would be incurred in liquidating certain items would be the same regardless of whether those items were awarded to Bob or Deborah. Neither Bob nor Deborah challenged either of these findings in the trial court or on appeal. Even if the trial court erroneously included contrary statements among the findings of fact and conclusions of law it issued in connection with the judgment previously rendered in this case, any such error is now moot, because that judgment has been reversed. We clarify, however, that the issues resolved by these particular findings by the jury do not need to be tried on remand. If the trial court again makes findings contrary to the jury verdict, that point of error can be raised again, if necessary.

[1] *See* Act of May 24, 2005, 79th Leg., R.S., ch. 490, § 1, 2005 Tex. Gen. Laws 1353, 1353, *repealed by* Act of May 29, 2009, 81st Leg., R.S., ch. 768, § 11(1), 2009 Tex. Gen. Laws 1950, 1953. All statutory references in this opinion are to the version of the Texas Family Code that was in effect immediately prior to the 2009 repealer.

[2] *See Carreras v. Marroquin,* 339 S.W.3d 68, 71 (Tex.2011) (stating "statutory interpretation begins by examining the text of the statute," just before quoting the text of the statute at issue); *In re Smith,* 333 S.W.3d 582, 586 (Tex.2011) (stating "when construing a statute, we begin with its language"); *Fresh Coat, Inc. v. K-2, Inc.,* 318 S.W.3d 893, 901 (Tex.2010) (stating that "we begin with the statute's text" and that "we examine the entire act to glean its meaning, try to give meaning to each word, and avoid treating statutory language as surplusage where possible") (quotations omitted). *See also Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) (stating that "the starting point for interpreting a statute is the language of the statute itself").

[3] *See ante* at pp. 795-98.

[4] *See ante* at pp. 795-98.

[5] Act of May 24, 2005, 2005 Tex. Gen. Laws at 1353.

[6] *See Nat'l Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527 (Tex.2000).

[7] *See Cail v. Serv. Motors, Inc.,* 660 S.W.2d 814, 815 (Tex.1983); *Dob's Tire & Auto Center v. Safeway Ins. Agency,* 923 S.W.2d 715, 719 (Tex.App.-Houston [1st Dist.] 1996, writ dism'd w.o.j.).

[8] *See TGS-NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 439 (Tex.2011); *Alex Sheshunoff Management Servs., L.P. v. Johnson,* 209 S.W.3d 644, 651-52 & n. 4 (Tex.2006).

[9] *See Fleming Foods of Texas, Inc. v. Rylander,* 6 S.W.3d 278, 283-84 (Tex.1999) (holding that, although Texas Government Code section 311.023 states that courts may consider the legislative history of unambiguous statutes, the legislative history of a statute cannot be used to alter the unambiguous meaning of a statute, except for the rare instance in which it is used to show a typographical error); *Ramco Oil & Gas, Ltd. v. Anglo Dutch (Tenge) L.L.C.,* 171 S.W.3d 905, 915 (Tex.App.-Houston [14th Dist.] 2005, published Rule 24 order) (stating that courts cannot use legislative history to interpret statute in a manner that contradicts the statute's unambiguous language).

[10] *In re Smith,* 333 S.W.3d at 586, 588; *Alex Sheshunoff Management Servs., L.P.,* 209 S.W.3d at 652.

[11] *See ante* at p. 797.

[12] *See id.*

---------

993 S.W.2d 781 (Tex.App. —Houston [14 Dist.] 1999)

ROBERT MCWHORTER, ET AL. , Appellant

v.

DAVID L. SHELLER, Appellee.

No. 14-96-00875-CV

Court of Appeals of Texas, Fourteenth District, Houston

May 6, 1999

On Appeal from the 189th District Court, Harris County, Texas, Trial Court Cause No. 94-013776

Page 782

[Copyrighted Material Omitted]

Page 783

[Copyrighted Material Omitted]

Page 784

Panel consists of Justices Maurice E. Amidei, Fowler, and Draughn.[*]

O P I N I O N

Joe L. Draughn, Justice (Assigned.)

This action was brought by David L. Sheller ("Sheller") against Robert McWhorter ("McWhorter") for negligence, misrepresentation, fraud, and civil conspiracy. Following a non-jury trial, the court entered judgment against McWhorter, awarding Sheller damages in the amount of $65,380.00. McWhorter assigns four points of error, challenging the sufficiency of the evidence to support the trial court's judgment. McWhorter also argues that the trial court erred in imposing sanctions against his attorneys because of the lack of any evidence of bad faith conduct. We affirm in part and reverse and vacate in part.

I. BACKGROUND

McWhorter is a licensed attorney in Texas and possesses a federal firearms license. Sheller is also a licensed attorney in Texas. Sheller desired to invest in the firearms business. Thus, Sheller gave David Beavers and Jeff Provost, agents of McWhorter, $65,380 to purchase firearms to be sold at gun shows. Many of the firearms purchased with Sheller's money were subsequently sold at a gun show in December 1993, held at the Houston

Astrohall. Several of Sheller's firearms remained unsold, however. Sheller contacted McWhorter about his investment. Sheller claimed that McWhorter told him there was nothing to worry about and that Beavers and Provost were doing an accounting and inventory on the firearms. However, Beavers and Provost subsequently transferred the remaining firearms to another firearms licensee. No firearms were returned to Sheller, nor was he compensated for the sale of any of the firearms. Sheller filed this action against McWhorter, Beavers, and Provost. Beavers and Provost were dismissed from the suit because Sheller was unable to obtain service of process.

Page 785

II. DISCUSSION[1]

In his second point of error, McWhorter contends that the trial court erred in rendering a judgment in favor of Sheller because there was no finding by the trial court that McWhorter "borrowed" money from Sheller.

A trial court's findings are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing evidence supporting a jury's answer. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994). In reviewing a "no evidence" point of error, a reviewing court may consider only the evidence and inferences that tend to support challenged findings and will disregard all evidence and inferences to the contrary. *Wal-Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d 934, 936 (Tex. 1998). If there is more than a scintilla of evidence to support the findings, the "no evidence" challenge cannot be sustained. Catalina, 881 S.W.2d at 297.

The trial court found that "BEAVERS and PROVOST and MCWHORTER through them enticed $65,380 from SHELLER, on MCWHORTER's behalf." McWhorter avers that the "trial court's finding that money was 'enticed' from SHELLER . . . does not support the inference that money was borrowed, or that there was a contractually binding obligation to repay the money." McWhorter suggests in his brief that if he merely "enticed" the money from Sheller, as opposed to "borrowing" the money, then he was not obligated to repay Sheller. He further contends that without a specific finding that he "borrowed" money from Sheller, the judgment of the trial court cannot be upheld on a contract theory. McWhorter asserts that even if a contract was found to exist, that the judgment against him should be reversed because a contract with a 75% return rate, as promised to Sheller, would be "illegal and unenforceable" because of its usurious interest rate. McWhorter cites no authority to support his contentions.

The trial court in this case refused to find that McWhorter "borrowed" the money from Sheller because

it expressly found that McWhorter, inter alia, defrauded Sheller to secure his financial investment in McWhorter's business of selling firearms. The elements of actionable fraud are that: (1) a material representation was made; (2) the representation was false; (3) when the representation was made the speaker knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) the speaker made the representation with the intent that it should be acted upon by the party; (5) the party acted in reliance upon the representation; and (6) the party thereby suffered injury. *Holmes v. P.K. Pipe & Tubing, Inc.,* 856 S.W.2d 530, 541 (Tex.App.-Houston [1st Dist.] 1993, no writ). The "measure of damages in a fraud case is the actual amount of the plaintiff's loss that directly and proximately results from the defendant's fraudulent conduct." *Tilton v. Marshall,* 925 S.W.2d 672, 680 (Tex. 1996); see also Holmes, 856 S.W.2d at 543. The trial court awarded Sheller $65,380.00, the actual amount of Sheller's loss due to McWhorter's fraudulent conduct. See id.

The trial court's finding that McWhorter defrauded Sheller is supported by the evidence contained in the record presented for our review. See Wal-Mart Stores, Inc., 968 S.W.2d at 936. It was not necessary for the trial court to find that McWhorter "borrowed" money from Sheller in order to enter a judgment in Sheller's favor. McWhorter's second point is overruled.

**Page 786**

In his third point of error, McWhorter contends the trial court erred by entering contradictory findings of fact. McWhorter complains that the trial court's findings that he acted both negligently and intentionally are contradictory and therefore the judgment should be reversed. He also complains that the trial court's findings and conclusions do not support the trial court's judgment that he acted both negligently and intentionally.

In its findings of fact and conclusions of law, the trial court expressly found that McWhorter committed fraud, engaged in a civil conspiracy to defraud Sheller, and made negligent representations to Sheller to secure his financial investment in McWhorter's firearms business. The trial court's written findings of fact and conclusions of law, while inartfully drafted, support the trial court's judgment. See *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996); *Luna v. Southern Pacific Transp. Co.,* 724 S.W.2d 383, 384 (Tex. 1987) (court of appeals under a duty to harmonize findings whenever possible). Further, assuming arguendo that the trial court's findings are contradictory, McWhorter fails to develop in his brief how this error, if any, caused the rendition of an improper judgment. "No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of probably caused the rendition of an improper judgment." TEX. R. APP. P. 44.1(a)(1) (West 1999). We are unable to reach such a conclusion in this case.

McWhorter's third point is overruled.

In his fourth point of error, McWhorter contends that the trial court erred in finding that fraud or misrepresentation occurred in this case because there was no evidence to show that Beavers and Provost possessed apparent authority to borrow or solicit money on his behalf. McWhorter asserts that the evidence is legally insufficient to support such a finding. When reviewing a legal sufficiency point, this Court "must consider only the evidence and inferences tending to support the trial court's finding, disregarding all contrary evidence and inferences." Wal-Mart Stores, Inc., 968 S.W.2d at 936.

While actual authority is created by written or spoken words or conduct by the principal to the agent, apparent authority is created by written or spoken words or conduct by the principal to a third party. *El Estillero v. J.S. McManus Produce,* 964 S.W.2d 332, 334 (Tex.App.-Corpus Christi 1998, no pet.); see also *Baptist Memorial Hosp. System v. Sampson,* 969 S.W.2d 945, 949 (Tex. 1998). To establish apparent authority, one must show a principal either knowingly permitted an agent to hold itself out as having authority or showed a lack of ordinary care in order to clothe the agent with indicia of authority. Id. A court may consider only the conduct of the principal leading a third party to believe the agent has authority in determining whether an agent has apparent authority. Id. A party seeking to charge a principal through the apparent authority of its agent must establish conduct by the principal which would lead a reasonably prudent person to believe the agent has the authority it purports to exercise. Id.; see also *Biggs v. United States Fire Ins. Co.,* 611 S.W.2d 624, 629 (Tex. 1981). The principal must have affirmatively held out the agent as possessing the authority or must have knowingly and voluntarily permitted the agent to act in an unauthorized manner. Id.

Here, the record shows that McWhorter allowed Beavers and Provost to use McWhorter's non-transferrable federal firearms license to buy and sell firearms for profit. McWhorter testified that Beavers and Provost were his agents. McWhorter knew that Sheller gave $65,380.00 to Beavers and Provost to buy firearms for the purpose of selling them at gun shows. McWhorter never told Sheller that his agents were acting outside their agency relationship with him. When Sheller

**Page 787**

did not receive any return on his investment, he contacted McWhorter. McWhorter told Sheller that his agents were conducting an accounting, which led Sheller to believe that they were still operating within the scope of their authority. McWhorter further ratified his agents' conduct by accepting Sheller's financial investment and profiting therefrom.

Ratification is the affirmance by a person of a prior

act which when performed did not bind him, but which was professedly done on his account, whereby the act is given effect as if originally authorized by him. *Disney Enterprises, Inc. v. Esprit Finance, Inc.,* 981 S.W.2d 25, 31 (Tex.App.-San Antonio 1998, no pet.) (citing RESTATEMENT (SECOND) OF AGENCY § 82 (1958)). Ratification, in this context, is not a form of authorization, but a legal concept in agency law describing the relations between parties after affirmance by a person of a transaction done or purported to be done for him. Id. A ratification will lie when the individual for whom an act was done retains the benefits of the transaction after acquiring full knowledge of the transaction. Id.; see also *Land Title Co. of Dallas v. F.M. Stigler, Inc.,* 609 S.W.2d 754, 756 (Tex. 1980). Most case law interpreting the doctrine of ratification couches its discussion in the context of an existing agency relationship where the agent exceeds the scope of her authority and the principal later accepts the benefits of such act after acquiring full knowledge. Id.; *Humble Nat'l Bank v. DCV, Inc.,* 933 S.W.2d 224, 237 (Tex.App.--Houston [14th Dist.] 1996, writ denied). Ratification, however, can occur outside this general paradigm. Id. While most cases will fall within the context of an agency relationship, such a relation is not necessary to cause the ratification to be effective. Id. It is true, however, that because ratification is not a form of authorization, the ratification of an act of a stranger will not create an agency relationship, it will only bind the ratifier to the specific transaction that is ratified. Disney Enterprises, Inc., 981 S.W.2d at 31.

The trial court's findings that McWhorter's respective agents possessed apparent authority and that McWhorter ratified their fraudulent conduct is supported by the record. See Wal-Mart Stores, Inc., 968 S.W.2d at 936. McWhorter's fourth point is overruled.

In his fifth point of error, McWhorter contends that the evidence is legally and factually insufficient to show that he agreed to enter into a conspiracy with Beavers and Provost to defraud Sheller. As previously noted, when reviewing a legal sufficiency point, we consider only the evidence and inferences tending to support the trial court's finding and disregard all contrary evidence and inferences. Wal-Mart Stores, Inc., 968 S.W.2d at 936. On the other hand, in reviewing the factual sufficiency of the evidence, we consider all of the evidence in the record, not just the evidence which supports the judgment. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406-07 (Tex. 1998). We may set aside a judgment only if it is so contrary to the overwhelming weight of the evidence so as to be clearly wrong and unjust. Id. at 407. An appellate court may not pass upon the credibility of witnesses nor the weight to be accorded their testimony. The fact finder may accept or reject any witnesses' testimony in whole or in part. See id.; see also *Bocquet v. Herring,* 972 S.W.2d 19, 22 (Tex. 1998) (Baker, J., dissenting). If the appellate court affirms the judgment, it not necessary for the court to detail all the evidence

supporting the judgment. See Maritime Overseas Corp., 971 S.W.2d at 407.

An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Operation Rescue-National v. Planned Parenthood of Houston,* 975 S.W.2d 546, 553 (Tex. 1998). The essential elements are (1) two or more persons

**Page 788**

agreed on, (2) an object to be accomplished, (3) a meeting of minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as the proximate result. Id.; *Carroll v. Timmers Chevrolet, Inc.,* 592 S.W.2d 922, 926 (Tex. 1979). Once a civil conspiracy is proven, each conspirator is responsible for the acts done by any other conspirator to further the conspiracy. Carroll, 592 S.W.2d at 926. Further, "the common purpose from which conspiracy liability arises may be established by reasonable inferences." Id.

McWhorter argues that there was no direct evidence of any agreement between him and Beavers and Provost to defraud Sheller. He contends that he authorized his agents to only buy and sell firearms and that he met Sheller only after Sheller gave his money to Beavers and Provost. Sheller testified that Beavers and Provost took him to McWhorter's law office before making his investment. The record shows that McWhorter was present at the gun show where the firearms were displayed and sold and that he conveyed to Sheller that he was aware that his agents purchased firearms with Sheller's money. McWhorter's federal firearms license was used to purchase firearms with Sheller's money and the license was displayed and used at the gun show. After the gun show, McWhorter told Sheller that his agents were conducting an accounting and that the unsold firearms would be stored by McWhorter until being returned for credit. No firearms or money were ever returned to Sheller. McWhorter received a profit from the firearms purchased and sold with Sheller's money. See id.

We conclude that the evidence was legally and factually sufficient to show that McWhorter entered into a conspiracy with Beavers and Provost to defraud Sheller. See Maritime Overseas Corp, 971 S.W.2d at 406-07; Wal-Mart Stores, Inc., 968 S.W.2d at 936. The trial court's conspiracy finding is not so against the overwhelming weight of the evidence as to be clearly wrong and unjust. See id. McWhorter's fifth point is overruled.

In his sixth point of error, McWhorter contends that the trial court erred in imposing sanctions against his attorney. He argues that the sanctions are unwarranted because his attorney did not act in bad faith and did not interfere with the administration of justice.

The trial judge initiated a telephone conference with

both parties' respective counsel to communicate her findings of fact and conclusions of law so that an appropriate order could be prepared. Unbeknownst to the trial judge and Sheller's counsel, McWhorter's counsel recorded the telephone conference.[2] Upon being apprised of the tape-recording by McWhorter's counsel, Sheller's counsel moved for sanctions against McWhorter's counsel and her law firm. The trial court entered an order which imposed sanctions in the sum of $500.00 against counsel, her law partner and their law firm and additional $500.00 for attorney's fees.

The decision to impose a sanction is left to the discretion of the trial court and will be set aside only upon a showing of abuse of discretion. *Onwuteaka v. Gill,* 908 S.W.2d 276 (Tex.App.-Houston [1st Dist.] 1995, no writ). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles, or whether under the circumstances of the case the trial court's action was arbitrary or unreasonable. Id. Texas courts have previously held courts have inherent power to discipline an attorney's behavior. See, e.g., *Lawrence v. Kohl,* 853 S.W.2d 697, 700 (Tex. App.-Houston [1st Dist.] 1993, no writ) (holding that trial

**Page 789**

courts have the power to sanction parties for bad faith abuse of the judicial process not covered by rule or statute); *Kutch v. Del Mar College,* 831 S.W.2d 506, 509-10 (Tex. App.-Corpus Christi 1992, no writ).

The trial judge did not make a finding that McWhorter's attorney acted in bad faith in tape recording her instructions. McWhorter's counsel contended that she recorded the conversation so that the order to be prepared would accurately reflect the instructions given by the judge. There is no evidence that McWhorter's attorney acted in a manner which would interfere with the administration of justice or detract from the trial court's dignity and integrity. Indeed, the trial judge noted that the findings of fact and conclusions of law prepared from the recording tracked the telephone conference. The trial judge also noted that the findings were specific and that she felt comfortable adopting them.

We note that the trial court's inherent power to sanction exists to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process, such as any significant interference with the traditional core functions of Texas courts. Kutch, 831 S.W.2d at 510. Accordingly, for inherent power to apply, there must be some evidence and factual findings that the conduct complained of significantly interfered with the court's legitimate exercise of one of these powers. See id. In the instant case, no such finding was made and we find no evidence indicating bad faith by McWhorter's attorney. The attorney's recording of the telephone conference, at best, represents some degree of inexperience and

negligence on her part, rather than an intentional act made in bad faith. We also observe that an Ethics Opinion concerning an attorney's obligation to inform all parties before tape recording a conversation was published during the same month as this recording occurred. See 59 TEXAS BAR JOURNAL 181 (Ethics Opinion 514) (Feb. 1996). We emphasize that Ethics Opinion 514 is a legally binding part of Rule 8.04(a)(3), supra, and is applicable to all attorneys licensed in this state. Accordingly, should such a recording occur in the future without informing all parties and securing the permission of the trial judge, sanctions against the recording attorney may be appropriate. For the reasons previously stated, we find that the trial court abused its discretion in imposing sanctions in this case. McWhorter's fifth point is sustained.

We reverse and vacate the trial court's judgment concerning the imposition of sanctions of $500 and attorney's fees of $500. In all other respects the trial court's judgment is affirmed.

---------

Notes:

[*]. Senior Justice Joe L. Draughn sitting by assignment.

[1]. In McWhorter's first point of error, entitled "Issue Number One," he argues that his challenges to the trial court's findings are preserved for appellate review. We agree and conclude that McWhorter's points of error are preserved for appellate review. See Regan v. Lee, 879 S.W.2d 133, 136 (Tex.App.-Houston [14th Dist.] 1994, no writ); Westech Eng. v. Clearwater Constructors, 835 S.W.2d 190, 196-97 (Tex.App.-Austin 1992, no writ).

[2]. Disciplinary Rule 8.04 (a)(3) prohibits an attorney from electronically recording a telephone conversation with another party without first informing that party that the conversation is being recorded. See TEX. DISCIPLINARY R. PROF. CONDUCT 8.04(a)(3) (1989).

---------

Page 506

831 S.W.2d 506 (Tex.App. —Corpus Christi 1992)

Marilynn T. KUTCH, Appellant,

v.

DEL MAR COLLEGE, et al., Appellees.

No. 13-91-285-CV.

Court of Appeals of Texas, Thirteenth District, Corpus Chritsi

May 21, 1992

Page 507

Martha P. Owen, Vans Os, Deats, Rubinett & Owens, Austin, for appellant.

Frank E. Weathered, Dunn, Cason & Weathered, Lev Hunt, Hunt, Hermansen, McKibben & Barger, Shirley Selz, Gary, Thomasson, Hall & Marks, Corpus Christi, for appellees.

Before GILBERTO HINOJOSA, KENNEDY and SEERDEN, JJ.

OPINION

GILBERTO, HINOJOSA, Justice.

Appellant was dismissed from her job as a secretary at Del Mar College. She filed suit alleging wrongful dismissal. Initially, her husband represented her in this suit. Special exceptions were levied against the petition. A new petition was filed; however, many of the problems associated with the first petition were not cured in the second petition.

The trial court heard arguments on the special exceptions and on December 19, 1990, it granted them. The court set January 18, 1991, as a deadline for the new petition.

The deadline was not met. A hearing was held on a motion to dismiss and a motion for extension of time to replead. The trial court granted appellee's motion and dismissed the cause with prejudice. A motion for new trial was filed. At this motion appellee argued that the trial court's ruling was sustainable as a sanction. Appellant challenges the trial court's

Page 508

actions by three points of error. We modify the trial court's judgment, and as modified, affirm.

By appellant's first point of error she argues that the trial court erred in sustaining appellees' special exceptions to her petition. The trial court has broad discretion to sustain special exceptions and order more definite pleadings as a particular case may require. See *Hubler v. City of Corpus Christi,* 564 S.W.2d 816, 820 (Tex.Civ.App.--Corpus Christi 1978, writ ref'd n.r.e.). Thus, we review the trial court's actions under the abuse of discretion standard of review.

The test for determining if the trial court abused its discretion is whether the trial court acted without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex.1985). If the trial court acts in an arbitrary or unreasonable manner, it abuses its discretion. *Loftin v. Martin,* 776 S.W.2d 145, 146 (Tex.1989); Downer, 701 S.W.2d at 241-42; *Smithson v. Cessna Aircraft Co.,* 665 S.W.2d 439, 443 (Tex.1984). The trial court does not necessarily abuse its discretion if under the same facts an appellate judge would decide the matter differently, or if the court commits a mere error in judgment. Loftin, 776 S.W.2d at 146; Downer, 701 S.W.2d at 242; *Southwestern Bell Tel. v. Johnson,* 389 S.W.2d 645, 648 (Tex.1965). This court will reverse a trial court's rulings if it abuses its discretion and the error is harmful. TEX.R.APP.P. 81(b)(1). See generally *Landon v. Jean-Paul Budinger, Inc.,* 724 S.W.2d 931, 935-36 (Tex.App--Austin 1987, no writ) (discussing the standard).

We have reviewed the pleadings and the special exceptions. Many paragraphs in the plaintiff's petition are overbroad and arguably do not provide reasonable notice of the factual basis of the claims. The trial court did not abuse its discretion in sustaining many of these special exceptions. Appellant's first point of error is overruled.

Appellant's second point complains that the trial court erred in dismissing her petition with prejudice. She argues that this is not a case in which she elected to stand on her pleadings and test the trial court's ruling on review, or a case in which the pleadings did not state a valid cause of action. Rather, this is a case in which she desired to replead but did not meet the court's deadline. We must overrule this point and affirm if the trial court's ruling is sustainable on any theory supported by the pleadings and the evidence. *Guarantee County Mutual Ins. Co. v. Reyna,* 709 S.W.2d 647, 648 (Tex.1986).

As set forth above, special exceptions were levied against the first petition. Thereafter, the plaintiff filed a FIRST SUPPLEMENTAL ORIGINAL PETITION. Many of the defects which appeared in the plaintiff's ORIGINAL PETITION were not cured. A hearing was held. The trial court entered an order permitting the plaintiff to file an amended petition by January 18, 1991.

Prior to January 18, 1991, the plaintiff filed a motion for extension of time to file the second amended petition. This motion was denied. The defendants filed a motion to dismiss. A hearing was held, and the cause dismissed with prejudice.

Generally, a trial court cannot dismiss a plaintiffs' entire case with prejudice if the pleadings state a valid cause of action, but are vague, overbroad, or otherwise susceptible to valid special exceptions. The proper remedy is to dismiss without prejudice. See *Hajdik v. Wingate,* 753 S.W.2d 199, 202 (Tex.App.--Houston [1st Dist.] 1988) affirmed on other grounds, 795 S.W.2d 717 (Tex.1990).

In the instant case, a number of valid causes of action were pleaded, although inartfully. Remaining portions of the pleadings stated valid causes of action. Thus, the trial court's ruling dismissing the cause with prejudice is not sustainable on special exception grounds. Id; *D.A. Buckner Const., Inc. v. Hobson,* 793 S.W.2d 74, 75-76 (Tex.App.--Houston [14th Dist.] 1990, no writ).

Appellees argue that dismissal with prejudice was proper as a sanction for violation of the pretrial order to replead. See Koslow's

## Page 509

v. Mackie, 796 S.W.2d 700, 704 (Tex.1990) (affirming dismissal with prejudice for violation of a pretrial order). Texas courts have a statutory and rule based power to sanction. See e.g. TEX.R.CIV.P. 215; TEX.GOV.CODE ANN. § 82.061 (Vernon 1990). No case has yet determined whether Texas courts also have an inherent, common law power to sanction similar in scope to the federal power. See *Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).

To determine whether the trial court's dismissal with prejudice is sustainable as a sanction, the first issue we must address is whether the trial court has authority to sanction this conduct. This sanction does not relate to discovery. Thus, the rules governing discovery sanctions do not apply. See TEX.R.CIV.P. 215. The sanction order did not state "good cause" as required by TEX.R.CIV.P. 13, [1] and there is no allegation of groundless pleadings. Thus, this sanction may not be justified under TEX.R.CIV.P. 13. We have found no other statute or rule expressly authorizing sanctions for this violation of the court's order to replead.

The issue presented is whether the trial court had some other authority to assess sanctions for this type of conduct. We hold Texas courts have inherent power to sanction for bad faith conduct during litigation. See e.g. Chambers, 111 S.Ct. at 2134 (federal courts have inherent power to sanction for bad faith conduct).

In Chambers, a similar issue was presented: whether a federal district court has inherent powers to sanction

abusive conduct not expressly covered by federal sanctions rules. The Supreme Court of the United States held that federal courts have such inherent power. Although ill defined, the Court recognized this power is quite potent, and should be used only with great restraint and discretion. Id. at 2133.

Significantly, the Court reasoned that this power is derived from certain institutional aspects all courts possess, including the power to "impose silence, respect, and decorum, ... and submission to their lawful mandates;" the power to "punish for contempts;" and the power to dismiss for "failure to prosecute." Id. Texas courts, like all civilized courts of justice, have these inherent powers. *Public Util. Comm'n v. Cofer,* 754 S.W.2d 121, 124 (Tex.1988); *Eichelberger v. Eichelberger,* 582 S.W.2d 395, 398-400 (Tex.1979); see e.g. *Worldwide Anesthesia v. Bryan Anesthesia,* 765 S.W.2d 445, 447 (Tex.App.--Houston [14th Dist.] 1988, no writ) (courts have express or implied power to dismiss or render a default judgment to ensure orderly administration of justice). Thus, the Supreme Court's reasoning is persuasive authority for the proposition that Texas Courts have certain other inherent powers as well, including the power to sanction for bad faith abuse of the judicial process.

Our review of Texas case law reveals that Texas Courts possess significant inherent powers. For example, Texas courts have the power to impose contempt. Ex

## Page 510

Parte Pryor, 800 S.W.2d 511, 512 (Tex.1990). Texas courts have the power to appoint a master. *Simpson v. Canales,* 806 S.W.2d 802, 810 (Tex.1991). Texas courts have the inherent power to compel expenditure of public funds for essential court functions. *Mays v. Fifth Court of Appeals,* 755 S.W.2d 78, 80 (Tex.1988) (Spears, concurring); *Vondy v. Commissioners Court of Uvalde County,* 620 S.W.2d 104, 109-110 (Tex.1981). Texas courts have the power to insure adversary proceedings despite statutes providing otherwise. Cofer, 754 S.W.2d at 124.

Significantly, in Mackie v. Koslow's, 774 S.W.2d 741, 743 (Tex.App.--El Paso 1989) reversed *Koslow's v. Mackie,* 796 S.W.2d 700 (Tex.1990), the appellate court held the trial court did not have authority under Rule 215 or any other rule to impose a sanction for violation of a pre-trial order. The Supreme Court of Texas reversed holding the trial court did have such authority under Rule 166. Rule 166 does not provide for sanctions. However, the Court sustained the trial court's power to sanction because "the trial court had the power implicit under Rule 166 to provide in his pretrial order that the refusal to participate in the status conference or the failure to file a timely joint status report would result ... [in] dismissal, default, or other sanctions ..." Id. at 703.

The Supreme Court of Texas has recently reaffirmed the position that Texas courts have inherent powers which are necessarily derived from the judiciary's status as a co-equal branch of the government. See Cofer, 754 S.W.2d 121, 124 (Tex.1988). The Cofer Court relied on Eichelberger, wherein the Court expressly recognized that:

The inherent judicial power of a court is not derived from legislative grant or specific constitutional provision, but from the very fact that the court has been created and charged by the constitution with certain duties and responsibilities. The inherent powers of a court are those which it may call upon to aid in the exercise of its jurisdiction, in the administration of justice, and in the preservation of its independence and integrity.

Id. 582 S.W.2d at 398. The scope of these powers has been unclear. We write today to clarify the scope of inherent powers to sanction.

The power to compel compliance with valid orders incident to the administration of justice is fundamental, and closely related to the core functions of the judiciary. We expressly recognize this power today. Consequently, we hold that Texas Courts have the inherent power to sanction for abuse of the judicial process which may not be covered by rule or statute. This power includes the power to sanction appropriately for failure to comply with a valid court order incident to one of the core functions of the judiciary.

Recognizing this power, we also recognize certain limitations. Eichelberger recognized the linkage between the inherent power and a court's administration of justice. The Court of Criminal Appeals has more clearly refined and identified this concept by articulating the core functions of the judiciary, which are: hearing evidence, deciding issues of fact raised by the pleadings, deciding questions of law, entering final judgment and enforcing that judgment. *Armadillo Bail Bonds v. State,* 802 S.W.2d 237, 239-40 (Tex.Crim.App.1990). Inherent power to sanction exists to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process, such as any significant interference with the traditional core functions of Texas courts. Accordingly, for inherent power to apply, there must be some evidence and factual findings that the conduct complained of significantly interfered with the court's legitimate exercise of one of these powers.

In addition, other limitations exist. The amorphous nature of this power, and its potency, demands sparing use. The best practice is to rely upon the rules and statutes expressly authorizing sanctions whenever possible. See Chambers, 111 S.Ct. at 2135-36.

We also recognize that the legislature's lawmaking powers may operate to limit certain exercises of inherent power.

See e.g. *Dow Chemical Co. v. Alfaro,* 786 S.W.2d 674, 679 (Tex.1990) (the legislature has the power to abolish forum non-conveniens). [2] Most importantly, the rights of litigants may not be infringed by the abusive exercise of this power. This point merits further discussion.

Due process limits a court's power to sanction. *Hammond Packing Co. v. Arkansas,* 212 U.S. 322, 29 S.Ct. 370, 53 L.Ed. 530 (1909); *Tate v. Commodore County Mutual Ins. Co.,* 767 S.W.2d 219, 225 (Tex.App.--Dallas 1989, no writ). The traditional Due Process protections of notice and hearing are also necessary before imposition of sanctions. *Sears Roebuck & Co. v. Hollingsworth,* 156 Tex. 176, 293 S.W.2d 639, 642 (Tex.1956); TEX.R.CIV.P. 215(2)(b).

In *Transamerican Natural Gas v. Powell,* 811 S.W.2d 913 (Tex.1991) the Court, relying on Due Process principles, limited imposition of death penalty [3] sanctions to circumstances in which a party has exhibited flagrant bad faith or callous disregard for discovery rules or court orders raising the inference that a party's claims lack merit. Transamerican, 811 S.W.2d at 918; see *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976).

Additionally, the Transamerican Court wrote:

In our view, whether an imposition of sanctions is just is measured by two standards. First, a direct relationship must exist between the offensive conduct and the sanction imposed. This means that a just sanction must be directed against the abuse and toward remedying the prejudice caused the innocent party. It also means that the sanction should be visited upon the offender. The trial court must at least attempt to determine whether the offensive conduct is attributable to counsel only, or to the party only, or to both. This we recognize will not be an easy matter in many instances. On the one hand, a lawyer cannot shield his client from sanctions; a party must bear some responsibility for its counsel's discovery abuses when it is or should be aware of counsel's conduct and the violation of discovery rules. On the other hand, a party should not be punished for counsel's conduct in which it is not implicated apart from having entrusted to counsel its legal representation. The point is, the sanctions the trial court imposes must relate directly to the abuse found.

Second, just sanctions must not be excessive. The punishment should fit the crime. A sanction imposed for discovery abuse should be no more severe than necessary to satisfy its legitimate purposes. It follows that courts must consider the availability of less stringent sanctions and whether such lesser sanctions would fully promote compliance.

Id. 811 S.W.2d at 917.

Significantly, Koslow's recognized that a court's "implicit" power to sanction was governed by the justness or appropriateness standard which was later developed in Transamerican. Koslow's, 796 S.W.2d at 703-4 n. 1. At least these limits constrain exercise of inherent powers, regardless of their form.

Having found that trial courts have an inherent power to sanction for certain conduct which affects the core functions of the judiciary, we must now determine if the conduct sanctioned was properly subject to this inherent power. As described above, the inherent power is strongest, and most powerful when the conduct complained of interferes with one of the core functions of the judiciary. Violation of a court order relating to the court's management and administration of

**Page 512**

a particular legal claim generally will be a significant interference with one or more of the judiciary's functions. In the instant case, appellant's failure to replead after being given a chance to do so inhibited the court's and the other litigant's abilities to determine what evidence and legal issues are relevant to this suit. This is a significant interference with the administration of justice. We hold the evidence supported the trial court's assessment of some sanction for this conduct based on its inherent power.

The next issue is whether the trial court's dismissal of appellee's lawsuit with prejudice exceeded its limited inherent power to sanction for abuse of the judicial process. Initially, we must determine what standard of review to apply.

Two standards of review could apply to this issue, the de novo standard or the abuse of discretion standard. Koslow's applied the abuse of discretion standard. In *Home Owners Funding Corp. v. Scheppler,* 815 S.W.2d 884, 889 (Tex.App.--Corpus Christi 1991, no writ), this Court carefully considered and decided that the abuse of discretion standard of review applied to TEX.R.CIV.P. 13 sanction orders. HOFCA, in turn relied in part upon *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990), which applied the abuse of discretion standard of review to FED.R.CIV.P. 11 sanction orders. Chambers applied the abuse of discretion standard in reviewing sanction orders under the federal court's inherent powers. In accordance with this line of authority we hold the abuse of discretion standard of review applies in determining whether the trial court properly exercised its inherent powers to sanction.

Properly applying the abuse of discretion standard for sanction orders requires us to review the entire record. We review the conflicting evidence in the light most favorable to the trial court's ruling, and draw all reasonable inferences therefrom which sustain the judgment. *Vaughn v. Texas Emp. Comm'n,* 792 S.W.2d

139, 143 (Tex.App.--Houston [1st Dist.] 1990, no writ); *Hlavinka v. Griffin,* 721 S.W.2d 521, 524 (Tex.App.--Corpus Christi 1986, no writ). We will reverse or modify the judgment only if the error is harmful. TEX.R.APP.P. 81(b)(1).

The evidence showed that one reason why the pleadings were not timely amended was that a new lawyer had not been found. The reason why a new lawyer was needed was because the old lawyer was the plaintiff's husband. Serious (and obvious) conflicts existed. A new lawyer who is representing appellant on appeal had been contacted, but had not been retained as of the date of the hearing on the motion to dismiss. The search for new counsel had taken at least five months. An additional reason for the failure to replead was appellant's husband/lawyer was tied up in court immediately prior to the January 18 deadline. Cross examination revealed, however, that the conflict problem was clear at the inception of this suit. It also showed that appellant's husband/lawyer was well informed about the factual allegations in the suit. This raised the inference that he could have repleaded.

Although the evidence supports the trial court's ruling that appellant's reasons for the delay were unsatisfactory, we must determine whether "death penalty" sanctions are appropriate under the standards set forth in Transamerican. If the evidence does not support "death penalty" sanctions under Transamerican, we must conclude that the trial court abused its discretion in assessing such sanctions in this case.

Our first inquiry under Transamerican is whether a direct relationship between the abuse and the sanction exists. Dismissal of appellant's petition with prejudice for failure to replead is a sanction directly related to the violation of the court's order to replead. However, the sanction most strongly effects the client, and not the offending party, her attorney.

The second inquiry is whether the sanctions were excessive. The legitimate purposes of sanctions must be furthered by the sanction order, but not excessively. These purposes are to secure compliance,

**Page 513**

deter future violations, and punish violators. *Bodnow v. City of Hondo,* 721 S.W.2d 839, 840 (Tex.1986). We first look to see if lesser sanctions were imposed or considered by the trial court in order to secure compliance.

Except for the court's order granting the defendant's special exceptions and permitting appellant to replead, no lesser sanctions were assessed by the trial court to encourage compliance. [4]

An additional factor supporting severe sanctions is a finding of callous disregard for the rules or flagrant bad faith. Transamerican, 811 S.W.2d at 918. We find no

evidence in the record that the failure to replead was motivated by flagrant bad faith or callous disregard for the trial court's order. Although appellant failed to timely replead, a motion for extension of time to replead was filed, and supported by evidence adduced at the hearing. A new petition was tendered at the motion for new trial. The old petition alleged facts supporting a valid cause of action; thus the presumption that appellant's claims lack merit is absent. Under these circumstances, the dismissal with prejudice violated appellant's due process rights. Transamerican, 811 S.W.2d at 918. The punishment for this "crime" was excessive.

We hold that the trial court abused its discretion in striking appellant's pleadings and dismissing the cause with prejudice.

The final issue we must address is whether the error is harmful. [5] TEX.R.APP.P. 81(b)(1). We have reviewed the pleadings on file. Even after the special exceptions are taken into account, they allege sufficient facts to sustain a valid cause of action for wrongful dismissal. No motion for summary judgment with supporting evidence has been filed to controvert the facts alleged in the pleadings. Thus, we find the error harmful. Id. Appellant's second point of error is sustained.

We modify the trial court's ruling to delete the words "with prejudice," and as modified, affirm.

---------

Notes:

[1] Rule 13 provides:

The signatures of attorneys or parties constitute a certificate by them that they have read the pleading, motion, or other paper; that to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith or groundless and brought for the purpose of harassment. Attorneys or parties who shall bring a fictitious suit as an experiment to get an opinion of the court, or who shall file any fictitious pleading in a cause for such a purpose, or shall make statements in pleading which they know to be groundless and false, for the purpose of securing a delay of the trial of the cause, shall be held guilty of a contempt. If a pleading, motion or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, after notice and hearing, shall impose an appropriate sanction available under Rule 215-2b, upon the person who signed it, a represented party, or both.

Courts shall presume that pleadings, motions, and other papers are filed in good faith. No sanctions under this rule may be imposed except for good cause, the particulars of which must be stated in the sanction order. "Groundless" for purposes of this rule means no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law. A general denial does not constitute a violation of this rule. The amount requested for damages does not constitute a violation of this rule.

TEX.R.CIV.P. 13.

[2] Of course the legislature's power to limit exercises of inherent powers cannot impair the traditional ability of a Texas courts to function as courts. Armadillo v. State, 802 S.W.2d 237, 239-40 (Tex.Crim.App.1990) (separation of powers doctrine limits the legislature's ability to restrict core functions of the judiciary).

[3] The death penalty refers to a sanction which terminates the litigation either by striking pleadings, rendering a default judgment, or both.

[4] Lesser sanctions such as an order assessing a fine or attorney's fees might have resulted in compliance with the court's order to replead. Appellant's counsel appeared at the motion for new trial and requested leave to file an amended pleading which she stated cured all the problems associated with the earlier pleading. Counsel was not permitted to file this pleading.

[5] Dismissal with prejudice is not necessarily harmful error. For example, if the pleadings did not state a valid cause of action the dismissal could have been harmless.

---------

898 S.W.2d 257 (Tex. 1995)

Ex parte Franklin D. CHAMBERS

No. 94-0495.

Supreme Court of Texas.

March 30, 1995

Argued Nov. 11, 1994.

Rehearing Overruled June 15, 1995.

Robert K. Frisch, Dallas.

Ray N. Donley, Jane M.N. Webre, Austin.

HIGHTOWER, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and HECHT, CORNYN, GAMMAGE, SPECTOR and OWEN, Justices, join.

In this case we must decide whether a judgment of contempt was properly rendered against a corporate officer, director and shareholder for his personal failure to cause the corporation to pay a contempt fine previously adjudged against it. Although we find that the order was sufficiently specific to give rise to a personal duty on Chambers' part to obey it, we grant his petition for writ of habeas corpus because we find that he has conclusively proven that the corporation was unable to comply with the order.

In early 1992, Franklin Delano Chambers was an employee of International Business Exchange Corporation (hereinafter "IBEC"), a corporation whose business consisted primarily of bringing together buyers and sellers of businesses through listings, mail outs and advertising. In connection with his employment, Chambers entered into an agreement in which he promised not to use IBEC's marketing tools and trade secrets in competition with IBEC. In April 1992, Chambers founded International Business Search, Inc. (hereinafter "IBS"). IBS employed Chambers and several other former IBEC employees to provide essentially the same business listing services which they had offered as employees of IBEC. Chambers, along with Donna Nicholls and Allan Millen, made up IBS's initial board of directors; however, Nicholls and Millen were removed from the board only two months after IBS

was formed. This left Chambers as the sole officer,

director and 100% stockholder.

In mid 1992, believing that IBS and Chambers were unlawfully competing with it in violation of the nondisclosure and noncompetition agreements, IBEC sued IBS, Chambers, and the other former IBEC employees. Among the remedies sought by IBEC and granted by the trial court was an injunction to restrain the defendants from using or disclosing IBEC's trade secrets and confidential information. The injunctions granted by the trial court were subsequently and repeatedly violated.

On February 2, 1993, IBS and the individual defendants were found to be in contempt of court for violating the injunctions through customer contacts which occurred in July and August of 1992. Fines were ordered and were paid. During March of 1993, Chambers proceeded to shut down IBS and open a sole proprietorship called Investor Brokerage Service (hereinafter "IBS II"). The assets of IBS were transferred to IBS II, which used the same location, the same phone number, and engaged in the same business as IBS. On June 24, 1993, the defendants were again found to be in violation of the trial court's injunctions stemming from customer contacts in September, November and December of 1992. On this occasion, however, only IBS was held in contempt. For these multiple acts of contempt, IBS, of which Chambers was the sole officer, director and shareholder, was ordered to pay a $3000 fine within seven days.

One hundred fifteen days later, the fine from the second contempt judgment against IBS remained unpaid and Chambers was ordered to show cause why he should not be held in contempt for the failure of IBS to pay the fine. At the show cause hearing, Chambers contended that IBS was unable to pay the fine. Chambers and IBS were both found to be in contempt of court. Chambers, individually, was ordered to pay a total fine of $6000 and was sentenced to jail for a period of 7 days and for so long thereafter as the $6000 fine remained unpaid.

Chambers sought a writ of habeas corpus from the Third Court of Appeals, which writ was ultimately denied by that court. --- S.W.2d ----. We initially granted Chambers' release on bond while his application was pending, and we now grant the writ of habeas corpus because Chambers has established the corporation was unable to pay the court ordered fine.

I.

We must first decide whether Chambers, a corporate officer and director, can be held in contempt of court when the violated order is directed only to the corporation. Contempt of court is broadly defined as disobedience to or disrespect of a court by acting in opposition to its authority. Ex parte Norton, 144 Tex.

445, 191 S.W.2d 713, 714 (1946). See also William W. Kilgarlin & Scott A. Ozmun, Contempt of Court in Texas--What You Shouldn't Say to the Judge, 38 Baylor L.Rev. 291, 292 (1986). Within this definition, there are two basic types of contempt: direct contempt and constructive contempt. Direct contempt is that type of disobedience or disrespect which occurs within the presence of the court, while constructive contempt occurs outside the court's presence. *Ex Parte Gordon,* 584 S.W.2d 686, 688 (Tex.1979). The contempt alleged in this case, violation of a written court order, outside the presence of the court, is constructive contempt. A criminal contempt conviction for disobedience to a court order requires proof beyond a reasonable doubt of: (1) a reasonably specific order; (2) a violation of the order; and (3) the willful intent to violate the order. See *In the Matter of Hipp, Inc.,* 5 F.3d 109, 112 (5th Cir.1993) (citing *Cooper v. Texaco, Inc.,* 961 F.2d 71, 72 n. 3 (5th Cir.1992); *United States v. Burstyn,* 878 F.2d 1322 (11th Cir.1989)). [1] In reviewing the record, we are without jurisdiction to weigh the proof and determine whether it preponderates for or against the relator; rather, we determine only if the judgment is void because, for example, the relator has been confined without a hearing or with no evidence

**Page 260**

of contempt to support his confinement. Ex parte Barnett, 600 S.W.2d 252 (Tex.1980); Ex parte Helms, 152 Tex. 480, 259 S.W.2d 184 (1953). See also Ex parte Howell, 843 S.W.2d 241, 245 (Tex.App.--Houston [1st Dist.] 1992, orig. proceeding).

A.

We first consider whether the order Chambers is accused of violating is sufficiently specific to support a judgment of contempt. The order which Chambers is charged with violating is an order directing IBS to pay a $3000 fine, but it does not designate any particular person to carry out its terms. In order to support a judgment of contempt, Texas law requires that the underlying decree set forth the terms of compliance in clear, specific and unambiguous terms so that the person charged with obeying the decree will readily know exactly what duties and obligations are imposed upon him. Ex parte MacCallum, 807 S.W.2d 729, 730 (Tex.1991); Ex parte Hodges, 625 S.W.2d 304, 306 (Tex.1981); Ex parte Slavin, 412 S.W.2d 43, 44 (Tex.1967). Chambers argues that nonpayment by the corporation cannot result in his own contempt because the court did not clearly and unambiguously order him to pay the fine. We disagree.

A court order is insufficient to support a judgment of contempt only if its interpretation requires inferences or conclusions about which reasonable persons might differ. MacCallum, 807 S.W.2d at 730. Only the existence of reasonable alternative constructions will prevent enforcement of the order. See, e.g., Ex parte Crawford,

684 S.W.2d 124 (Tex.App.--Houston [14th Dist.] 1984, orig. proceeding) (holding an obligor in contempt who knew with certainty he was to pay one of two amounts of child support but ignored the order altogether). The order need not be full of superfluous terms and specifications adequate to counter any flight of fancy a contemnor may imagine in order to declare it vague. Ex parte Johns, 807 S.W.2d 768, 774 (Tex.App.--Dallas, 1991).

There is no question in this case which corporation was responsible for paying the court ordered fine. Further, there is no ambiguity concerning the amount of the fine ordered or when it was due. The only issue is whether it was reasonable to conclude that IBS was required to pay the fine, but that it would do so without human intervention. The absurdity of the question provides its own answer.

Although a corporation is a legally distinct and cognizable entity, it is only able to act through its agents. *San Antonio Bar Ass'n v. Guardian Abstract & Title Co.,* 156 Tex. 7, 291 S.W.2d 697, 699 (1956). Since a corporation is capable of violating a court order only if its agents act or refrain from acting, it follows that an order directed at a corporation is binding on agents authorized to act on its behalf, whether specifically named in the order or not. See, e.g., *Wilson v. United States,* 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911) (order directed at corporation only but president held in contempt); *United States v. Laurins,* 857 F.2d 529 (9th Cir.1988), cert. denied, 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989) (order directed at corporation and vice-president but managing director held in contempt). See also Charles R.P. Keating, Fletcher Cyclopedia of Corporations § 5073 (Perm. ed. 1986). There can be no doubt that a command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. Wilson, 221 U.S. at 376, 31 S.Ct. at 542-43. Were this not true, entities could delegate their disobedience to physical actors who, since they would be beyond judicial power, would have no reason to recognize or obey it. [2]

**Page 261**

Simply because a corporation has failed to comply with a court order, it does not necessarily follow that all corporate agents or officers are in contempt because of their agent status. There must be evidence in the record that the corporate agent charged with contempt was somehow personally connected with defying the authority of the court or disobeying its lawful decrees. See, e.g., *Deramus v. Thornton,* 160 Tex. 494, 333 S.W.2d 824 (1960). We have previously refused to uphold a judgment of contempt against a corporate president because of the absence of any evidence that the president had either encouraged or participated in the violations of injunctions carried out by other employees. Id. at 828-30. However, when an agent of the corporation, having knowledge of an order directed at the

corporation, participates in or encourages the violation of that order, that agent may be individually held in contempt of court. [3]

The record indicates that Chambers was IBS's only officer, its only director, and indeed, its only shareholder. It is also undisputed that Chambers was present when the trial court ordered IBS to pay the initial contempt fine. Since Chambers was the only person capable of compelling IBS to pay the court ordered fine, it is clear that IBS's disobedience is due to Chambers' personal refusal to act. Thus, since the order to IBS is binding on Chambers, and since the trial court heard evidence that Chambers personally participated in its violation with notice of the order, the judgment of contempt is not void on these grounds.

B.

We now consider whether Chambers willfully violated the court's order. Chambers argues that there is no evidence that he violated the court's order knowingly and intentionally. Although at times not clearly enunciated in Texas case law, the requirement of willful disobedience is a necessary consequence of the accumulated contempt jurisprudence. As explained above, to support a judgment of contempt, the underlying order must be clear and unambiguous. MacCallum, 807 S.W.2d at 730. In addition, one must have knowledge or notice of an order which one is charged with violating before a judgment of contempt will obtain. See, e.g., Ex parte Conway, 419 S.W.2d 827, 828 (Tex.1967). Noncompliance with an unambiguous order of which one has notice will ordinarily raise an inference that the noncompliance was willful.

It is uncontested in this case that Chambers was present when the trial court ordered IBS to pay the contempt fine. It is also clear that Chambers and Chambers alone is responsible for IBS' disobedience. Although Chambers argues that he did not willfully violate the order because he acted on the advice of his attorney, this argument is unavailing. While reliance upon the advice of counsel may be considered in mitigation of contempt, it does not constitute a defense. *Edrington v. Pridham,* 65 Tex. 612, 617 (1886). See also *S.E.C. v. First Financial Group, Inc.,* 659 F.2d 660 (5th Cir.1981).

The analysis above does not end our inquiry concerning Chamber's alleged willfulness. The involuntary inability to comply with an order is a valid defense to criminal contempt, for one's noncompliance cannot have been willful if the failure to comply was involuntary. See Ex parte Rohleder, 424 S.W.2d 891, 892 (Tex.1967); Ex parte Kollenborn, 154 Tex. 223, 276 S.W.2d 251, 253-54 (1955). Although the inability to comply defense technically rebuts the willfulness element of contempt liability, the relator bears the burden of proving his inability to comply. See, e.g., Kollenborn,

276 S.W.2d at 254. Again, we do not weigh the evidence, but

**Page 262**

only determine if there is no evidence to legitimize the relator's confinement. Ex parte Barnett, 600 S.W.2d 252 (Tex.1980); Ex parte Helms, 152 Tex. 480, 259 S.W.2d 184 (1953). See also Ex parte Howell, 843 S.W.2d 241, 245 (Tex.App.--Houston [1st Dist.] 1992, orig. proceeding). Thus, the issue in habeas corpus review is whether the relator has conclusively established that IBS was involuntarily unable to pay. Chambers argues that he has conclusively established this defense, and we agree.

It is undisputed that IBS did not have sufficient assets to pay the fine at any point subsequent to the date on which the fine was ordered. In point of fact, IBS had ceased doing business altogether. IBS could not have paid the fine even if Chambers had acted.

One month after the first series of fines, IBS ceased doing business and Chambers continued providing the same services in the form of a sole proprietorship, IBS II. The assets of IBS were transferred to IBS II, which took up residence in the same office space and used the same telephone number as IBS. IBEC points to this evidence and argues that Chambers has not conclusively proven IBS was involuntarily unable to pay the fine, but that IBS's inability to pay was purposefully achieved. We must disagree.

The shifting of assets from IBS to IBS II occurred prior to the imposition of the court-ordered fine. A contemnor cannot be held in constructive contempt of court for actions taken prior to the time that the court's order is reduced to writing. See *Ex Parte Price,* 741 S.W.2d 366 (Tex.1987). Chambers had no duty to preserve IBS assets for the payment of fines to be ordered in the future; therefore, his actions, taken alone, prior to the issuance of the fine, do not raise any inference that he was seeking to avoid the contempt powers of the trial court.

IBEC further argues that the assets of IBS II ought to be included in determining whether IBS, which it considers to be Chambers' alter ego, was capable of paying the fine when ordered. We need not determine whether Chambers' personal assets ought to be included in determining IBS's ability to comply because this was not the basis of the motion for contempt below. IBEC, in its motion for contempt, sought only to hold Chambers accountable for his own failure to make IBS act. Nowhere did IBEC allege that IBS was Chambers' alter ego. Full and unambiguous notice of the accusation of contempt must be served on the alleged contemnor. *Ex Parte Adell,* 769 S.W.2d 521 (Tex.1989). We cannot justify Chambers' imprisonment on a basis which is not alleged in the respondent's sworn motion for contempt, but rather is raised for the first time when Chambers

seeks his freedom through writ of habeas corpus.

The dissent makes much of the fact that the only reason IBS lacked sufficient assets to pay its fine is because, before the fine issued, Chambers transferred them out of the corporation and into his own pocket. The effect of this position is to require IBS to stay in business solely to pay fines which hypothetically would be levied in the future. We believe that meaningful review of the "inability to comply" defense is more readily accomplished by limiting the contemnor's burden to proving that the corporation lacked sufficient assets (or access to assets) to pay the fine at all times after the fine was entered. If the opposition wishes to prove that pre-fine transfers were fraudulent or that the corporate form was being used as a sham to perpetrate a fraud, it should be their burden to so allege and so prove.

Since we find that Chambers has established IBS's inability to comply defense, it is unnecessary to address his remaining points. We therefore grant Chambers' petition for writ of habeas corpus and order that he be discharged from custody.

ENOCH, Justice, concurring.

I agree that the petition for writ of habeas corpus should be granted in this matter, but for reasons other than those expressed by the Court. Specifically, I disagree with the Court that a corporate agent may be held in contempt of court for the corporation's violation of an order directed only against the corporation. Because the order did not specifically name Chambers or direct him to take any action on behalf of the corporation,

**Page 263**

the order lacks specificity and cannot support a contempt judgment against Chambers. As the contempt judgment against Chambers is void, I concur in the Court's judgment granting the petition for writ of habeas corpus.

In this case, the June 24, 1993 judgment of contempt (and the order incorporated therein) unambiguously directed that the corporation pay $3,000 to the clerk of the court during the period from June 24th to July 1st. The order did not require the corporation to generate the funds necessary to pay the fine or restrict the transfer of any assets or operations. The order did not include any direction to Chambers or any of the other individual defendants, as had previous orders in the case. The trial court could have directed the actions of the corporation and the individual defendants, but it did not.

A corporation is a separate legal entity, and "[t]he corporate form normally insulates shareholders, officers, and directors from liability for corporate obligations." *Castleberry v. Branscum,* 721 S.W.2d 270, 271 (Tex.1987). We disregard the corporate form in only two situations. First, when "the corporate form has been used as part of a basically unfair device to achieve an

inequitable result." Id. In that situation, the corporation is considered the alter ego of the individual, and the two are treated as one. Second, we ignore the corporate form when we hold corporate representatives personally liable for the consequences of their own wrongful acts, even when those acts are performed in the corporation's name and within the scope of their authority. This exception exists in negligence and criminal law. *Leyendecker & Assoc., Inc. v. Wechter,* 683 S.W.2d 369, 375 (Tex.1984); TEX.PENAL CODE § 7.23. In that situation, the penalties for the wrongful deeds can be imposed on the corporation, the individual, or both.

By determining that the June 24, 1993 judgment of contempt unambiguously ordered Chambers to comply with its terms, the Court has in effect determined that the corporation was Chambers' alter ego or that he committed a tortious or criminal act. To allow this Court or the trial court to make that determination for the first time in a contempt hearing raises serious questions of whether Chambers was given proper notice of the charges against him before he was subjected to incarceration and a fine.

It is an accepted rule of law that for a person to be held in contempt for disobeying a court decree, the decree must spell out the details of compliance in clear, specific and unambiguous terms so that such person will readily know exactly what duties or obligations are imposed upon him.

Ex parte Slavin, 412 S.W.2d 43, 44 (Tex.1967). In this case, the trial court failed to issue an order of sufficient scope to sustain its contempt judgment against Chambers; it failed to order Chambers to do or not do anything at all. The initial judgment of contempt, issued in January 1993, rightfully imposed fines on both the corporation and the individual defendants. The June 1993 judgment of contempt, however, was limited to the corporation alone. More than anything else, this omission is responsible for whatever miscarriage of justice would occur by relieving Chambers of the contempt penalties here. We should not distort the substantive law of contempt to remedy such an oversight.

Because I would hold the contempt judgment against Chambers void, I concur in the judgment granting the petition for writ of habeas corpus.

GONZALEZ, Justice, dissenting.

I will not join an opinion that allows Chambers to continue brazenly flouting the orders of the trial court, thus making a mockery of the judicial system. Chambers has repeatedly ignored the trial court's injunctions. It was only after the trial court held him in contempt for the second time that it assessed the penalty (seven days in jail and a $6,000 fine) that he presently challenges. Because Chambers willfully failed to comply with the trial court's order and voluntarily rendered himself unable to comply with the order, I would deny his writ of habeas corpus.

This case arises out of a lawsuit to protect the

International Business Exchange Corporation's (IBEC's) customer and buyer lists from misuse by ex-employees. When IBEC hired Chambers, he agreed not to use any

**Page 264**

information and methods learned at IBEC to compete with IBEC for one year following the termination of his employment. When Chambers left IBEC and set up a competing business, International Business Search (IBS), he immediately began using IBEC's information and customer lists for his own company's benefit. IBEC commenced judicial proceedings to enforce its non-compete agreement with Chambers.

A brief summary of the events that followed shows the utter contempt Chambers displayed toward the trial court:

April 9, 1992 Chambers incorporated IBS to compete with IBEC. June 1992 After removing former IBEC employees from the IBS board, Chambers became the sole officer, director, and shareholder of IBS. July 15, 1992 First restraining order. The trial court issued a temporary restraining order (TRO) ordering Chambers and IBS not to use IBEC's customer leads, not to mail letters "very similar to" IBEC's customer solicitation letters, and not to use or disclose any of IBEC's confidential information. August 19, 1992 Amended restraining order. After notice and an evidentiary hearing which Chambers and his attorney attended, the trial court concluded that Chambers and IBS intended to use IBEC's customer information and marketing tools to compete with IBEC in violation of the agreement not to compete. It amended the TRO to clarify that the order prohibited these activities. January 4, 1993 Second TRO. The trial court found that IBS was contacting former and current IBEC customers and making defamatory statements about IBEC and "fomenting spurious litigation." The court enjoined IBS from contacting IBEC's customers. January 15, 1993 The trial court made the January 4, 1993 TRO into a permanent restraining order. February 2, 1993 First contempt judgment. The trial court held Chambers and IBS in contempt of court for violating the amended TRO, after finding numerous instances in which Chambers had contacted IBEC's customers. It fined Chambers $350 and IBS $700. March 1993 Chambers began doing business as Investors Brokerage Service (IBS"2) as a sole proprietorship. IBS"2 occupied the same office space as IBS, retained the same phone number, and continued IBS's lease payments on Chambers' car. Chambers drained cash reserves from the first company, IBS, leaving it with cash reserves of only $11,488. June 8, 1993 The day before the hearing on IBEC's second motion for contempt, Chambers withdrew the last $209.22 from the IBS bank account. June 24, 1993 Second contempt order. The trial court held IBS in contempt for six violations of prior restraining orders, and fined it $3,000. It ordered the sanction paid within seven days of the judgment. Neither IBS nor Chambers

paid the fine. October 25, 1993 Third judgment of contempt and order of commitment. The trial court held IBS and Chambers, as its sole officer, director, and shareholder, in contempt. It ordered the sheriff to take custody of Chambers and to place him in the county jail for seven days' imprisonment. The trial court also fined Chambers individually $6,000.

----------

**Page 265**

Three days later, Chambers petitioned the court of appeals for a writ of habeas corpus. The court of appeals held the contempt judgment to be both civil and criminal in nature because it punished Chambers for failing to see that IBS's fine was timely paid, and coerced him to pay his own fine by incarcerating him until such time as it was paid. --- S.W.2d ----, ----. It further determined that the orders directing IBS to pay fines had the legal effect of commanding payment by the company's officers, in this case, Chambers alone. Id. at ----. Also, the court of appeals held that the trial court did not err in fining Chambers $6000 individually and in refusing to credit jail time toward satisfaction of the fine. Lastly, it ruled that the "purging provision" in the commitment order removed it from the statutory six-month limit for incarceration under order of contempt in Section 21.002 of the Texas Government Code.

We initially granted Chambers' release on bond while his application for writ of habeas corpus was pending. This Court today grants relief and issues the writ. However, I would overrule the application for writ of habeas corpus and remand Chambers to the custody of the Sheriff of Williamson County, to be confined until he serves his time and pays his fine.

I.

In the trial court's second contempt order of June 24, 1993, the court enumerated six specific instances in which Chambers and IBS violated the court's prior restraining order. The trial court ordered IBS to pay a $3000 fine within seven days. Chambers argues that the order failed to set out the details of compliance in "clear, specific, and unambiguous terms" so that he would know that he was "obligated to pay or cause the corporation to pay the $3000 fine." He further claims that because no individual defendants other than IBS were found in contempt, punished by fine, or ordered to take affirmative steps for paying the fine or causing it to be paid, he was not aware that he might be held accountable for IBS's failure to pay the fine. I disagree.

The decree underlying a judgment of contempt must set forth clear, specific, and unambiguous terms of compliance so that the person charged with obeying the decree will readily know exactly what duties and obligations it imposes. Ex parte MacCallum, 807 S.W.2d 729, 730 (Tex.1991). An order is insufficient if its

interpretation requires inferences or conclusions about which reasonable minds could differ. Id. We should not review the order in this case in a vacuum. The issue is whether a reasonable person in Chambers' position would have concluded that the court's order imposed no duty upon him. Once apprised of an order directed to the corporation, if an agent responsible for the conduct of corporate affairs prevents compliance or fails to take appropriate action within his power and in fulfillment of his corporate duty, the agent, no less than the corporation itself, is guilty of disobedience and may be punished for contempt. *Wilson v. United States,* 221 U.S. 361, 376, 31 S.Ct. 538, 542-43, 55 L.Ed. 771 (1911).

Admittedly, the trial court's third contempt order of October 25, 1993 most clearly holds Chambers in contempt for failing to require IBS to pay the fine. However, the second contempt order of June 24, 1993 would have indicated to a reasonable corporate officer in Chambers' place that not merely IBS alone was responsible for the fine. Chambers was IBS's sole officer, director, and shareholder. Chambers alone managed the day-to-day affairs of the company. For all intents and purposes, Chambers was IBS. He cannot claim he was surprised that the trial court would hold him accountable for IBS's failure to obey its contempt orders. Thus, Chambers willfully failed to comply with the trial court's orders. Because

**Page 266**

he is responsible, he may properly be held in criminal contempt.

II.

Chambers argues that contempt is improper in this case because he established that IBS was unable to pay the court-imposed fines. Again, I disagree. He attempts to invoke an "involuntary inability" of the company to pay the $3,000 fine to excuse his own violations of the trial court's orders.

The movant for a contempt order has the burden of proving that the other party has willfully disobeyed the court's command. The "involuntary inability" defense technically rebuts the "willfulness" element on which the opposing party bears the burden of proof. Thus, the relator bears the burden of proving his inability to comply with a court order. See Ex parte Kollenborn, 154 Tex. 223, 276 S.W.2d 251, 254 (1955); accord *S.E.C. v. AMX, Int'l, Inc.,* 7 F.3d 71, 73 (5th Cir.1993). Upon review of an order of contempt, we do not weigh the evidence but only examine it to determine if there is any evidence to legitimize the relator's confinement. Ex parte Helms, 152 Tex. 480, 259 S.W.2d 184, 186 (1953). Therefore, the issue in habeas corpus review is whether the relator has conclusively established that he was involuntarily unable to pay a fine because there is no evidence to the contrary.

Chambers has not established that IBS was involuntarily unable to pay the trial court's fine. At one time, IBS had sufficient assets to pay the $3,000 fine. Chambers caused IBS's alleged subsequent inability to pay the fine. He did so by ceasing IBS business operations, withdrawing all its cash reserves, and creating IBS-2, a twin business entity with identical operations.

Only an involuntary inability to comply with a court's order is a valid defense to contempt. Ex parte Sanchez, 703 S.W.2d 955, 959 (Tex.1986). In this case, I would hardly call IBS's inability to pay involuntary. Chambers, the sole corporate officer who was responsible for the company's obedience to a court order, transferred assets from the company to his own pockets or to another company. He shut down IBS's operations to start a new, yet nearly indistinguishable company, solely to escape court sanction and to create an impoverished contemnor. There is no evidence Chambers cannot undo the situation he created. I remain convinced that he can be held in contempt under the record in this case.

III.

I next consider whether the trial court exceeded its authority in ordering that Chambers pay a $6000 fine and that he be confined for seven days and for so long thereafter as the fine remains unpaid. Resolution of this issue turns on the distinction between civil contempt and criminal contempt.

The distinction does not depend on whether the underlying litigation is civil or criminal, but rather on the nature and purpose of the court's punishment. See generally Ex parte Werblud, 536 S.W.2d 542, 545-46 (Tex.1976). The object of civil contempt is to coerce the contemnor to comply with some order of the court. Id. The court possesses the power to jail or to fine a contemnor. Imprisonment under a civil contempt order coerces compliance through the use of a "purging" provision. A contemnor "carries the keys of [his] prison in [his] own pocket," since he will be released upon obedience to the court's order. Id. at 545 (quoting *Shillitani v. United States,* 384 U.S. 364, 368, 86 S.Ct. 1531, 1534, 16 L.Ed.2d 622 (1966)); see Kilgarlin & Ozmun, Contempt of Court in Texas--What You Shouldn't Say to the Judge, 38 BAYLOR L.REV. 291, 297 (1986).

Criminal contempt differs from civil contempt in both purpose and scope. A criminal contempt order vindicates the authority of the court. The court imprisons the contemnor to punish him for a completed act which affronted the dignity and authority of the court. Werblud, 536 S.W.2d at 545. In cases of criminal contempt, in which courts punish contemnors' past actions rather than coerce future compliance, the Legislature has limited the severity of the punishment. See TEX. GOV'T CODE § 21.002. However, these limitations do not circumscribe the court's authority to coerce future obedience to its lawful decrees through civil contempt. See Ex parte

Klugsberg, 126 Tex. 225, 87 S.W.2d 465, 468 (1935).

A.

Chambers argues that the proceedings in this case were solely civil in nature, yet the

**Page 267**

trial court ordered only criminal punishment. This argument is without merit.

The trial court's order of commitment fined Chambers for his past disobedience and committed him to jail for an absolute period of seven days. This was an order of criminal contempt. Its duration is well within the six-month limit on incarceration set by the Legislature. See TEX. GOV'T CODE § 21.002. No subsequent obedience on Chambers' part permitted him to avoid serving seven days in jail or paying the fine. Werblud, 536 S.W.2d at 545. Once the seven days is served, the trial court's order directed that Chambers be jailed for so long as his fine remained unpaid. At this point, Chambers will hold the keys to his own prison: he can purge himself of contempt by paying the court-ordered fine. Therefore, the latter component of the court's order was an order of civil contempt. Id. The trial court may combine both civil and criminal contempt in one order. Sanchez, 703 S.W.2d at 957.

B.

Chambers also argues that the trial court impermissibly "pierced the corporate veil" by jailing an individual officer for the company's failure to pay a corporate debt. I disagree with Chambers on two grounds.

First, although Chambers' imprisonment arose in part from IBS's failure to pay the $3,000 fine, he was not "imprisoned for debt." TEX. CONST. art. I, § 18. When neither IBS nor its sole officer, director, and shareholder paid the fine, the trial court held Chambers in criminal contempt. The $6,000 fine, like the seven days' imprisonment, is a penalty owed to the sovereign authority for violation of the criminal law. It is not a debt, a monetary obligation owed to another party. See BLACK'S LAW DICTIONARY 363 (5th ed. 1974) (defining "debt").

The power to hold parties in contempt and to sanction non-compliance is an essential element of judicial independence and authority. Ex parte Browne, 543 S.W.2d 82, 86 (Tex.1976). Without this power, courts are merely boards of arbitration, whose judgments and decrees would be only advisory. Kilgarlin & Ozmun, supra, at 292-93 (citing *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 450, 31 S.Ct. 492, 501-02, 55 L.Ed. 797 (1911). The framers of our state's constitutional prohibition on imprisonment for debt did not intend to prevent courts from coercing payment of lawfully-imposed monetary penalties for criminal

contempt with imprisonment. See *Thompson v. State,* 557 S.W.2d 521, 524-25 (Tex.Crim.App.1977); *Dixon v. State,* 2 Tex. 481, 483 (1847). In 1847 this Court stated:

The words "imprisonment for debt" have a well defined and well known meaning, and have never been understood or held to apply to criminal proceedings. It is not to be supposed, and it will scarcely be contended, that it ever entered into the minds of the framers of the Constitution that they were to be understood as having any application to the administration of the criminal laws; or that they were to have the effect to prevent the punishment of crimes.

Dixon, 2 Tex. at 482-83 (citations omitted and emphasis added).

Second, Chambers was not fined and imprisoned for an act or omission of IBS or any other corporate agent. The trial court held him in contempt for his own willful refusal to obey its orders. In the underlying lawsuit, International Business Exchange Corp. v. International Business Search, Inc., No. 92-207-C368, the trial court held IBS in contempt for repeated disobedience of the restraining orders prohibiting breaches of the agreement not to compete with IBEC. The court first ordered IBS to pay a $700 fine, and upon further non-compliance, a $3,000 fine. Chambers, the only person who could have caused IBS to comply with these orders, willfully refused to do so. As a general rule, a person who willfully disobeys a valid court order is guilty of contempt. Ex parte Hall, 854 S.W.2d 656, 658 (Tex.1993). It requires no "veil piercing" to hold the sole corporate officer, director, and shareholder responsible for his own, knowingly wrongful conduct. See *Kinkler v. Jurica,* 84 Tex. 116, 19 S.W. 359, 360 (1892) (holding directors personally liable for their misconduct, and not as agents of the corporation). Thus, the corporate veil need not be pierced to find Chambers subject to contempt for his willful

**Page 268**

refusal to comply with the court order directed at IBS.

C.

Chambers next argues that the trial court's order of commitment was defective because it did not credit or off-set time he served in jail against the $6,000 fine. I disagree.

With regard to the criminal contempt portion of the order mandating an absolute seven days' imprisonment, Section 21.002 of the Texas Government Code contains the only statutory limitation on the trial court's power to punish for contempt. As stated, seven days' confinement is well within the power Section 21.002 grants to the trial court. With regard to the civil contempt portion of the order mandating confinement until the criminal fine is paid, Chambers carries the keys to his own jail cell. He is

entitled to release from jail upon payment of $6,000. Once a person is lawfully confined for civil contempt, only the contemnor's stubborn willingness to remain in jail lengthens his confinement. Chambers has cited to no authority, and I am aware of none, which would require the trial court to give Chambers two sets of keys: one set which releases him upon payment, and another which releases him once he is confined for a time equivalent in value to the amount of the fine. In fact, this Court has stated that the statute authorizing good time credit "does not apply to coercive civil contempt orders." Ex parte Acly, 711 S.W.2d 627, 628 (Tex.1986) (discussing TEX.REV.CIV.STAT. art. 5118a (repealed) (codified at TEX.CODE CRIM.P. art. 42.032)). Chambers' proposed "time served" credit would dilute the coercive power of civil contempt. See Ex parte Harrison, 741 S.W.2d 607, 609 (Tex.App.--Austin 1987, no writ).

D.

Finally, Chambers argues that the $6000 fine exceeds the $500 limit placed upon trial court by Section 21.002 of the Texas Government Code. I disagree once more.

Courts have inherent power to find parties before them in contempt. Ex parte Pryor, 800 S.W.2d 511, 512 (Tex.1990); see TEX. GOV'T CODE ANN. § 21.001 (stating that courts have all necessary power to enforce lawful orders and to control proceedings). Moreover, courts have the power to fine a party for each of multiple infractions of a court's order. Ex parte Genecov, 143 Tex. 476, 186 S.W.2d 225, 226-27 (1945). Because a contemnor is entitled to know what acts or failures on his part subject him to punishment, Ex parte Parr, 505 S.W.2d 242, 245 (Tex.1974), punishment for more than one act within one proceeding is permissible only if the motion for contempt specifically sets out distinct and separate violations. Ex parte Oliver, 736 S.W.2d 277, 278 (Tex.App.--Fort Worth 1987, no writ).

In this case, the trial court issued the first TRO on July 15, 1992, and amended it on August 19, 1992. The trial court prohibited IBS and Chambers from using IBEC's customer lists, customer leads, buyer and seller lists, and other confidential information. In the month between the initial TRO and the amended restraining order, Chambers and IBS representatives violated the trial court's order at least six times by calling IBEC's customers and signing two of IBEC's customers to contracts with IBS. The trial court held IBS and Chambers in contempt of court and fined them for these violations in the first contempt order on February 2, 1993.

Chambers thereafter continued to defy the court. On December 22, 1992, Chambers faxed a letter to IBEC's president and counsel threatening to contact IBEC customers and expose IBEC's "fraudulent" practices. He claimed that "we are starting to work with anyone who ever listed a business with IBEC." Chambers then made at least seven calls to IBEC customers who, within a week, called IBEC threatening to sue IBEC based on Chambers' misrepresentations about IBEC's practices. Some of the customers who called were Chambers' former clients from when Chambers worked for IBEC. In response, IBEC moved for a new TRO, which the trial court granted against IBS on January 15, 1993.

IBEC later learned that IBS and Chambers had made additional contacts with IBEC's customers in violation of the trial court's amended restraining order of August

**Page 269**

19, 1992. IBEC responded by moving a second time that they be held in contempt. The trial court granted the motion on June 24, 1993. In the second order of contempt, the trial court noted that IBS made six separate phone calls to different IBEC customers. Consequently, the trial court fined IBS $500 for each call and ordered the $3,000 fine paid within seven days.

Chambers' refusal to pay IBS's fine constituted a separate act of contempt. The fine went unpaid 115 days before IBEC moved to have IBS and Chambers held in contempt of court a third time on October 25, 1993. Chambers refused to pay the fine because IBS lacked sufficient funds and, during the 115-day period, Chambers filed for bankruptcy and disbanded IBS as a business. (However, Chambers found the financing and initiative during the same period to launch IBS-2, a mere shadow and clone of IBS.) At the contempt hearing, the trial court had to instruct Chambers several times to be more responsive and less sarcastic on cross-examination. Clearly, Chambers took the third contempt action against him and IBS no more seriously than he had taken the trial court's authority over him throughout the underlying suit.

The trial court found Chambers in contempt of court for each of the 115 days. It fined him $6000. Chambers displayed an utter lack of respect for the trial court throughout the proceedings. Given his multiple violations and flagrant disregard for the trial court's orders, I would hold the full $6,000 fine proper. The record of the case shows numerous instances of Chambers' disdain for the trial court. This fine was well within the trial court's inherent authority to fine a party for contempt of court. See Pryor, 800 S.W.2d at 512. Chambers "knew that if he violated this order he would be held accountable for his actions; and still, he wilfully affronted the dignity and authority of the court by engaging in prohibited sales." Ex parte Griffin, 682 S.W.2d 261, 264 (Tex.1984) (Gonzalez, J., dissenting). I would therefore affirm the trial court's third judgment of contempt and order of confinement, and remand Chambers to the custody of the Sheriff of Williamson County to serve his seven-day sentence and to remain there for so long thereafter as his fine remains unpaid.

---------

Notes:

[1] The federal authority cited more clearly sets out the elements of proof for a criminal contempt case than some of our state jurisprudence; however, as will be demonstrated in the following paragraphs, the requirements under Texas law are functionally the same.

[2] Similar concerns are present in the aider and abettor context. A court's order has no power at all if it may be flaunted by a proxy acting in contempt of the court's authority. Therefore:

[A] decree of injunction not only binds the parties defendant but also those identified with them in interest, in "privity" with them, represented by them or subject to their control. In essence ... defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.

Waffenschmidt v. Mackay, 763 F.2d 711 (5th Cir.1985), cert. denied, 474 U.S. 1056, 106 S.Ct. 794, 88 L.Ed.2d 771 (1986) (quoting Regal Knitwear Co. v. Nat'l Labor Relations Board, 324 U.S. 9, 14, 65 S.Ct. 478, 481, 89 L.Ed. 661 (1945)).

[3] See, e.g., State ex rel. Grimsley v. West Lake Development, Inc., 71 N.C.App. 779, 323 S.E.2d 448 (1984), review denied, 313 N.C. 514, 329 S.E.2d 401 (1985) (upholding contempt judgment against general manager where court order concerning sedimentation and erosion control was directed solely at the corporation and it was stipulated that the general manager had notice of the order and was responsible for sedimentation and erosion control); Department of Revenue v. Carpet Warehouse, Inc., 296 Or. 400, 676 P.2d 299 (1984) (upholding contempt judgment against corporate president for failure of corporation to file tax return as ordered). See also 10A Charles R.P. Keating, Fletcher Cyclopedia of the law of Private Corporations § 5073 (Perm. ed. 1986).

---------

741 S.W.2d 366 (Tex. 1987)

**Ex parte John Wiley PRICE, Relator.**

**No. C-5372.**

**Supreme Court of Texas.**

**December 2, 1987**

David L. Botsford, Maloney, Gotcher & Yeager, Austin, Emmett Colvin, Bruner, McColl, McColloch & McCurley, Dallas, for petitioner.

Jerry L. Hughes, Bliss & Hughes, John E. Collins, Dallas, for respondent.

OPINION

RAY, Justice.

This original habeas corpus proceeding arises out of a judgment holding John Wiley Price in violation of a permanent injunction orally rendered on May 2, 1986. The permanent injunction, however, was not reduced to writing and signed until May 9, 1986, after the allegedly contemptuous conduct occurred on May 3, 1986 and after a motion for contempt was filed on May 6, 1986. We hold that the judgment of contempt is void insofar as it is based upon the May 2, 1986 oral order purporting to render a permanent injunction, and order relator Price discharged. In view of this holding, it is unnecessary to address the remainder of Price's statutory and constitutional arguments.

On April 30, 1986, Paul Ragsdale, a candidate for reelection as state representative, filed an action seeking temporary and permanent injunctive relief and damages against the Progressive Voter's League, John Wiley Price, and other individuals, based on alleged violations of Chapter 251 of the Texas Election Code. The petition alleged that the League was a "political committee" within the meaning of § 251.001(15) of the Code and was therefore required to designate a campaign treasurer before it could conduct any political activities. [1] An ex parte temporary restraining order was signed the same day, which, inter alia, enjoined the League and Price from:

Issuing, mailing or in any way distributing political slate cards, announcements, recommendations or campaign materials of any kind in support for or in opposition to candidates for public office ...

At a hearing on May 2, 1986, the court announced from the bench that it was granting a 30 day "permanent injunction," to expire of its own terms without further order of the court, and that it was continuing the terms of the temporary restraining order "as a permanent injunction."

The permanent injunction was not reduced to writing and signed until May 9, 1986. In the meantime, on May 6, Ragsdale filed a motion for contempt based on the May 2nd oral order. Since the permanent injunction had not yet been reduced to writing, this motion depended heavily on the original temporary restraining order in alleging that the Progressive Voter's League and Price had engaged in contemptuous conduct on election day, May 3, by distributing or causing to be distributed certain "Voters' Guides"--slate cards recommending certain candidates. After a hearing on May 23, the court held Price in contempt of the May 2nd oral order in that he gave to "some young person" green slate cards bearing the legend "Progressive Voters League Official Voters' Guide." The court assessed a punitive sentence of 96 hours in jail.

In this court, Price alleges various violations of his rights of freedom of speech, press and political association, as well as his rights to equal protection and due process of law, under both the Texas and Federal constitutions. Among other things, he asserts that the May 2nd oral "permanent injunction" is overbroad and vague in violation of both his First Amendment rights, and of his due process rights under *Ex Parte Slavin,* 412 S.W.2d 43 (Tex.1967).

In order for a party to be held in contempt for disobeying a court decree, the decree must spell out the terms of compliance in clear, specific and unambiguous terms so that such person will readily know what duties and obligations are imposed on him. *Ex Parte Slavin,* 412 S.W.2d 43, 44 (Tex.1967). A corollary to this rule is that a party who is committed to jail for constructive civil contempt should be able to find somewhere in the record the written order which meets Slavin's requirements. It is this written order, signed by the court and entered upon the minutes, which evidences a parties' rights and duties. "Oral

orders are poor substitutes for the requirement of one final judgment." *Ex Parte Padron,* 565 S.W.2d 921, 924 (Tex.1978). See also *Ex Parte Wilkins,* 665 S.W.2d 760 (Tex.1984). Here, the permanent injunction was not reduced to writing until after the allegedly contemptuous election day conduct occurred, and after a motion for contempt had been filed based on the May 2nd oral order and the prior temporary restraining order. Thus, Price had no operative written order to consult concerning what were his obligations and duties on election day, and

moreover, no way to test the validity of that order before it became moot.

In addressing another aspect of constructive contempt, we have held that due process requires both a written judgment of contempt and a written order of commitment, although the trial court may cause a contemnor to be detained for a short reasonable time while the judgment of contempt and an order of commitment are prepared for the court's signature. *Ex Parte Barnett,* 600 S.W.2d 252, 254 (Tex.1980). We are unwilling to extend that "grace period" to the instant situation, however, or to hold as a matter of law that the delay here was reasonable. There is nothing in the record to indicate that the delay in reducing the permanent injunction to writing was necessary, and its reasonableness should not be presumed. Nor can the contempt judgment be alternatively based on the temporary restraining order. See *Ex Parte Gordon,* 584 S.W.2d 686 (Tex.1979). For the reasons set out above, we hold that Price could not be held in contempt of the oral order dated May 2, 1986. Accordingly, relator is ordered discharged.

SPEARS, J., concurs with opinion.

GONZALEZ, J., concurs with opinion joined by KILGARLIN, J.

MAUZY, J., concurs with opinion.

SPEARS, Justice, concurring.

I concur for the same reason I concurred in Ex Parte Wilkins, 665 S.W.2d 760, 761 (Tex.1984) (Spears, J., concurring). I disagree with the majority's holding that an oral order which is reduced to writing within a reasonable time can never satisfy the requirements of *Ex Parte Slavin,* 412 S.W.2d 43, 44 (Tex.1967).

Ex Parte Padron, 565 S.W.2d 921, 924 (Tex.1978) established that one who is committed to jail for civil contempt should be able to find somewhere in the record the written order. That requirement was met in this case because the trial court's oral permanent injunction was eventually reduced to writing. The relator was held in contempt for his actions during the "window" period between the time the oral order was handed down and reduced to writing.

The majority adds an inflexible requirement to Ex Parte Slavin by holding that conduct which occurs during this "window" period can never be punished with contempt. This added requirement is unrealistic. In the busy courtrooms of this state, direct, explicit orders are frequently announced from the bench, with the formal written orders to be prepared by the attorneys or the court shortly thereafter. Oral orders, which are specific enough to give proper notice under *Ex Parte Slavin,* 412 S.W.2d at 44, should be obeyed by the parties and must be enforceable by contempt proceedings. The majority's

creation of this "window" period allows parties to violate otherwise valid court orders with impunity. As I stated in Ex Parte Wilkins, 665 S.W.2d at 761 (Spears, J., concurring), this "window" can have disastrous consequences, particularly in family law proceedings.

I would hold that oral orders must be reduced to writing within a reasonable time under Ex Parte Padron, and must satisfy the notice and specificity requirements of Ex Parte Slavin. I would further hold that when an unambiguous, specific oral order is preserved in the record, and the party charged with contempt had actual notice of the order, the court can enforce it by contempt proceedings for a reasonable time until a written order can be signed. *Ex Parte Wilkins,* 665 S.W.2d at 762 (Spears, J., concurring).

## Page 369

Price had actual notice of the terms of the permanent injunction during the "window" period because the trial court merely continued the provisions of a prior written temporary restraining order. Additionally, seven days was not an unreasonable time to elapse before reducing an oral permanent injunction to writing in this case.

I concur in the result of this cause because the permanent injunction does not satisfy the notice and specificity requirements of Ex Parte Slavin, 412 S.W.2d at 44. The court order upon which an order of contempt is based must spell out the details of compliance in clear, specific and unambiguous terms so that a person will readily know exactly what duties or obligations are imposed on him. Id. A violation of a vague and uncertain court order cannot be punished by contempt. *Ex Parte Reese,* 701 S.W.2d 840, 842 (Tex.1986).

The section of the permanent injunction which was allegedly violated by Price provided that Price, the Progressive Voters League, and a number of other individuals would desist and refrain from:

2. Issuing, mailing, or in any way distributing political slate cards, announcements, recommendations or campaign materials of any kind in support for or in opposition to candidates for public office until such time as the Progressive Voters League and Jesse Jones, John Wiley Price, James Whitlow, Jean Swindell, Bill Forest and Frances Dirks shall fully comply with all the filing, reporting and disclosure provisions of Chapter 251, Sec. 251.001-251.019 of the Texas Election Code.

This provision is impermissibly vague and uncertain. It does not specify whether Price was enjoined in his capacity as a member of the Progressive Voters League, as a Dallas County commissioner, or as a private citizen. Moreover, this provision does not specifically limit the impermissible conduct to the dissemination materials relating to the Progressive Voters League. Accordingly, I would hold that the judgment of contempt is void for

vagueness.

GONZALEZ, Justice, concurring.

I concur in the judgment of the court. However, there is an additional basis for holding the injunction void. The injunction violates state and federal guarantees of freedom of speech.

The trial court's May 2 oral injunction, insofar as it incorporated by reference the original temporary restraining order, was neither limited to "unlawful contributions" or "expenditures," nor punished Price for making "unlawful expenditures" or using "unlawful contributions." The judgment of contempt was based solely on Price's distribution of political slate cards.

Prior restraints upon constitutionally protected speech, whether legislatively or judicially fashioned, are subject to judicial scrutiny with a heavy presumption against their constitutional validity. *Iranian Muslim Org. v. City of San Antonio,* 615 S.W.2d 202, 205 (Tex.1981). See *Hajek v. Bill Mowbray Motors, Inc.,* 647 S.W.2d 253 (Tex.1983).

Freedom of expression has long been one of the most basic American freedoms. In *Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed.2d 1138 (1925), the United States Supreme Court decided that the First Amendment guarantees of free expression were part of the fundamental liberties protected against state action by the Fourteenth Amendment. Texas, however, had already decided the issue. In 1920, officers of a labor union were enjoined from "vilifying, abusing or using opprobrious epithets to or concerning" certain persons. In rejecting this assertion of judicial power, Chief Justice Phillips wrote:

Punishment for the abuse of the right [of free expression], not prevention of its exercise, is what the provision contemplates. There can be no liberty in the individual to speak, without the unhindered right to speak. It cannot co-exist with a power to compel his silence or fashion the form of his speech....

The theory of the provision [Tex. Const. Art. 1, § 8] is that no man or set of men are to be found, so infallible in mind and character as to be clothed with an absolute authority of determining

**Page 370**

what other men may think, speak, write or publish; that freedom of speech is essential to the nature of a free state; that the ills suffered from its abuse are less than would be imposed by its suppression; and, therefore, that every person shall be left at liberty to speak his mind on all subjects, and for the abuse of the privilege to be responsible in civil damages and subject to the penalties of the criminal law.

Ex Parte Tucker, 220 S.W. 75, 76 (Tex.1920). See *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964).

The constitutional right to express one's ideas has long been extended to the communication of ideas by handbills and literature, as well as by the spoken word. See *Jamison v. Texas,* 318 U.S. 413, 416, 63 S.Ct. 669, 671, 87 L.Ed. 869 (1943); *Hague v. C.I.O.,* 307 U.S. 496, 514-16, 59 S.Ct. 954, 963-64, 83 L.Ed. 1423 (1939); *Lovell v. City of Griffin,* 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938); *De Jonge v. Oregon,* 299 U.S. 353, 364, 57 S.Ct. 255, 259, 81 L.Ed. 278 (1937); *Grosjean v. American Press Co.,* 297 U.S. 233, 245-46, 56 S.Ct. 444, 447, 80 L.Ed. 660 (1936); *Near v. Minnesota,* 283 U.S. 697, 713-16, 51 S.Ct. 625, 630-31, 75 L.Ed. 1357 (1931).

The trial court's injunction is not authorized by Chapter 251 of the Election Code. Chapter 251 regulates political funds and campaigns. The other means to enforce the provisions of the Election Code for failure to designate a campaign treasurer provided in section 251.008 (civil remedy); section 250.009 (criminal penalty); section 251.014 (civil penalty for late filing); and 251.017 (regulation of illegal acts & the duties of the Secretary of State), are more than adequate to enforce the act without stifling free speech.

For the reason set out above, I would hold that the oral injunction, in addition to violating the requirements of Ex Parte Slavin, 412 S.W.2d 43 (Tex.1967), also violated state and federal guarantees of free speech, and was therefore not punishable by contempt.

KILGARLIN, J., joins in this concurring opinion.

MAUZY, Justice, concurring.

I concur in the result reached by the majority but would simply add that the fatal error in the trial court was not the issuance of the oral order, nor the time taken to reduce it to writing. The major flaw committed by the trial judge was the issuance of an ambiguous and vague written order. Relator's conduct appears from the record to be a clear violation of the court's oral mandate and should not be condoned. However, by handing down a written order that failed to satisfy the terms outlined in Ex Parte Slavin, 412 S.W.2d 43 (Tex.1967), this court has no choice but to reverse the contempt order.

---------

Notes:

[1] Section 251.002(f)(1), (2) of the Code provides that it is unlawful for a political committee to make a contribution or expenditure in support for or in opposition to a candidate, unless the committee's designation of a campaign treasurer was filed thirty days before the election. Contributions and expenditures are defined at §

251.001(4) and (5).

---------

THE TEXAS CONSTITUTION

ARTICLE 1. BILL OF RIGHTS

Sec. 8. FREEDOM OF SPEECH AND PRESS; LIBEL. Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press. In prosecutions for the publication of papers, investigating the conduct of officers, or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence. And in all indictments for libels, the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

The Interpretative Commentary to section 8 explains the nature of this constitutional guaranty:

Ever since the Constitution of the Republic, Texas has explicitly guaranteed the freedom of the people of the state to write, to publish, and to speak, the present Section 8 being a result of combining Sections 5 and 6 of Article I of former constitutions of the state. Thus, the fundamental law since 1836 has recognized the transcendent importance of such freedom to the search for truth, the maintenance of democratic institutions, and the happiness of individual men.

PROPERTY CODE

TITLE 7. CONDOMINIUMS

CHAPTER 81. CONDOMINIUMS CREATED BEFORE ADOPTION OF
UNIFORM CONDOMINIUM ACT

Sec. 81.209.  CONDOMINIUM RECORDS.  (a)  The administrator or board of administration of a condominium regime or a person appointed by the bylaws of the regime shall keep a detailed written account of the receipts and expenditures related to the building and its administration that specifies the expenses incurred by the regime.

(b)  The accounts and supporting vouchers of a condominium regime shall be made available to the apartment owners for examination on working days at convenient, established, and publicly announced hours.

(c)  The books and records of a condominium regime must comply with good accounting procedures and must be audited at least once each year by an auditor who is not associated with the condominium regime.

Acts 1983, 68th Leg., p. 3625, ch. 576, Sec. 1, eff. Jan. 1, 1984.

PROPERTY CODE

TITLE 7. CONDOMINIUMS

CHAPTER 82. UNIFORM CONDOMINIUM ACT

Sec. 82.114.  ASSOCIATION RECORDS.  (a)  The association shall keep:

       (1)  detailed financial records that comply with generally accepted accounting principles and that are sufficiently detailed to enable the association to prepare a resale certificate under Section 82.157;

       (2)  the plans and specifications used to construct the condominium except for buildings originally constructed before January 1, 1994;

       (3)  the condominium information statement prepared under Section 82.152 and any amendments;

       (4)  the name and mailing address of each unit owner;

       (5)  voting records, proxies, and correspondence relating to amendments to the declaration;  and

       (6)  minutes of meetings of the association and board.

(b)  All financial and other records of the association shall be reasonably available at its registered office or its principal office in this state for examination by a unit owner and the owner's agents.  An attorney's files and records relating to the association are not records of the association and are not subject to inspection by unit owners or production in a legal proceeding.

(c)  The association shall, as a common expense, annually obtain an independent audit of the records.  Copies of the audit must be made available to the unit owners.  An audit required by this subsection shall be performed by a certified public accountant if required by the bylaws or a vote of the board of directors or a majority vote of the members of the association voting at a meeting of the association.

(d)  A declarant shall furnish copies to the association of the information required by Subsection (a) on the date the first unit is sold.

(e)  Not later than the 30th day after the date of acquiring an interest in a unit, the unit owner shall provide the association with:

(1)  the unit owner's mailing address, telephone number, and driver's license number, if any;

(2)  the name and address of the holder of any lien against the unit, and any loan number;

(3)  the name and telephone number of any person occupying the unit other than the unit owner;  and

(4)  the name, address, and telephone number of any person managing the unit as agent of the unit owner.

(f)  A unit owner shall notify the association not later than the 30th day after the date the owner has notice of a change in any information required by Subsection (e), and shall provide the information on request by the association from time to time.

Added by Acts 1993, 73rd Leg., ch. 244, Sec. 1, eff. Jan. 1, 1994.

BUSINESS ORGANIZATIONS CODE

TITLE 2. CORPORATIONS

CHAPTER 22. NONPROFIT CORPORATIONS

SUBCHAPTER H. RECORDS AND REPORTS

Sec. 22.351.  MEMBER'S RIGHT TO INSPECT BOOKS AND RECORDS.  A member of a corporation, on written demand stating the purpose of the demand, is entitled to examine and copy at the member's expense, in person or by agent, accountant, or attorney, at any reasonable time and for a proper purpose, the books and records of the corporation relevant to that purpose.

Acts 2003, 78th Leg., ch. 182, Sec. 1, eff. Jan. 1, 2006.

BUSINESS ORGANIZATIONS CODE

TITLE 6. ASSOCIATIONS

CHAPTER 252. UNINCORPORATED NONPROFIT ASSOCIATIONS

Sec. 252.010.  BOOKS AND RECORDS.  (a)  A nonprofit association shall keep correct and complete books and records of account for at least three years after the end of each fiscal year and shall make the books and records available on request to members of the association for inspection and copying.

(b)  The attorney general may inspect, examine, and make copies of the books, records, and other documents the attorney general considers necessary and may investigate the association to determine if a violation of any law of this state has occurred.

Acts 2003, 78th Leg., ch. 182, Sec. 1, eff. Jan. 1, 2006.

RULE 4. COMPUTATION OF TIME

In computing any period of time prescribed or allowed by these rules, by order of court, or by any applicable statute, the day of the act, event, or default after which the designated period of time begins to run is not to be included. The last day of the period so computed is to be included, unless it is a Saturday, Sunday, or legal holiday, in which event the period runs until the end of the next day which is not a Saturday, Sunday, or legal holiday. Saturdays, Sundays, and legal holidays shall not be counted for any purpose in any time period of five days or less in these rules, except that Saturdays, Sundays, and legal holidays shall be counted for purpose of the three-day periods in Rules 21 and 21a, extending other periods by three days when service is made by mail.

Notes and Comments:

Comment to 1990 change: Amended to omit counting Saturdays, Sundays and legal holidays in all periods of less than five days with certain exceptions.

**RULE 21. FILING AND SERVING PLEADINGS AND MOTIONS**

(a) Filing and Service Required. Every pleading, plea, motion, or application to the court for an order, whether in the form of a motion, plea, or other form of request, unless presented during a hearing or trial, must be filed with the clerk of the court in writing, must state the grounds therefor, must set forth the relief or order sought, and at the same time a true copy must be served on all other parties, and must be noted on the docket.

(b) Service of Notice of Hearing. An application to the court for an order and notice of any hearing thereon, not presented during a hearing or trial, must be served upon all other parties not less than three days before the time specified for the hearing, unless otherwise provided by these rules or shortened by the court.

(c) Multiple Parties. If there is more than one other party represented by different attorneys, one copy of each pleading must be served on each attorney in charge.

(d) Certificate of Service. The party or attorney of record, must certify to the court compliance with this rule in writing over signature on the filed pleading, plea, motion, or application.

(e) Additional Copies. After one copy is served on a party, that party may obtain another copy of the same pleading upon tendering reasonable payment for copying and delivering.

(f) Electronic Filing.

> (1) Requirement. Except in juvenile cases under Title 3 of the Family Code, attorneys must electronically file documents in courts where electronic filing has been mandated. Attorneys practicing in courts where electronic filing is available but not mandated and unrepresented parties may electronically file documents, but it is not required.

> (2) Email Address. The email address of an attorney or unrepresented party who electronically files a document must be included on the document.

> (3) Mechanism. Electronic filing must be done through the electronic filing manager established by the Office of Court Administration and an electronic filing service provider certified by the Office of Court Administration.

> (4) Exceptions.

(A) Wills are not required to be filed electronically.

(B) The following documents must not be filed electronically:

(i) documents filed under seal or presented to the court in camera; and

(ii) documents to which access is otherwise restricted by law or court order.

(C) For good cause, a court may permit a party to file other documents in paper form in a particular case.

(5) Timely Filing. Unless a document must be filed by a certain time of day, a document is considered timely filed if it is electronically filed at any time before midnight (in the court's time zone) on the filing deadline. An electronically filed document is deemed filed when transmitted to the filing party's electronic filing service provider, except:

(A) if a document is transmitted on a Saturday, Sunday, or legal holiday, it is deemed filed on the next day that is not a Saturday, Sunday, or legal holiday; and

(B) if a document requires a motion and an order allowing its filing, the document is deemed filed on the date that the motion is granted.

(6) Technical Failure. If a document is untimely due to a technical failure or a system outage, the filing party may seek appropriate relief from the court. If the missed deadline is one imposed by these rules, the filing party must be given a reasonable extension of time to complete the filing.

(7) Electronic Signatures. A document that is electronically served, filed, or issued by a court or clerk is considered signed if the document includes:

(A) a "/s/" and name typed in the space where the signature would otherwise appear, unless the document is notarized or sworn; or

(B) an electronic image or scanned image of the signature.

(8) Format. An electronically filed document must:

(A) be in text-searchable portable document format (PDF);

(B) be directly converted to PDF rather than scanned, if possible;

(C) not be locked; and

(D) otherwise comply with the Technology Standards set by the Judicial Committee on Information Technology and approved by the Supreme Court.

(9) Paper Copies. Unless required by local rule, a party need not file a paper copy of an electronically filed document.

(10) Electronic Notices From the Court. The clerk may send notices, orders, or other communications about the case to the party electronically. A court seal may be electronic.

(11) Non-Conforming Documents. The clerk may not refuse to file a document that fails to conform with this rule. But the clerk may identify the error to be corrected and state a deadline for the party to resubmit the document in a conforming format.

(12) Original Wills. When a party electronically files an application to probate a document as an original will, the original will must be filed with the clerk within three business days after the application is filed.

(13) Official Record. The clerk may designate an electronically filed document or a scanned paper document as the official court record. The clerk is not required to keep both paper and electronic versions of the same document unless otherwise required by local rule. But the clerk must retain an original will filed for probate in a numbered file folder.

Comment to 2013 Change: Rule 21 is revised to incorporate rules for electronic filing, in accordance with the Supreme Court's order - Misc. Docket No. 12-9206, amended by Misc. Docket Nos. 13-9092 and 13-9164 - mandating electronic filing in civil cases beginning on January 1, 2014. The mandate will be implemented according to the schedule in the order and will be completed by July 1, 2016. The revisions reflect the fact that the mandate will only apply to a subset of Texas courts until that date.

## RULE 682. SWORN PETITION

No writ of injunction shall be granted unless the applicant therefor shall present his petition to the judge verified by his affidavit and containing a plain and intelligible statement of the grounds for such relief.

**RULE 683. FORM AND SCOPE OF INJUNCTION OR RESTRAINING ORDER**

Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise. Every order granting a temporary injunction shall include an order setting the cause for trial on the merits with respect to the ultimate relief sought. The appeal of a temporary injunction shall constitute no cause for delay of the trial.

**RULE 684. APPLICANT'S BOND**

In the order granting any temporary restraining order or temporary injunction, the court shall fix the amount of security to be given by the applicant. Before the issuance of the temporary restraining order or temporary injunction the applicant shall execute and file with the clerk a bond to the adverse party, with two or more good and sufficient sureties, to be approved by the clerk, in the sum fixed by the judge, conditioned that the applicant will abide the decision which may be made in the cause, and that he will pay all sums of money and costs that may be adjudged against him if the restraining order or temporary injunction shall be dissolved in whole or in part.

Where the temporary restraining order or temporary injunction is against the State, a municipality, a State agency, or a subdivision of the State in its governmental capacity, and is such that the State, municipality, State agency, or subdivision of the State in its governmental capacity, has no pecuniary interest in the suit and no monetary damages can be shown, the bond shall be allowed in the sum fixed by the judge, and the liability of the applicant shall be for its face amount if the restraining order or temporary injunction shall be dissolved in whole or in part. The discretion of the trial court in fixing the amount of the bond shall be subject to review. Provided that under equitable circumstances and for good cause shown by affidavit or otherwise the court rendering judgment on the bond may allow recovery for less than its full face amount, the action of the court to be subject to review.